outside of the Rector Apartments on the West Thames Street entrance safer for children crossing the street.

44. Concrete barriers in the median of the streets and stop signs were to be installed according to City DOT drawings, but Milford opposed the plans because they would have made it impossible to make an illegal turn into the parking garage of the building, inconveniencing the wealthy tenants with luxury cars. In his article on BatteryPark.TV, Plaintiff identified Milford by name, angering Rossi (**Exhibit H**, page 1).

45. Plaintiff's reporting on this scandal was one factor that led to Milstein, the owner of Plaintiff's building and managing partner in Defendant Mariners, to pursue this irrational strategy of trying to evict the Plaintiff after 13-years of residence and paying above-market-rate rent. Milstein was also working in collusion with Defendants Serpico and Mehiel at the BPCA who also wanted the Plaintiff silenced.

46. On January 31st, at 4:11 PM, Plaintiff called Clive Spagnoli, a leasing agent employed by Milford, to inquire as to why the lease was not being renewed. Mr. Spagnoli had no answer as he was in the dark too.

47. In February 2014, Plaintiff received a letter dated January 24, 2014, sent via regular U.S. Mail from Clive Spagnoli of Milford, which is incorporated by reference and attached hereto as **Exhibit D**. It informed Plaintiff that Milford would not be renewing Plaintiff's the lease, and no reason was given.

48. Plaintiff continued to try to get answers from Milford. On February 11, 2014, he called Rossi and arranged to meet him in his office at the Milford office on Battery Place. When the plaintiff arrived, Mr. Rossi was not in his office.

49. On February 12, 2014, Plaintiff tried to call Rossi, but Rossi would not accept his call. Plaintiff walked over to Rossi's office, and Plaintiff was met at the entrance by a private security guard working for Spartan Security. Plaintiff believes that Milford hired the guard specifically in anticipation of Plaintiff's visit. The guard asked the plaintiff to speak with him outside, then warned the plaintiff to never visit the office again. No explanation was given. This entire exchange was captured on the plaintiff's cell phone video camera, which is in Plaintiff's

possession.

## PLAINTIFF ALSO EXPOSED THE BCPA DEFENDANTS' MISCONDUCT TO THE PUBLIC

50. Plaintiff's critical news reporting about all Defendants resulted in all Defendants retaliating against Plaintiff and violating his First Amendment rights.

51. Plaintiff's reporting in BatteryPark.TV has led to the prompt "resignation" of two of Defendant BPCA Chairman Mehiel's Presidents of the BPCA: Gayle Horwitz and Demetrios Boutris. Two other targets of the Plaintiff's muckraking have also abruptly left the BPCA: the "Executive Vice President, Operations", Anne Fenton, and Matthew Monahan (**Exhibit H,** page 5).

52. One of the most important stories reported by the Plaintiff on his BatteryPark.TV involved a serial sexual harasser, Defendant Serpico, who has been employed for more than 30-years by the BPCA as Chief Financial Officer (CFO). Plaintiff's sources, who used to work at the BPCA, claim that Serpico has a thick file of complaints about him in the Human Resources department for rubbing against women, making misogynistic comments, and sending blast emails with sexually explicit cartoons (**Exhibit H,** page 7). Yet Mr. Serpico's clout in the State of New York afforded to him by his controlling the billions of revenue raised by state-issued bonds for the BPCA has caused the investigations to go away and never result in the termination of his employment. This news story came after the eviction proceedings began and is not an example of the cause for the retaliatory eviction. However, it is attached to show the Court the character of the Defendant.

53. In December of 2014, the Plaintiff reported that two in-house lawyers for the BPCA investigating the Robert Serpico sexual harassment charges, Nancy Harvey and Allison Ford, both African American women, were either fired or forced into "retirement." (**Exhibit H,** page 19). They were investigating sexual harassment complaints against defendant Serpico made by a female paralegal named Elizabeth (Elsa) Papanicolaou. This news story also came after the eviction proceedings began and is not an example of the cause for the retaliatory eviction. However, it is attached to show the Court the character of the Defendant.

54. The BPCA Chairman and CEO, Mehiel, remains in his position despite the scandals. Plaintiff's reporting has alerted several state and federal agencies about wrongdoing by Mr. Mehiel's BPCA, and various levels of investigation are underway.

55. Defendant Mehiel hired Shari Hyman to be the President of the BPCA in January of 2014. However, she is the wife of the head of the New York State Joint Commission on Public Ethics ("JCOPE"), representing a serious conflict of interest since JCOPE should be investigating Defendant Mehiel and his BPCA (**Exhibit H,** page 21). This news story came before the eviction proceedings began, and is an example of what led to the retaliatory eviction.

