**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

15 CV 6119 (AJN)

| | |
|---|---|
| STEVEN E. GREER, MD<br>an individual. | AMENDED<br>**COMPLAINT** FOR: |
| Plaintiff; | 1.   VIOLATION OF FIRST AMENDMENT<br>RIGHTS |
| v. | 2.   DISCRIMINATION IN VIOLATION OF<br>FAIR HOUSING ACT 42 U.S.C. §3601 et seq. |
| **Dennis Mehiel**, an individual, **Robert<br>Serpico**, an individual, **The Battery Park<br>City Authority**, a New York State<br>authority, **Howard Milstein**, an individual,<br>**Steven Rossi**, an individual,  **Janet Martin**,<br>an individual, **Milford Management**, a<br>New York corporation, and **Mariners Cove<br>Site B Associates**, a New York corporation. | 3.   RETALIATION IN VIOLATION OF<br>FAIR HOUSING ACT 42 U.S.C. §3617 et seq.<br><br>4.   DEFAMATION<br><br><br>DEMAND FOR JURY TRIAL |
| Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10 23 15

Plaintiff Steven E. Greer ("Greer" or "Plaintiff") hereby complains and alleges as follows:

<u>NATURE of CASE</u>

1.     The Plaintiff was retaliated against by Dennis Mehiel, Robert Serpico, The Battery Park City Authority, Howard Milstein, Steven Rossi, Janet Martin, Milford Management and Mariners Cove Site B Associates (collectively as "Defendants") over his local news reporting of each of them. They colluded to evict Plaintiff from his apartment where he has paid above-market-rate rent for 13-years and. In doing so, Defendants have violated Plaintiff's First Amendment rights.

2.     In the course of defending himself in state court to stop the eviction, Plaintiff uncovered more wrongdoing relating to The Fair Housing Act. Defendants have violated the

Fair Housing Act be scheming to segregate apartment buildings by race and income. Lastly, Defendants have defamed Plaintiff.

3.      This federal case shares the same common nucleus of operative facts as an ongoing state Landlord and Tenant court case and Plaintiff asks that this court to enjoin that case.

THE PARTIES

4.      Plaintiff Steven E. Greer ("Greer") is a citizen of the United States of America currently living and domiciled in New York, New York.  Since 2002, Plaintiff has resided at 200 Rector Place, 35F, New York, New York, 10280. Greer is a citizen of New York and the United States.

5.      Defendant Dennis Mehiel ("Mehiel") is a citizen of the United States of America currently living and domiciled in New York, New York. Mehiel is a citizen of New York. At all times relevant herein, Mehiel was Chairman of the Battery Park City Authority ("BPCA") in New York..

6.      Defendant Robert Serpico ("Serpico") is a citizen of the United States of America currently living and domiciled in New York, New York.  Serpico is a citizen of New York. At all times relevant herein, Serpico was the Chief Financial Officer of the Battery Park City Authority.

7.      The Battery Park City Authority ("BPCA") is a New York State Authority located in Southern Manhattan, New York City.

8.      Defendant Howard Milstein ("Milstein") is a citizen of the United States of America currently living and domiciled in New York, New York.  Milstein is a citizen of New York.

9.      Defendant Steven Rossi ("Rossi") is a citizen of the United States of America currently living and domiciled in New York, New York.  Rossi is a citizen of New York. At all times relevant herein, Rossi has worked for Milford Management and Milstein.

10.      Defendant Janet Martin ("Martin") is a citizen of the United States of America currently living and domiciled in New York, New York.  Martin is a citizen of New York. At all

times relevant herein, Martin has worked for Milford Management and Milstein.

11.     Defendant Milford Management ("Milford") is a New York State corporation with its principal place of business in New York City, New York.  Milford is owned by Milstein.

12.     Defendant Mariners Cove Site B Associates ("Mariners") is a New York corporation with its principal place of business in New York, New York.  Mariners is owned by three different LLC partnerships. Milstein owns a 40% interest in Mariners through another one of his companies, Rector Park LLC.

13.     At all times relevant herein, Milstein, Martin, and Rossi were/are employees of Mariners and Milford. Defendant Rossi reports daily to work at 99 Battery Place in Lower Manhattan.  Martin works mostly in the Midtown Manhattan offices of Milford. Milstein employs individual defendants Martin and Rossi through shell companies, such as Defendants Milford and Mariners.

14.     The interrelationship of the Defendants and their multilayered shell companies is intentionally complex to discourage litigation. Below is a simplified chart to explain the organizations.

### Shell companies that own the building at 200 Rector Place, New York, NY

**Mariners Cove Site B Associates**
(The company that owns 200 Rector Place)

| | | Ownership |
|---|---|---|
| Howard Milstein | Rector Park Associates LLC | 40% |
| Michael Nelson | Cara Associates LLC (Which is owned by Underhill Cara Managers Associates LLC) | 30% |
| Ivan Goodstein | Hudson South B Associates LLC and Hudson South Associates LLC (which are part of the Goodstein Development Corporation) | 30% |

**Milford Management**
(Staffs and maintains the building)

| Howard Milstein | 100% ownership |
|---|---|

AMENDED COMPLAINT

## JURISDICTION AND VENUE

15.     The Plaintiff's complaint contains federal claims arising under the Constitution and laws of the United States.  Defendants colluded to violate Plaintiff's rights to freedom of the press and speech guaranteed by the First Amendment. Defendants further violated the federal Fair Housing Act 42 U.S.C. § 3601 et seq. and 42 U.S.C. § 3617.  This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 3601, and 42 U.S.C. § 1983.

16.     Plaintiff's state law claims against Defendants arise from the same common nucleus of operative facts and are of such character that the claims are so related to claims in the action within such original jurisdiction of the Court that Plaintiff's state law claims form part of the same case or controversy.  Thus, this Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

17.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants reside in the district of the Southern District of New York and all Defendants are residents of the State of New York.

## FACTS

18.     The Plaintiff is a medical doctor (surgeon) and author of a medical textbook, as well as numerous peer-review research papers. He has been awarded prestigious federal research grants to conduct clinical trials. He also became a portfolio manager for premier financial funds, most recently at Merrill Lynch, where he was responsible for $250 Million in assets within a $10 Billion internal prop-trading unit. Both medicine and finance are highly regulated industries requiring Plaintiff to have undergone strenuous background checks, fingerprinting, and extensive state and federal testing.

19.     Plaintiff continues to volunteer his medical services to elderly patients in nursing homes in need of wound care, as well as to severely injured amputee veterans via assisting MusiCorp. His research experience, having conducted clinical trials with federal grants from the VA and having written a textbook on wound healing, has medical directors of large New York

long-term care facilities still requesting him to speak at grand rounds to educate their staff.

20.     In addition, the Plaintiff is a journalist, with several Op-Ed's published in the Wall Street Journal, and the publisher of one of the most viewed local news website for Downtown Manhattan called BatteryPark.TV. Plaintiff spends tens of thousands of his own dollars, and many hundreds of hours of time, each year to operate BatteryPark.TV as a community service.

21.     Plaintiff's journalism led him into federal oversight activities assisting the U.S. Senate and House investigate waste and fraud in medicine. He has worked with Senator Grassley's Finance and Judiciary committees, helping get the Physician Payments Sunshine Act passed as part of the ACA law in 2010. His journalism has been referenced during congressional testimony.

22.     Plaintiff is also a regular guest pundit on national cable TV news channels, such as CNBC, MSNBC, and Fox.

23.     In the course of reporting, Plaintiff began to uncover scandals relating to the Defendants.

24.     In or around 1984, the owners of the apartment tower with more than 500 units located at 200 Rector Place, New York, New York, 10280 "Rector Apartments", where Plaintiff lives, signed a lease with the state-controlled BPCA. The lease allowed the BPCA to take advantage of certain property tax breaks provided by the N.Y. RPT. Law § 421-a ("421-a").

