# Exhibit C

H3LMGREC

1

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  STEVEN E. GREER, M.D.,

 4                 Plaintiff,

 5          v.                        15 Civ. 6119 (AJN)(JLC)

 6  DENNIS MEHIEL; ROBERT SERPICO;
    THE BATTERY PARK CITY
 7  AUTHORITY; HOWARD MILSTEIN;
    STEVEN ROSSI; JANET MARTIN;
 8  MILFORD MANAGEMENT, a New York
    Corporation; and MARINERS COVE
 9  SITE B ASSOCIATES,

10                 Defendants.

11  ------------------------------x
                                        New York, N.Y.
12                                      March 21, 2017
                                        4:35 p.m.
13
    Before:
14
                        HON. JAMES L. COTT,
15
                                        Magistrate Judge
16
                         APPEARANCES
17
    STEVEN E. GREER, Plaintiff Pro Se
18
    SHER TREMONTE LLP
19       Attorneys for Defendants Robert Serpico and
         The Battery Park City Authority
20  BY:  MICHAEL TREMONTE
         JUSTIN J. GUNNELL
21
    ROSENBERG & ESTIS
22       Attorneys for Defendants Howard Milstein, Steven Rossi,
         Janet Martin, Milford Management, and
23       Mariners Cove Site B Associates
    BY:  DEBORAH E. RIEGEL
24       ISAAC TILTON

