UNITED STATES DISTRICT COURT
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **STEVEN E. GREER**, MD | ) | **15-cv-6119  (AJN) (JLC)** |
| Plaintiff; | ) | |
| | ) | |
| v. | ) | **HON. ALISON J. NATHAN** |
| | ) | DISTRICT JUDGE |
| **Dennis Mehiel**, **Robert Serpico**, **The Battery Park City Authority**, **Howard Milstein**, **Steven Rossi**, **Janet Martin**, **Milford Management**, **Mariners Cove Site B Associates** | ) | **HON. JAMES L. COTT** |
| | ) | MAGISTRATE JUDGE |
| Defendants. | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT**</u>
<u>**OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**</u>

Steven Greer, *pro se*
4674 Tatersall Court
Columbus, Ohio 43230
(212) 945-7252
steve@batterypark.tv

# <u>TABLE OF CONTENTS</u>

Background and Preliminary Statement ................................................................. 1

Legal Authority ...................................................................................................... 3

   1. Statutory Provisions ....................................................................................... 3

   2. The First Amendment Protects the Press from Retaliation ............................ 3

   3. The First Amendment Guarantees Equal Access for all Members of the Press .................... 4

   4. Plaintiff is Indeed a Journalist and Protected by the First Amendment ................. 4

Arguments .............................................................................................................. 5

   1. Legal Standard for Summary Judgment ......................................................... 5

   2. Plaintiff Proved Count 2: That He Was Barred from Public BPCA Meetings ...................... 5

      A. Dennis Mehiel Admitted Responsibility for Count 2: Barring Plaintiff from Public BPCA Board Meetings .......................................................................... 5

      B. Dennis Mehiel's Actions Were Intentional and Unjustified .................... 7

      C. The BPCA Has Conducted Q&A with Reporters During Past Meetings .......... 9

   3. Plaintiff Proved Count 1: Defendants Retaliated Against the Press ................ 12

      A. This Court's Previous Decisions on the Matter .................................. 12

      B. The Evidence ........................................................................................ 13

   4. Defendants Failed to Produce Any Evidence to Support a Defense ................ 17

   5. Spoliation Warrants Sanctions and Summary Judgment ................................ 19

      A. The Acts of Spoliation ....................................................................... 19

      B. The Statutes and Case Law Supporting Sanctions .............................. 20

      C. Sanctions Are Also Warranted Under The Court's Inherent Powers .............. 22

      D. The Defendants' Negligence Also Warrants Default Judgment ................ 22

Punitive Damages ........................................................................................................... 23

1. Statutes and Case Law for Punitive Damages ..................................................... 23

2. The BPCA was Negligent, Warranting Punitive Damages .................................... 24

3. The BPCA's Actions Were Malicious, Warranting Punitive Damages ................... 25

Equitable Relief is Allowed in This Case ........................................................................ 27

Summary ........................................................................................................................ 29

Relief .............................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Am. Broadcasting Cos. v. Cuomo,* 570 F.2d 1080, 1083 (2d Cir. 1977) ...................................... 11

*Am. Friends of Yeshivat Ohr Yerushalayim, Inc. v. UnitedStates of Am*., 2009 U.S. Dist. Lexis 47986, *19 (E.D.N.Y. 2009).* .................................................................................................... 21

*Am. Stock. Exch., LLC v. Moped, Inc*., 215 F.R.D. 87, 93 (S.D.N.Y. 2002) ............................... 21

*Anderson v. Cryovac, Inc.,* 805 F.2d 1, 9 (1st Cir. 1986) ........................................................... 11

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). .......................................................... 5

*Chambers v. Nasco*, 501 U.S. 32, 46 (1991),.............................................................................. 22

*Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006)................................................ 21

*DLC Mgmt.Corp.*, 163 F.3d at 136 ............................................................................................. 22

*Gusinski v Genger*, 10-cv-04506 Dkt. No. 117 (S.D.N.Y. 2012)................................................. 22

*Huminski v. Corsones*, 396 F.3d 53, 83–84 (2d Cir.2005) ............................................................. 8

*Hutto v. Finney,* 437 U.S. 678, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978).................................... 27

*Jackson v Dallas School District*: Case No. 3:12cv1903, Middle District of Pennsylvania, (decided 2015). ..................................................................................................................... 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986),............................. 5

*Sekisui America Corp. v. Hart*, 945 F. Supp. 2d 494 (S.D.N.Y. 2013). ....................................... 22

*Sherrill v. Knight,* 569 F.2d 124, 129-30 (D.C. Cir. 1977)........................................................... 11

*Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983)................................ 23

*Stevens v. N. Y Racing Ass 'n, Inc.,* 665 F. Supp. 164, 175 (E.D.N.Y. 1987).............................. 10

*United States v. City of Yonkers,* 96 F. 3d 600 (2nd Cir. 1996)................................................... 27

*White et al v. West Publishing Corporation et al*, Case No. 1:12-cv-01340 (S.D.N.Y, 2015)....... 5

*Wyatt v. Stickney,* 344 F. Supp. 373 (M.D. Ala. 1972);..............................................27

**Statutes**

42 U.S.C. § 1983 ...............................................................................................3, 23

New York real Property Law, Article 7 § 223-b ......................................... 17

New York State Senate Bill  S.130/A.4002 - Glick/Niou..........................28

**Rules**

Federal Rules of Civil Procedure 56(e)(2) .................................................... 5

Federal Rule of Evidence Article VIII, § 801(d)(2). ................................... 15

Federal Rule of Evidence, Article VIII, § 804(b)(3)(A)(B)........................ 16

Federal Rule of Evidence, Article X, § 1002 ............................................... 15

Federal Rules of Evidence Rule 1004........................................................... 7

Federal Rules of Civil Procedure 26(e) ....................................................... 20

Federal Rules of Civil Procedure 30(d), ..................................................... 25

Federal Rules of Civil Procedure 37(c) ....................................................... 20

Federal Rules of Civil Procedure 37(e) ....................................................... 16

Federal Rules of Civil Procedure 406........................................................... 15

Federal Rules of Civil Procedure 56(a) ........................................................ 3

Federal Rules of Civil Procedure 56(d) ....................................................... 21

**Treatises**

Leonard B. Sand, et al., *Modern Federal Jury Instructions* ........................ 14

*Marquette Law Review*, Volume 67, Issue 4, Summer 1984........................ 23

Ninth Circuit Model Jury Instructions, Chapter 1.5 ................................... 14

Rodney A. Smolla, Smolla & Nimmer on Freedom of Speech § 25: 1 (2016). ............................ 3

Third Circuit Model Jury Instructions Chapter 1.6....................................................................... 14

## Background and Preliminary Statement

**Steven E. Greer, MD**, the Plaintiff, founded and runs BatteryPark.TV, which is the most viewed local news source for the 13,000 residents of Lower Manhattan's Battery Park City Community. Starting some time around 2011, Plaintiff began to expose numerous scandals relating to the Battery Park City Authority ("BPCA") and its senior executives, Dennis Mehiel and Robert Serpico, who are also defendants. After Plaintiff's coverage in the press, several high-ranking BPCA officials either resigned or were fired.[1] Plaintiff then began to expose a decades-long pattern of sexual abuse by Robert Serpico (**Exhibit C**). As a result, Mr. Serpico decided in late 2013 to retaliate against Plaintiff by having him evicted from his apartment home of 14-years that also served as the office for BatteryPark.TV and The Healthcare Channel.