56. In May of 2014, Plaintiff reported on a complaint filed by a BPCA senior employee, Kirk Swanson, who was fired and then filed a complaint with the New York State Civil Rights Department (**Exhibit H,** page 22). Mr. Swanson alleged that the BPCA violated the law by awarding contracts to cronies and friends of Defendant Mehiel. Mr. Swanson also alleged that Defendant Serpico has a long history of sexually inappropriate behavior in the office, as detailed above. This news story came after the eviction proceedings began and is not an example of the cause for the retaliatory eviction. However, it is attached to show the Court the character of the Defendant.

## WITNESSES OF CONSPIRACY TO EVICT PLAINTIFF

57. On January 12, 2014, Vince McGowan, a former senior executive employed by the BPCA who still had connections to BPCA insiders, tipped off Plaintiff that the BPCA was working to evict him. Mr. McGowan wrote an email referring to a photo the plaintiff had posted online of his apartment view, "**It is good to see that you appreciate what we have on the West Side, Hope you can stay.**" Mr. McGowan's e-mail is incorporated by reference and attached hereto as (**Exhibit I**). Plaintiff subsequently spoke to Mr. McGowan on the phone, and Mr. McGowan confirmed that the Serpico was working with other Defendants to evict the Plaintiff by not renewing his lease.

58. In the second week of February 2014, Plaintiff received the letter from defendant Milford Management's employee Clive Spagnoli, which was dated January 24, 2014, explaining that Plaintiff's lease would not be renewed. Plaintiff then began an investigation and attempted

to speak with Milford employee Rossi. In further retaliation against Plaintiff, all Defendants refused to communicate with Greer.

59. In early February of 2014, after Plaintiff learned that Milford was not going to renew the lease, the offices at Milford, for the first time since Plaintiff moved in back in 2002, refused to take calls or reply to his emails. In fact, they even hired a private security company to threaten Plaintiff to not visit the Milford office on 99 Battery Place. If Mariners, Milford, and Rossi had acted in good faith, then they would have openly discussed the situation with Plaintiff. Instead, they ignored Plaintiff and hid under their desks.

60. Mariners, Milford, and Rossi ignored all of Plaintiff's attempts to negotiate with them and went straight to New York Landlord and Tenant Court seeking to evict Plaintiff. In their legal complaint (**Exhibit C**), Mariners (the petitioner of the Landlord and Tenant court complaint) intentionally listed no reason for the non-renewal of lease, knowing that they had do defensible reason.

61. On May 5, 2014, yet another BPCA insider approached Plaintiff via email, tipping him off that a whistleblower was filing a complaint against the BPCA to the New York Civil Rights Department. The whistleblower's name was/is Kirk Swanson, and he had been recently fired from the BPCA. Plaintiff spoke with Mr. Swanson, and Mr. Swanson acknowledged that it was well known within the offices of the BPCA that the BPCA had pressured Mariners, Milford, and Rossi to not renew Plaintiff's lease. There is no likely way that the BPCA staff would have heard about such a private matter as this unless the actions had originated from Defendants Serpico and Mehiel of the BPCA.

## DEFENDANTS SHUT DOWN PLAINTIFF'S FREEDOM OF SPEECH

62. On July 29, 2015, at 12:00 PM, the BPCA convened a board meeting. Pursuant to New York's Open Meeting Law *N.Y. Pub. Off. Law § 103*, anyone is allowed up to the 24th floor BPCA office. However, Dependents, employed by the BPCA, gave instructions to the private

security firm stationed at the BPCA office located at 200 Liberty Street, New York, New York, to specifically single out the Plaintiff and prevent him from attending the meeting. Therefore, he was unable to do any reporting on the meeting for his BatteryPark.TV local news site.

63. Meanwhile, other members of the local press, such as Matt Fenton of the Broadsheet and Irene Plagianos of DNAinfo, were permitted to enter the 24th floor after Plaintiff was denied admission. All of this was filmed by Plaintiff and the video will be played during the trial.

64. The security staff explained that there was an "overflow room" set up a half mile away on 21 South End Avenue, in the Park Enforcement Patrol office, where the meeting was being webcast via large-screen projector. However, the board meeting room on the 24th floor at 200 Liberty was not filled to capacity and all others wishing to attend the meeting were allowed up after Plaintiff was denied.

65. Not only was the "overflow room" at 21 South End Avenue unnecessary, and set up as a pure charade by the Defendants to pretend to not be violating the law, it was an inadequate substitute for attending the open meeting that is required to be open to the press by New York State Open Meetings laws. It was a one-way video feed, and the public was unable to ask questions or take quality photographs.

66. The "overflow room" had no one in attendance other than a BPCA employee manning the projector. This further highlights the fact that Plaintiff was not sent there due to any overcrowding problem, but rather that he was singled out, in violation of his First Amendment rights to freedom of the press and speech.