25.     Years later, in or around 1987, the building owners filed a "condominium offering" with the New York Attorney General and failed to state that 40% of the apartments would be kept as rentals indefinitely. As a result, the building owners were awarded a condominium status for the building as if there were no rental apartments, when in fact there have been rentals since the building was built. Defendants Milstein and Mariners never intended to sell the apartments that comprise 40% of the building and have continued to deceive the Attorney General for more than thirty years by filing at least twenty (20) more condominium offerings, none of which state that rental apartments were never meant to be sold as condominiums.

26.    In 2002, Plaintiff moved into 200 Rector Place, 35F, as a renter paying $2,265 per month pursuant to the "Coop/Condo Lease Agreement" between Mariners, Milford, and plaintiff ("Lease") with Milford, which is incorporated by reference and attached hereto as **Exhibit A.** Plaintiff's lease with Milford made no mention of the fact that the building was partaking in the 421-a program.  As a result, Plaintiff's apartment was "rent-stabilized" and not a "condo."

27.    On July 15, 2014 defendant Rossi stated in an Affidavit filed in Landlord and Tenant Court, **Case No. 63974/2014**, that the 421-a status was "irrelevant" to renting tenants. The Affidavit is incorporated herein by reference and attached hereto as (**Exhibit J** see ¶ 59).

28.    In 2004, Plaintiff renewed his lease and the rent increased 8% to $2,450. Rent-stabilization would have capped the increase to only 2.2%, or to $2,310. Plaintiff renewed his lease eight more times, most recently in 2013. The rent demanded in the 2013 lease was 7.8% greater than the year before and rose to $3,395 per month.

**Lease terms for
Rent paid by Plaintiff**

| Year | | year-over-year increase |
|------|--------|------|
| 2002 | $2,265 | |
| 2003 | $2,378 | 5.0% |
| 2004 | $2,450 | 3.0% |
| 2005 | $2,575 | 5.1% |
| 2006 | $2,675 | 3.9% |
| 2007 | $2,850 | 6.5% |
| 2008 | $2,995 | 5.1% |
| 2009 | $2,995 | 0.0% |
| 2010 | $2,995 | 0.0% |
| 2011 | $3,150 | 5.2% |
| 2012 | $3,150 | 0.0% |
| 2013 | $3,395 | 7.8% |
| | **CAGR** | |
| | 4.5% | |

Rent-stabilization caps increases at 2.2%

**Actual total rent paid by Plaintiff**

| Year | | annual payments |
|------|--------|-----------------|
| 2002 | $2,265 | $27,180 |
| 2003 | $2,378 | $28,539 |
| 2004 | $2,450 | $29,400 |
| 2005 | $2,575 | $30,900 |
| 2006 | $2,675 | $32,100 |
| 2007 | $2,850 | $34,200 |
| 2008 | $2,995 | $35,940 |
| 2009 | $2,995 | $35,940 |
| 2010 | $2,995 | $35,940 |
| 2011 | $3,150 | $37,800 |
| 2012 | $3,150 | $37,800 |
| 2013 | $3,395 | $40,740 |
| | Total | $406,479 |

**Total rent that should have been paid
if the building were rent-stabilized**

| Year | | annual payments |
|------|--------|-----------------|
| 2002 | $2,265 | $27,180 |
| 2003 | $2,315 | $27,778 |
| 2004 | $2,366 | $28,389 |
| 2005 | $2,418 | $29,014 |
| 2006 | $2,471 | $29,652 |
| 2007 | $2,525 | $30,304 |
| 2008 | $2,581 | $30,971 |
| 2009 | $2,638 | $31,652 |
| 2010 | $2,696 | $32,349 |
| 2011 | $2,755 | $33,060 |
| 2012 | $2,816 | $33,788 |
| 2013 | $2,878 | $34,531 |
| | Total | $368,668 |

**Total amount of rent overpaid by Plaintiff**

**$37,811**

29.     In 2009, Plaintiff created the local news website called **BatteryPark.TV** and began muckraking, uncovering corruption at the city and state levels of government. Defendants

were targets of his investigative reporting, which is incorporated by reference and attached hereto as (**Exhibit H**). Note the numerous scathing stories written by Plaintiff about the defendants that date back several years, predating the 2014 eviction proceedings.

30.     Plaintiff has also organized some members of the community and to try and help them enforce their rights under the Fair Housing Act through a tenants' association, and through a block association called "Friends of BPC", which held its first meeting on March 23rd, 2014.

### THE REAL ESTATE DEFENDANTS AND BPCA DEFENDANTS HAVE CLOSE TIES

31.     In New York, big real estate companies are often closely intertwined with state politicians. In this instant case, the New York State-controlled BPCA has powerful influence over any real estate developer that leases property from the BPCA, such as Milstein and Mariners, where the Plaintiff lives. The BPCA negotiates the ground lease and  "Payments in Lieu of Taxes" ("PILOT fees")  that Defendants Milstein and Mariners in this case have to pay. If Defendants Serpico and Mehiel wanted to collude and retaliate against Plaintiff by asking defendants Milstein, Rossi, or Martin to evict him, they easily would have obtained the cooperation of said Defendants.

32.     As evidence of this cozy relationship between the BPCA and its tenants, such as Defendants Milstein, Milford, and Mariners, one of the rare sales that Milstein has ever made of the original rental apartments set aside in the 1980's was a sale to a BPCA board member, Robert Mueller, at below-market-rate. This is according to a legal complaint filed by real estate business partners of Defendants Milstein and Mariners, which is incorporated by reference and attached hereto as (**Exhibit B**).

### PLAINIFF'S LEASE EXPIRES WITHOUT RENEWAL

33.     After dozens of calls and emails from Plaintiff to Defendants went unanswered, the expiration date of Plaintiff's apartment lease on April 31, 2014 passed by. Plaintiff was then served papers to appear in New York Civil Court, Landlord and Tenant division, to face

eviction proceedings (**Exhibit C**). Again, no reason for the eviction was given, just as no reason was given in the January, 2014 letter from Clive Spagnoli.

34.     The case number for the ongoing Landlord and Tenant Court eviction case is **63974/2014**. The case has been allowed to go to trial and the next court date is August 10th, 2015. Notably, the judge in that case allowed respondent Greer (The Plaintiff in this instant case) to argue that he was evicted out of retaliation, violating "N.Y. RPP. LAW § 223-b : Retaliation by landlord".


## MILFORD INITIATES EVICTION PROCEEDINGS AGAINST PLAINTIFF

35.     In February of 2014, Plaintiff received a letter from an employee of Milford notifying him that the lease would not be renewed and to leave by April 30th of 2014 (**Exhibit D).** No reason was given for the eviction, and Plaintiff was paying his rent in full. This move to evict Plaintiff was clearly in retaliation for his news reporting.

36.     In March of 2015, defendant served a "Notice of Petitioner Holdover Dwelling, condominium apartment" on Plaintiff (**Exhibit C**).  Plaintiff replied that the building was not "condominium" and that the defendants were violating N.Y. Real Prop. Law § 223-b. ("Section 223-b") in a retaliatory eviction (**Exhibit E).**

37.     On March 13, 2015, Judge Hahn of the Landlord and Tenant court at 111 Centre Street decided to allow Greer the respondent (The Plaintiff in this instant case) to argue that Mariners violated Section 223-b and that the warranty of habitability was breached. Judge Hahn did not allow Plaintiff to argue that the building was not "condo" because that action would have been  a "counterclaim," which was forbidden by the lease. However, Judge Hahn stated that the argument could be made in a separate proceeding, which is being argued in this the instant action in federal court (**Exhibit F**).

38.     On April 20, 2015,  Mariners (the petitioners in the housing case), filed an Order to Show Cause ("OSC") to evict the Plaintiff, which is incorporated by reference and attached hereto as (**Exhibit G**).

39.     There is an OSC hearing set for August 10, 2015, and the entire matter is set for

trial.