25
```

 1          (Case called)

 2          MR. GREER:  Steven Greer, plaintiff.

 3          MR. TREMONTE:  Michael Tremonte.  I'm here with my

 4  colleague, Justin Gunnell.  We represent the BPCA, Battery Park

 5  City Authority, and also Mr. Serpico.  I note that Alix

 6  Pustilnik, who is the general counsel of the Battery Park City

 7  Authority, is here in the courtroom today.

 8          MS. RIEGEL:  Debra Riegel for the landlord defendants,

 9  Howard Milstein, Steven Rossi, Janet Martin, Milford Management

10  and Mariners Cove Site B Associates with my colleague, Isaac

11  Tilton.

12          THE COURT:  Good afternoon, everyone.  Let's try and

13  be as efficient as we can so we are not here such that we will

14  have to order dinner, which I'm afraid if we go slowly we may

15  have to.

16          We will start with the letter from the Battery Park

17  City defendants, the March 10 letter that's docket No. 272.  I

18  know there is some overlap with the landlord defendants, so we

19  will try and deal with issues of commonality and then we can

20  double back to anything we have not addressed in that.

21          Once we have gone through all of the back table's

22  document requests, then we will turn, Mr. Greer, to you, to

23  follow up on any open questions related to your further

24  document requests.

25          Who is going to take us through this from the Battery

 1    Park side of things?  Are you, Mr. Gunnell, or Mr. Tremonte?

 2           MR. TREMONTE:  I think Mr. Gunnel will take the lead

 3    on the details.  I think as an overarching matter, consistent

 4    with the Court's instructions to Mr. Greer that he needs to

 5    produce to us all documents that he intends to rely on to

 6    support his case, I think that's the touchstone for really

 7    pretty much every demand we are making in the motion.  I think

 8    there is any number of instances which we have highlighted in

 9    our letter where either Mr. Greer has made a blanket objection

10    and produced nothing or has said things to indicate to our ear

11    that we don't have everything he intends to produce, so, again,

12    that's the touchstone.

13           THE COURT:  I think we have said that since the first

14    conference we had in this case and I know we have said it

15    during several telephone conferences and that's true for both

16    sides, which is that any document that either side is going to

17    use in the litigation going forward in either motion practice

18    or trial must be produced.  If it's not, then it's going to be

19    precluded either by me or, to the extent an application is

20    made, presumably by Judge Nathan when it gets to her for a

21    motion practice and for trial.  That's not just a touchstone.

22    That's really the baseline and I think I've said that and it

23    applies equally.  With that in mind, let's start with the first

24    category of documents.

25           I'm looking at the March 10 letter.  So this is

 1   request No. 1, yes.

 2            MR. GUNNELL:  That's correct, your Honor.  In our

 3   first request we ask for documents concerning any of the

 4   individuals that the plaintiff listed in his own initial

 5   disclosures, and on the meet and confer we had on this, we

 6   limited that to the extent that Mr. Greer has documents that he

 7   plans on introducing to support his case at trial that relate

 8   to any of these witnesses that I identified, and he identified

 9   quite a few, that he would turn those documents over to us and

10   his response was that it was an overly broad request.

11            THE COURT:  It is a broad request.  When you say you

12   want documents related to the individuals listed in his Rule 26

13   disclosures that relate to the remaining claims, that's still

14   pretty broad, is it not?

15            MR. GUNNELL:  We agree with you.  That's why on the

16   meet and confer we further limited to what he intends to use to

17   prove his claims at trial, and these are presumably witnesses

18   he has identified for a purpose.  And if he has some idea of

19   how they fit in and why he wants to use them, we believe we are

20   entitled to that support and those documents.

21            THE COURT:  With that limitation, Mr. Greer, why have

22   you not produced anything in that category?

23            MR. GREER:  Good question.  Because I have.  I don't

24   know why they are bringing this up.  I've given them thumb

25   drives, e-mails.  Everything I have has been turned over and

1    this is moot.  It's such a vague question, I don't even know

2    what they are asking for, but I have given them everything I

3    have.

4              THE COURT:  I don't have your Rule 26 disclosures in

5    front of me.  Pick a name, gentlemen at the back table.

6              MR. GUNNELL:  I'm happy to hand up a copy if your

7    Honor would like to see it.  For instance, Nancy Harvey.

8              THE COURT:  Nancy Harvey.  On the thumb drive any

9    document you have in your possession related to Nancy Harvey

10   that you plan to use at trial you have produced.  Is that your

11   statement?

12             MR. GREER:  Correct.  Most of that evidence will come

13   from depositions.

14             THE COURT:  Most of what evidence?

15             MR. GREER:  If they turn out to be witnesses that I

16   can use at trial, it will come from deposition.  Right now I

17   don't have any e-mails from them, nothing.

18             THE COURT:  What I'm being told by Dr. Greer is that

19   this thumb drive and any other production he has made includes

20   anything that would fall within that category.

21             Let's move to the next one.  I think you can assume

22   then that there are not going to be any documents that you

23   already have not received from him that would fall into that

24   category.  If they are, they will be precluded.

25             MR. TREMONTE:  I don't want to get ahead of ourselves,

 1    but that may take care of the questions we have as to most of

 2    these and maybe we just need a minute to confer.  If the

 3    plaintiff is making a representation that he has produced

 4    everything that he has that is responsive to our document

 5    requests, there might not be much to talk about.

 6            May we have a moment to confer, your Honor?

 7            THE COURT:  Sure.

 8            MR. TREMONTE:  Your Honor, if it's the plaintiff's

 9    position that he does not have documents responsive to any of

10    the requests that are discussed in our letter and he's not

11    withholding documents that he would intend to rely on to prove

12    his case because on the basis of some objection he's unhappy

13    with our requests, if the Court is willing to issue an order

14    that he's precluded from using any documents that he hasn't

15    produced or doesn't produce by a date certain that's very soon,

16    I don't think we need to go through this request by request.

17            THE COURT:  Well, I think I've made that statement

18    several times, including about five minutes ago.  If you want

19    me to put a written order on the docket to that effect, I can

20    do that.  I don't know how necessary it is.  Let me put a

21    little bit more of a fine point on what you said.

22            From what I understand from Dr. Greer, to the extent

23    he has any documents that he's planning to use in this case

24    going forward, he has produced them and he doesn't have any

25    other documents that he's planning to use that he hasn't

 1   produced.  Is that a fair statement?

 2          MR. GREER:  That is a fair statement with one

 3   exception.  I keep getting stuff from Linda Soriero, last night

 4   at midnight.  There are a few e-mails and documents from one

 5   person, Linda Soriero, that on a real time basis I am going to

 6   have to keep producing.  I just got some more today.

 7          THE COURT:  That's consistent with what the federal

 8   rules require, which is that you have to supplement any prior

 9   production you've made that's responsive.  And if you do

10   receive documents of that kind or any others that are

11   responsive to any of the requests you have received, then you

12   have a duty to supplement what you have already produced and it

13   sounds like you understand that and you are going to do that.

14          MR. TREMONTE:  Your Honor, there are several numbered

15   requests that go to damages.  On ours, Section E of our letter

16   of March 10 and beginning at numbered request 29 and going

17   through, I think, 51.

18          It doesn't make sense to us that Mr. Greer doesn't

19   have more information about some of these things.  For example,

20   pay stubs, tax returns, profit-and-loss statements, financial

21   documents relating to the various Internet businesses,

22   documents that would provide any evidence in support of his

23   claimed damages for reputational harm.

24          THE COURT:  We are talking about a bunch of different

25   categories now and you're lumping them all together.

 1            MR. TREMONTE:  As damages.

 2            THE COURT:  It's one thing to talk about damages that

 3    relate to his website and its value, so to speak, and it's

 4    another thing to talk about emotional distress damages and how

 5    to value that.  Those are two different categories, for

 6    example.  So I don't think we should lump all those together.

 7    I think we need to address them.  And if we are pulling them

 8    out of the prior discussion and addressing them separately,

 9    that's fine.  Is that what we are doing?

10            MR. TREMONTE:  I think that makes sense, your Honor.

11            THE COURT:  Let's talk first about E1, which is your

12    BatteryPark.TV and the Healthcare Channel.com request.  What is

13    your argument and let me hear from Dr. Greer about that.

14            MR. TREMONTE:  Dr. Greer produced nothing in response

15    to those requests.  He made boilerplate objections that they

16    were overbroad and unduly burdensome and, from our perspective,

17    it simply can't be that there are no documents of any kind that

18    are relevant to these damages claims.

19            THE COURT:  Dr. Greer, how is it that the defendants

20    are going to be able to test the allegations you've made that

21    if you are successful on liability you can establish your

22    damages to a certain value?  They have a right through the

23    discovery process to be able to test that.

24            MR. GREER:  I anticipated this and what they said is

25    so misleading.  In my initial disclosures, I revised them after

 1    the real estate defendants came on board, so -- in my second

 2    set of initial disclosures I absolutely provide all of the

 3    rationale for damages.

 4          THE COURT:  It's not just a question of rationale,

 5    though.  It's a question of what documents, if any, do you have

 6    in your possession that back up your rationale, so to speak?

 7          MR. GREER:  In that rationale it clearly explains that

 8    IRS, tax, revenue, none of that is relevant whatsoever in the

 9    valuation of my company.  That's not how you value an

10    early-stage startup.  I've done this in Wall Street.

11          THE COURT:  That's your opinion about that.  I don't

12    think your opinion gets us to carry the day and you get to

13    preempt what someone else wants to choose to do as far as how

14    to valuate a company is concerned.  Then you can have an

15    argument about that down the road.  That's not a basis to

16    withhold documents to the extent they exist.

17          MR. GREER:  Except I specifically worded the damages

18    so as to not relate to revenue or income whatsoever.  I am not

19    claiming any reduction in revenue or income.

20          THE COURT:  Let's talk about that because I need to

21    understand what your damages claims are going to be going

22    forward because that determines what the scope of discovery

23    related to that should be.  For example, I've had many cases

24    where a plaintiff, in a variety of contexts, let's take

25    employment discrimination for one, decides that they do not

1   want to have to open their medical records to the employer and,

2   therefore, waives any right to seek emotional distress damages

3   in the case, for example, and, therefore, that no longer

4   necessitates any discovery related to it.

5        With respect to the claim for damages to your website,

6   what, if any, are you claiming?  If you get to a trial in this

7   case and there is a verdict form that is going to be submitted

8   to the jury, will they be asked, from your perspective, to

9   award you as damages, and if it's a category in which you think

10  your business, if I can call it that, was harmed to a certain

11  amount of money, then the defendants have the right during the

12  discovery process to probe that claim on your part so that they

13  have a way to defend themselves.

14       MR. GREER:  It's detailed in the initial disclosures.

15  The valuation is based on the output of my content, the

16  stories, and I've shown them the decrease in output since I've

17  been tied up in litigation, been forced out of New York.  So

18  BatteryPark.TV stories have plummeted, my number of interviews

19  with doctors and so forth for the Healthcare Channel over the

20  last two years has gone down.

21       My evidence is output of content, distraction from

22  time off the job.

23       But the valuation of an early stage company, and I

24  give several comparables of other media companies like it, most

25  of them are losing tens of millions of dollars.  Revenue and

1    income has nothing to do with how AOL might value it if AOL

2    wanted to buy it.

3           THE COURT:  Let me ask you this.  What, if any,

4    financial statements exist with respect to BatteryPark.TV?  Are

5    there financial statements, broadly speaking, associated with

6    BatteryPark.TV?

7           MR. GREER:  My taxes are LLCs combined with personal.

8    When my accountant files it, it's all lumped together.

9           THE COURT:  I'm not asking about tax returns.  Tax

10   returns are a different category.  BatteryPark.TV does not have

11   annual financial statements of any kind.

12          MR. GREER:  I'm an employee of one.

13          THE COURT:  Do you have bank statements for

14   BatteryPark.TV?

15          MR. GREER:  Those are intermingled with my personal.

16   To turn over bank statements for years would be revealing

17   everything I do.  Those are my personal bank statements.  I

18   pay -- some expenses for the company are intertwined with -- my

19   apartment rent is also the office.  Yes, I have bank

20   statements, yes.

21          THE COURT:  Other than bank statements and tax returns

22   that, to use your word, intermingle your own personal matters

23   with these company matters, are there any what I'll

24   characterize as standalone documents unrelated to you

25   personally that exist that should be produced as it relates to

1    BatteryPark.TV or as it relates to the Healthcare Channel.com,

2    either category?

3         MR. GREER:  The only thing would be my company bank

4    statements.

5         THE COURT:  I thought you said your bank statements

6    are intermingled with your own personal bank statements.

7         MR. GREER:  Not inappropriately intermingled so to

8    make the LLC invalid.  The same expenses overlap.  The

9    apartment I live in is also the rent.  That's just one example.

10   To show -- I would have to redact a lot of them, which I don't

11   have the time to or ability to do so.

12        THE COURT:  Dr. Greer, you're alleging that you've

13   incurred damages between $7 million and $100 million due to

14   lost value of these companies, right?

15        MR. GREER:  Yes.

16        THE COURT:  What is the basis for that allegation?

17        MR. GREER:  It's in the initial disclosures.  It's

18   based on comparable sales, it's based on IPOs and sale values

19   of other media companies that resembled mine and which went for

20   hundreds of millions, so I'm being conservative.

21        THE COURT:  Did you ever have any correspondence with

22   anyone about valuing your company?

23        MR. GREER:  Yes.  Over the years, since I started the

24   Healthcare Channel 10 years ago, I have met with every major

25   media company you can imagine, so I've had numerous discussions

H3LMGREC                                                            13

1     with ABC, Bloomberg, Reuters.  I used to be partnered with

2     Reuters.  I've been partnered with Bloomberg.  All of this is

3     over 10 years.  Recently, especially in the last three or four

4     years, when this lawsuit -- this takes up all my time.  I have

5     not pursued any partnering or that type of communication in the

6     last three or four years.

7          THE COURT:  Gentlemen, I've just deposed Dr. Greer on

8     the subject for the last 10 minutes to suggest to you that

9     maybe the best way to get at this subject is through his

10    deposition in the first instance.  And then during the course

11    of that deposition if he identifies any particular documents,

12    then you can make a request of them.  I'm not hearing in his

13    recitation anything that stands out to me that would be

14    appropriate.

15         I'm not inclined to direct him to produce his tax

16    returns to you at this time because I think obtaining someone's

17    tax returns is something that is usually done as a matter of

18    last resort, and only a matter of last resort for all the

19    obvious reasons, and there is a lot of case law to that effect

20    and you have not deposed Dr. Greer yet and I think when you do

21    you can explore a lot of these avenues.

22         And it may not necessitate seeking further information

23    in that regard, especially given what he said and given that I

24    think what he is effectively hanging his hat on, so to speak,

25    is what he's already articulated in his disclosure statement to

1    you, and that's his, quote, rationale, to use his word, as to

2    why his damages are what they are and it's not like he's got

3    some file in which some banker has valued BatteryPark.TV at a

4    certain value and now it has less value or something.  I don't

5    think documents of that kind exist, correct?

6              MR. GREER:  Correct.

7              THE COURT:  You would like to have that if it exists.

8    I don't think they do.  I don't know what does exist that might

9    be relevant that wouldn't be so intrusive that you should

10   otherwise receive it.

11             MR. TREMONTE:  Understood, your Honor.  I think our

12   request 44 and 49, 45 and 50 and 47, 51 which are discussed in

13   E1, which seek documents concerning the subscriber bases,

14   unique visitor traffic, and revenue from the websites, that

15   should be pretty straightforward.  We have had conversations

16   with Dr. Greer and he has given us I think at least one

17   document which suggests that he can access that kind of

18   information.

19             MR. GREER:  Those have been answered.

20             MR. TREMONTE:  Surely.

21             THE COURT:  I thought that wasn't in controversy.

22             MR. GREER:  I've already answered it.

23             THE COURT:  Have you produced that information in some

24   form?

25             MR. GREER:  Yes.  In complete form and I am forced to

1   conclude that they are not reading what I sent them.

2          THE COURT:  You're sending a thumb drive that has a

3   lot of things on it, so it's probably not the easiest thing to

4   go through.

5          MR. GREER:  The BatteryPark.TV, I do not collect

6   revenue, it's a money loser, but that doesn't mean it doesn't

7   have value because the hassle of getting $300 advertising is

8   not worth it, and it biases the coverage and so forth.  Battery

9   Park.TV has no revenue, but its valuation is based on monthly

10  viewers, and I gave them a chart of the data source.  There is

11  a thing called StatCounter that measures real hits to the

12  website.  And I opened up my book, so to speak, and I showed

13  them in a chart how the viewership went from 50,000 a month

14  down to nothing.  That's my best evidence for valuation hit of

15  the company.

16          The Healthcare Channel is a subscription thing where I

17  sell subscriptions to large mutual fund and so forth and the

18  viewership numbers don't matter there.  It's a subscription

19  thing.  And it would be trade secrets and all sorts of things

20  to turn over the list of my clients.  They are the biggest Wall

21  Street firms.  I'm not going to do that.  Unless I'm ordered

22  to, I am not going to do that and it's not necessary.

23          THE COURT:  He says he has produced what you've just

24  described.

25          MR. TREMONTE:  He produced one page.

 1              MR. GUNNELL:  What we described was broader than that.

 2   What he says he provided was not quite accurate.  What he did

 3   provide was a screenshot, a single screenshot that shows views,

 4   but it's impossible to determine with any degree of accuracy

 5   because it's a three-year period in one screenshot.  It's one

 6   screen shot.  And we would need to know monthly views.  We need

 7   to know unique subscribers.

 8              I think the argument Dr. Greer is making is that he

 9   has decided to value his companies through a comp method, but

10   that shouldn't preclude us from looking at the metrics behind

11   what someone else might want to value the website at to

12   impeach --

13              THE COURT:  What metrics have not been produced for

14   any one?

15              MR. GUNNELL:  The unique subscriber, the list of the

16   subscribers for each of his websites.

17              THE COURT:  Why is a list of subscribers probative of

18   anything?

19              MR. GUNNELL:  Because we would be able to determine

20   how many unique subscribers are generating the Pay-Per-Views.

21   In other words, it would be able to determine it's not 10

22   people constantly refreshing the page; it's 500 people that

23   each have a unique access to his website.

24              MR. GREER:  I could save time.  I can do it.  You

25   didn't ask for it.  I gave you what you asked for and now you

1   want more.  Fine.  I'll give you more details.

2          MR. TREMONTE:  Your Honor, if he has subscribers who

3   are paying him money, we are entitled to know how much, over

4   what period of time, and we are entitled to explore and

5   research whether or not the damages claim that he's making is

6   justified, given the revenue and subscribers that he has.

7          THE COURT:  He is going to produce to you this

8   additional information that you've just identified.  What else?

9          MR. GREER:  If I can clarify.  We agreed on a

10  conference call that I would give him a screenshot of the

11  StatCounter chart.  That's what I did.  And now they are trying

12  to make it seem as if I didn't do what we agreed upon.  If they

13  want more granular data on unique viewers, I can do it, not a

14  problem, but it wasn't asked for.

15         And now with the Healthcare Channel, I want to get

16  this clear.  You want to know the names of my clients that are

17  the most important biggest clients in all of Wall Street?

18         THE COURT:  Why are the names of the clients important

19  here?  It's not names.  It's volume.  Isn't that what's

20  important from a metrics standpoint?  Why is who it is relevant

21  to anything?

22         MR. TREMONTE:  I think there is a risk of conflating

23  here.  There are two different businesses with different

24  business models.  As Mr. Greer has just described it, I think

25  the healthcare company is individuals or individual businesses

1      that pay a fee.

2                  MR. GREER:  Correct.

3                  MR. TREMONTE:  That's one thing.

4                  MR. GREER:  And viewership does not matter.  But

5      viewership matters for the BatteryPark.TV, yes.

6                  MR. TREMONTE:  With respect to BatteryPark.TV, you've

7      got a certain number of page views per period, so like 100 page

8      views a day.  For that it's important to us to know the names

9      of the people who visit the site because only with that

10     information in combination with the numbers can you tell how

11     many of those are unique.  And as I understand the rationale

12     for plaintiff's damages claim on that entity, it has to do with

13     comparing this kind of web company that gets this much unique

14     traffic to other web companies that get a similar volume of

15     unique traffic and that's sort of at the heart of the valuation

16     model.

17                 MR. GREER:  When you say names --

18                 MR. TREMONTE:  If I can just finish.  We would like to

19     be in a position to have sufficient information with respect to

20     BatteryPark.TV.  There we would need the names of individuals

21     in addition to the data on a number of visits so we can decide

22     which ones are unique.

23                 MR. GREER:  They are asking for things that are

24     protected by federal law.  They want the names of the people

25     who signed up to BatteryPark.TV, gave me their names and

```
 1    e-mails.  That's protected by federal law.  That's privileged

 2    and it's trade secret and it's totally unnecessary.  If you

 3    want the statistics from StatCounter at granular level, I can

 4    do that.