By conspiring and colluding with the building owner and management of Plaintiff's apartment (i.e. Howard Milstein, Steve Rossi and the real estate companies of Mariners Cove Site B Associates and Milford Management, (collectively referred to as "real estate defendants")), Serpico was able to evict Plaintiff through a lengthy housing court litigation process that began in early 2104 and lasted into 2016.

More than a year after the housing court eviction process began in 2014, the Chairman and CEO of the BPCA, Dennis Mehiel, then began in 2015 to retaliate against Plaintiff in a new way by barring him from the public BPCA board meetings without justification. This also violated his First Amendment rights to freedom of the press.

---

[1] BPCA executives who either abruptly resigned or were fired after Plaintiff's press coverage include former presidents Gayle Horwitz and Demetrios Boutris, former media relations staff Robin Forst, Matt Monahan, and Anne Fenton, former general counsel Seema Singh, and board members Martha Gallo, Fernando Mateo, and Frank Branchini. In addition, the current Chairman and CEO, Dennis Mehiel, did not have his appointment renewed by the governor and has been serving past his term expiration of December 31, 2015.

Plaintiff eventually lost in housing court and was evicted in April of 2016. Because the real estate defendants own or manage nearly half of the apartment buildings in Plaintiff's community and he was barred from renting at those locations due to litigation, *inter alia*, Plaintiff was forced to leave New York and move to Ohio.

Realizing that the retaliation against Plaintiff's press reporting was a violation of the First Amendment, Plaintiff filed this complaint *pro se* in federal court in August of 2015. Nearly two years later, this motion for summary judgment is now being filed.

Plaintiff has suffered great financial and mental harm as a result of the protracted litigation brought upon him and the mental anguish from being evicted and dislocated from his long-time home in Manhattan. Plaintiff was an established and respected member of the community in Lower Manhattan[2]. That has been taken away from him and his reputation damaged. His media businesses and medical ventures have also been harmed.

In addition, during the discovery process, evidence was produced demonstrating that the BPCA is a rogue pseudo-state agency operating in the shadows. The BPCA has been plagued for decades by incompetence and complicity. The collateral damage has been the ruined lives of many people who simply tried to blow the whistle to EEOC officers over rigging of contracts and sexual assault. The First Amendment has also been a casualty. This federal Court is the only body empowered to stop these injustices with equitable relief[3].

---

[2] See the "Testimonials" tab and comments section on BatteryPark.TV at http://batterypark.tv/
[3] See the corresponding local rule 56.1 form for citations relating to the facts in this section.

# Legal Authority

## 1. Statutory Provisions

Plaintiff brings this complaint against both the BPCA defendants and the real estate defendants, pursuant to 42 U.S.C. § 1983, as two violations of the First Amendment. This instant motion for summary judgment is brought pursuant to FRCP 56(a) since no "genuine dispute as to any material fact" exists. The discovery period has concluded, per Magistrate Judge Cott's order from May 19, 2017 (Dkt. No. 345).

## 2. The First Amendment Protects the Press from Retaliation

In Count 1 regarding retaliatory eviction, the First Amendment violation occurred when all of the defendants colluded and conspired to retaliate against Plaintiff in response to his muckraking reporting on his news site called BatteryPark.TV. This Court has previously ruled that Plaintiff has a plausible complaint (see pages 6-8 of the February 24th, 2016 order denying Plaintiff's preliminary injunction, Dkt. No. 138, also see pages 10-12 of the order denying the motions to dismiss, Dkt. No. 177). The First Amendment guarantees, at a minimum, that the press have the same access to information as the general public. 3 Rodney A. Smolla, Smolla & Nimmer on Freedom of Speech § 25: 1 (2016).

The private entity real estate defendants have been previously ruled by this Court to be eligible defendants for Count 1 of the First Amendment claims. *Id.* at 7 ¶ 1.

In addition, this Court ruled that Serpico of the BPCA was not entitled to qualified immunity and is eligible to be sued as an individual. *Id.* at 8 ¶ 2. However, Mehiel was dismissed as a defendant for Count 1. *Id.* at 7-8.

### 3. The First Amendment Guarantees Equal Access for all Members of the Press

In Count 2 regarding barring Plaintiff from public meetings, the First Amendment violation occurred by the BPCA singling him out from the other journalists and denying him equal access to board meetings. This Court has also previously ruled that Plaintiff has a plausible complaint here too. *Id.* at 8-12.

The BPCA is the sole defendant for Count 2. Both individuals, Mehiel and Serpico, were dismissed as defendants for Count 2. *Id.* at 12 ¶ 2. However, Plaintiff now moves this Court to add Mehiel and Serpico back to the list of defendants since they admitted during sworn deposition testimony to orchestrating Count 2.

### 4. Plaintiff is Indeed a Journalist and Protected by the First Amendment

Plaintiff has been previously designated by this Court as a member of the press for the sake of First Amendment protections (see September 30th, 2015 order, Dkt. No. 177, page 10, footnote 6). In addition, Magistrate Judge Cott rebuked the defendants' argument that Plaintiff was not a journalist (**Exhibit A** at 34:16 to 37:24, note in particular 35:8-18).

During the document discovery and depositions, Plaintiff provided ample evidence of his press activity and journalism. In Plaintiff's response to the BPCA's document requests, his reply to requests numbered 41-43 detail examples of his journalism in The Wall Street Journal, Reuters, etc., press pass access to The White House, his articles referenced by congressional hearings, etc. (**Exhibit B** at 38-43). In addition, Plaintiff provided a list of BatteryPark.TV stories that uncovered BPCA scandals (**Exhibit C**).

# Arguments

## 1. Legal Standard for Summary Judgment

Plaintiff will demonstrate in this memorandum of law that no genuine issue as to any material fact remains. There is a mountain of evidence in the form of documents and sworn testimony that prove his case.

In the winning case of *White et al v. West Publishing Corporation et al*, Case No. 1:12-cv-01340, S.D.N.Y, 2015 (The Memorandum of Law, Dkt. No 47), "Summary judgment should be granted if the evidence, viewed in the light most favorable to the nonmoving party, shows that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To defeat a properly made and supported motion for summary judgment, the opposing party must come forward with "specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); Fed. R. Civ. P. 56(e)(2). That factual evidence must be "of such a character that it would warrant a jury in finding a verdict in favor of" the nonmoving party. *Anderson*, 477 U.S. at 251 (citation omitted). Summary judgment cannot be defeated simply by raising "metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986), or by adducing evidence that is "merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249 (citation omitted)."