15
COMPLAINT

## DEFENDANTS COLLUDED TO WRONGFULLY OBTAIN "CONDIMINIUM" STATUS FROM THE NEW YORK ATTORNEY GENERAL IN ORDER TO SKIRT RENT STABILIZATION LAW

67. Defendant Mariners (the petitioner in the Landlord and Tenant court case) claims in their original Notice of Petition Holdover Dwelling filed on May 2, 2014 (**Exhibit C**) that the apartment building is "Condominium Apartment" and that they have the right to not renew Plaintiff's lease without justification. Paragraph 6 of the affidavit states:

> "The premise is not subject to the Rent Control Law, Rent Stabilization Law of 1969, as amended by Chapter 576 of the Laws of 1974 or the Emergency Tenant Protection Act of 1974 because the Premise is a condominium apartment."

68. It is true that *RPTL §421-a* exempts condominiums from rent-stabilization. The pertinent law excerpt is listed below:

> Notwithstanding the provisions of any local law for the stabilization of rents in multiple dwellings or the emergency tenant protection act of nineteen seventy-four, the rents of each dwelling unit in an eligible multiple dwelling shall be fully subject to control under such local law, unless exempt under such local law from control by reason of the **cooperative or condominium** status of the dwelling unit, for the entire period for which the eligible multiple dwelling is receiving benefits pursuant to this section.

69. This would seem to give the Plaintiff (the respondent in the Landlord and Tenant case) few defenses against eviction since his lease is with a "condo" building. However, in fact, his apartment should never have been awarded the coveted "condominium" status by the New York Attorney General, and should have been rent-stabilized, making it illegal to not renew Plaintiff's lease for no good reason.

70. The building in which Plaintiff lives, 200 Rector Place, was opting into the 421-a law and receiving tax breaks. Defendants Mariners and Rossi admit this in their July 17th, 2014 motion (¶ 59 of **Exhibit J**). The Steve Rossi affidavit filed in support of the motion states:

**"(petitioner's) receipt of 421-a tax benefits was irrelevant to Petitioner's tenants..."**

71. The lease made in 1984 between Defendants Mariners and BPCA also clearly spells out the terms of the 421-a law that they were opting into. It explains that the 421-a regulations and benefits would "expire in 27-years", which would have been the year 2011, long after Plaintiff had moved in. The rent-stabilization protections grandfather after expiration for tenants staying in their apartments.

72. Rossi also admits in ¶ 59 that Defendants Milford, Mariners, Rossi, Martin, and Milstein failed to provide the affordable housing units that go along with the tax-breaks they received as part of the 421-a bargain. Additionally, Defendants Mariners, Milford, Martin, Milstein, and Rossi failed to advise tenants of 200 Rector Place that the building has been under rent stabilization law since it was constructed. The same Defendants improperly took advantage of tax-breaks by failing to provide affordable housing or accept rent-stabilization constrictions.

73. With 421-a law clearly established as the valid regulation governing the respondent's building and apartment at 200 Rector Place, the question is whether the "condominium status" that petitioner claims is legitimate, thereby annulling the 421-a regulations, or whether the condo status is illegitimate because defendants misled the New York Attorney General with an "affirmative misrepresentation" in 1987 to get this coveted "condo" status.

74. Despite the defendants opting into the 421-a program, they made no mention of this in their "Declaration of Condominium" that they filed in year 1987 with the City.

75. However, Defendants do admit to opting into the 421-a law in their "Condominium Offering Plan" filed with the New York Attorney General's office back in 1987, which was then amended more than 20 times later, as recently as 2015 (This document is more than 500-pages long and the entire document is not attached as an exhibit).

76. In their Condominium Offering Plan, Defendants did not just simply fail to disclose that it intended to keep 40% of the units of the building for themselves to rent out, they actively lied about it. It was an "affirmative misrepresentation."

77. On the page labeled as "129" in the Condominium Offering Plan (**Exhibit K**), the Defendants Mariners, Milford, and Milstein affirmatively misrepresented to the New York

Attorney General that all units of the apartment building would "eventually" be "transferred to purchasers." While the Defendant's did not put a timeframe on the purchase, 30-plus years is obviously well beyond any possible reasonable timeframe to sell the more than 200 apartments that are still only rented to this day.