40.     At the time the eviction proceedings were initiated against Plaintiff, Plaintiff was paying above the market rate for his apartment and was in good standing, having no complaints made about him by other tenants or by the defendants.

41.     In the course of defending himself against the retaliatory eviction proceedings underway in Landlord and Tenant Court, the Plaintiff discovered that Defendants Mariners, Milford, Rossi, and Milstein had fraudulently obtained "condominium" status for Rector Apartments and were not advising tenants of Rector Apartments that the building was actually rent-stabilized by Section 421-a.

THE DEFENDANTS' DECISION TO EVICT PLAINTIFF IS IRRATIONAL
UNLESS THE INTENT IS TO RETLAIATE

42.     The decision to evict the Plaintiff from his apartment at 200 Rector Place, unit 35F, is completely irrational, unless the real intent is to run the Plaintiff out of the community, making it impossible for him to exercise his freedom of speech and freedom of the press through BatteryPark.TV. Plaintiff pays a higher rent than comparable market rate apartments in his building, pays his rent in full, and has had no complaints against him in the 13-years of living at Rector Apartments. No other renter in a similar good standing has ever had his or her lease not renewed by the Defendants.

43.     The targets of the Plaintiff's investigative reporting, the Defendants, filed an action to evict Plaintiff and not to renew Plaintiff's lease in an attempt to chill and stifle his First Amendment rights (**Exhibits C, G**). All of the Defendants knew, that by removing Plaintiff from the neighborhood of Battery Park City, that his news site called BatteryPark.TV would be effectively shut down, or hindered at least.

## PLAINTIFF'S CRITICAL REPORTING ON THE REAL ESTATE
### DEFENDANTS LED TO RETALIATORY EVICTION

44.     Plaintiff has lived in his apartment complex Rector Apartments in Battery Park City for 13-years. On October 23, 2013, he reported in BatteryPark.TV on an issue involving Mariners, Milford, and Rossi. Plaintiff reported that Defendant Milford had schemed to sabotage street safety measures planned by the City DOT that would have made the street outside of the Rector Apartments on the West Thames Street entrance safer for children crossing the street.

45.     Concrete barriers in the median of the streets and stop signs were to be installed according to City DOT drawings, but Milford opposed the plans because they would have made it impossible to make an illegal turn into the parking garage of the building, inconveniencing the wealthy tenants with luxury cars. In his article on BatteryPark.TV, Plaintiff identified Milford by name, angering Rossi (**Exhibit H**, page 1).

46.     Plaintiff's reporting on this scandal was one factor that led to Milstein, the owner of Plaintiff's building and managing partner in Defendant Mariners, to pursue this irrational strategy of trying to evict the Plaintiff after 13-years of residence and paying above-market-rate rent. Milstein was also working in collusion with Defendants Serpico and Mehiel at the BPCA who also wanted the Plaintiff silenced.

47.     On January 31st, at 4:11 PM, Plaintiff called Clive Spagnoli, a leasing agent employed by Milford, to inquire as to why the lease was not being renewed. Mr. Spagnoli had no answer as he was in the dark too.

48.     In February 2014, Plaintiff received  a letter dated January 24, 2014, sent via regular U.S. Mail from Clive Spagnoli of Milford, which is incorporated by reference and attached hereto as **Exhibit D**. It informed Plaintiff that Milford would not be renewing Plaintiff's lease, and no reason was given.

49.     Plaintiff continued to try to get answers from Milford. On February 11, 2014, he called Rossi and arranged to meet him in his office at the Milford office on Battery Place. When the plaintiff arrived, Mr. Rossi was not in his office.

AMENDED COMPLAINT

50.     On February 12, 2014, Plaintiff tried to call Rossi, but Rossi would not accept his call. Plaintiff walked over to Rossi's office, and Plaintiff was met at the entrance by a private security guard working for Spartan Security. Plaintiff believes that Milford hired the guard specifically in anticipation of Plaintiff's visit. The guard asked the plaintiff to speak with him outside, then warned the plaintiff to never visit the office again. No explanation was given. This entire exchange was captured on the plaintiff's cell phone video camera, which is in Plaintiff's possession.

## PLAINTIFF ALSO EXPOSED THE BCPA DEFENDANTS' MISCODUCT TO THE PUBLIC

51.     Plaintiff's critical news reporting about all Defendants resulted in all Defendants retaliating against Plaintiff and violating his First Amendment rights.

52.     Plaintiff's reporting in BatteryPark.TV has led to the prompt "resignation" of two of Defendant BPCA Chairman Mehiel's Presidents of the BPCA: Gayle Horwitz and Demetrios Boutris. Two other targets of the Plaintiff's muckraking have also abruptly left the BPCA: the "Executive Vice President, Operations", Anne Fenton, and Matthew Monahan (**Exhibit H,** page 5).

53.     One of the most important stories reported by the Plaintiff on his BatteryPark.TV involved a serial sexual harasser, Defendant Serpico, who has been employed for more than 30-years by the BPCA as Chief Financial Officer (CFO). Plaintiff's sources, who used to work at the BPCA, claim that Serpico has a thick file of complaints about him in the Human Resources department for rubbing against women, making misogynistic comments, and sending blast emails with sexually explicit cartoons (**Exhibit H,** page 7). Yet Mr. Serpico's clout in the State of New York afforded to him by his controlling the billions of revenue raised by state-issued bonds for the BPCA has caused the investigations to go away and never result in the termination of his employment. This news story came after the eviction proceedings began and is not an example of the cause for the retaliatory eviction. However, it is attached to show the Court the character of the Defendant.

54.     In December of 2014, the Plaintiff reported that two in-house lawyers for the

BPCA investigating the Robert Serpico sexual harassment charges, Nancy Harvey and Allison Ford, both African American women, were either fired or forced into "retirement." (**Exhibit H,** page 19).   They were investigating sexual harassment complaints against defendant Serpico made by a female paralegal named Elizabeth (Elsa) Papanicolaou. This news story also came after the eviction proceedings began and is not an example of the cause for the retaliatory eviction. However, it is attached to show the Court the character of the Defendant.

55.      The BPCA Chairman and CEO, Mehiel, remains in his position despite the scandals. Plaintiff's reporting has alerted several state and federal agencies about wrongdoing by Mr. Mehiel's BPCA, and various levels of investigation are underway.

56.      Defendant Mehiel hired Shari Hyman to be the President of the BPCA in January of 2014. However, she is the wife of the head of the New York State Joint Commission on Public Ethics ("JCOPE"), representing a serious conflict of interest since JCOPE should be investigating Defendant Mehiel and his BPCA (**Exhibit H,** page 21). This news story came before the eviction proceedings began, and is an example of what led to the retaliatory eviction.

57.      In May of 2014, Plaintiff reported on a complaint filed by a BPCA senior employee, Kirk Swanson, who was fired and then filed a complaint with the New York State Civil Rights Department (**Exhibit H,** page 22).  Mr. Swanson alleged that the BPCA violated the law by awarding contracts to cronies and friends of Defendant Mehiel. Mr. Swanson also alleged that Defendant Serpico has a long history of sexually inappropriate behavior in the office, as detailed above. This news story came after the eviction proceedings began and is not an example of the cause for the retaliatory eviction. However, it is attached to show the Court the character of the Defendant.

<u>WITNESSES OF CONSPIRACY TO EVICT PLAINTIFF</u>

58.      On January 12, 2014, Vince McGowan, a former senior executive employed by the BPCA who still had connections to BPCA insiders, tipped off Plaintiff that the BPCA was working to evict him. Mr. McGowan wrote an email referring to a photo the plaintiff had posted online of his apartment view, stating:

"It is good to see that you appreciate what we have on the West Side, Hope you can stay."

59.     Mr. McGowan's e-mail is incorporated by reference and attached hereto as (**Exhibit I**). Plaintiff subsequently spoke to Mr. McGowan on the phone, and Mr. McGowan confirmed that the Serpico was working with other Defendants to evict the Plaintiff by not renewing his lease.