 5            THE COURT:  I don't know about trade secrets here.  Is

 6    your point, Mr. Tremonte, if John Smith is a repeat person a

 7    hundred times and he has 102 subscribers and 100 of them are

 8    John Smith, if you will, that's what you want to know relative

 9    to there being 102 distinct people?

10            MR. TREMONTE:  Correct.  And if the jury returned --

11            THE COURT:  Why do you have to know who they are,

12    though?

13            MR. GREER:  You don't need to know that.  StatCounter

14    will tell you whether it's the same person with the same IP

15    address or not.  The generic statistics and numbers answer his

16    question.  You don't have to know the name of the person behind

17    the IP address.

18            THE COURT:  I'm disinclined to require the names.  I'm

19    inclined to require the statistical information that you are

20    asking for because that goes to the metrics, if you will,

21    behind it so you can have a different approach to that that he

22    does and then you can argue what's proper.

23            MS. RIEGEL:  Judge, except what Mr. Greer is

24    suggesting is, he give us IP addresses.

25            MR. GREER:  That's not what I'm suggesting.
```

```
 1            MS. RIEGEL:  Let me finish, please.

 2            MR. GREER:  You're wrong.

 3            MS. RIEGEL:  That's what I heard you say.

 4            MR. GREER:  That's not what I'm saying, so let's not

 5     waste the judge's time.

 6            How about this.  I'll give them the password so they

 7     can get into StatCounter, the thing I use, and they can look at

 8     one day, one week.  They can do whatever they want.  That's all

 9     I have.

10            She is wasting your time because she is misguided.

11     That's not what I said.

12            MS. RIEGEL:  My iPhone has a different IP address from

13     my iPad, which has a different IP address from my desktop in my

14     office and a different IP address for my laptop at home.