## 2. Plaintiff Proved Count 2: That He Was Barred from Public BPCA Meetings

### A. Dennis Mehiel Admitted Responsibility for Count 2: Barring Plaintiff from Public BPCA Board Meetings

In the September 30th, 2016 order by The Hon. Alison Nathan denying defendants' motions to dismiss (Dkt. No. 177), it removed individuals Mehiel and Serpico from Count 2 of

the First Amendment claim. Now, after an extensive discovery process, there is irrefutable proof that Dennis Mehiel personally ordered the BPCA staff to ban Plaintiff from public BPCA board meetings, with no justification, and that Serpico carried out the plans, both violating Plaintiff's First Amendment rights. Therefore, Plaintiff motions this court to reinstate Mehiel and Serpico as defendants[4].

The rationale for allowing the count to stand against the BPCA but not against the individuals was detailed. *Id.* at 8-12. On page 12, it states (emphasis added):

> But the claim that Mehiel and Serpico *should have known* is insufficient to find that they actually *were* personally involved in keeping Greer out of the meeting…Accordingly, the BPCA Defendants' motion to dismiss is granted with respect to the individual claims against Mehiel and Serpico for the actions taken against Greer at the July 29, 2015 meeting."

However, it is now known from sworn deposition testimony that, (A) Dennis Mehiel personally ordered the staff to ban me from meetings, that (B) Robert Serpico knew about the plans and carried them out, that (C) there was no justification for the defendants doing this since they failed to produce any evidence that Plaintiff was a disruptive threat to public meetings, and that (D) the BPCA orchestrated an elaborate ruse to use as an excuse for Plaintiff not being allowed into board meetings, which was that the room was supposedly too full.

During Dennis Mehiel's deposition on April 3rd, 2017, he stated that he was the man who ordered staff to bar Plaintiff from public meetings (**Exhibit F** at 28–33 and 38:12-15). There was no equivocation. Mehiel admitted in no uncertain terms to being the person who thought of and ordered the plan to bar Plaintiff.

---

[4] FRCP 60(c)(1) allows this motion since the order was rendered less than one year ago.

During the April 6th deposition of BPCA Chief of Staff Kevin McCabe, he too reiterated that Dennis Mehiel ordered staff to bar Plaintiff from public board meetings (**Exhibit G** at 32:24-25).

During the deposition of Robert Serpico on March 21st, 2017, he stated that he believed that Mehiel was responsible for the plan to bar Plaintiff from public meetings (**Exhibit H** at pages 37:6-12). Serpico could not recall any specific incident or bad behavior by Plaintiff during public meetings by Plaintiff to justify barring him.

Finally, beyond the sworn deposition testimony is the irrefutable <u>video evidence</u> of Plaintiff being barred from numerous board meetings over a span of approximately a year. Not only was he barred from the board meetings, but also town hall meetings designed specifically to allow public feedback and questions from the press.

**The URL links to the videos** on YouTube are found below[5]:

BPCA barring Plaintiff from July 29, 2015 board meeting
https://youtu.be/K3bHq3p1flc

BPCA not allowing Plaintiff into December 16, 2015 town hall meeting
https://youtu.be/6kgNVEVM58o

BPCA not letting me in to April 13, 2016 board meeting
https://youtu.be/QEh2D0tKH18

BPCA allowing Plaintiff into June 8, 2016 board meeting after federal order was issued
https://youtu.be/IMh0Zzid86U

## B. Dennis Mehiel's Actions Were Intentional and Unjustified

The only defense that the BPCA defendants could use to prevent their actions from being found to have violated the First Amendment would be if they could demonstrate that Plaintiff was justifiably barred from the public board meetings for being disruptive or physical threat.

---

[5] The original unedited videos for the July 29, 2015 and the April 13, 2016 meetings were produced during discovery. Per Federal Rules of Evidence Rule 1004, the YouTube copies of the December 16, 2015 and June 8, 2016 meetings are admissible since the original unedited videos no longer in existence

"Officials must at least have the ability to close the courtroom door to any person whom they reasonably think may pose a threat to person, property, or decorum." *Huminski v. Corsones*, 396 F.3d 53, 83–84 (2d Cir.2005).

However, the BPCA defendants failed to provide any such evidence of Plaintiff being disruptive or a threat.

During his deposition, Kevin McCabe focused on the board meeting of June 9th, 2015 as the time when Plaintiff supposedly became abusive and disruptive enough to warrant the decision to bar him. But after extensive questioning, McCabe admitted that Plaintiff never even as much as touched McCabe, and that no security forces were called to remove Plaintiff. *Id*. at 32-35.

McCabe was asked whether Mehiel cited any specific provision of New York Open Meeting Laws to justify barring Plaintiff from board meetings. He replied that Mehiel had provided no such legal rationale. *Id.* at 38:15 to 40:9.

During the April 6th deposition of BPCA Comptroller Karl Koenig, he stated that he knew of no instance when any BPCA board member expressed concern over Plaintiff's behavior during board meetings. He also confirmed that no security staff was ever called to deal with Plaintiff (**Exhibit I** at 24:4-16). When asked whether Mehiel gave him any reason for barring Plaintiff, Koenig could not recall any. *Id.* at 26:5-8. When asked whether he could recall of any occasion when the BPCA boardroom was too crowded to allow Plaintiff in, he could not recall of any. *Id.* at 28-29.

During the June 9th, 2015 BPCA board meeting cited by defendants, Plaintiff was merely standing up as the BPCA board prepared to go into a private "executive session" and was asking for Mehiel to explain the justification for the private executive session. Executive session is

allowed only under strict guidelines by the New York Open Meeting law, and the BPCA has routinely abused this legal loophole to conduct business behind closed doors. After a few seconds, Plaintiff left the meeting without incident when Kevin McCabe instructed him to leave.

During Plaintiff's deposition on April 13, 2017, he explained the rationale for why he was seeking to investigate the pattern of abuse of closed-door executive session (**Exhibit J** at 126-141). Some of the most important decisions ever made by the BPCA, resulting in hundreds of millions of taxpayer dollars being misappropriated to projects that benefited cronies of the state, have been made in secret during these closed-door executive sessions.

The actions by Plaintiff described above are in no way a justification for barring him from the public board meetings given that there is no evidence Plaintiff did anything other than engage in investigative reporting and challenge a closed-door executive session. In *Huminski*, it states, "The means the Vermont officials chose to safeguard the courts from whatever threat they may have reasonably feared from *Huminski* were wildly disproportionate to the perceived threat."

## C. The BPCA Has Conducted Q&A with Reporters During Past Meetings

It was also established during deposition testimony that Chairman/CEO Mehiel has allowed reporters to ask questions during previous BPCA board meetings (**Exhibit F** at 38:16-40:14) Therefore, Plaintiff's attempt to ask questions during board meetings was also by no means out of line or a justification for barring him from meetings.

If the BPCA defendants could have demonstrated that questions from reporters were never allowed during the board meetings, then they might have been able to claim as a defense that being sent to a video overflow room down the road from BPCA offices did not harm Plaintiff. However, Mehiel's testimony proves the opposite. Mehiel has indeed field questions

from reporters during previous BPCA meetings. Therefore, being quarantined to the video overflow room harmed Plaintiff.