78.  Moreover, Milstein is quoted in a legal complaint, filed by his own real estate partners in his Mariners project, that he never intended to sell. On May 28th, 2015, Defendants Nelson and Goodstein filed a "Reply Affirmation" (**Exhibit L**) in their lawsuit against Milstein, which is not part of this instant case, and in ¶17 they stated:

> **""...the 60% partners wrote to Milstein, seeking his consent to a sale of all of the units at $800 per foot. Milstein's response was "I am not a seller."**

79.  On the printed page labeled as "160" of the condo offering plan (**Exhibit K**), the Defendants state that even though they seek "condo" status, they will still abide by 421-a rent-stabilization:

> **"The Lease requires that Sponsor, as tenant thereunder, as a condition precedent to receiving such (tax-break) benefits under the Lease equivalent to benefits under Section 421-a, comply with all of the requirements (i.e. rent-stabilization) of Section 421-a and the rules and regulations promulgated thereunder."**

80.  Likewise, nowhere in the 131-page detailed Declaration of Condominium document does it mention the plan for the Defendants to retain 40% of the apartment units and keep them as pure rentals.

81.  Plaintiff in this instant case has been renting one of those pure-rental units since the year 2002. He has never been informed by any Defendant that it was a 421-a rent-stabilized apartment.

82.  Defendants were awarded "condo" status by the Attorney General, even though the "Declaration of Condominium" and "Condominium Offering" were both misleading lies. Defendants wanted all of the legal protection granted by condominium status, and also the

revenue generated from pure-rental apartments, but wanted none of the limitations of rent regulation that apply to a rental building taking 421-a tax breaks. With approximately 531 apartment units in the 200 Rector Place building, and with 40% of them being rental, this translates into 212 pure-rental apartments. To call the building a "condominium" is truly a farce.

83. Even if it can be proved that the 421-a program expired for Defendants at some point before 2013, which was when the Plaintiff last renewed his lease, then, their rent-stabilization protection remains if the tenants in a 421-a building remain in apartments after the expiration of 421-a. However, never on any lease has the respondent been told of the 421-a program and the rent-stabilization protections, or affordable housing possibilities that the law provides. Petitioner actually admits that they never told any tenants about the 421-a participation because it was "irrelevant" in their view.

84. Since it is now clear that the building in which the Plaintiff lives was under 421-a rent-stabilization regulations from the time that the petitioner signed their lease with the BPCA in the year 1984, several years before the Attorney General awarded them condominium status in 1987, then the General Business Law§352-eeee, subsection 2(c)iii, states that the change to "condo" does not annul the 421-a regulation:

> (iii) **Non-purchasing tenants who reside in dwelling units subject to government regulation as to rentals and continued occupancy prior to the conversion of the building or group of buildings or development to cooperative or condominium ownership shall continue to be subject thereto.**

85. The other financial damages are to the city and state. The actual "taxes" paid (which are in the form of PILOT payments to the Battery Park City Authority rather than "taxes" to the city) were only a small fraction of what they should have been if 421-a tax breaks were not awarded. Since the petitioner failed to live up to the bargain of 421-a affordable housing and made no rental units available as "affordable" or rent-stabilized, then the underpaid taxes or PILOT fees add up to tens of millions of dollars that the City of New York was shortchanged.

### DEFENDANTS VIOLATED THE FAIR HOUSING ACT BY SEGREGATING THE BUILDING VIA DEPRIVING TENANTS OF RENT STABILIZATION PROTECTION

86. Plaintiff argues that the Defendants have created a segregated housing community in Battery Park City, New York, by withholding crucial rent-stabilization protection from apartments that should have been made available due to the 421-a law that the Defendants opted into. By doing so, the defendants have kept the large apartment building they own with thousands of residents in it to an almost all-white demographic. Fewer than 2% of the tenants are African American or Hispanic.

87. The Plaintiff in this case was organizing the community in several ways and encouraging renters to exercise their rent-stabilization rights. Plaintiff formed the local news activist site called BatteryPark.TV in 2009, and many of his stories have focused on renters' rights. He also formed the "Friends of BPC" block association, which held its first meeting on March 23, 2014.

88. The Defendants have retaliated against the Plaintiff by not renewing his apartment lease and by harassing him in Housing Court for the last 18-months.

### FIRST CAUSE OF ACTION
(Violation of First Amendment Rights)
(Against Serpico and Mehiel)

89. Plaintiff restates and incorporates by reference each of the foregoing paragraphs.

90. Plaintiff engaged in speech protected under the First Amendment. That speech was in the form of journalism reporting on BatteryPark.TV and as a tenants' association.

91. Acting under the color of the law, Defendants Serpico and Mehiel, employees of the state-controlled BPCA, abused their power and coerced the other Defendants, Milstein and Rossi to use their shell companies, Mariners and Milford, to evict the Plaintiff. This was a retaliatory eviction in response to Plaintiff's speech about the Defendants. Defendants also singled out Plaintiff and banned him from public meetings of their July 29th, 2015 BPCA board in violation of New York's Open Meeting Laws and Plaintiff's First Amendment Rights.

92. The aforementioned conduct deprived Plaintiff of his freedom of the press and