60.     In the second week of February 2014, Plaintiff received the letter from defendant Milford Management's employee Clive Spagnoli, which was dated January 24, 2014, explaining that Plaintiff's lease would not be renewed. Plaintiff then began an investigation and attempted to speak with Milford employee Rossi. In further retaliation against Plaintiff, all Defendants refused to communicate with  Greer.

61.     In early February of 2014, after Plaintiff learned that Milford was not going to renew the lease, the offices at Milford, for the first time since Plaintiff moved in back in 2002, refused to take calls or reply to his emails. In fact, they even hired a private security company to threaten Plaintiff to not visit the Milford office on 99 Battery Place. If Mariners, Milford, and Rossi had acted in good faith, then they would have openly discussed the situation with Plaintiff. Instead, they ignored Plaintiff and hid under their desks.

62.     Mariners, Milford, and Rossi ignored all of Plaintiff's attempts to negotiate with them and went straight to New York Landlord and Tenant Court seeking to evict Plaintiff. In their legal complaint (**Exhibit C**), Mariners (the petitioner of the Landlord and Tenant court complaint) intentionally listed no reason for the non-renewal of lease, knowing that they had do defensible reason.

63.     On May 5, 2014, yet another BPCA insider approached Plaintiff via email, tipping him off that a whistleblower was filing a complaint against the BPCA to the New York Civil Rights Department. The whistleblower was Kirk Swanson who had been recently fired from the BPCA.

64.     Plaintiff spoke with Mr. Swanson, and Mr. Swanson acknowledged that it was well known within the offices of the BPCA that the BPCA had pressured Mariners, Milford, and

Rossi to not renew Plaintiff's lease.

65.     Swanson said that he was first informed in January of 2014 of the plan to not

renew Plaintiff's lease by Kevin McCabe, the Chief of Staff to Mehiel. This mundane lease

matter involving an individual renter became fodder for BPCA office gossip, clearly indicating

that the BPCA does indeed get involved in such matters?

66.     Then, according to Swanson, he directly asked Serpico in January of 2014

whether he was responsible for the non-renewal letter sent to Plaintiff, and Serpico confirmed

that he was. Mr. Swanson will be providing testimony on this when the discovery period begins.

67.     There is no likely way that the BPCA staff would have heard about such a

private matter as this unless the actions had originated from Defendants Serpico and Mehiel of

the BPCA.

### DEFENDANTS STIFLED PLAINTIFF'S
### FREEDOM OF SPEECH AND PRESS

68.     On July 29, 2015, at 12:00 PM, the BPCA convened a board meeting.  Pursuant to

New York's Open Meeting Law *N.Y. Pub. Off. Law § 103*, anyone is allowed up to the 24th floor

BPCA office. However, Dependents, employed by the BPCA, gave instructions to the private

security firm stationed at the BPCA office located at 200 Liberty Street, New York, New York,

to specifically single out the Plaintiff and prevent him from attending the meeting. Therefore, he

was unable to do any reporting on the meeting for his BatteryPark.TV local news site.

69.     Meanwhile, other members of the local press, such as Matt Fenton of the

Broadsheet and Irene Plagianos of DNAinfo, were permitted to enter the 24th floor after Plaintiff

was denied admission.  All of this was filmed by Plaintiff and the video will be played during the

trial.

70.     The security staff explained that there was an "overflow room" set up a half mile

away on 21 South End Avenue, in the Park Enforcement Patrol office, where the meeting was

being webcast via large-screen projector. However, the board meeting room on the 24th floor at

200 Liberty was not filled to capacity and all others wishing to attend the meeting were allowed

up after Plaintiff was denied.

71.     Not only was the "overflow room" at 21 South End Avenue unnecessary, and set

up as a pure charade by the Defendants to pretend to not be violating the law, it was an

inadequate substitute for attending the open meeting that is required to be open to the press by

New York State Open Meetings laws. It was a one-way video feed, and the public was unable to

ask questions or take quality photographs.

72.     Going back to at least the year 2009, the BPCA has never before set up any such

satellite video viewing station. It was not a "lawful and routine" maneuver for the BPCA.

73.     The "overflow room" had no one in attendance other than a BPCA employee

manning the projector. This further highlights the fact that Plaintiff was not sent there due to any

overcrowding problem, but rather that he was singled out, in violation of his First Amendment

rights to freedom of the press and speech.

DEFENDANTS CHILLED PLAINTIFF'S
FREEDOM OF THE PRESS

74.     On October 12th, 2015, at 9:47 PM, Plaintiff was filming for a BatteryPark.TV

news story the response, or lack thereof, by the Park Enforcement Patrol (PEP) to a complaint

about people smoking marijuana in Rector Park. He walked to the PEP office on West Thames

Street to inquire why no PEP responded to his call.

75.     Upon walking out, PEP Sergeant William Guzman engaged Plaintiff on the public

sidewalk. He stated, "We met at the community board meeting the other day" where he saw

Plaintiff acting as a reporter with a camera at the meeting. Guzman then walked to within a foot

of Plaintiff and demonstrated aggressive body language, clearly upset that Plaintiff was filming

in the PEP office. When Plaintiff tried to deescalate the confrontation by walking away, Sergeant Guzman followed him in a stalking manner. Plaintiff had to insist loudly that he not be followed.

76.    The incident can be viewed on this YouTube video found here:

**https://youtu.be/K4KiZ1CCRoo**

77.    This scary incident was clearly intended to chill the Plaintiff and discourage any reporting on the PEP office. It was also not the first incident like this.

78.    The PEP covering Battery Park City have a long history of beating up residents who were simply walking their dogs, etc.. In 2011, Adam Pratt was assaulted by a team of PEP. He sued, and the case was settled for $25,000.

79.    On June 6th, 2013, Plaintiff was filming another story near the same PEP office. The PEP Captain did not allow him inside, and had several PEP officers push him out the door. The incident can be viewed on this YouTube video:

**https://youtu.be/GsJ3OqEbdCk**

80.    The BPCA pays for the services of these city PEP. The details of their job function, duties, schedules, etc. are all spelled out by a contract drafted by the BPCA. There are BPCA employees assigned to oversee the PEP. These violations of the First Amendment by the PEP make the BPCA liable.

## DEFENDANTS COLLUDED TO WRONGFULLY OBTAIN "CONDIMINIUM" STATUS FROM THE NEW YORK ATTORNEY GENERAL IN ORDER TO SKIRT RENT STABILIZATION LAW

81.     Defendant Mariners (the petitioner in the Landlord and Tenant court case) claims in their original Notice of Petition Holdover Dwelling filed on May 2, 2014 (**Exhibit C**) that the apartment building is "Condominium Apartment" and that they have the right to not renew Plaintiff's lease without justification.  Paragraph 6 of the affidavit states:

> "The premise is not subject to the Rent Control Law, Rent Stabilization Law of 1969, as amended by Chapter 576 of the Laws of 1974 or the Emergency Tenant Protection Act of 1974 because the Premise is a condominium apartment."

82.     It is true that *RPTL §421-a* exempts condominiums from rent-stabilization. The pertinent law excerpt is listed below:

> Notwithstanding the provisions of any local law for the stabilization of rents in multiple dwellings or the emergency tenant protection act of nineteen seventy-four, the rents of each dwelling unit in an eligible multiple dwelling shall be fully subject to control under such local law, unless exempt under such local law from control by reason of the **cooperative or condominium** status of the dwelling unit, for the entire period for which the eligible multiple dwelling is receiving benefits pursuant to this section.  *See* N.Y. Real Prop. Tax Law § 421-a (emphasis added).

83.     This would seem to give the Plaintiff (the respondent in the Landlord and Tenant case) few defenses against eviction since his lease is with a "condo" building. However, in fact, his apartment should never have been awarded the coveted "condominium" status by the New York Attorney General, and should have been rent-stabilized, making it illegal to not renew Plaintiff's lease for no good reason.