15     Giving us access to IP addresses does not give us unique users.

16            THE COURT:  He is not going to give you IP addresses.

17     He is going to give you access to --

18            MR. GREER:  It's called StatCounter.  It's one of many

19     and it has --

20            THE COURT:  You'll have access to StatCounter.

21            Timeout.  My conference.  I get to decide.  We have

22     dealt with this issue until we are blue in the face.  That's

23     what he is giving you.  If it's unsatisfactory, you take his

24     deposition and ask more questions about how he keeps track of

25     things and if after that you still think there is more
```

1    documentation that you need beyond what you have, you'll tell

2    me after you further discussed it with him.  That's what we are

3    doing on this subject.

4              MR. TREMONTE:  Battery Park Healthcare.  There, can we

5    have the revenue over time?  That's a different business model.

6              THE COURT:  The revenue over time.

7              MR. GREER:  We just discussed this.

8              MR. TREMONTE:  Mr. Greer says --

9              THE COURT:  In what form, based on the conversation we

10   have had in colloquy, do you think there are documents that

11   memorialize its revenue over time?  Because I didn't hear

12   anything.

13             MR. TREMONTE:  Yes.  He said they are subscribers.

14   They are individual subscribers who pay a fee.  If that's the

15   case, there must be documentation of the payment and receipt of

16   those fees, every fee, by every subscriber.

17             THE COURT:  That strikes me as very burdensome.

18             MR. GREER:  It's also irrelevant, your Honor, because

19   I said revenue has nothing to do with the valuation.

20             THE COURT:  That's your view of it.

21             MR. GREER:  I'm an expert.  I did this banking at the

22   highest level and my models are still used by Wall Street

23   executives now.

24             THE COURT:  I really don't think that has any

25   relevance whatsoever to a discovery issue in this case.  That's

 1   your view of this.  You can't inform what gets produced based

 2   on your own view of that.  I tried to ask you this before.  I

 3   really want to move along.

 4        What documents, if any, exist that describe the

 5   revenue that Healthcare Channel.com receives?  What documents

 6   are there?  Let me ask it another way.  If I want to be a

 7   subscriber, tonight, when I go home -- and I can assure you I

 8   am not going to be, for the record -- but if I wanted to go

 9   home and subscribe to Healthcare Channel.com tonight, what

10   would I do?  I would go online.

11        MR. GREER:  It's a high-level Wall Street.  It's not

12   some anonymous thing.  It's like large deals and Wall Street.

13        THE COURT:  How will I pay for my subscription?

14        MR. GREER:  With a large check.  With an invoice and a

15   large check.

16        THE COURT:  How do I communicate to you that I want to

17   be a subscriber?

18        MR. GREER:  It's the same way salespeople work in Wall

19   Street with clients.  They call me, I reach out to them.

20        THE COURT:  I can't go to the website?

21        MR. GREER:  No, you can't pay on the website, no.

22        THE COURT:  I can't go to Healthcare Channel.com and

23   subscribe?

24        MR. GREER:  No.  It's too big for that.  It's a

25   $10,000 subscription, your Honor.  I just revealed something.

23

1    It's not something you can do.

2            THE COURT:  If a company wants to do it, they have to

3    contact you personally?

4            MR. GREER:  Yes.  Which is how Wall Street works.  I

5    give information -- I used to be the portfolio manager.  I

6    turned the tables and now I'm providing information --

7            THE COURT:  Your argument is that as a result of what

8    the defendants did to you, the value of Healthcare Channel.com

9    is lower than it used to be, correct?

10           MR. GREER:  No, that's not my argument.  I carefully

11   said the valuation of the Healthcare Channel has absolutely

12   nothing to do with the revenue.  The valuation has to do with

13   how other companies like mine have been sold or done IPOs in

14   the past, and the value of it is do I put out one story a month

15   or 10 stories a month.  And the value of it, as I can show, my

16   output, number of doctors interviewed and so forth every month

17   has gone down at least 50 percent.

18           THE COURT:  What has got down 50 percent?

19           MR. GREER:  The output of my content.

20           THE COURT:  As a result of that decline, therefore,

21   the website has less value.

22           MR. GREER:  Yes.  I gave them the information already.

23   I gave them the spreadsheet that showed every person I've

24   interviewed over the years, and you can chart it out.  And I

25   used to do several a month and now I'm lucky if I do one a

1    month.

2            THE COURT:  I want to move on, folks.  We are not

3    going to be here for two hours.  The hour is already late.  I'm

4    done with this subject.  You'll have to live with it.

5            This is a pro se plaintiff.  You all are litigating

6    against him like this is Cravath, which is frankly annoying.

7    He's a sophisticated gentleman in a lot of ways, but he's not a

8    lawyer.  He is someone who has a little information.  As we all

9    know, a little information is very dangerous because he is not

10   a lawyer and I'm trying to be mindful that he is pro se.

11           I'm also mindful you all don't get along with each

12   other and I have to supervise you on a weekly basis, which I

13   can't begin to tell you how annoying that is.  It's the first

14   time in seven years on the bench I ever had to issue the kind

15   of order I did last week about telling a pro se litigant how

16   many times they are allowed to submit letters to the Court.

17   You all are submitting document requests as if this is someone

18   who is represented by counsel.  We have now spent 45 minutes on

19   about three issues.  You are overlitigating this case in the

20   extreme and we need to move on.

21           Next subject, please.

22           You are not on.  They have the next subject.  Is the

23   next subject other damages, E2?

24           And keep in mind what I said before, which is, you

25   have not deposed Dr. Greer yet, correct?

 1                 MR. TREMONTE:  That is correct, your Honor.

 2                 THE COURT:  And like all lawyers, you think you have

 3     to have every single piece of paper in your hand before you can

 4     ask him questions, and that is just a fiction.  And get over it

 5     and take his deposition and ask him the kinds of questions I

 6     was asking during colloquy and see where it leads.  And if it

 7     leads you to the identification of actual documents that he

 8     hasn't produced, then you ask him for them.  And if he refuses

 9     and you meet and confer and he still refuses, then you tell me

10     and we will be back and we will have another conversation.

11                 OK.  Next.

12                 MS. RIEGEL:  I think what we were hoping to avoid,

13     your Honor, and I hear you loud and clear, but I think what we

14     were hoping to avoid was two depositions where we deposed

15     Dr. Greer, we get additional documents, and we go back, but I

16     hear you.

17                 THE COURT:  I'm not promising anything.  I don't know

18     how any of this is going to play out and you are going to run

19     out of time because it's already March 21 and we are finished

20     with discovery on April 14 and I've told you about 10 times I'm

21     not moving that date, even if there is an act of God that

22     intervenes.  You are going to have to finish what you are doing

23     between now and then.  For all the many obvious reasons you can

24     imagine why I'm holding you all.  It's in your interests.  The

25     longer we keep this going in discovery, the more fights you

 1    have, etc.  You're fighting on a daily, if not weekly, basis as

 2    it is.

 3              What about E2.  What are we doing in that category,

 4    the so-called other damages?

 5              MS. RIEGEL:  The other damages, your Honor, are $20

 6    million in reputational damage, a million dollars for mental

 7    anguish, a million dollars for his loss of enjoyment of the

 8    apartment for which he was evicted, pursuant to the state court

 9    order, and $50,000 related to his move-out from the apartment.

10              Let me take the easy one.  While he claims $50,000

11    related to his move-out from the apartment, he substantiated

12    approximately $13,000 in damages.  No idea what that delta is

13    and no documents have been produced to substantiate that delta.

14    That seems to be relatively straightforward.  If it cost him

15    $50,000 to move, there are invoices, there are checks, there

16    are credit card statements.  This is not a mystery and it's not

17    amorphous.

18              THE COURT:  What other documents, Dr. Greer, if any,

19    that add up to that $50,000 that hasn't been produced?

20              MR. GREER:  This is such a waste --

21              THE COURT:  Don't waste my time saying it's a waste of

22    time.  Just answer the question, please.

23              MR. GREER:  I answered those document requests, no

24    documents exist, no documents exist.

25              THE COURT:  You have reduced it from 50 to 13,000

 1   then?

 2          MR. GREER:  No.  So far the documents I have were a

 3   very select group of invoices I just happened to find.  I have

 4   not gone back and done all of the accounting because I'm too

 5   busy doing other things.

 6          THE COURT:  Hold on a minute here.  If you're seeking

 7   $50,000 in damages, you have to justify that.  You have to have

 8   documents that support that and you have to produce them.

 9          MR. GREER:  At this stage or --

10          THE COURT:  At this stage.  It's called discovery.

11   What other stage would it be at?

12          MR. GREER:  It's irrelevant if I don't even win the

13   case.

14          THE COURT:  You're hoping to get to a jury trial,

15   correct?

16          MR. GREER:  Correct.

17          THE COURT:  And before the jury, among other things,

18   you are going to try and get the jury to award you $50,000 in

19   damages for your move-out costs, right?

20          MR. GREER:  Correct.

21          THE COURT:  You are going to show them documents at

22   that time that add up to $50,000 and the defendants don't have

23   to wait until trial to see those documents.  That's what

24   discovery is for.  We don't have trial by surprise in federal

25   court.

H3LMGREC                                                                                      28

1          MR. GREER:  To go back and get the full accounting --

2     I was in Greenwich and Westchester this time last year, after

3     they evicted me, and there is expenses on my credit card.  I

4     don't have the resources to go back and itemize, and the easy

5     ones was where I had a big block of hotel for four weeks.

6     Those big easy receipts I turned over.

7          THE COURT:  What's the basis for $50,000?

8          MR. GREER:  It's an estimate.

9          THE COURT:  What do you want me to do, Ms. Riegel?

10          MS. RIEGEL:  If we don't have additional documents I

11     would ask that Dr. Greer stipulate that the claim is reduced to

12     $13,000.

13          THE COURT:  I think it would be not in the nature of a

14     stipulation necessarily unless he's willing to do that.  Are

15     you willing to stipulate?

16          MR. GREER:  No.  Because it is much more than that.

17          THE COURT:  Then you are going to make a motion *in*

18     *limine*.  You are not going to make it now.  You are going to

19     make it down the road when it's relevant to make it.  Do you

20     know what that is, a motion *in limine*?

21          MR. GREER:  To say there are no damages at all?

22          THE COURT:  No, no.  It's what it sounds like.  It's

23     trying to limit you on a certain basis and it's usually made

24     before trial.

25          Here is the way this case is going to shake out.  Let

1   me explain.  Discovery is going to end on April 14.  Then you

2   are going to go see Judge Nathan and you are going to get a

3   schedule for motion practice, I assume, and there is going to

4   be summary judgment motions made.  If they are granted, your

5   case is going to be over and you'll have to take an appeal.  If

6   it's denied in whole or in part, then you'll have a trial

7   eventually before Judge Nathan.  She will have a conference, a

8   pretrial conference, to start getting the case organized for