In addition, McCabe testified during his deposition that the BPCA had allowed questions from reporters during meetings. <u>He also acknowledged that the BPCA has never convened a press conference during the Mehiel administration, thereby making Plaintiff's behavior of asking questions even more appropriate</u> (**Exhibit G** at 46:0-49-8). In fact, as a result of Plaintiff's public complaints about the lack of interaction with the press or public by the BPCA, New York State Senator Daniel Squadron began a campaign to pressure the BPCA into allowing what are now carefully screen questions from the public at the end of each board meeting.

Moreover, there exists video evidence of Mehiel answering questions during board meetings, below[6]:

Mehiel replying to a question by BatteryPark.TV
https://youtu.be/PxKT7qdlVoA

Mehiel answering questions from the press
https://youtu.be/LV5dGyrxZME

Mehiel and others answering questions at town hall
https://youtu.be/kp-t_FKlsOM

Therefore, since Plaintiff has demonstrated that the BPCA has indeed routinely fielded questions from the press during previous meetings, Plaintiff's ability to gather information was meaningfully impacted by being barred from the boardroom during the meetings. This violates the First Amendment.

Per Judge Nathan's ruling dismissing the motions to dismiss (Dkt No. 177 at Page 10), the case law to support this is "*Stevens v. N. Y Racing Ass 'n, Inc.,* 665 F. Supp. 164, 175 (E.D.N.Y. 1987) (finding plaintiff likely to succeed on First Amendment equal access claim

---

[6] Per Federal Rules of Evidence Rule 1004, these YouTube copies are admissible since the original unedited videos no longer in existence

where plaintiff was the only member of the press prohibited "from bringing a camera into and taking and being in pictures in the paddock areas of defendant's racing tracks")".

Also supporting Plaintiff's claim that it is a First Amendment violation to single out a reporter and bar them from a meeting, the *Huminski* ruling states, "A person singled out for exclusion from the courtroom, who is thereby barred from first-hand knowledge of what is happening there, moreover, is placed at an extraordinary disadvantage in his or her attempt to compete in the "marketplace of ideas" about the conduct of judges and the judicial system. *Cf. Anderson v. Cryovac, Inc.,* 805 F.2d 1, 9 (1st Cir. 1986) (holding that a district court's order protecting discovery materials from public disclosure with a limited exception for the producers of a particular television program violates other press outlets' First Amendment rights because "[a] court may not selectively exclude news media from access to information otherwise made available for public dissemination"); *Am. Broadcasting Cos. v. Cuomo,* 570 F.2d 1080, 1083 (2d Cir. 1977) (holding, in a case involving the exclusion of a single television news network from live coverage of New York City post-mayoral Democratic Party primary runoff activities at the candidates' headquarters, that "once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable"); *Sherrill v. Knight,* 569 F.2d 124, 129-30 (D.C. Cir. 1977) (stating in the context of a challenge to the issuance of White House press passes as arbitrary or content-based in violation of the First Amendment, that "[n]ot only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information").

Exclusion of an individual reporter also carries with it "[t]he danger [that] granting favorable treatment to certain members of the media . . . allows the government to influence the type of substantive media coverage that public events will receive," which effectively harms the public. *Anderson,* 805 F.2d at 9; *see also Cuomo,* 570 F.2d at 1083 ("If choice were allowed for discrimination in a public event . . . in the various media, then we reject the contention that it is within the prerogative of a [government official]. We rather think that the danger would be that those of the media who are in opposition or who the [official] thinks are not treating him fairly would be excluded. And thus we think it is the public which would lose."). "Neither the courts nor any other branch of the government can be allowed to affect the content or tenor of the news by choreographing which news organizations have access to relevant information." *Anderson,* 805 F.2d at 9. "

### 3. Plaintiff Proved Count 1: Defendants Retaliated Against the Press

### A. This Court's Previous Decisions on the Matter

In this Court's ruling from February 24, 2016, denying the Plaintiff's preliminary injunction on the housing court case (Dkt. No. 138), it concluded that Plaintiff made a believable argument that he was retaliated against by the defendants in response to his reporting on BatteryPark.TV that exposed scandals. On pages 8-12, the ruling states:

> "Greer's complaint states a cognizable section 1983 claim for First Amendment retaliation against both the BPCA Defendants and the Landlord Defendants….Greer's allegations concerning the blog posts he wrote about the BPCA are sufficient to infer a retaliatory intent….It is reasonable to infer from these posts, which report unfavorably on previous BPCA employees and imply that those individuals engaged in corruption and harassment, that the BPCA Defendants had motive to retaliate against Greer. He has therefore stated a claim for First Amendment retaliation."

Now, after a thorough discovery process, Plaintiff has accrued enough evidence to prove the allegations made in the complaint.

**B. The Evidence**

Kirk Swanson is a former senior executive at the BPCA who is now also suing the BPCA in this federal court for wrongful termination. During the Swanson deposition on March 21st, he testified that he witnessed certain actions and words by Robert Serpico to make him believe that Serpico was behind the eviction of Plaintiff. In the transcript (**Exhibit K** at 24:7-22), Swanson stated that he believed Serpico was the cause of Plaintiff's eviction (by getting Plaintiff's landlord to not renew his apartment lease), because he had heard about it from Kevin McCabe in the BPCA offices on January 21, 2014. *Id.* at 19:4-20:19. Swanson then immediately walked to Serpico's office and asked him whether he had anything to do with, "Greer not getting his lease renewed". Swanson then concluded, based on Serpico's response with a smirk and shrug, that Serpico was indeed the culprit.

Swanson also testified that Serpico was often aware of and upset by Plaintiff's press coverage of him, indicating a motive for the retaliation. *Id.* at 16:4-17:9, and 22:5-18.

Swanson also testified that he saw defendants Serpico and Rossi meeting in late 2013 shortly before Plaintiff was notified that he was going to be evicted. The meetings would take place outside of the BPCA offices, for example, in the coffee shop called Au Bon Pain. *Id.* at 21:2-22:4. This is evidence of the collusion between the real estate and BPCA defendants.

In addition, Allyson Ford is a former in-house legal counsel for the BPCA and an African-American female. She too was fired in retaliation for properly doing her job and investigating Robert Serpico, similarly to Kirk Swanson. During Ms. Ford's deposition on April 12, 2017, she shed light on the motive for Serpico retaliating against Plaintiff. During the deposition (**Exhibit L** at 9:16-11:13), she explained how the then-acting president Robert Serpico would discuss Plaintiff and his press coverage in BatteryPark.TV during official board

meetings. Serpico instructed staff to not read or believe what was on the news site. This occurred in 2013 prior to Plaintiff learning that his lease would not be renewed. Ford also testified that Serpico was the source of anonymous information being leaked to Plaintiff in order for negative press to be written about Serpico's enemies within the BPCA. *Id.* 33:2-23. Clearly, Serpico was obsessed with Plaintiff and his reporting.