84.     The building in which Plaintiff lives, 200 Rector Place, was opting into the 421-a law and receiving tax breaks. Defendants Mariners and Rossi admit this in their July 17th, 2014 motion (¶ 59 of **Exhibit J**). The Steve Rossi affidavit filed in support of the motion states:

> **"(petitioner's) receipt of 421-a tax benefits was irrelevant to Petitioner's tenants..."**

85.     The lease made in 1984 between Defendants Mariners and BPCA also clearly spells out the terms of the 421-a law that they were opting into. It explains that the 421-a regulations and benefits would "expire in 27-years", which would have been the year 2011, long after Plaintiff had moved in. The rent-stabilization protections grandfather after expiration for tenants staying in their apartments.

86.     Rossi also admits in ¶ 59 that Defendants Milford, Mariners, Rossi, Martin, and Milstein failed to provide the affordable housing units that go along with the tax-breaks they received as part of the 421-a bargain. Additionally, Defendants Mariners, Milford, Martin, Milstein, and Rossi failed to advise tenants of 200 Rector Place that the building has been under rent stabilization law since it was constructed. The same Defendants improperly took advantage of tax-breaks by failing to provide affordable housing or accept rent-stabilization constrictions.

87.     With 421-a law clearly established as the valid regulation governing the respondent's building and apartment at 200 Rector Place, the question is whether the "condominium status" that petitioner claims is legitimate, thereby annulling the 421-a regulations, or whether the condo status is illegitimate because defendants misled the New York Attorney General with an "affirmative misrepresentation" in 1987 to get this coveted "condo" status.

88.     Despite the defendants opting into the 421-a program, they made no mention of this in their "Declaration of Condominium" that they filed in year 1987 with the City.

89.     However, Defendants do admit to opting into the 421-a law in their "Condominium Offering Plan" filed with the New York Attorney General's office back in 1987, which was then amended more than 20 times later, as recently as 2015 (This document is more than 500-pages long and the entire document is not attached as an exhibit).

90.     In their Condominium Offering Plan, Defendants did not just simply fail to disclose that it intended to keep 40% of the units of the building for themselves to rent out, they actively lied about it. It was an "affirmative misrepresentation."

91.     On the page labeled as "129" in the Condominium Offering Plan (**Exhibit K**), the Defendants Mariners, Milford, and Milstein affirmatively misrepresented to the New York

Attorney General that all units of the apartment building would "eventually" be "transferred to purchasers." While the Defendant's did not put a timeframe on the purchase, 30-plus years is obviously well beyond any possible reasonable timeframe to sell the more than 200 apartments that are still only rented to this day.

92.     Moreover, Milstein is quoted in a legal complaint, filed by his own real estate partners in his Mariners project, that he never intended to sell. On May 28th, 2015, Defendants Nelson and Goodstein filed a "Reply Affirmation" (**Exhibit L**) in their lawsuit against Milstein, which is not part of this instant case, and in ¶17 they stated:

> ""...the 60% partners wrote to Milstein, seeking his consent to a sale of all of the units at
> $800 per foot. Milstein's response was "I am not a seller."

93.     On the printed page labeled as "160" of the condo offering plan (**Exhibit K**), the Defendants state that even though they seek "condo" status, they will still abide by 421-a rent-stabilization:

> "The Lease requires that Sponsor, as tenant thereunder, as a condition precedent to receiving such
> (tax-break) benefits under the Lease equivalent to benefits under Section 421-a, comply with all of
> the requirements (i.e. rent-stabilization) of Section 421-a and the rules and regulations promulgated
> thereunder."

94.     Likewise, nowhere in the 131-page detailed Declaration of Condominium document does it mention the plan for the Defendants to retain 40% of the apartment units and keep them as pure rentals.

95.     Plaintiff in this instant case has been renting one of those pure-rental units since the year 2002. He has never been informed by any Defendant that it was a 421-a rent-stabilized apartment.

96.     Defendants were awarded "condo" status by the Attorney General, even though the "Declaration of Condominium" and "Condominium Offering" were both misleading lies. Defendants wanted all of the legal protection granted by condominium status, and also the revenue generated from pure-rental apartments, but wanted none of the limitations of rent regulation that apply to a rental building taking 421-a tax breaks. With approximately 531 apartment units in the 200 Rector Place building, and with 40% of them being rental, this

translates into 212 pure-rental apartments. To call the building a "condominium" is truly a farce.

97.     Even if it can be proved that the 421-a program expired for Defendants at some point before 2013, which was when the Plaintiff last renewed his lease, then, their rent-stabilization protection remains if the tenants in a 421-a building remain in apartments after the expiration of 421-a. However, never on any lease has the respondent been told of the 421-a program and the rent-stabilization protections, or affordable housing possibilities that the law provides. Petitioner actually admits that they never told any tenants about the 421-a participation because it was "irrelevant" in their view.

98.     Since it is now clear that the building in which the Plaintiff lives was under 421-a rent-stabilization regulations from the time that the petitioner signed their lease with the BPCA in the year 1984, several years before the Attorney General awarded them condominium status in 1987, then the General Business Law§352-eeee, subsection 2(c)iii, states that the change to "condo" does not annul the 421-a regulation:

> **(iii) Non-purchasing tenants who reside in dwelling units subject to government regulation as to rentals and continued occupancy prior to the conversion of the building or group of buildings or development to cooperative or condominium ownership shall continue to be subject thereto.**

99.     The other financial damages are to the city and state. The actual "taxes" paid (which are in the form of PILOT payments to the Battery Park City Authority rather than "taxes" to the city) were only a small fraction of what they should have been if 421-a tax breaks were not awarded. Since the petitioner failed to live up to the bargain of 421-a affordable housing and made no rental units available as "affordable" or rent-stabilized, then the underpaid taxes or PILOT fees add up to tens of millions of dollars that the City of New York was shortchanged.

100.    Plaintiff filed a complaint with the New York Attorney General about this fraudulent condominium offering. They replied in writing declining to investigate, giving Plaintiff the right to sue in federal court as his only relief (**Exhibit O**)

## DEFENDANTS SEGREGATED THE BUILDING
### via DEPRIVING TENANTS OF RENT STABILIZATION PROTECTION

101.    Plaintiff argues that the Defendants have created a segregated housing community in Battery Park City, New York, by withholding crucial rent-stabilization protection from apartments that should have been made available due to the 421-a law that the Defendants opted into. By doing so, the defendants have kept the large apartment building they own with thousands of residents in it to an almost all-white demographic. Fewer than 2% of the tenants are African American or Hispanic.

102.    It is a fact that people of color represent the lower income demographics more than whites. Therefore, by inflating the rent in the building, the defendants have segregated it as an almost all-white building (and neighborhood, since they are doing this in at least two other buildings on the same street).

103.    The Plaintiff in this case was organizing the community in several ways and encouraging renters to exercise their rent-stabilization rights. Plaintiff formed the local news activist site called BatteryPark.TV in 2009, and many of his stories have focused on renters' rights. He also formed the "Friends of BPC" block association and tenant's association, which held its first meeting on March 23, 2014.

## DEFENDATS HAVE RETALIATED AGAINST PLAINTIFF
### DUE TO THE COMPLAINT HE FILED

104.    The Defendants have retaliated against the Plaintiff by not renewing his apartment lease and by harassing him in city Landlord and Tenant court for the last two-years.

105.    Recently, the retaliation has escalated as the self-proclaimed lawyer for the real estate defendants, Deborah Riegel, has engaged in a bizarre series of harassing actions against Plaintiff.

106.    Shortly after this complaint was filed in August of 2015, Plaintiff was informed by one of the building staff that the entire staff had been gathered for a meeting by the building management. They were forced to sign an agreement to not talk to Plaintiff about details of the business of the building. This agreement document will be produced during discovery. The result was an immediate and dramatic chilling of the staff against Plaintiff, causing them to give

him the cold shoulder in the lobby.