9   trial and require certain submissions from the parties, which

10  will include any motions *in limine*.  They will be trying to get

11  certain evidence in, trying to keep certain evidence out,

12  trying to limit the nature of certain proof like, for example,

13  even though you alleged in your complaint $50,000 worth of

14  damages in this category, if at the end of discovery you've

15  only provided $13,000 worth of invoices, they are going to

16  argue to Judge Nathan, you can't try and convince the jury that

17  you get $50,000.  You can only get $13,000 in that category.

18  You follow me?

19          MR. GREER:  After April 14, I can do the motion

20  limine.

21          THE COURT:  Motion *in limine*.  We are talking Latin.

22          MR. GREER:  Will I ever have any opportunity to spend

23  the time necessary, go through with a fine-tooth comb and come

24  up with the extra damage of values after April 14?

25          THE COURT:  The answer is generally no.  But I am not

1    going to rule on something that's not in front of me.  You've

2    made a discovery request.  You've alleged $50,000 in damages.

3    They want all documents that you have related to that.  You're

4    supposed to produce it within the discovery period.  We have

5    said it before and we will say it again.  Anything you don't

6    produce in the discovery period you can't use.  So you better

7    figure out how to produce it to get to $50,000.

8          MR. GREER:  I'm in the middle of doing depositions.

9    Between now and April 14, I will attempt to supplement what

10   I've turned over.

11         THE COURT:  Great.  Next category.

12         MR. GREER:  She mentioned other damages.

13         MS. RIEGEL:  Next category of damage relates to the

14   claim for mental distress, anxiety and depression.  We have

15   asked Dr. Greer for medical records or a HIPAA compliant

16   authorization with respect to the medical claims.  He has not

17   provided either.

18         THE COURT:  If you put that in play, you waive any

19   privacy rights you otherwise would have related to that.  This

20   is what I was talking about earlier.  If you don't want them to

21   look into that, you can waive your right to seek damages on

22   that basis.

23         MR. GREER:  But I've answered it and they don't exist.

24   I'm a doctor.  I treat myself for most things.  I have not

25   sought any psychiatric, psychological therapy for mental

1    anguish.  It's obvious.  The jury won't need it.  If someone

2    gets kicked out of their apartment and move to Ohio, there is

3    obvious damages.  I don't need a psychiatrist for evidence.  I

4    have no medical records to turn over, so why should I give them

5    a HIPAA form.

6              THE COURT:  You have not seen any professional of any

7    kind related to any of the categories that Ms. Riegel just

8    identified?

9              MR. GREER:  And I've said that to them many times.

10             THE COURT:  So you have what the law generally

11   characterizes as garden-variety damages at best.  If you don't

12   have any expertise that's going to be brought to bear, if you

13   never saw a therapist or psychologist or psychiatrist or anyone

14   else about any of this, then you're simply going to rely on

15   your own testimony and that's permissible.  But those are the

16   boundaries which define what that is.  I think we can let it go

17   at that and move on.  What else?

18             MS. RIEGEL:  There is a million dollar claim for loss

19   of enjoyment of the apartment from which Dr. Greer was evicted.

20   We have no substantiation of that million dollars in any way,

21   shape, or form.

22             MR. GREER:  That's the value of the apartment.  That's

23   my rationale.

24             THE COURT:  I think that's the kind of thing you

25   should explore at his deposition and see what he means by that.

 1          MS. RIEGEL:  That's fine.

 2          THE COURT:  I am not sure that's a document discovery

 3   related topic in the first instance.

 4          MS. RIEGEL:  Not based on what he has just said.  I

 5   understand.

 6          MR. GREER:  How do you value a view of an apartment?

 7   The open market value is that.  The open market --

 8          THE COURT:  Hold your fire until they depose you.

 9   Then you can answer those questions.

10          MS. RIEGEL:  Last, but not least, we have a $20

11   million claim for reputation damages.

12          THE COURT:  I think that may well fall into the same

13   category.  Do you have any documents that relate to that?

14          MR. GREER:  Yes.  Now I do.  When the BPCA recently

15   gave me their thumb drive, on it were e-mails, unbelievable.

16   When they were kicking me out of the open meetings, the public

17   meetings, they were e-mailing the head of Brookfield Properties

18   security, the NYPD.  I'm a scary guy.  The detailed e-mails are

19   unbelievable to prove that they totally ruined my reputation

20   with corporations all over lower Manhattan and Canada.  That's

21   my evidence that has now been produced.  It came from them.  I

22   don't need to produce it.  It came from them.

23          THE COURT:  Do you have any documents of your own that

24   you would characterize as documents that relate to your

25   reputation having been damaged as a result of the alleged

1    conduct by the defendants?

2          MR. GREER:  In my initial disclosures I explained

3    that's valued by what other medical practices are worth and so

4    forth.  No.  I have no documents.

5          MS. RIEGEL:  Judge, Dr. Greer's response to the

6    initial disclosure says that his claim for $20 million is based

7    on his medical practice earnings or earning potential as

8    compared to other doctors in the area.  It goes back to -- I

9    know your Honor said tax returns should be the measure of last

10   resort.  But if he's talking about damages to his earnings as a

11   doctor or his potential earnings as a doctor, what he has

12   earned as a medical professional is relevant to his damage

13   claim.

14         THE COURT:  Take his deposition first, inquire on the

15   subject.  If you're unsatisfied and you believe you are

16   entitled to more, including his tax returns, review the case

17   law on the subject, which you will find, as you may well know

18   already, suggests that you don't, as a first matter, get

19   someone's tax returns.  You only get them if they are uniquely

20   the source of information you cannot get from any other source,

21   including the deposition of the witness.

22         I am reserving on that question until after the

23   deposition.  I think this whole issue about reputational

24   damages is amorphous enough that you need to explore it, pin

25   him down to sworn testimony, and then make a judgment that you

1    think on the record that has been developed that your defense

2    would be hamstrung if you do not have access to financial

3    records of Dr. Greer, including, but not limited to, his tax

4    returns.  I'm not prepared to direct that today, but that's

5    without prejudice to a further application, if necessary, and

6    you think you can meet what I will characterize as the high

7    burden a defendant would have in these sorts of circumstances,

8    OK.  You're winning, so I don't know why you need to respond to

9    that.

10         MR. GREER:  It's better than that.  It's all moot.  I

11   don't have evidence from a medical practice now.

12         THE COURT:  Fine.  You will tell them that when they

13   ask you about it.

14         Are we done with E2?  Are we done with damages?

15         MS. RIEGEL:  I think we are.

16         THE COURT:  We are up to F.  Is there anything else

17   you want to explore about Dr. Greer as a journalist?  What's in

18   that category of documents that hasn't been produced that you

19   think he has that should be produced?

20         MR. TREMONTE:  Maybe he doesn't have any, but if he

21   has any documents that go to his occupation, employment --

22         THE COURT:  What does that mean?

23         MR. TREMONTE:  Press credentials, revenue he has

24   received as an employee of a press organization, payments for

25   working as a journalist, expenses that he has made --

1          THE COURT:  Please don't interrupt.

2          Why is that probative?

3          MR. TREMONTE:  He claims in paragraph 20 of the

4    complaint that he's a journalist and his claims are predicated

5    on the fact on his contention that his rights as a journalist

6    have been curtailed, his First Amendment rights as a practicing

7    journalist have been curtailed.

8          We asked, I think plausibly, that if he has evidence,

9    if he has documentation relating to his occupation, to either

10   money that he has been paid or money that he has spent in

11   connection with supporting his profession, or anything else

12   that evidences the fact that he's a journalist, we would be

13   entitled to that.

14         THE COURT:  I don't like what that entails.  I think

15   that is so vague.  I don't really know what that means.  It's

16   not like asking someone for a driver's license.  It's like he

17   has a journalism license?  That sort of sounds like what you

18   think he should produce to you.  That doesn't exist.

19         MR. TREMONTE:  Press credentials, too.

20         THE COURT:  I don't think you understand what I've

21   been suggesting for the last hour.  Take his deposition.  I

22   could ask 10 minutes of questions on this subject right now

23   that would put your position, I think, in a very favorable

24   light on the subject, very easily, and I don't know why you all

25   are standing on ceremony about these subjects.  Take his

1    deposition.  Can't you think of the kind of questions you

2    should ask that will verify the legitimacy or lack thereof of

3    Dr. Greer as a journalist?

4              MR. TREMONTE:  We certainly can, your Honor, and we

5    will do that.

6              THE COURT:  If you do that and then if you say, so,

7    you tell me as a journalist you covered the Republican National

8    Convention or the Democratic National Convention.  Did you

9    receive press credentials?  Do you have a copy of those press

10   credentials?  Will you produce those?

11             This is what I mean about ask first, produce later in

12   certain categories because the odds are, there are not going to

13   be a lot of productions in a lot of the categories because he

14   is going to say:  No, I didn't do that; no, I didn't do that.

15   And then your impeachment at the trial of his testimony before

16   the jury is, he tells you he's a journalist, but he hasn't done

17   these 18 things that any journalist would do.

18             Why are we doing this?  You people are so

19   overlitigating this, it is just astounding to me.

20             Keep yourself quiet, Dr. Greer.  You're winning.  I'm

21   not making you produce anything right now.

22             MR. GREER:  I already have produced it.

23             THE COURT:  You've produced what?

24             MR. GREER:  Extensive lists of all of my articles in

25   the Wall Street Journal, my passes to the White House, where

1    I'm allowed into the White House.  I am a journalist beyond

2    belief.  The national news.  I can get on the phone of David

3    Rhodes of CBS.  They use my stories.  I have given them all of

4    that evidence.  Why are we talking about this?  I turned it

5    over.

6           THE COURT:  I don't know what you've given.

7    Apparently, it's not satisfactory.

8           MR. TREMONTE:  Your Honor, we are here litigating this

9    point only because Mr. Greer has asserted a journalistic

10   privilege which under our research does not apply.  We don't

11   know if he's withholding documents pursuant to that privilege.

12          THE COURT:  What are you withholding, if anything?

13          MR. GREER:  We do know whether I'm withholding.  I've

14   answered the document request and they have everything they

15   have asked for.  There is no reason for them to even be talking

16   about this now other than to try to play a game and make it

17   seem like I'm the bad guy.

18          THE COURT:  I think I've said before and I'm going to

19   admonish everyone again, you right now.  I am not interested.

20   I do not enjoy parties, whether you are lawyers or not,

21   characterizing anyone in a personal way.  Let's act

22   professionally.  We are in a federal courtroom.  We are going

23   to the next subject.

24          MR. GREER:  I provided it.

25          THE COURT:  We are going to the next subject.  This is

1    the so-called whistle blower complaint issue.  What's left on

2    that subject?

3         MR. TREMONTE:  We requested documents.  Plaintiff