Ford also testified that she believed the executives within the BPCA engaged in "ill behavior", "wrongdoing", and harmed many people. *Id.* 25:12-26:6 and 42:6-43:12. That indicates a pattern of behavior by the BPCA consistent with the retaliation against Plaintiff. Of note, another African-American female in-house counsel for the BPCA, Nancy Harvey, was also fired in retaliation for investigating complaints about Serpico. *Id.* 7:19-8:3.

During document production, the BPCA produced several emails sent from Serpico to Rossi (**Exhibit M**). Therefore, those same emails should have been available on the real estate servers and produced by them as well, but they were not. The real estate defendants subsequently admitted to Judge Cott on a May 18th, 2017 conference call, and then again in an affidavit (**Exhibit N**), of being guilty of spoliation by deleting emails from the in-house server that was supposed to archive documents. This spoliation occurred after Plaintiff sent on March 23, 2014 (**Exhibit O**) and May 28, 2014 (**Exhibit P**) cease-and-desist emails warning all defendants to not delete documents or evidence.

Regarding the use of circumstantial evidence during trials, various federal district court model jury instructions have stated, "The law makes no distinction between the weight to be given to either direct or circumstantial evidence"[7]. In the Southern District of New York and Second Circuit, Leonard B. Sand, et al., *Modern Federal Jury Instructions* is often used.

---

[7] From Ninth Circuit Model Jury Instructions, Chapter 1.5, and Third Circuit Model Jury Instructions Chapter 1.6

In this instant case, the overwhelming evidence establishes that, (a) Serpico and Rossi knew one another and routinely met outside of official offices, that (b) Serpico was obsessed with Plaintiff and his press coverage of him, that (c) Serpico had a motive to retaliate seeing that Plaintiff's actions had led to disciplinary actions against other BPCA officials and a warning letter from the New York Inspector General, that (d) witnesses close to Serpico testified that they believe Serpico contacted Rossi to effectuate Plaintiff's eviction, and that (e) this was a "Habit and Routine Practice" by Serpico and the BPCA, which is admissible per FRCP 406.

A witness, Linda Soriero, who was Serpico's personal secretary for 18-years, can be heard on an audio recording made by Plaintiff of a telephone call on March 12th, 2017 that she directly witnessed an email on Serpico's computer at work in his office proving that Serpico conspired and colluded with Rossi no less than a "year and a half ago" to retaliate against Plaintiff using eviction as the means (**Exhibit Q** at 2:19-3:25, and 16:23-17:14, and 18:4-20).

However, soon after Linda Soriero began to be a cooperating witness to Plaintiff, the BPCA tampered with the witness by firing her from the BPCA. A complaint was made to Magistrate Judge Cott on April 7, 2017 (Dkt. No.s 311 and 313). As a result, Soriero ignored two different subpoenas to be deposed on two different occasions. Therefore, sworn testimony to corroborate the audio does not yet exist.

Federal Rule of Evidence, Article X, § 1002 requires that an original copy of the audio recording be produced in order to be admissible. Plaintiff has provided that to the defendants.

The testimony by Soriero is not hearsay because she spoke about things that she directly witnessed, per Federal Rule of Evidence Article VIII, § 801(d)(2).

Also, because declarant Soriero is unavailable for cross-examination before the jury, due to being chilled and tampered by the BPCA, her testimony is not hearsay, given that her

testimony made on the telephone was against her best interests, and indeed got her fired. Federal

Rule of Evidence, Article VIII, § 804(b)(3)(A)(B) states:

> "(A) a reasonable person in the declarant's position would have made <u>only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest</u> or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
> (B) is <u>supported by corroborating circumstances</u> that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."

There is ample "corroborating circumstances" proved in this case to support the declarant's

testimony, and her testimony led to her losing her job. Therefore, the criteria in (A) and (B) are

met.

However, the defendants never produced this "smoking gun" email that should have been

stored in their computers. Two attempts at subpoenaing these computers by Plaintiff were

quashed by Magistrate Judge Cott based on procedural technicalities (Dkt No's. 324 and 345).

Since all defendants admitted under oath to deleting emails from their office computers

(detailed above) and even from backup computer servers (**Exhibit N**), <u>that spoliation authorizes</u>

<u>this Court to grant sanctions of adverse inference in favor of Plaintiff. The emails missing should</u>

<u>be assumed to exist as Soriero and Plaintiff claim they do, and are unfavorable to the defendants</u>.

FRCP 37(e).

In addition to the deleted emails above, one email was produced by witness Soriero

helping to prove the conspiracy between Serpico and Rossi. Serpico emailed Rossi after Plaintiff

sent a cease-and-desist email to not destroy documents on May 28, 2014 (**Exhibit M** at 2). This

was long before the federal case was filed that made them co-defendants. <u>Conspiracy to evict is</u>

<u>the likely explanation for the two men to be communicating in such a way at that early time.</u>

**4. Defendants Failed to Produce Any Evidence to Support a Defense**

The defendants failed to produce evidence to support their defense that Plaintiff was a deadbeat, non-rent-paying, harassing troublemaker, worthy of being evicted. Therefore, the eviction was a retaliatory act in response to Plaintiff's press coverage violating the First Amendment.

Starting with the original housing court eviction petition (**Exhibit R**), there was no mention whatsoever of Plaintiff being late in rent or causing any trouble in the apartment building. The only justification given for the non-renewal of the lease was that the building was designated as "condominium" and was not rent-stabilized. Therefore, they argued that they were under no obligation to renew the lease. However, New York real Property Law, Article 7 § 223-b, *inter alia*, makes it illegal to evict even a person in a free-market condominium if it is done as retaliation. Only years later, when Plaintiff sued in federal court and the defendants needed a defense strategy, did they begin to concoct stories about Plaintiff harassing other residents.

During the Rossi deposition, when asked about specific examples of Plaintiff causing trouble, he could not think of any details or specific dates. Rossi only made vague references to alleged noise complaints some time during 2013 and 2014 made by Plaintiff's neighbors (**Exhibit S** at 31:12-24). In fact, Plaintiff never received any written notices or calls about these complaints and defendants provided no documents to prove they took place.

Rossi only made vague references to disputes Plaintiff had with certain night-shift doormen who were failing to do their job. *Id.* at 2:10-40:19. However, those non-incidents occurred in 2015, long after the retaliatory eviction was initiated. By that time, Plaintiff was collecting, for the purpose of litigation, evidence of wrongdoing by the real estate defendants. He

filed complaints about doormen sleeping on the job, allowing people past the desk without screening, refusing to call 911 when real fires erupted, etc.

The real estate defendants also claimed that Plaintiff failed to pay rent, and that was why they evicted him (*Id.* at 40:20-43:11). However, nowhere in the extensive housing court litigation was evidence of this produced, and nothing from the discovery period in this federal case unearthed such evidence. In fact, Plaintiff produced copies of checks for the years 2012 and 2013 that prove he paid on the first of the month and was never more than 30-days late (**Exhibits T, U**). Ongoing disagreements over the actual balances owed are the reason for the differing amounts of the checks from month to month. Moreover, the real estate defendants have a 10-day grace period policy for submitting rent checks (**Exhibit X**).