107.    Then, on October 20, 2015, Lawyer Riegel began sending Plaintiff strange emails in the evening from her iPhone. She claimed that an "official complaint" had been made by an anonymous staff member to the SEIU doorman union about him.

> "Mr. Greer – Please be advised that your communications with building staff
> have resulted in a formal complaint to my client by the union representing the
> building employees.  Accordingly, you are hereby directed that going forward,
> any service requests or communication with respect to building issues (except in
> the case of an emergency) should be directed to me for disposition.
>
> No one is denying you services, and your requests will be as promptly addressed
> as was this email.  My client is simply insuring that its employees, whose
> representatives have complained of the manner in which you interact with the
> building staff, are not subject to further similar behavior.  My designation by
> my client as your point of contact is nothing more, or less, than a designation of
> his agent for purposes of addressing your complaints."

108.    Riegel refused to produce any documents or proof of the "complaint". The superintendent of the building, Gus Ouranitsas, had no knowledge of the complaint when asked about it on October 21st.

109.    If a real complaint even exists, it was likely caused by Lawyer Riegel instigating and urging the staff to file the complaint, in order to chill and harass Plaintiff. Her law firm has been sanctioned by New York court this year alone for similar aggressive slumlord tactics.

### FIRST CAUSE OF ACTION
(Violation of First Amendment Rights)
(Against the BPCA, Serpico, and Mehiel)

110.    Plaintiff restates and incorporates by reference each of the foregoing paragraphs.

111.    Plaintiff engaged in speech protected under the First Amendment. That speech was in the form of journalism reporting on BatteryPark.TV and as a tenants' association.

112.    Acting under the color of the law, Defendants Serpico and Mehiel, employees of the state-controlled BPCA, abused their power and coerced the other Defendants, Milstein and Rossi to use their shell companies, Mariners and Milford, to evict the Plaintiff. This was a retaliatory eviction in response to Plaintiff's speech about the Defendants.

113.    Plaintiff had a legally protected interest and right to renew the lease since the building was regulated under 421-a law, and Plaintiff argues that the building is not a real condominium. Therefore, the 421-a regulations are not negated by condo status.

114.    Plaintiff runs a site called BatteryPark.TV with offices in his apartment at the Mariners building of 200 Rector Place, 35F. Because the plaintiff needs to have those offices directly in the community of Battery Park City, which is controlled by Defendants via the BPCA and their real estate companies, the retaliatory eviction against Plaintiff violated Plaintiff's freedom of the press and speech.

115.    The retaliatory eviction proceedings, dragging on for nearly two-years in city housing court, have directly caused tangible, concrete mental and financial hardship for the Plaintiff.

116.    The hundreds of hours required of the Plaintiff to respond to legal motions and appear in court have reduced his production at his subscription-website called The Healthcare Channel. Plaintiff is the sole employ of The Healthcare Channel, and every minute that has to be spent on litigation takes away from his ability to earn an income.

117.    If the defendants succeed in evicting Plaintiff, then the Plaintiff's freedom of speech and press will be violated even further in a tangible and concrete way, since it is essential for Plaintiff to maintain his current office located in Battery Park City. This is an

imminent threat, not a hypothetical one.

118.    Defendants also singled out Plaintiff and banned him, and only him, from the public BPCA meeting on July 29th, 2015. This violated New York's Open Meeting Laws and Plaintiff's First Amendment Rights.

119.    Plaintiff recorded this entire incident on video, which can be seen on this YouTube video:

**https://youtu.be/K3bHq3p1flc**

120.    By preventing Plaintiff from reporting at the July 29th BPCA meeting, they caused a concrete injury by preventing plaintiff from writing about and filming that meeting, with proper question and answering required by a journalist, that could have only been possible by being at the meeting in person.

121.    Plaintiff had a legally protected interest or right to attend this BPCA meeting, as guaranteed by §103 of the New York Open Meeting law, which states,

> **"Any meeting of a public body that is open to the public shall be open to being photographed, broadcast, webcast, or otherwise recorded and/or transmitted by audio or video means."**

122.    Plaintiff had a video camera on him, in plain view, when he tried to enter the July 29th meeting, and has always recorded the BPCA meetings in the past. The BPCA knew that they would be preventing Plaintiff from recording the meeting by singling him out as the only person not allowed into the meeting.

123.    In the case of Glick v. Harvey, 2014 WL 96413 (N.Y.Sup.), City Council Speaker Quinn was forced to remove a large group of 100 protestors from City Hall, which the court ruled was reasonable since the event was also live broadcast on video. The protestors were not journalist trying to record the event as Plaintiff was in this instant matter. By the BPCA sending Plaintiff to an isolated room a half mile away with a crude video webcast projector set up, they stifled his freedom of the press.

124.    Also, the BPCA Chairman and CEO Dennis Mehiel has indeed allowed questions from plaintiff and other reporters many times over the years during the open BPCA meetings. Since he has never held a single formal "press conference", the meetings have been the *de facto* way for the press to ask questions. By denying Plaintiff, and only the Plaintiff,

access to the July 29th meeting, they suppressed his ability to ask questions as a free member of the press.

125.   Of note, the current in-house legal counsel for the BPCA, Alix Pustilnik, was the senior counsel to City Council Speaker Quinn when the <u>Glick v. Harvey</u>, 2014 WL 96413 (N.Y.Sup.) incident occurred in 2014. She was clearly dipping into her bag of dirty tricks when she dreamed up the scheme to ban Plaintiff from the July 29th BPCA meeting.

126.   The aforementioned conduct of the Defendants directly caused the concrete injuries suffered by the Plaintiff. The BPCA directly instructed security of the building where the BPCA conducts its meetings to not allow Plaintiff into the meeting on July 29th, 2015. Also, the BPCA staff directly initiated to plan to not renew Plaintiff's lease in his apartment, leading to the lengthy eviction proceedings still underway in housing court.

127.   The BPCA defendants also violated Plaintiff's First Amendment Rights by having their PEP officers harass and intimidate him when he has tried to film stories in or near the PEP office on West Thames Street, on October 12th, 2015, and on June 6th, 2013, as described previously.

128.   With the history of violence toward Battery Park residents by the PEP, this behavior has had a severe chilling effect on Plaintiff relating to his freedom of the press, causing him to stop reporting on the PEP using video footage. This is a tangible injury of a legally protected right, and directly caused by the BPCA defendants who manage the PEP and have been made well aware of complaints about the PEP.

129.   By the acts and practices described above, Defendants Serpico and Mehiel, acting in their individual capacity and under the color of the law, violated the First Amendment of the United States Constitution when they colluded to chill and deprive Plaintiff of his rights to freedom of speech and freedom of the press by removing him from the neighborhood and apartment building via eviction.

130.   Because Plaintiff is a community activist and organizes a tenants association, Defendant's retaliatory eviction violates state law N.Y. RPP. LAW § 223-b.

131.   42 U.S.C. § 1983, commonly referred to as "section 1983" provides the plaintiff

with the legal tool to sue the defendants over the violation of his First Amendment rights.

132.    "Section 1983" allows for compensatory and punitive damages. As a result of the defendants illegal behavior, the plaintiff has suffered years of irreparable mental anguish not knowing the fate of his home or whether he will be homeless, has been forced to expend the hundreds of hours of work required in preparing pro se court documents and attend court, has been humiliated in his community.

133.    As employees and members of the state-run Battery Park City Authority (BPCA), defendants Serpico and Mehiel were acting under the "color of the law" in "individual capacity" when they deprived the plaintiff of his constitutional rights under the First Amendment, and also when they violated the Fair Housing Act.