4    alleges that his reporting has alerted several state and

5    federal agencies about wrongdoing by the BPCA and various

6    levels of investigation are underway.  During the meet and

7    confer, plaintiff says he has documents, right, but they are

8    privileged whistle blower documents and on that basis he is not

9    going to turn them over.

10        THE COURT:  What is what he complained about have to

11   do with your current claims or defenses?

12        MR. TREMONTE:  I believe that his lawsuit is

13   predicated on the idea that he's being punished, retaliated

14   against because he has complained in various forms.  Again, we

15   would not be litigating this issue if Mr. Greer did not assert

16   a privilege which we are duty bound to research.  We did.  And,

17   in our view, it doesn't apply and he says --

18        THE COURT:  Are you withholding, Dr. Greer, any

19   complaints that you made in writing to any governmental

20   authority, local, state, or federal?

21        MR. GREER:  No.  And I told them that.  They were

22   either filed electronically by the New York Attorney General's

23   website.  I don't have a document on that.  I looked for some

24   ones I sent to Preet Bharara.  There might be some out there,

25   but basically I did look and I thought I kept them.  There may

1  be one or two letters to one of these oversight agencies which

2  if I find I'll produce.

3  THE COURT:  Are you withholding any documents because

4  you are invoking a whistle blower privilege of some kind which

5  you obviously identified at some point in your responses, which

6  is why the issue is before me.

7  MR. GREER:  I think what's going on here is this

8  question and others, I answer at the end, no documents.  But I

9  also say, even if there were, I don't have to give it -- I gave

10  them a rationale that they are arguing, but it's all moot

11  because I don't have the documents.  I don't think they

12  understand what I'm doing here.  For example, I'm saying, First

13  Amendment rights or freedom -- there are some other arguments

14  I've used where this is privileged because I'm a journalist and

15  the source was anonymous.  But, by the way, no documents exist.

16  Then they will dwell on the first part.  There is no documents

17  to turn over.

18  THE COURT:  Just to be clear for the record, you are

19  not withholding any documents on a whistle blower privilege

20  basis?  Answer yes or no.

21  MR. GREER:  No.  And I gave them one that came to me

22  last night, which was a letter from the New York Inspector

23  General that I believe I caused.  It was a letter demanding

24  Robert Serpico to get sexual harassment training.  That just

25  came into my lap from a person.  I looked --

1          THE COURT:  We are talking about complaints that you

2     made or filed, or whatever the right verb is, to governmental

3     authorities.  You say you have produced some.

4          MR. GREER:  I will look again.

5          THE COURT:  You will look again and you will produce

6     anything else you may have.

7          Next subject.  I think we are done with your letter.

8          MR. TREMONTE:  Yes, your Honor.

9          THE COURT:  Ms. Riegel, what in your letter have we

10    not covered?

11         MS. RIEGEL:  I think the only thing we have not

12    covered, your Honor, by way of background, we served an initial

13    demand on Dr. Greer.  He objected to it because he claimed

14    since we used the word all, it was overbroad.  We modified the

15    request and Dr. Greer, nevertheless, declined to respond to the

16    modified request and insisted that he was responding to the

17    first request.

18         THE COURT:  That's all in your letter that I read.

19         MS. RIEGEL:  We have asked for documents related to

20    his interactions with the landlord defendants and their

21    employees, e-mails, letters, whatever documents he has in his

22    possession.  All I'm looking for --

23         THE COURT:  What has been produced in that category,

24    Dr. Greer?

25         MR. GREER:  They started off with an absurdly broad

 1    question which I don't know how to answer.  I've lived there

 2    for 14 years and read the question, your Honor.  It's a

 3    ridiculous question.  It starts off with all documents.  I

 4    don't even know how to answer No. 1 or 2 or whatever.  But

 5    later on, when they get more specific, I supplied them.  I have

 6    given them a thumb drive with hundreds of e-mails.  They have

 7    everything and they are trying to make it seem as if I have not

 8    produced it.  The only ones I have not produced are because the

 9    questions were so absurdly broad I didn't even know what you

10    were asking for.

11         THE COURT:  What I don't understand, Ms. Riegel, is,

12    even based on the way you just described it, it sounds like an

13    e-mail to the doorman in 2007 would be responsive, right?

14         MS. RIEGEL:  Within the time frame that we have

15    established for document discovery, up through the date of the

16    commencement of the eviction proceedings.

17         THE COURT:  What is the time frame?

18         MR. TILTON:  Additionally, I tried to narrow the scope

19    as well in a meet and confer.

20         THE COURT:  What is the time frame?

21         MR. TILTON:  August 2010 through May 2, 2014, which is

22    the date that we commenced the holdover proceeding.

23         THE COURT:  Why 2010?

24         MR. TILTON:  Because we didn't want to go too far

25    back, but he was in substantial arrears in August 2010 and he

1   continued to be in arrears generally through 2010 through the

2   time we commenced the proceedings.

3          THE COURT:  What I don't understand is, he has

4   produced documents to you.  Are you saying that they are not

5   responsive?  Are you saying you think there are more than what

6   he has produced?  What are you saying?

7          MR. TILTON:  Part of the issue is there is

8   approximately 45 requests and he only responded to

9   approximately 13 by saying, I am producing documents, I do not

10  have documents.  We hammered out --

11         THE COURT:  I would interrupt you to say this.  You

12  are serving 45 document requests on a pro se litigant.  Why are

13  you doing that?  Why are you doing that?

14         MR. GREER:  They are duplicative.

15         THE COURT:  I think this case is being so

16  overlitigated.  You are losing the forest for the trees.  You

17  are so immersed in the forest you can't get out.  Has he

18  produced documents to you?  Hasn't he produced hundreds of

19  pages of documents to you?  Have you looked at every page of

20  them?  What makes you think in good faith that Dr. Greer is

21  sitting on a treasure trove of documents, having heard from me

22  that any one of those documents he might be sitting on and

23  hasn't produced to you, if you are skeptical he cannot use in a

24  lawsuit?  Why would he withhold anything if he wants to use it

25  if he knows?

1      And I will put on the docket tonight or tomorrow, if

2  you want, an order that makes this crystal clear.  My order

3  after this conference today is going to say, for the reasons

4  set forth on the record, the parties are directed to the

5  transcript with respect to the Court's rulings.  P.S.  As

6  discussed and as all parties were told, no document that has

7  not been produced can be used in motion practice or trial at

8  this case.  If anyone at either table wants to try and do that,

9  you will be in violation of that order in addition to every

10  other time I've said it, including today.  OK.

11      MS. RIEGEL:  The answer to your question as to how I

12  know he hasn't produced them is because in producing the thumb

13  drive with his production, which, by the way, he sent to the

14  Battery Park City counsel and asked them to deliver it to us.

15  We got it.  It came with a covering letter that specifies that

16  with respect to the real estate defendant's requests, here are

17  the items I'm replying to, and this is it.  This is the

18  one-page response we got.  There is nothing in the covering

19  letter that specifies that Dr. Greer has provided a single

20  communication with any of my clients or any of my client's

21  employees.

22      THE COURT:  Have you looked at the documents to see if

23  those exist and what's been produced?

24      MS. RIEGEL:  Am I willing to represent to you that I

25  have looked at every single page of every document?  No.  Have

1    we looked at them?  Yes.  And I do not see communications with

2    my client.

3              THE COURT:  What kind of communications are you

4    expecting there to exist, e-mails?

5              MS. RIEGEL:  There are e-mails with respect to

6    Dr. Greer's rental history.

7              THE COURT:  Which you have, presumably, on your side.

8              MS. RIEGEL:  But what I don't know and what I don't

9    have from Dr. Greer is any representation.  And since he has

10   already said he hasn't gone through the work to provide, for

11   instance, the documents related to his damages for moving out

12   of the apartment, I don't know whether he has gone through the

13   work to give me all of the e-mails related to my clients.

14             THE COURT:  What does that mean?  Don't you see when

15   you say you want all the e-mails related to your clients that I

16   would say, that is an overbroad request and I would not direct

17   Dr. Greer to respond to that request.  It's overbroad.  What

18   are you looking for?  Are you looking for e-mail communication

19   between Dr. Greer and employees of your client with respect to

20   his payment of rent?

21             MS. RIEGEL:  With respect to his apartment.

22             THE COURT:  That's too broad.  You mean about when the

23   kitchen sink was broken?  No.  That's not what you mean.  What

24   do you mean?

25             MS. RIEGEL:  He has complaints about building staff

1   that he has articulated.  He has complaints about other people

2   in the building that he claims he has articulated.

3           THE COURT:  What does that have to do with the claims

4   and defenses in the case?

5           MS. RIEGEL:  The defense in the case, your Honor, is

6   not just that he failed to pay his rent but that his conduct

7   was objectionable, and it relates to his interpersonal

8   relationships with other people in the building.

9           THE COURT:  In that regard you have on the receiving

10  end everything he may have ever sent by e-mail, anyway, to the

11  people who complained to suggest that this misconduct as

12  alleged existed.  You want a duplication of it from him?  You

13  want his e-mail that you already have?  I don't understand.

14          MS. RIEGEL:  I want to know if he has something

15  different than I do or if he has something additional.

16          THE COURT:  What does he have that's different?  What

17  could that be?

18          MS. RIEGEL:  I don't know.

19          THE COURT:  What could it be?

20          MS. RIEGEL:  Could be e-mails that he sent that were

21  deleted from somebody's computer before this litigation

22  commenced and anybody had any sense that they needed to

23  preserve documents.  He may have sent e-mails that don't --

24          THE COURT:  Let me ask you this, Dr. Greer.  On your

25  computer is it easy for you to search individual names?

1        MR. GREER:  I have done that.  I have given them

2   hundreds of e-mails that relate to rent payment and the renewal

3   of the lease, everything relevant, on a thumb drive in PFD

4   form, and she is sitting here wasting the Court's time saying I

5   have not done it.

6        THE COURT:  What about if you had some complaints

7   about particular employees and the landlord?

8        MR. GREER:  Those are everything I've got.  I've given

9   them will volumes of e-mails and she is trying to -- I watch

10  myself.  I have done this and we are talking about something

11  that doesn't exist.  It's all moot.  I have turned it over.

12       THE COURT:  I'm ready to move on.

13       MS. RIEGEL:  If he's representing that he has not held

14  anything back, we will deal with it in the deposition.  He

15  didn't say in his responses whether he held anything back.  I

16  hear him.

17       MR. GREER:  I did.

18       THE COURT:  Here is the thing.  Timeout.  He is not a

19  lawyer, but he's a smart person.  So as I said before, someone

20  who is not a lawyer who is a smart person thinks they can

21  litigate like a lawyer, which he can't.

22       With all respect, Dr. Greer, you're not a lawyer.

23  You're a very smart person, but you're not a lawyer.  You

24  lawyers at the back table are being so literal.  Perfect is the

25  enemy of the good.  You know that expression.  I'm sure you do.