Most importantly, the defendants renewed Plaintiff's lease in May of 2013, just months before they decided to evict Plaintiff (**Exhibit V**), as well as on numerous previous occasions over the 14-years of his occupancy. This also helps prove that tenant was in good standing regarding rent.

Plaintiff produced hundreds of emails sent by him to the landlord, over a period of five years (**Exhibit W**), documenting how their rent accounting system was chronically inaccurate. On numerous occasions, the real estate defendants admitted to being wrong and reversed the accounting claiming that plaintiff owed money. *Id* at 1,4,7,8,9.

There is also no evidence that the real estate defendants have ever evicted anyone else in the building for being slightly late in rent or creating stereo noise disturbances. When Rossi was asked during deposition to list examples of other evictions, he could not recall any (**Exhibit S** at 43:24-48:20). Likewise, during the Milstein deposition, he could not recall of any other similar

evictions. During document production, the defendants could not produce any evidence of evictions for any reason, much less for the minor alleged infractions, such as stereo noise.

The likely conclusion to be drawn from the above scenario is that it would be highly irrational and unusual for this landlord defendant, operating in the high cost of living of Manhattan, to evict a tenant such as Plaintiff who was willing to pay the high rents charged for small apartments. Therefore, Plaintiff was likely evicted out of retaliation.

## 5. Spoliation Warrants Sanctions and Summary Judgment

The egregious pattern of spoliation by all defendants alone warrants sanctions and/or a summary judgment in favor of Plaintiff. <u>Sanctions should be in the form of precluding the defendants from denying that they evicted plaintiff in retaliation for his press coverage</u>.

### A. The Acts of Spoliation

The real estate defendants admitted to Judge Cott on May 18, 2017, and later in an affidavit (**Exhibit N**), that they deleted emails from their computers at work and a backup server. This occurred after Plaintiff sent all defendants on March 23, 2014 and May 28, 2014 cease-and-desist letters to not destroy any documents due to pending litigation (**Exhibits 0, P**). Chief of Staff Kevin McCabe admitted to receiving the cease-and-desist email letters (**Exhibit G** at 9:15-22) and Serpico emailed Rossi after the second cease-and-desist was sent by Plaintiff on May 28, 2014 (**Exhibit M**)

The BPCA defendants also admitted during deposition that they deleted work emails after instructed not to do so. Serpico stated that he deleted emails (**Exhibit H** at 21:13-22:19), as did McCabe (**Exhibit G** at 9:3-10:8), and Koenig (**Exhibit I** at 11:22-12:3).

<u>As a result of the email spoliation, crucial evidence was not produced and Plaintiff has been severely prejudiced against proving his case</u>. The email(s) referenced by Linda Soriero,

discussed above, should be residing on the archived document computer server of the BPCA, which is held at a third-party computer company called Iron Mountain. However, the BPCA refused to produce those during document requests, and successfully quashed a subpoena. Likewise, the same email(s) that Soriero witnessed being sent from Serpico to Rossi should reside on the real estate servers, but they have already admitted to deleting them "by accident". Moreover, during post-deposition documents requests, all defendants refused to respond to any requests seeking information on the servers or emails (**Exhibit Y**).

In perhaps the most egregious act of malicious "willful bad faith" warranting sanctions of default judgment, the BPCA fired Linda Soriero after she began to assist Plaintiff in his case. This chilled the witness and she vanished, refusing to answer calls from Plaintiff and even her own lawyer. Soriero did not appear for two different dispositions. This action by the BPCA was flagrant witness tampering.

Another piece of crucial evidence obtained by Plaintiff to help prove his case exists in the form of the September, 2013 letter from New York Inspector General Catherine Leahy Scott mandating managerial training for Serpico (**Exhibit Z**). It was caused by Plaintiff's press coverage and complaints filed and was the "final straw" motivating Serpico to retaliate. However, during Serpico's deposition, lawyer Tremonte inappropriately and in bad faith instructed his client to not answer any questions on the matter (**Exhibit H** at 27:11-34:6).

**B. The Statutes and Case Law Supporting Sanctions**

FRCP 37(c) gives this Court the explicit authority to sanction the defendants for their failure to provide the information required under FRCP 26(e). FRCP 37(c)(1), by its plain language, imposes a self-executing sanction unless the FRCP 26(e) violation "was substantially justified or is harmless." The Second Circuit has adopted a four-part test to determine whether to

sanction a party under Rule 37(c). The Court must look to: (1) the party's explanation for the failure to disclose or supplement; (2) the importance of the evidence sought to be precluded; (3) the prejudice suffered by the opposing party; and (4) the possibility of a continuance. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006). Sanctions under Rule 37(c) do not require a finding of bad faith or callous disregard, but evidence of good or bad faith may be considered by this Court as part of defendants' explanation for his failure to comply with their discovery duties. *Id.* at 296; *accord Am. Friends of Yeshivat Ohr Yerushalayim, Inc. v. UnitedStates of Am.*, 2009 U.S. Dist. Lexis 47986, *19 (E.D.N.Y. 2009). Ultimately, it is the defendants' obligation under Rule 37(c) to prove harmlessness or substantial justification for his Rule 26(e) violations. *See, e.g., Am. Stock. Exch., LLC v. Moped, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002).

FRCP 56(d) and FRCP 37(b)(2)(A)(vi) also authorize this Court to grant summary judgment. "Sanctions [can include] rendering a default judgment against the disobedient party" Default judgment may be "imposed only if the court concludes that a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault." *Reg'l Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 153–54 (6th Cir. 1988). In this case, it is clear that the defendants "willfully and in bad faith" engaged in an elaborate scheme to prevent crucial evidence from being revealed to Plaintiff and the judge or jury.

**C. Sanctions Are Also Warranted Under The Court's Inherent Powers**

While the Federal Rules provide adequate basis for the relief sought herein, it should be noted that the Court has broader, inherent powers to sanction parties for all manner of litigation abuses. "Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent powers to manage its own affairs." *Residential Funding Corp.*, 305 F.3d at 106-07, and *Gusinski v Genger*, 10-cv-04506 Dkt. No. 117 (S.D.N.Y. 2012). In *Chambers v. Nasco*, 501 U.S. 32, 46 (1991), the inherent power exists, in the Supreme Court's words, "to fill in the interstices." In order to exercise these inherent powers, the Court must find that a party and/or his attorneys "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *DLC Mgmt. Corp.*, 163 F.3d at 136, citing *Chambers*, 501 U.S. at 45-46; *see also Oliveri v. Thompson*, 803.

**D. The Defendants' Negligence Also Warrants Default Judgment**

Negligence contributed to the defendants' pattern of spoliation. As previously detailed, the BPCA provided no training on open meetings law, FOIA law, or document retention. In fact, the New York Inspector General had to step in and mandate Serpico undergo training. As a result of this negligence, crucial electronic documents were destroyed and Plaintiff was barred from public meetings. Therefore, FRCP 37(e) gives this Court the authority to grant a default judgment in favor of Plaintiff, or sanctions precluding arguing that the retaliatory eviction did not transpire, and/or sanctions of adverse inference favoring Plaintiff. *Sekisui America Corp. v. Hart*, 945 F. Supp. 2d 494 (S.D.N.Y. 2013).