SECOND CAUSE OF ACTION
(Violation of the Fair Housing Act 42 U.S.C. § 3601et seq.)
(Against All Defendants)

134.    Plaintiff restates and incorporates by reference each of the foregoing paragraphs.

135.    By the acts and practices described above, Defendants acting in their individual capacity and under the color of the law, coerced, intimidated, threatened, and interfered with Plaintiff's exercise and enjoyment of a quality of life that would have been enjoyed in a more racially diverse building and community, thereby violating terms of the Fair Housing Act of 1968 (Title VIII of the Civil Rights Act of 1968), 42 U.S.C. Section 3604, and/or (The Civil Rights Act of 1866) 42 U.S.C. Section 1982

136.    By withholding vital rent-stabilization protections that should have been afforded to the plaintiff in the building, the defendants effectively segregated the building, making it virtually all-white. That is a crime against the prospective tenants in the protected classes of The Fair Housing Act, and also deprived the plaintiff of a certain quality of life that would have been enjoyed in a more racially diverse building and community.

137.    The Supreme Court of the United States ruled on June of 2015, in Texas
Department of Housing & Community Affairs v. The Inclusive Communities Project, Inc., that
it is a violation of the Fair Housing Act for a "business practice" to cause a **disparate-impact** to
minorities. In that case, the State of Texas was selectively awarding Low Income Housing Tax
Credits to regions of Dallas that were already predominantly minority, thereby de facto
propagating a housing segregation policy.

138.    In the instant case, the Plaintiff argues that the defendants have likewise created
a **disparate-impact** of a segregated housing community in Battery Park City, New York, by
withholding crucial rent-stabilization protection from apartments that should have been made
available due to the 421-a law that the defendants opted into. By doing so, the defendants have
kept the large apartment building they own with thousands of residents in it to an almost all-
white demographic, since people of-color are disproportionately of low income. Fewer than 2%
of the tenants of the building (and other buildings on the street owned by defendants) are
African American or Hispanic. This is a **disparate-impact.**

139.    All fendants colluded and participated in this illegal violation of the Fair Housing
Act. The real estate Defendants, Mariners, Milford, Milstein, and Rossi committed the illegal
acts of concealing of the rent-stabilization protection that should have been afforded to renters
and of defrauding the New York State Attorney General, while the BPCA employee
Defendants, Serpico and Mehiel, looked the other way knowing without a shadow of doubt that
the apartment building in question had rental units from the day it was built more than 30-years
ago and was part of the 421-a rent-stabilization program since the lease was signed between
their BPCA and the real estate Defendants in 1984.


THIRD CAUSE OF ACTION

AMENDED COMPLAINT

(Retaliation Under Fair Housing Act 42 U.S.C. § 3617 et seq.)
(Against All Defendants)

140.    Plaintiff restates and incorporates by reference each of the foregoing paragraphs.

141.    By the acts and practices described above, Defendants violated § 3617 of The Fair Housing Act when they retaliated against the plaintiff by pursuing eviction proceedings in court.

142.    The Plaintiff had been assisting others in the community with their Fair Housing Act rights, through his BatteryPark.TV reporting and tenants' association, which is protected activity under the Fair Housing Act.

143.    All Defendants were aware of the protected activity of Plaintiff since they are regular viewers and readers of BatteryPark.TV.

144.    All Defendants subsequently subjected Plaintiff to an adverse action, which as the retaliatory eviction proceeding.

145.    There was a causal connection between this adverse action and Plaintiff's protected activity. No other renting tenant of the Defendants has ever been evicted while also being paid up in rent and having no other complaints made about him.

146.    Since this complaint was filed in August of 2015, Lawyer Riegel, claiming to be authorized to represent the real estate defendants, has engaged in several retaliatory tactics to harass Plaintiff and withhold services from him, as previously discussed (i.e. She forced staff to sign an agreement to not talk to Plaintiff, has prevented the building from replacing a broken dishwasher, and instigated a bogus complaint to a union by the staff against Plaintiff).

147.    As a result of the defendants illegal behavior, the plaintiff has suffered years of irreparable mental anguish not knowing the fate of his home or whether he will be homeless, has been forced to expend the hundreds of hours of work required in preparing pro se court documents and attend court, has been humiliated in his community, and has been overcharged for rent since the year 2004 totally an amount of at least $40,000, factoring in "fair use" payments made at $3,395 per month after the last lease expired in 2014.

## FOURTH CAUSE OF ACTION
(Defamation)
(Against Defendants Martin, Rossi, Milford, and Mariners)

148.    Plaintiff restates and incorporates by reference each of the foregoing paragraphs.

149.    The Defendants defamed The Plaintiff. On May 30th, 2014, Martin, who runs the real estate interests of her co-defendant and boss Milstein, wrote in an email **(Exhibit M)** to her staff that was accidentally cc'd to the Plaintiff:

> **"Rossi and I are on top of this issue. He is a truly deranged person who has no concept of reality. Will keep you posted. Security will post pictures in this bldg for safety reasons."**

150.    This comment broadcast to others was *per se* defamatory. It exposed Plaintiff to public hatred, contempt, ridicule and disgrace.

151.    There is no question that the email comment was referring to the Plaintiff.

152.    The email from Martin was sent to others. Therefore, it was broadcast to the public.

153.    The email from Martin contained statements meant to be fact, not opinion, which were untrue. The Plaintiff is not a "truly deranged person who has no concept of reality." and there is no need to post photos of him alerting security.

154.    Martin sent the email and published it a grossly irresponsible manner without consideration for the standards of information gathering and dissemination followed by responsible parties. She made no attempt to research the facts, and had never met the Plaintiff in her life. At the time of this complaint filing, the Plaintiff and Martin still have never met in person nor spoken on the phone.

155.    The false allegation in the Martin email caused actual harm to the Plaintiff. He has suffered damages, such as personal humiliation, mental anguish and suffering, and damage to Plaintiff's reputation or standing in the community. As a result of this defamation by Defendants Martin, Rossi, and Milstein, many of the plaintiff's neighbors have shunned him.

156.    The Milsteins also own Emigrant Bank and Martin's email was sent to other bank employees. The "building" she was referring to seems to be one of the bank offices. Therefore, she was setting up Plaintiff to possibly be arrested had he unknowingly walked into one of their

banks.

157.    The Plaintiff is a medical doctor and licensed financial expert who works in two highly-regulated professions. Any assertion that he is mentally ill, as Martin made in her blast email, is "*per se*" defamation.

158.    In addition, Rossi has been telling other tenants of the Plaintiff's building that he is a deranged man whom they are "trying to evict", and that he is a freeloader "not paying rent".

159.    On April 29th, 2015, the Plaintiff interacted with the building superintendent, Gus Ouranitsas, over major repairs need to his apartment. Mr. Ouranitsas accused the Plaintiff of not paying rent, which was why he was received a used dishwasher to replace the old one, and not getting new kitchen cabinets after the pipes in the sink burst. The assistant handyman Paul Maddox witnessed the comment. The Plaintiff documented the conversation in an email (**Exhibit N**):

> **"You just left my apartment at 4:10 PM today...(I said to you) "I pay $3,500 for this apartment. I demand proper repairs. Not this half ass work", and you derisively replied, "You are not paying rent".**
>
> **That explains it all. You and your supervisors are clearly harassing me and withholding services from me because you think I am not paying rent."**

160.    The fact that Mr. Ouranitsas uttered these words means that Defendants Rossi, Martin, or Milstein had told him lies about Plaintiff, defaming him.

161.    Additional witnesses and evidence will be produced during trial to detail the full extend of the defamation created by the Defendants' smear campaign.

162.    The actual, assumed, and punitive damages to the plaintiff allowed in cases of defamation will be determined during trial by this court.

## PERMANENT INJUNCTION
### (on the state Landlord and Tenant Court case)

163.    The plaintiff is requesting of this court to enjoin the ongoing case in Landlord and Tenant court, "*Mariners Cove Site B Associates v Dr. Steven Greer*", **Case No. 63974/2014**, since it involves many of the constitutional matters of this instant federal case as a "common

nucleus of fact".