```
 1    That is the headline of this case.  Perfect is the enemy of the

 2    good.  Let's move on.

 3           I think we are done with your letters.

 4           MS. RIEGEL:  Yes.

 5           THE COURT:  Hold on one second.  Anything else on your

 6    end document discovery wise that you want to raise?  Because

 7    this may be the last time you deal with document discovery

 8    predeposition and I hope not again.  But the only other time I

 9    would entertain it is postdeposition to the extent you can

10    identify something you should get after the deposition has been

11    taken.  Is there anything else document wise?  Otherwise, we

12    are closing the books on that subject.

13           MR. TREMONTE:  Yes, your Honor.  One very discrete

14    issue.  Dr. Greer mentioned a few moments ago that he received

15    a document from a person.  I have a copy of that document

16    because Dr. Greer -- he asked questions about it at one of the

17    depositions today.  He wanted to introduce it and we

18    volunteered to make copies for him and we did.  So he provided

19    us with a copy of the document.

20           It is a September 19, 2013 letter from the New York

21    State Office of the Inspector General addressed to one of my

22    clients.  It has to do with participation in certain training

23    courses.  I asked Mr. Greer simply:  Where did you get the

24    document?  And he said:  I'm not going to tell you.  I said:

25    But we are going to ask you at the deposition.  Moreover, it
```

sounds like you are getting more documents.  And now he has

confirmed he has.  It would make things simpler and certainly

help us with internal housekeeping if we could have some

information about where Dr. Greer is getting this and perhaps

other documents, which are clearly out of the files either of

the Office of the Inspector General or our own business.

          MR. GREER:  You tell me what to do, your Honor.

          THE COURT:  I don't give legal advice.  That's not in

my job description.

          MR. GREER:  If you order it, I will do it.  Here is

the thing.  This is the source who is scared to death, and

rightly so, of the Battery Park City Authority that he or she

will be retaliated against, because they have done it to so

many people, and they gave me these documents in confidence and

I said -- and it's more story related.  It's journalism I have

already written about this morning.  These is stories.  This is

a journalistic source.  I said: I won't burn you.  If you

order me to tell you the source, I will.

          THE COURT:  Why, Mr. Tremonte, is it important for you

to know who it's from?  Why does it matter who it's from?  What

difference does it make?

          MR. TREMONTE:  Your Honor, if it's one of the

individuals who is listed on the initial disclosures and that's

somebody that to date we have not elected to depose but

certainly we would if it was one of those people.  Similarly,

1   if it's a current employee, that's something that we would want

2   to consider, whether or not to depose that person.  She is

3   having communications with Dr. Greer about the subject matter

4   of the litigation and providing him with evidence.  We are

5   going to ask him at the deposition and I don't see on what

6   ground he would resist answering.

7          MR. GREER:  If you order me to say it, I'll say it.

8          MR. TREMONTE:  Plus, we only have until the 14th.  I

9   don't want to get jammed up in a position where we don't have

10  time --

11         THE COURT:  Let me ask you, Dr. Greer.  You are going

12  to be deposed.  They are going to ask you questions like, who

13  did you get the document from.  You would not answer, but on

14  what basis would you not want to answer?

15         MR. GREER:  Because I've done a little bit of

16  searching and journalists don't have to reveal their sources.

17  It's fundamental journalism protected by the First Amendment.

18  If someone is a source, you don't burn them.  That's why.  I

19  don't have to tell them to give me sources.  But if you order

20  me to, I will.

21         MR. TREMONTE:  He's putting the document in play.  He

22  is asking questions about it.  And, moreover, he is taking the

23  position that he caused it to happen.  I don't see how under

24  those circumstances there would be an applicable privilege that

25  would bar us from deposing that person.

H3LMGREC

 1           THE COURT:  I'm mindful that there is certainly a

 2   reporter's privilege.  The problem is, you're a plaintiff in a

 3   1983 lawsuit and there is a tension between that capacity

 4   you're litigating in and a reporter's privilege that might

 5   exist if you weren't a party in a lawsuit.  If there was a

 6   Battery Park litigation, and you were not involved in it, but

 7   you are getting this kind of information and they tried to

 8   serve you with a subpoena, that would be a very different

 9   posture than we are in.

10           MR. GREER:  I'm not going to fight this.

11           THE COURT:  I did some research myself on this

12   subject.  Frankly, there is not a lot of law that I found,

13   although I actually did find a somewhat interesting case from

14   Colorado called *Zinna v. Board of County Commissioners*.  The

15   cite is 250 Federal Rules Decision 527.  And that was a case in

16   which the plaintiff was a website operator and he tried to

17   invoke the common law reporter's privilege in a 1983 action

18   that he had brought against the county for violating his First

19   Amendment rights, so on some level it seemed rather on point.

20   And, as a result of his initiating the litigation, he

21   effectively waived his right to invoke the privilege.

22           It seems to me in these circumstances, Dr. Greer, I

23   can't allow you to hide behind the reporter's privilege.

24           MR. GREER:  Linda Soriero, source, and she keeps

25   giving me 10 a day.  I can't keep up with it.

 1          THE COURT:  Whether you are going to depose her or not

 2  is up to you.

 3          MR. GREER:  Your Honor, I had a communication with her

 4  out in the hall.  The in-house counsel, Alix, reached out to

 5  her and said, you have got a deposition notice which I sent.

 6  Then she called me and I said:  Well, what are you going to do?

 7  She said:  I'm absolutely not going to be represented by their

 8  lawyers.

 9          THE COURT:  We are going far afield of my question.

10  My question is, anything else document wise?  That's done.  Are

11  we done?  Can we move on?

12          MS. RIEGEL:  Yes, Judge.

13          THE COURT:  Dr. Greer, what, if anything, on your

14  agenda today relates to documents?  Just documents.  Anything

15  you have not received that you think you should have received

16  because this is probably going to be the last time we are going

17  to talk about documents in this case.

18          MR. GREER:  This is what we have been discussing which

19  have in fact been produced and they claim they haven't.  Let's

20  start with the most important.  Request No. 8 of the real

21  estate where you ordered that the real estate lawyers on one of

22  the calls to give me documents that show whether they have

23  evicted anyone else in my similar situation or not evicted.

24          What they did is, they missed your deadline of March

25  13.  Then they realized -- I don't want to put words in their

1    mouth.  Then they rush out something which was what I call a

2    data dump, 1500 pages of unresponsive nonsense, and there were

3    about 40 pages that could have been responsive, but they are

4    all black and redacted.  That one issue that you made a big

5    matter of on the call and said give it by this date has not

6    been done yet.

7            THE COURT:  What's the story on that?

8            MS. RIEGEL:  Judge, you ordered that we produce

9    documents related to other tenants in Dr. Greer's building who

10   had been subject to eviction on similar grounds.  We gave him

11   two categories of documents.  We gave him legal action reports

12   for my client's entire portfolio.

13           THE COURT:  What is a legal action report?

14           MS. RIEGEL:  It's essentially a status report of what

15   tenants and in Battery Park City what perhaps condominium unit

16   owners are subject to legal action, and it breaks them down

17   building by building.  It is redacted as to the other

18   buildings.  It is not redacted as to Dr. Greer's building.  So

19   what he got was the entire -- rather than me segmenting out the

20   building, what he got was the report redacted so that he could

21   see that his building is disclosed and the rest have been

22   redacted.

23           MR. GREER:  May I show that exhibit to the judge.

24   Because I couldn't print out 1500 pages.

25           MS. RIEGEL:  In combination with that, he has

1       essentially a rent ledger for the building for the relevant

2       time frame that will tell him if there were any other tenants

3       who were similarly in arrears.  That is the information your

4       Honor asked us to produce and we produced it.

5            MR. GREER:  I'm a financial expert and I cannot make

6       heads or tails of what they gave me in that last thing.  That's

7       their whole problem is, I have e-mails I gave them since 2009

8       where every single month their balances are completely off

9       because their accounting is a mess.  They gave me this

10      accounting gibberish that I can't make heads or tails of.

11           To your point, I should depose him and ask him because

12      what they are giving me is useless.  Maybe I'll just say,

13      handle it in depositions.  I'll say, have you ever evicted

14      someone in my similar situation?  I think it's just a

15      deposition matter because they are giving me useless stuff.

16           THE COURT:  These documents that you've been given,

17      you can certainly use to ask an appropriate witness what they

18      mean so they can try and explain them to you.

19           MR. GREER:  What I'll do is, a name on there, I'll

20      say, did that person go late because they skipped out and left

21      the building or were they trying to stay in the building?  I

22      have some names to work with.

23           THE COURT:  Why don't you do that and it will be in

24      the same category as what we talked about at the other table,

25      which is, postdeposition, if you find the production to have

 1    been inadequate, then we can revisit the question.

 2              MR. GREER:  I'm quick, your Honor.  See.

 3              THE COURT:  Is that the only document issue you have?

 4              MR. GREER:  That's all for the real estate.

 5              For the BPCA, this is easy.  They have not given me

 6    anything except they gave me a thumb drive with hundreds of

 7    e-mails, but guess what those e-mails were?  They gave me

 8    hundreds of e-mails that were my own e-mails that I had sent to

 9    them.

10              THE COURT:  They are required to do that.

11              MR. GREER:  Fine.  Then at the end, and I have not had

12    ability to really look at them carefully, there were -- I don't

13    know what's in there.  I have not looked at them.  They gave me

14    in a format, I have to click -- it's not categorized.  They

15    don't say this response to document request No. 14.  None of it

16    is categorized, telling me what it responds to.

17              THE COURT:  What lawyers call a document dump?

18              MR. GREER:  Yes.

19              THE COURT:  How, if at all, what was produced

20    categorized or was it not?

21              MR. GREER:  It wasn't.

22              MR. TREMONTE:  It was not, your Honor.  We made two

23    productions, one on the 10th and one on the 17th.  The

24    production on the 10th is just a couple dozen documents and

25    those are all responsive to the six live requests.  I suppose

H3LMGREC

 1   we could label them, but I think it's crystal clear what those

 2   couple of dozen documents are.

 3           MR. GREER:  I can solve this.

 4           MR. TREMONTE:  In the second production we produced

 5   everything that we had from him, as we are supposed to do.

 6   It's hundreds of documents, but they are all his documents.

 7   Then there is a category, an additional category of documents

 8   that we intend to affirmatively use that are not -- they don't

 9   correspond to his requests for documents that we intend to use

10   and that's that.

11           MR. GREER:  May I ask one simple thing.  Could you

12   please categorize them and that's all.  I don't even need them.

13   Because the deposition we had today is going to win me on

14   summary judgment.  I have Kirk --

15           THE COURT:  You are going too fast and I'm not that

16   interested.

17           MR. GREER:  If they can just categorize it, that will

18   solve it.

19           THE COURT:  What does that mean, exactly?

20           MR. GREER:  Of those data dumps which request are they

21   replying to?

22           THE COURT:  Is that easy to do for you or not easy to

23   do?

24           MR. TREMONTE:  We will do it, Judge.  Easy or not, we

25   will do it.

 1          THE COURT:  Can we talk about depositions now?  Are we

 2   done with documents?

 3          MR. GREER:  One other thing is, they refused to even

 4   acknowledge my interrogatories, so I got zero replies in the

 5   interrogatories.  Whatever.  It doesn't matter.

 6          THE COURT:  Interrogatories --

 7          MR. GREER:  -- are useless.

 8          THE COURT:  -- are useless.  You've learned something

 9   that most lawyers will admit to you under oath, but not

10   otherwise.

11          MR. GREER:  The most important thing here is to set up

12   the deposition schedule so I can get these subpoenas signed.

13          THE COURT:  Let's work through that.

14          MS. RIEGEL:  Judge, I just want to report, because it

15   will impact what Dr. Greer may elect to do, Mr. Rossi had a

16   quadruple bypass.  He is not expected back in the office before

17   April 14.

18          THE COURT:  Fine.  He has going to have to be deposed

19   post the discovery deadline and we will deal with that.  But

20   his deposition standing alone is not going to affect setting a

21   motion schedule.  You will schedule it sometime when he's

22   available.  I'm not going to preclude you from taking his

23   deposition if you want it after April 14.  You will work that

24   out.

25          MR. GREER:  I apologize because I was cynical and I

H3LMGREC

1   apologize.

2          THE COURT:  Have you all talked about a schedule for

3   the other witnesses?  How much of this do you need me to

4   supervise or what?  What I want to make sure is, I don't get

5   letters with you all fighting about whose deposition is going

6   to be when.  You had two depositions today, correct?

7          MR. GREER:  They went very well.

8          THE COURT:  We have more depositions to schedule

9   between now and April 14.  You are here.  I'm not a

10  professional scheduler.  It's not what I normally do.  We have

11  a pro se litigant who wants to take depositions.  I know you

12  want to at least take his deposition, if not perhaps other

13  witnesses as well.  Do you need me to sit with the calendar and

14  you all and map this out right now?  If you do, we will do it

15  so that there are no fights about it.  You tell me.  I'll do

16  that if that's what we need to do.  And you have your

17  calendars, as I hope I encouraged you to bring here, so you

18  know when we can do these things.

19         MR. TREMONTE:  From the BPCA, we only have three

20  individuals.  Mr. Mehiel we have proposed a date, April 3.  I

21  believe that that's agreeable to Mr. Greer.  We have indicated

22  to Mr. Greer that Mr. McCabe is available pretty much any time

23  between now and the 14th.  That should not be a problem.  And

24  Ms. Soriero, that is indeed up in the air, your Honor, as you

25  can imagine.  The authority has notified Ms. Soriero that she

 1   has been noticed for a deposition and provided a copy of the

 2   notice to her.  Apparently, she is in contact with the

 3   plaintiff but not with us.  All that we know at the moment from

 4   her is she has taken medical leave and I suppose -- and that

 5   she doesn't want -- she is separately represented.  That we

 6   have learned from Mr. Greer.

 7           THE COURT:  Do either of you know who the lawyer is

 8   who is representing her?

 9           MR. TREMONTE:  We do not.

10           MR. GREER:  She doesn't have one yet.  I tried to find

11   her one.  I just suggested that she go here or there.  They

12   looked at it.  She doesn't have a lawyer yet.

13           THE COURT:  I suggest she should be scheduled for the

14   end of the discovery process because it sounds like she needs

15   to find a lawyer and work through that.  You said for

16   Mr. Mehiel April 3?

17           MR. TREMONTE:  Yes, your Honor.

18           THE COURT:  Should we put that down for Mr. Mehiel?

19           MR. TREMONTE:  Yes, your Honor.

20           THE COURT:  What about for Mr. McCabe?

21           MR. GREER:  3rd.

22           THE COURT:  Can you do that the same day?

23           MR. TREMONTE:  I believe we can, yes.

24           THE COURT:  The only other BPCA witness that's

25   implicated here is Ms. Soriero, or are there any others?

1    MR. TREMONTE:  There are two former BPCA employees,

2    Allison Ford and Nancy Harvey.  Again, it would be helpful to

3    have a proffer from the plaintiff, as we did with Ms. Soriero.

4    From our perspective, they don't have relevant information.

5         And if I may direct the Court to Dr. Greer's

6    submission to Judge Nathan seeking to appeal your Honor's

7    decision, this is his January 26 submission, on page 4 of that

8    document, Dr. Greer spelled out the rationale for wanting to

9    depose Ms. Ford and Ms. Harvey.  And that rationale, I can read

10   it but it's now been rejected by your Honor.

11        THE COURT:  Refresh my memory.  I don't recall.

12        MR. TREMONTE:  Sure.  Mr. Greer says:  "This all

13   relates to my First Amendment claims because it is crucial for

14   the jury to know that Serpico has made it his modus operandi

15   over 30 years of retaliating against anyone who dared to

16   investigate him.  I know it to be true from reliable sources

17   that Serpico recently had two different African-American

18   in-house lawyers fired from the BPCA simply because they were

19   properly following up with yet another complaint about sexual

20   harassment.  And this goes on to talk about Mr. Serpico's HR

21   file.

22        THE COURT:  Are Ms. Ford and Ms. Harvey the lawyers

23   that are referred to there?

24        MR. TREMONTE:  I believe so, yes.

25        MR. GREER:  Your Honor has already ruled that I can't

H3LMGREC                                                          60

```
 1   delve into his peccadillo.  These are witnesses who will very

 2   likely be favorable witnesses because they are no longer

 3   employed there, number one.  And they were extremely involved

 4   in every intermingling and if Robert Serpico -- if they scheme

 5   to evict me, which they did, they would know about it.  And

 6   unlike their own employed witnesses, these two witnesses will

 7   be likely friendly witnesses and say the truth.

 8           THE COURT:  Why do you have any good-faith basis to

 9   think that either Ms. Ford or Ms. Harvey has any knowledge of

10   any kind with respect to your eviction?

11           MR. GREER:  That's how this office works.  I wish you

12   could see the transcripts of Kirk Swanson today.  It's a small

13   office.  Everybody knows everything.  They have meetings all

14   the time.  They hear one another.  Kirk Swanson said today:  I

15   was the talk of the office.  Everyone knows about it.

16           THE COURT:  Here is the thing.  They are former

17   employees, so you don't control them.  So you don't have any

18   standing, frankly, on some level to say whether they can or

19   can't get deposed.  They can be deposed if he can serve a

20   subpoena on them and set a date for that, right?

21           MR. TREMONTE:  That's fair, your Honor, although the

22   rationale for deposing them has been rejected multiple times.

23           THE COURT:  Let's be clear.  If they are noticed and

24   he convenes a deposition and he starts asking questions about

25   what has been precluded, you can summarily direct them not to
```

1   answer to the extent that it's consistent with a protective

2   order that I had issued in the case that they are not parties

3   to for obvious reasons.  But that would be appropriate to do if

4   that's what Dr. Greer is trying to do.  His deposition of these

5   individuals is limited to what knowledge they have about his

6   current claims, which are why he was evicted, etc.  I made that

7   clear innumerable times.

8           MR. GREER:  My questions for them will be very similar

9   to what I asked Mr. Swanson today.

10          MR. TREMONTE:  May I simply ask, your Honor, there is,

11  under the rules, a 10-deposition limit.  There is no proffer of

12  a good-faith basis for deposing these witnesses.  May we have

13  an agreement that if these people sit for depositions, Ms. Ford

14  and Ms. Harvey, and they have, as we expect, absolutely nothing

15  of relevance to say that Mr. Greer doesn't get more depositions

16  because he has wasted time with these two.

17          THE COURT:  He doesn't get more depositions.  I

18  already have a list of 11, so he's one over the list already.

19  So he's not getting more.  He's getting 10.

20          MR. GREER:  May I suggest the week of April 10 to do

21  Nancy Harvey, Allison Ford, and Linda Soriero, sometime during

22  the week of April 10.

23          MR. TREMONTE:  We don't control them.

24          THE COURT:  You will have to serve a subpoena on them.

25          MR. GREER:  I have their information.