# Punitive Damages

## 1. Statutes and Case Law for Punitive Damages

"Section 1983 (42 U.S.C. § 1983 (Supp. IV 1980)) is a powerful legislative "sword" enacted by Congress for the protection of constitutional rights against infringement by the states. In *Smith v. Wade,* the United States Supreme Court decided what constitutes a "proper case" for an award of punitive damages under this statute. The Court, in a five to four decision, explicitly authorized punitive damages under section 1983 and established a "reckless disregard" standard as the requisite mental state for their imposition" *Marquette Law Review*, Volume 67, Issue 4, Summer 1984.

More recently, in the federal first amendment case of *Jackson v Dallas School District*: Case No. 3:12cv1903, Middle District of Pennsylvania, (decided 2015). "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983). In the instant case, the jury may be able to determine that the individual defendants' actions evinced a reckless or callous indifference to plaintiff's federally protected rights. Thus, it is inappropriate to grant judgment on the punitive damages claim at this time…. Remaining in the case will be plaintiff's first amendment associational claims, including the punitive damage claim against the defendants in their individual capacities. An appropriate order follows".

In the decision of another federal first amendment case using section 1983, *Jones v. City of Key West, Fla.*, 679 F. Supp. 1547 (S.D. Fla. 1988), it concluded that one of the individuals named as defendants were deserving of punitive damages.

The *Jones v Key West* decision also detailed various other first amendment cases that awarded punitive damages, in an attempt to estimate the going rate for damages. In a review of more than 10 cases involving violations of the first amendment rights of plaintiffs, the punitive damages awarded ranged from $1,000 to $400,000. The $400,000 amount in the case of *Kemp v. Ervin,* 651 F. Supp. 495, 506-09 (N.D.Ga. 1986) was based on a rationale of doubling of the mental anguish award.

## 2. The BPCA was Negligent, Warranting Punitive Damages

During the BPCA depositions, there was admission that the BPCA never offered any training to anybody regarding how to operate an open meeting and comply with the laws, how to handle Freedom of Information Act requests (FOIA), or how to properly retain and store documents. Therefore, the BPCA was negligent and is deserving of punitive damages.

During the Karl Koenig deposition, he stated that he had received no training in open meeting laws (**Exhibit I** at 24:17-25). He also received no training in FOIA (*Id.* at 12:9-15) or document retention (*Id.* at 11:6-20).

During the McCabe deposition, he stated that he had received no training in document retention (**Exhibit G** at 8:13-24). His training in FOIA is questionable given that he is not a lawyer but was assigned to handling FOIA requests (*Id.* at 10:15-12:18).

Stated during a voicemail message from Linda Soriero to Plaintiff on March 14, 2017 (**Exhibit zA** at 2), and in an email on the same day (**Exhibit zB**), Soriero blew the whistle on the sham of an Equal Employment Opportunity Commission (EEOC) office that the BPCA had installed after the previous firings of Kirk Swanson, Allyson Ford, and Nancy Harvey, who were all investigating EEOC complaints about Robert Serpico. Soriero explained that the new EEOC officer, Anthony Peterson, had no training or qualifications to hold that position and was making

a mockery of the job by spending his time at the office acting as the in-house sports betting bookmaker (**Exhibit zC**). She also explained in the email that the EEOC officer position now reports to operations rather than the legal department, presumably to prevent future instances of cases such as Ford, Harvey, or Swanson from investigating. Of note, during the deposition of Mehiel, his lawyer inappropriately impeded the fair examination of the witness by refusing to allow the questioning about Anthony Peterson to continue or his client to answer (**Exhibit F** at 9:10-10:16)[8].

Given the extensive history within the BPCA of people making complaints to the EEOC officers over many decades, for the CEO Dennis Mehiel to allow the EEOC role to become so diminished as it has demonstrates gross negligence. It also suggests a complicity in a scheme to discourage females from reporting sexual harassment complaints to an EEOC officer.

However, the most damning direct evidence proving that the BPCA was grossly negligent in training its staff is found in the September 19, 2013 letter from New York Inspector General Catherine Leahy Scott ordering Robert Serpico to undergo executive management and ethics training (**Exhibit Z**). He was the acting president of the BPCA at the time the letter was sent.

## 3. The BPCA's Actions Were Malicious, Warranting Punitive Damages

The decision by Mehiel to bar Plaintiff from open meetings, which he admitted to making during deposition, demonstrates intent. The plan was then executed in an illicit and fraudulent manner, making it malicious and worthy of strong punitive damages.

Firstly, the BPCA maliciously destroyed Plaintiff's reputation in Battery Park City by telling the security of staff of the large real estate company Brookfield Properties and officers of

---

[8] Per FRCP 30(d), this Court can issue sanctions for lawyer Tremonte's impeding of the deposition. In this case, it would be appropriate to order that the Soriero testimony and evidence be admissible and assumed to be accurate.

the New York Police Department to not allow Plaintiff into the meetings essentially because he was a dangerous threat. Numerous emails provided during discovery show the extent of this defamation (**Exhibit zD**). Video evidence also demonstrates these embarrassing scenes (*supra* at 7).

Secondly, the BPCA decided to perpetrate an elaborate fraud by concocting a ruse in the form of the "video overflow room" designed purely to quarantine Plaintiff, banishing him to a room a half-mile away from the board meetings. Deposition testimony proves that this was all a fraud.

During the Mehiel deposition, he admitted that the BPCA boardroom was never filled to capacity requiring any sort of annex site or video viewing room. He admitted that his decision to bar me had nothing to due with crowd size (**Exhibit F** at 36:12-38:15).

During the McCabe deposition, Mr. McCabe, who is the Chief of Staff for the BPCA and right-hand man of Mehiel, he admitted that the plan to set up an annex site with video streamed in of the live BPCA meeting was designed solely for Plaintiff and had nothing to do with the boardroom being too crowded (**Exhibit G** at 58:16 – 63:24). He explained that the annex site was the way that the BPCA planned to execute the orders of Mehiel who decided to bar Plaintiff.

During the Koenig deposition, he too admitted that the boardroom was never overcrowded necessitating an "overflow" room (**Exhibit I** at 28:5-29:11).

The BPCA's scheme to create an annexed video viewing room solely for Plaintiff violates the First Amendment. In the order denying the defendants motions to dismiss (Dkt. No 177), it states:

> "Second, the BPCA Defendants claim that Greer is not entitled to defy "lawful and routine event-management protocols." BPCA Defs Br. 17. Greer's allegations, however, suggest that he was not subject to such routine event-management protocols. Instead, he claims that "[g]oing back to at least the year 2009, the BPCA has never before set up [a] satellite video viewing station" and that he was the *only* member of the press or the public

> diverted to the one set up for the July 29, 2015 meeting. Com pl. ~~ 69-70, 72, 73. In
> other words, Greer alleges that the BPCA Defendants put restrictions in place solely to
> prevent his physical presence at the meeting."