164.    In the state Landlord and Tenant court case, a trial set for August 10th will determine whether a retaliatory eviction is being attempted by the defendants in this case (the petitioners in that case), which would be a violation of the RPP § 223-b. Courts have ruled that it is a First Amendment federal matter for state employees to violate § 223-b.

165.    Richard H. Fallon, Jr., et al., Hart and Wechsler's The Federal Courts and the Federal System, 903 (5th ed. 2003); 13D Charles Alan Wright, et al., Federal Practice & Procedure § 3566 (3d ed. 2009) (concluding that "the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution or laws")." In this instant case, "state officers" are Defendants Mehiel, Serpico, and BPCA who are working to evict Plaintiff in state court to violate his First Amendment rights.

166.    A 1998 review of Section 1983 by the Federal Judicial Center (FDC) states, "With jurisdiction over federal claims, many federal courts in 42 U.S.C. § 1983 suits also have jurisdiction to adjudicate state law claims that arise out of "a common nucleus of operative fact." Formerly known as ancillary and pendent jurisdiction, supplemental jurisdiction under 28 U.S.C.§ 1367 permits both pendent claim and pendent party jurisdiction. 28 U.S.C. § 1367 changed "the preexisting law in that it makes supplemental jurisdiction mandatory, not discretionary.".

167.    The arguments made in this instant federal case relate to whether the building is truly a "condominium" or whether the defendants obtained that status by misleading the New York Attorney General. Also, a key issue argued in the state court case is whether the building should have been rent-stabilized due to 421-a law, thereby making it illegal to evict Plaintiff. Those are all part of a "common nucleus of operative fact" that is also being argued in the lower state Landlord and Tenant court (**Exhibits C - G**).

168.    In the ongoing case in state Landlord and Tenant court, "*Mariners Cove Site B Associates v Dr. Steven Greer*", **Case No. 63974/2014**, the petitioners in that case, who are the Defendants in this federal case, have an Order to Show Cause pending a decision on August

10th that seeks the eviction of Plaintiff and possession of his apartment.

169.    The revised anti-injunction statute, section 2283 of Title 28 of the United States Code, includes three specific exceptions. Federal courts are given the power to enjoin state court proceedings to: 1) protect and effectuate federal judgments; 2) aid in jurisdiction; and 3) comply with Acts of Congress which expressly authorize injunctions.

170.    The retaliatory eviction proceedings in this case, which the Plaintiff seeks an injunction to stop, is a First Amendment issue. Cases involving the violation of civil rights granted by the First Amendment have been ruled by the courts to be one of the "federal judgments" of Title 28 that rise to the level of a federal injunction to prevent or stop the violation of rights.

171.    Moreover, cases brought in federal court under Section 1983 of the Civil Rights Act express authorization to grant injunction. This instant case involves Section 1983.

## DEMAND FOR JURY TRIAL

172.    Plaintiff respectfully demands a trial by jury in this action.

## INJURIES

1.    Plaintiff suffered the loss of freedom of speech and press as guaranteed by the First Amendment of the United States Constitution. The loss of a constitutionally guaranteed right is a *per se* tangible and concrete injury, satisfying the requirements of Article III of the constitution, per Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992), and *v. Obama*, 724 F.3d 170, 188 (2d Cir. 2013). This injury was directly caused by the BPCA, Mehiel, and Serpico.

2.    Plaintiff will also further suffer additional economic damages as a result of having to relocate his residence unless this court issues an injunction against the eviction proceedings pending in state Landlord and Tenant court. This is an imminent real threat, satisfying the requirements of Article III of the constitution, per Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992), and *v. Obama*, 724 F.3d 170, 188 (2d Cir. 2013).

3.     While Plaintiff is not yet evicted, it is an injury worthy of standing, nevertheless. Judge Engelmayer of this Southern District of New York wrote, "In First Amendment cases, such challenges are assessed "under somewhat relaxed standing and ripeness rules." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013). A plaintiff must still allege "something more than an abstract, subjective fear that his rights are chilled," but "a real and imminent fear of such chilling is enough." With a motion pending in city Landlord and Tenant court to evict the Plaintiff, this is the most imminent of threats.

4.     Plaintiff also suffered concrete economic damages in the form of overpayment of rent towards a building that was improperly issued "condominium status" but should have been rent-stabilized, in an amount exceeding $40,000. This injury was directly caused by the real estate defendants of Mariners, Milford, Milstein, Rossi, and Martin.

5.     Plaintiff has suffered a loss of enjoyment of racial diversity in his apartment building due to the lack of rent-stabilization and affordable housing that should have been provided but have been withheld, thereby violating the Fair Housing Act

6.     Plaintiff suffered undue embarrassment, humiliation, mental distress, anxiety, and depression as a result of Defendants' misconduct.

7.     Plaintiff suffered irreparable harm to personal and professional reputation as a result of defamation.

8.     All of these injuries will "likely," be "redressed by a favorable decision", satisfying the requirements of Article III of the constitution, per Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992), and Hedges v. Obama, 724 F.3d 170, 188 (2d Cir. 2013).

AMENDED COMPLAINT

## RELIEF

**WHEREFORE**, Plaintiff Steven Greer requests relief from this court as follows:

### For the First Cause of Action

1.      Compensatory damages for the first cause of action (Violation of Plaintiff's First Amendment rights) in the amount to be proven at trial.

2.      Punitive damages against for the first cause of action (Violation of Plaintiff's First Amendment rights) in the amount to be proven at trial.

### For the Second Cause of Action

3.      For this court to overturn the New York Attorney General's real estate finance bureau decision to grant "condominium" status to the building at 200 Rector Place.

4.      For this court to rule that the building the building at 200 Rector Place is, and always should have been, under rent-stabilization regulations dictated under 421-a law.

5.      Compensatory damages for the amount of rent that Plaintiff has been overcharged, which are in excess of $40,000.

6.      Compensatory damages for the second cause of action (Discrimination under the Fair Housing Act) in the amount to be proven at trial.

7.      Punitive damages against for the second cause of action (Discrimination under the Fair Housing Act) in the amount to be proven at trial.

### For the Third Cause of Action

8.      Compensatory damages for the third cause of action (Retaliation under the Fair Housing Act) in the amount to be proven at trial.

9.      Punitive damages for the third cause of action (Retaliation under the Fair Housing Act) in the amount to be proven at trial.

10.      For treble damages as to Plaintiff's third cause of action in the amount to be permitted at trial; and

AMENDED COMPLAINT

## For the Fourth Cause of Action

11.     Compensatory damages for the fourth cause of action (Defamation) in the amount to be proven at trial.

12.     Punitive damages for the fourth cause of action (Defamation) in the amount to be proven at trial.


## Other relief

13.     For an award of all costs and expenses incurred by Plaintiff permitted by law or rule of Court, including prejudgment and post-judgment interest;

14.     For attorney's fees in the amount to be proven at trial;

15.     For such other and further relief, including equitable relief, as the Court may deem just and proper.

16.     That this Court stay and enjoin the state Landlord and Tenants court proceedings in **Case No. 63974/2014** pending adjudication of Plaintiff's Federal Case commenced by the filing of this Complaint because of the "common nucleus of fact" with this federal complaint, per 42 U.S.C. § 1983.

17.     An order granting Plaintiff injunctive relief that Defendants, and their officers, agents, servants, representatives, employees, attorneys, and all other persons acting in concert with them be preliminarily and permanently enjoined from engaging in any activity that would constitute an attempt of an actual eviction of Plaintiff from the apartment building at 200 Rector Place, New York, New York, zip code 10280.

Signed this 23rd day of October, 2015          Signature of Plaintiff _____
                                                Mailing Address:

                                                Steven Greer
                                                200 Rector Place, 35F
                                                New York, NY 10280
                                                (212) 945-7252
                                                steve@batterypark.tv

AMENDED COMPLAINT