```
 1              MR. TREMONTE:  I think that may be true, also, with
 2    respect to Ms. Soriero under the rules.  I know we are not
 3    giving Mr. Greer legal advice.  I think, given the status, her
 4    status and what she has indicated to him and may indicate to
 5    the authority, she may need to be separately deposed and not
 6    just noticed through us.  A subpoena.
 7              MR. GREER:  I plan on doing all of that.  Don't worry.
 8              THE COURT:  You are going to serve Ms. Soriero with a
 9    subpoena.
10              MR. GREER:  I paid a private investigator.  I have got
11    all their information.
12              THE COURT:  So the week of April 10:  Ms. Soriero,
13    Ms. Ford and Ms. Harvey.
14              MS. RIEGEL:  Judge, I believe that Passover is Monday
15    and Tuesday of that week.  I'm just trying to check the
16    calendar.
17              THE COURT:  We can tell you.
18              MS. RIEGEL:  If it is, I have abbreviated days both
19    days.
20              THE COURT:  I think Passover begins the night of the
21    10th.  It begins at sundown on the 10th.
22              MS. RIEGEL:  Correct.  Which means I have abbreviated
23    days on the 10th and the 11th because I have to get out to Long
24    Island by 4:00.
25              THE COURT:  The week of the 10th also includes the
```

 1   12th, 13th, and 14th.

 2           MS. RIEGEL:  I understand.

 3           THE COURT:  These depositions sound like they are not

 4   long.  Sounds to me like Ms. Ford and Ms. Harvey can both be on

 5   the morning of the 10th potentially.  I'm not going to

 6   micromanage this to that level.

 7           MS. RIEGEL:  I just don't want there to be any

 8   confusion later.

 9           THE COURT:  That's fine.  You're obviously permitted

10   to have religious observance.  That is nothing that should

11   interfere with this.

12           We have said Mr. Rossi is going to be post April 14

13   for health reasons.

14           Let me ask this.  When is Dr. Greer's deposition is

15   going to take place?

16           MR. GREER:  I can do it the April 10 week.

17           THE COURT:  Would you want it to be the week of the

18   10th or you want it earlier than that, folks?

19           MR. TREMONTE:  That's fine, your Honor.

20           THE COURT:  Week of the 10th.

21           MS. RIEGEL:  Yes.

22           THE COURT:  What witnesses are left?

23           MR. GREER:  The only ones I can think of that would

24   matter, Dennis Mehiel.

25           THE COURT:  We said April 3 for him.

 1              MR. GREER:  Yes, we did.  I am not going --

 2              THE COURT:  Who is Gwen Dawson?

 3              MR. GREER:  She knows everything.  She is in charge

 4     of -- if there is a building construction project at Pier A,

 5     she does the grants.

 6              THE COURT:  What does she know about you?

 7              MR. GREER:  I can't talk about the lease, but you said

 8     with Dr. Greer you can depose and you can ask Gwen Dawson, have

 9     you ever done anything related to Greer?  You said she was in

10     on the scam.  She knows everything.  I can't ask her about the

11     money laundering lease that they made in my building.

12              THE COURT:  Correct.  It has to be about your claims.

13              MR. GREER:  Yes.  And it could be real short.  Could

14     be a 15-minute deposition.

15              THE COURT:  When are we taking Ms. Dawson?

16              MR. GREER:  April 3.

17              THE COURT:  Can you do three in one day or is that too

18     much?

19              MR. GREER:  Yes.

20              THE COURT:  I know you can, but they may not prefer to

21     three in one day.

22              MR. TREMONTE:  I don't think it makes sense.

23              THE COURT:  Do it the next day, the 4th.

24              MR. GREER:  But they are only taking an hour.

25              THE COURT:  If they are really an hour, taking three

1    depositions of an hour length, that's not a big deal.

2          MR. TREMONTE:  I wasn't minding the clock, but I don't

3    know that either of the depositions today were actually that

4    short.  I would be surprised --

5          THE COURT:  Dr. Greer is representing to me that if he

6    takes all three -- Mr. Mehiel is going to be an hour?

7          MR. GREER:  We can easily do Mehiel, McCabe and Dawson

8    on April 3.

9          MR. TREMONTE:  In an abundance of caution, your Honor,

10   we prefer not to have these three in a day.

11         THE COURT:  What's the problem doing the next one on

12   the 4th?

13         MR. GREER:  When I say the 3rd, I mean the week of the

14   3rd.

15         THE COURT:  They are talking about the day of the 3rd.

16   Two on the 3rd and one on the 4th.

17         MR. GREER:  When I say April 3 and April 10, I'm

18   talking about those two weeks.

19         THE COURT:  We are talking about Mehiel, McCabe, and

20   Dawson the week of the 3rd and then you'll figure out the next

21   day.

22         MR. TREMONTE:  With respect to Ms. Dawson, she was

23   dropped off of plaintiff's list, so we did not check with her

24   with her availability.

25         THE COURT:  Is she not on your list?

1           MR. GREER:  I don't believe so.

2           THE COURT:  You have 11 people on the list.  You took

3    Mr. Swanson and Mr. Serpico today?

4           MR. GREER:  So far we have two from today, three,

5    four, five, six, seven, eight, nine.

6           MR. TREMONTE:  The bottom line is, we have to check

7    with Ms. Dawson.  I have not done that.  And if that's my

8    fault, I apologize.  We have to check with her.  I'm sure there

9    will be a day before the 14th --

10          THE COURT:  What about Mr. Milstein?

11          MS. RIEGEL:  Mr. Milstein is available on April 7,

12   your Honor.

13          MR. GREER:  That's the week of April 3.

14          THE COURT:  That's the Friday.  What about Ms. Martin?

15          MS. RIEGEL:  Dr. Greer dropped her off his list.

16          THE COURT:  She is off.

17          MR. GREER:  Yes.

18          THE COURT:  I think we are done then, right?

19          MR. GREER:  I have room for one more, and this has

20   become apparent to me in today's depositions and from Linda

21   Soriero.  Another high-level executive named Karl Koenig, I

22   believe, will be very valuable to me.

23          THE COURT:  You get 10 depositions.  By my count you

24   have 10 already, not counting this person.

25          MR. GREER:  I have two from today, Mehiel, McCabe,

 1   Dawson, Milstein, Soriero, Harvey, Ford.

 2           THE COURT:  And Rossi.  That's eight.  Plus two is

 3   then.  You have 10.

 4           MR. GREER:  I can't count.

 5           THE COURT:  You get 10, unless you want to substitute

 6   the person you just said for someone else.

 7           MR. GREER:  Let's see if I want to substitute.  Can we

 8   substitute Gwen Dawson for Karl Koenig.

 9           THE COURT:  Now you don't have to talk to Ms. Dawson.

10           Mr. Koenig.

11           MR. GREER:  Yes, Karl Koenig.

12           THE COURT:  Karl Koenig.  What is his position?

13           MR. GREER:  It's high up.  They have so many names.  I

14   don't know.

15           MR. TREMONTE:  He wasn't on our radar screen, your

16   Honor.  We will have to confer with him.

17           THE COURT:  I know.  Sometime between now and April 14

18   you'll work it out.

19           MR. TREMONTE:  Yes, your Honor.

20           THE COURT:  I don't think I got an answer about when

21   Dr. Greer's deposition is going to be.

22           MR. TREMONTE:  Dr. Greer proposed that final week.

23   That's amenable to us.  The only question I have is I

24   anticipate, your Honor, we will, of course, do our level best,

25   especially in light of the Court's comments today, to keep our

1    postdeposition document demands to a rational minimum, but I

2    expect there will be some.  If we make them that last week,

3    Dr. Greer will almost certainly need -- he will probably need

4    more time to produce.  I assume that that's OK with the Court.

5    But his production --

6              THE COURT:  In terms of the April 14 deadline?

7              MR. TREMONTE:  For discovery.

8              THE COURT:  If you make any postdeposition document

9    requests before the 14th, you are entitled to do that and

10   Dr. Greer, obviously, has to respond to them to you.  And then

11   if there is any issue that flows from that, I'm sure I'll hear

12   about it, keeping in mind that I have a jury trial beginning

13   April 24 for two weeks, so you may not hear from me for a while

14   because, guess what, I work on other cases.  Did you know that,

15   Dr. Greer?  Are you aware that I'm not a one-case guy?  Not

16   just your case.

17             To that end, by the way, I think someone at the back

18   table sent at 12:30 today a request to have phones brought in,

19   and I can't turn on a dime like that.  If you need that sort of

20   relief, you have to ask me the day before.

21             MS. RIEGEL:  We apologize, your Honor.  It was the

22   court reporter and she had a child care issue and she was a

23   little exercised because she didn't realize she wouldn't be

24   able to bring in her phone.

25             THE COURT:  Did it get worked out?

1          MS. RIEGEL:  It worked out.

2          THE COURT:  If you have an emergency like that, you

3     can call my deputy and perhaps he can facilitate it.  I can't

4     guarantee anything.

5          MR. GREER:  I have left conference calls like this

6     before thinking that they are going to cooperate and they

7     don't.  We have weeks.  The week of the 3rd.  Can we get the

8     actual day of each person, please.  Maybe I wasn't paying

9     attention.

10          THE COURT:  We have not done the actual day.  But we

11     are committed to all of these witnesses the weeks of either

12     April 3 or April 10, right?

13          MR. TREMONTE:  Yes, your Honor.

14          THE COURT:  Dr. Greer, to be clear, these lawyers, as

15     lawyers and members of the bar of this Court, are officers of

16     the Court.  If they are representing in open court to me that

17     these witnesses -- to the extent they control them.  People you

18     have to subpoena they don't control.  But for those individuals

19     that they can control, they have represented to me that these

20     depositions are going to go forward on the weeks of the 3rd and

21     the 10th and you all will have conversations offline.  You

22     don't need me for them to say, this one can be on the 4th in

23     the morning and the 5th in the afternoon or whatever.  You'll

24     do that and I have no doubt that you'll be able to work that

25     out.

1         MR. TREMONTE:  Yes, your Honor.

2         THE COURT:  Are we done or is there anything else?

3    You should settle this case, but you won't because there is no

4    way to do that.

5         MR. GREER:  I am going to trial now because I am going

6    to win.

7         THE COURT:  I wish you all a good afternoon, good

8    evening.  I'm sure I'll be speaking to you down the road.

9                              o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25