Plaintiff has now proved beyond a reasonable doubt, and certainly by a preponderance of the

evidence, the allegations referenced in Plaintiff's complaint, cited above. Not only is the

BPCA liable, but the individuals of Mehiel and Serpico are also liable by their own

admissions.

      In this instant case, Plaintiff proved that the defendants demonstrated a "reckless

disregard", per *Smith v Wade*, and were "motivated by evil motive or intent, or when it involves

reckless or callous indifference to the federally protected rights of others.", per *Jackson v Dallas

School District*. Plaintiff is claiming $1,000,000 in mental anguish (**Exhibit zE**). Therefore, the

fair punitive damages should be at least $2,000,000, per *Kemp v. Ervin*. This is conservative

given that the cases upon which that amount was derived are now 30-years old.

## Equitable Relief is Allowed in This Case

      Section 1983 grants this Court broad power to grant equitable relief. Equitable remedies

that courts have provided in the past include school desegregation, restructuring of state mental

health facilities, and restructuring of prisons (*United States v. City of Yonkers,* 96 F. 3d 600 [2nd

Cir. 1996]; *Wyatt v. Stickney,* 344 F. Supp. 373 [M.D. Ala. 1972]; *Hutto v. Finney,* 437 U.S. 678,

98 S. Ct. 2565, 57 L. Ed. 2d 522 [1978]). The evidence warranting equitable relief in this instant

case was produced during discovery, after the complaint was filed.

      In this case, it has been proved that the BPCA defendants have engaged for decades in

retaliatory tactics to cover up illicit activity. Numerous people have lost their jobs when they

failed to capitulate to the wrongdoing. Recently, two African American female lawyers were

fired after they handled complaints from employees about Robert Serpico's sexual misconduct

and began investigations. Linda Soriero, Serpico's secretary of 18-years, was fired after she began to assist Plaintiff. Soriero also reported that a "Caribbean girl", who complained to the EEOC officer about Serpico groping her, was fired (**Exhibit Q** at 13:7-17). Kirk Swanson was fired after he refused to go along with schemes to rig government contracts, and Plaintiff was evicted from his home of 14-years after his muckraking coverage in the press.

It has also been proved that the BPCA is egregiously negligent by failing to provide even a modicum of managerial training on open meeting law, FOIA law, and document retention practices. Soriero also declared that she witnessed Serpico retrieve his own human resources files from a file cabinet and destroy them (**Exhibit Q** at 14:12-15:25).

Plaintiff has alerted every state oversight agency that he could think of, including the New York Inspector General, Comptroller, Attorney General, and Governor, and little action was taken to clean up the BPCA. Therefore, this federal Court should use the power granted to it for this very purpose and address the problems of the BPCA.

Plaintiff is requesting equitable relief in the form of restructuring of the Battery Park City Authority. There should be, (a) relief mandating that the BPCA provide all staff with proper training on New York Open Meeting laws, state and federal FOIA laws, sexual harassment laws, and document retention laws, and (b) relief mandating that the BPCA allow questions from the press and public during board meetings[9], and (c) relief mandating that BPCA board members be comprised of actual residents of Battery Park City[10], and (d) relief by removing Chairman/CEO Dennis Mehiel from the BPCA given his disastrous track record and the fact that the governor did not reappoint him after his term expired in 2015.

---

[9] Every elected official representing Battery Park City has written multiple letters urging the BPCA to allow questions from the public during meetings (http://www.ebroadsheet.com/bpca-offers-allow-elected-officials-speak-board-meetings-residents-will-submit-comments-paper/).
[10] A bipartisan bill passed the New York State Senate asking for this same type of restructuring of the BPCA. S.130/A.4002 - Glick/Niou

# Summary

Plaintiff has produced a mountain of evidence to prove beyond a reasonable doubt, much less a preponderance of the evidence, that the defendants conspired to retaliate against Plaintiff in response to negative coverage in the press, thus violating his First Amendment rights to freedom of the press and speech. The defendants demonstrated malicious intent and are deserving of strong punitive damages in addition to compensatory damages.

It is irrefutable that the BPCA defendants, ordered by Dennis Mehiel, schemed a plan to bar Plaintiff from public board meetings, singling him out from the other local journalists. Therefore, Count 2 is proved. Dennis Mehiel and Robert Serpico need to be held accountable as an individual defendant.

The evidence also proves beyond a preponderance of the evidence that the defendants conspired to evict Plaintiff. Therefore, Count 1 is proved.

Plaintiff had been a respected leader in the community of Battery Park City in Lower Manhattan. He operated two media companies there and was planning on building an urgent care surgery center there as well. All of that has been taken away from him. Government agencies in The United States of America should not be allowed to get away with retaliation against the press of such magnitude.

This country is now at a crossroads, with evidence growing that the press is being marginalized, silenced, and even physically attacked. A reporter in Montana was recently assaulted by a man who went on to become elected to congress the next day. In New York State and City, elected officials rarely conduct proper press conferences. In The White House, the West Wing daily press briefings are reality TV.

29

As other branches of government that are supposed to provide oversight become ever more corrupted, the press has become the most powerful oversight authority in The United States. Accordingly, The First Amendment has been elevated as one of the most important provisions of the constitution maintaining our free democracy and peaceful transfer of power. The verdict by this Court in this case will have loud repercussions.

## Relief

**WHEREFORE**, Plaintiff Steven E. Greer, MD requests relief from this court in the form of an order that:

(a)     Grants summary judgment of liability in favor of Plaintiff on all counts of defendants' violation of the First Amendment: Count 1- retaliatory eviction, Count 2- barring Plaintiff from open public meetings, on the grounds that no genuine issues regarding any material facts remains; and,

(b)     Grants a jury trial to determine compensatory and punitive damages; and,

(c)     Reinstates the individuals Serpico and Mehiel as defendants in Count 2; and,

(d)     Alternatively, if (a) is not awarded, grants sanctions precluding defendants from arguing that the retaliatory eviction did not take place, and for adverse inference on spoliated evidence in favor of Plaintiff; and,

(e)     Issues equitable relief mandating that the BPCA provide all staff with proper training on New York Open Meeting laws, state and federal FOIA laws, EEOC sexual harassment laws, and document retention laws; and,

(f)     Issues equitable relief mandating that the BPCA allow questions from the press during board meetings; and,

(g)     Issues equitable relief mandating that BPCA board members be comprised of actual residents of Battery Park City; and,

(h)     Issues equitable relief removing Dennis Mehiel as Chairman and CEO from the BPCA; and,

(i)     Leads to the immediate return of Plaintiff to his apartment at 200 Rector Place, with all moving costs to be paid by the defendants; and,

(j)     Awarding any other relief deemed fit and necessary by this Court


Signed this 7th day of June, 2017

Signature of Plaintiff  _____

Steven Greer
4674 Tatersall Court
Columbus, Ohio 43230
(212) 945-7252
steve@batterypark.tv