UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEVEN GREER,

                     Plaintiff,

     - against -

DENNIS MEHIEL, ROBERT SERPICO, THE
BATTERY PARK CITY AUTHORITY, HOWARD
MILSTEIN, STEVEN ROSSI, JANET MARTIN,
MILFORD MANAGEMENT and MARINERS COVE
SITE B ASSOCIATES,

                Defendants.

No. 15-CV-06119 (AJN) (JLC)

# MEMORANDUM OF LAW IN SUPPORT OF
## THE BATTERY PARK CITY AUTHORITY AND
## ROBERT SERPICO'S MOTION FOR SUMMARY JUDGMENT

Michael Tremonte
Justin J. Gunnell
Michael W. Gibaldi
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel:  212.202.2600
Fax:  212.202.4156
E-mail:  mtremonte@shertremonte.com

*Attorneys for the Hugh L. Carey Battery
Park City Authority and Robert Serpico*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ..................................................................................................... 2

ARGUMENT .............................................................................................................................. 3

I.     THERE IS NO EVIDENCE THAT THE BPCA DEFENDANTS CONSPIRED WITH THE LANDLORD DEFENDANTS TO EVICT PLAINTIFF FROM HIS APARTMENT .................................................................................................................. 3

II.    THE BPCA DEFENDANTS DID NOT VIOLATE PLAINTIFF'S FIRST AMENDMENT RIGHTS BY EXCLUDING HIM FROM THE BPCA BOARDROOM ON JULY 29, 2015 ............................................................................................................. 8

III.   THE BPCA AND SERPICO (IN HIS OFFICIAL CAPACITY) ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE NEITHER OF THE ALLEGED CONSTITUTIONAL VIOLATIONS WERE COMMITTED PURSUANT TO AN OFFICIAL POLICY OR CUSTOM .......................................................................... 13

IV.   EVEN IF PLAINTIFF COULD ESTABLISH A VIOLATION OF HIS FIRST AMENDMENT RIGHTS, THERE IS NO EVIDENCE TO SUPPORT AN AWARD GREATER THAN NOMINAL DAMAGES ....................................................................... 17

      A.    There is No Evidence to Support Plaintiff's Claims for Lost Profits and Lost Income Damages .................................................................................................. 18

      B.    There Is No Evidence to Support Plaintiff's Claimed Mental Anguish ............... 21

      C.    Plaintiff Cannot Recover Expenses Incurred After His Eviction ........................ 22

      D.    As a Public Benefit Corporation, the BPCA Is Immune from Punitive Damages under 42 U.S.C. § 1983 ........................................................................................ 24

CONCLUSION ......................................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Allan v. City of New York*,
    386 F. Supp. 2d 542 (S.D.N.Y. 2005)................................................................ 14

*Am. Broadcasting Cos., Inc. v. Cuomo*,
    570 F.2d 1080 (2d Cir. 1977)........................................................................ 8

*Annis v. County of Westchester*,
    136 F.3d 239 (2d Cir. 1998)...................................................................... 21, 22

*Bailey v. Pataki*, No. 08-CV-8563 (JSR),
    2010 WL 234995 (S.D.N.Y. Jan. 19, 2010) .................................................. 4

*Beechwood Restorative Care Ctr. v. Leeds*,
    436 F.3d 147 (2d Cir. 2006)........................................................................ 5

*Birmingham v. Ogden*,
    70 F. Supp. 2d 353 (S.D.N.Y. 1999).......................................................... 16

*Byrd v. Metro. Transit Auth.*,
    No. 15-CV-1364 (JG)(RLM), 2015 WL 4546718 (E.D.N.Y. July 28, 2015) ................. 13

*Carey v. Piphus*,
    435 U.S. 247 (1978)................................................................................ 18

*Carter v. Cty. of Suffolk*,
    No. 12-CV-1191 (JFB) (ARL), 2013 WL 6224283 (E.D.N.Y. Dec. 2, 2013) ................. 17

*Ciambriello v. Cty. of Nassau*,
    292 F.3d 307 (2d Cir. 2002)........................................................................ 4

*City of Newport v. Fact Concerts, Inc.*,
    453 U.S. 247 (1981)................................................................................ 24

*Cotarelo v. Vill. of Sleepy Hollow Police Dep't*,
    460 F.3d 247 (2d Cir. 2006)........................................................................ 7

*D'Amario v. Providence Civic Center Auth.*,
    639 F. Supp. 1538 (D.R.I. 1986), *aff'd*, 815 F.2d 692 (1st Cir. 1987) .............................. 9

*Dockery v. Tucker*,
    No. 97-CV-3584 (ARR) (RLM), 2006 WL 5893295 (E.D.N.Y. Sept. 6, 2006), *report & recommendation adopted in part*, 2008 WL 2673307 (E.D.N.Y. June 26, 2008)............ 20

*Eichenlaub v. Township of Indiana*,
        385 F.3d 274 (3d Cir. 2004)........................................................................ 12

*Eslin v. Hous. Auth. of Town of Mansfield*,
        No. 11-CV-134 (JCH), 2012 WL 113666 (D. Conn. Jan. 13, 2012)............................. 13

*Estes-El v. State Dep't of Motor Vehicles Office of Admin. Adjudication Traffic Violation
        Bureau*,
        No. 95-CV-3454 (JFK), 1997 WL 342481 (S.D.N.Y. June 23, 1997)............................ 13

*Figueroa-Rodriguez v. Aquino*,
        863 F.2d 1037 (1st Cir. 1988)..................................................................... 23

*Fisk v. Letterman*,
        401 F. Supp. 2d 362 (S.D.N.Y. 2005)............................................................... 5

*Gibeau v. Nellis*,
        18 F.3d 107 (2d Cir. 1994)........................................................................ 18

*Gierlinger v. Gleason*,
        160 F.3d 858 (2d Cir. 1998)....................................................................... 19

*Guan N. v. NYC Dep't of Educ.*,
        No. 11-CV-4299 (AJN), 2014 WL 1275487 (S.D.N.Y. Mar. 24, 2014) (Nathan, J.)...... 16

*H & P Research, Inc. v. Liza Realty Corp.*,
        943 F. Supp. 328 (S.D.N.Y. 1996) ................................................................. 19

*Huminski v. Corsones*,
        396 F.3d 53 (2d Cir. 2005)...................................................................... 9, 12

*Isaac v. City of New York*,
        701 F. Supp. 2d 477 (S.D.N.Y. 2010)................................................................ 7

*Jeffes v. Barnes*,
        208 F.3d 49 (2d Cir. 2000)........................................................................ 16

*Kenford Co. v. Erie Cty.*,
        493 N.E.2d 234 (N.Y. 1986)........................................................................ 20

*Kentucky v. Graham*,
        473 U.S. 159 (1985).............................................................................. 17

*Kerman v. City of New York*,
        374 F.3d 93 (2d Cir. 2004)........................................................................ 18

*Majer v. Metro. Transp. Auth.*,
   No. 90-CV-4608 (LLS), 1992 WL 110995 (S.D.N.Y. May 7, 1992)............................. 24

*Malta v. Slagle*,
   No. 05-CV-342S, 2007 WL 952045 (W.D.N.Y. Mar. 29, 2007) ..................................... 12

*McCann v. Coughlin*,
   698 F.2d 112 (2d Cir. 1983)......................................................................................... 18

*Memphis Cmty. Sch. Dist. v. Stachura*,
   477 U.S. 299 (1986)..................................................................................................... 18

*Mesa v. Hudson Cty. Bd. of Chosen Freeholders*,
   No. CIV.A. 09-3576 KSH, 2011 WL 4592390 (D.N.J. Sept. 30, 2011) ......................... 12

*Miller v. Lovett*,
   879 F.2d 1066 (2d Cir. 1989)........................................................................................ 23

*Monell v. Department of Social Services of the City of New York*,
   436 U.S. 658 (1978)........................................................................................... *passim*

*Monette v. Cty. of Nassau*,
   No. 11-CV-539 (JFB) (AKT), 2015 WL 1469982 (E.D.N.Y. Mar. 31, 2015)................ 22

*Nicholas v. City of New York*,
   No. 15-CV-9592 (JPO), 2017 WL 766905 (S.D.N.Y. Feb. 27, 2017) ............................ 9

*Pangburn v. Culbertson*,
   200 F.3d 65 (2d Cir. 1999)............................................................................................. 4

*Patrolmen's Benevolent Ass'n of City of New York v. City of New York*,
   310 F.3d 43 (2d Cir. 2002).................................................................................... 21, 22

*Patterson v. Cty. of Oneida, N.Y.*,
   375 F.3d 206 (2d Cir. 2004)......................................................................................... 17

*Pembaur v. City of Cincinnati*,
   475 U.S. 469 (1986)..................................................................................................... 15

*Phillips v. City of New York*,
   871 F. Supp. 2d 200 (E.D.N.Y. 2012) .......................................................................... 18

*Ramos v. City of New York*,
   No. 96-CV-3787, 1997 WL 410493 (S.D.N.Y. July 2, 1997)......................................... 17

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997)................................................................................ 7

*Ridgeview Partners, LLC v. Entwistle*,
    354 F. Supp. 2d 395 (S.D.N.Y. 2005)............................................................. 23

*RMLS Metals, Inc. v. Int'l Bus. Machines Corp.*,
    874 F. Supp. 74 (S.D.N.Y. 1995) .................................................................... 19

*Roe v. City of Waterbury*,
    542 F.3d 31 (2d Cir. 2008)............................................................................... 15

*S.H.A.R.K. v. Metro Parks Serving Summit Cty.*,
    499 F.3d 553 (6th Cir. 2007) ............................................................................. 9

*Sheikh v. City of New York, Police Dep't*,
    No. 03-CV-6326 (NGG), 2008 WL 5146645 (E.D.N.Y. Dec. 5, 2008).......................... 17

*Smith v. Campbell*,
    782 F.3d 93 (2d Cir. 2015)................................................................................. 4

*Smith v. Stratus Computer, Inc.*,
    40 F.3d 11 (1st Cir. 1994) .................................................................................. 6

*Stanczyk v. City of New York*,
    752 F.3d 273 (2d Cir. 2014)............................................................................. 19

*Stevens v. N.Y. Racing Ass'n, Inc.*,
    665 F. Supp. 164 (E.D.N.Y. 1987) .................................................................... 9

*Swanson v. Battery Park City Auth.*,
    No. 15-CV-6938 (JPO) (S.D.N.Y.).................................................................... 6

*Tanvir v. LaPorte*,
    No. 93-CV-6923 (JGK), 1997 WL 473084 (S.D.N.Y. June 13, 1997) ........................... 24

*Thornton v. City of Kirkwood*,
    No. 07-CV-79 (CDP), 2008 WL 239575 (E.D. Mo. Jan. 28, 2008)................................ 12

*Turpin v. Mailet*,
    619 F.2d 196 (2d Cir. 1980)............................................................................. 13

*Uddin v. New York City / Admin. for Children's Servs.*,
    No. 99-CV-5843 (GEL), 2001 WL 1512588 (S.D.N.Y. Nov. 28, 2001) ........................ 22

*Wallace v. Suffolk Cty. Police Dep't,*
    809 F. Supp. 2d 73 (E.D.N.Y. 2011) ............................................................................ 19

*Washington v. Kellwood Co.,*
    No. 05-CV-10034 (SN), 2016 WL 3920348 (S.D.N.Y. July 15, 2016) .......................... 20

*Weinstock v. Columbia Univ.,*
    224 F.3d 33 (2d Cir. 2000).............................................................................................. 3

*WPIX v. League of Women Voters,*
    595 F. Supp. 1484 (S.D.N.Y. 1984)................................................................................ 9

## Statutes

42 U.S.C. § 1981 .................................................................................................................. 17

42 U.S.C. § 1983 ........................................................................................................... *passim*

N.Y. Pub. Auth. Law §1970 ............................................................................................... 16

## Other Authorities

Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev. 927
    (1992).............................................................................................................................. 12

## Rules

Fed. R. Civ. P. 56.................................................................................................................. 3

Defendants the Hugh L. Carey Battery Park City Authority ("BPCA") and Robert

Serpico ("Serpico," and together with the BPCA, the "BPCA Defendants") respectfully submit

this Memorandum of Law in support of their Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Following the Court's September 30, 2016 order granting in part the BPCA Defendants'

motion to dismiss, only two claims remain:  (1) First Amendment retaliation claim against the

BPCA and Serpico, and (2) First Amendment equal access claim against the BPCA.  The record,

after discovery, contains no evidence to support either of these claims.  Contrary to Plaintiff's

baseless allegation that the BPCA and Landlord Defendants[1] conspired to evict him from his

apartment in retaliation for his blog posts, the evidence proves that the BPCA Defendants played

no role whatsoever in his eviction.  In fact, Plaintiff's landlord, acting alone, declined to renew

his lease because Plaintiff failed to pay his rent on time, was in arrears, and was the subject of

complaints by other tenants.  It is beyond dispute, moreover, that Plaintiff unsuccessfully

contested his eviction in housing court; at the end of those proceedings, a final judgment of

possession was issued in favor of the Landlord Defendants, together with a warrant of eviction.

In the face of overwhelming, uncontradicted evidence that the BPCA Defendants played no role

his eviction, and that he had only himself to blame for losing his apartment, Plaintiff would have

this Court require the BPCA Defendants to stand trial based on nothing more than an eye roll and

a shrug.  One witness, former BPCA employee Kirk Swanson, testified that he asked Serpico if

Serpico had been involved in the non-renewal of Plaintiff's lease, and that in response Serpico

rolled his eyes and shrugged.  This shrug and eye roll, which comprise the sum total of Plaintiff's

evidence of any BPCA Defendant's role in his eviction, cannot support a reasonable inference of

---

[1]      The BPCA Defendants use the term "Landlord Defendants" to refer to all defendants other than the BPCA
Defendants.

an unlawful conspiracy in violation of Plaintiff's constitutional rights. Accordingly, summary judgment is warranted in favor of the BPCA Defendants on Plaintiff's retaliatory eviction claim.

Plaintiff's claim that he was excluded from a BPCA board meeting in violation of his First Amendment rights is likewise unsupported by any proof. The record is replete with evidence of Plaintiff's prior, documented history of threatening and abusive behavior, which was directed at both BPCA staff and members of the BPCA community. That prior history of misconduct, coupled with Plaintiff's disruptive behavior at the BPCA board meeting in June 2015 – which Plaintiff admitted at his deposition – caused the BPCA Chairman to take steps to ensure public safety and the orderly conduct of BPCA business. The BPCA's solution – making available a live video and audio feed of the next BPCA board meeting at a room in a separate building – was reasonably tailored to those goals and did not impair Plaintiff's ability to gather and report on the news. The record contains not one shred of evidence to the contrary. Accordingly, summary judgment in favor of the BPCA is also warranted on Plaintiff's exclusion claim.

Finally, even if a material question of fact existed as to either of Plaintiff's remaining claims – which is not the case – the BPCA and Serpico (in his official capacity) are entitled to summary judgment because Plaintiff cannot show that the allegedly unconstitutional acts were performed pursuant to a municipal policy or custom, as is required under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and its progeny.

## FACTUAL BACKGROUND

For the relevant factual background, the BPCA Defendants refer the Court to their Statement of Material Facts filed pursuant to Local Rule 56.1 (cited herein as 56.1 ¶ __).

**ARGUMENT**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). Because there are no genuine disputes as to any material facts, and the evidence is insufficient to support a verdict in Plaintiff's favor on either of his remaining claims, summary judgment in favor of the BPCA Defendants is warranted.

## I.  THERE IS NO EVIDENCE THAT THE BPCA DEFENDANTS CONSPIRED WITH THE LANDLORD DEFENDANTS TO EVICT PLAINTIFF FROM HIS APARTMENT

Although it is beyond dispute that Plaintiff repeatedly failed to timely pay his rent, that his landlord received complaints about him from his neighbors, and that he unsuccessfully contested his eviction in housing court,[2] Plaintiff claims that his eviction was the result of an alleged conspiracy between the BPCA Defendants and Landlord Defendants in retaliation for his blog posts. In light of the uncontroverted evidence that Plaintiff had defaulted on his lease, that his eviction was previously litigated and held to have been proper, and the complete lack of evidence to support the existence of any conspiracy, Plaintiff's retaliatory conspiracy claim cannot survive summary judgment.

---

[2]     On March 13, 2015, Justice Arlene H. Hahn of the Civil Court of the City of New York Housing Part ordered Plaintiff to pay nearly a year of unpaid use and occupancy fees to the Landlord Defendants for the continued possession of his apartment. (*See* ECF No. 116-5 at 5.) After Plaintiff failed to pay this amount, on January 28, 2016, the Housing Court entered a money judgment against him in the amount of $44,135 "for unpaid use and occupancy for the period of April 2014 to April 2015" and "awarded a final judgment of possession and the forthwith issuance of the warrant of eviction" in favor of the Landlord Defendants. (*See* ECF No. 184-4 at 2.) Consistent with the warrant of eviction, Plaintiff vacated his apartment in April 2016. (*See* 56.1 ¶ 13.)

An agreement is the "*sine qua non* of any conspiracy claim," including a claim brought under § 1983. *See, e.g.*, *Bailey v. Pataki*, No. 08-CV-8563 (JSR), 2010 WL 234995, at *2 (S.D.N.Y. Jan. 19, 2010). "To prove a § 1983 conspiracy, a plaintiff must show:  (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002).  Here, with discovery completed, there is no evidence – literally none – to support any of the required elements of Plaintiff's claim that the BPCA Defendants and the Landlord Defendants conspired to evict him in retaliation for the exercise of his First Amendment rights.[3]

There is no evidence of any relevant agreement to act in concert to inflict constitutional injury, or of any overt acts in furtherance of the non-existent conspiracy.  To the contrary, Steve Rossi of Milford Management testified that he personally made the decision not to renew Plaintiff's lease, (*see* 56.1 ¶ 83), and that his decision was based upon Plaintiff's failure to pay his rent on time, as well as other tenants' and building staff members' complaints about Plaintiff. (*See id*. ¶¶ 84, 86, 87.)  Both Rossi and Serpico aver that Serpico played no role whatsoever in that decision (*see id.* ¶¶ 82–87), and their testimony is uncontradicted.  In fact, the only evidence reflecting any communications between Serpico and Rossi about Plaintiff is a single email, in which Serpico asked Rossi, "Is he now evicted ?  Where is he living ?"  (Serpico Decl. ¶ 6, Ex.

---

[3]     In its September 30, 2016 Order, the Court construed Plaintiff's eviction claim as a claim of "conspiracy to engage in First Amendment retaliation."  Order at 6, ECF No. 177.  To prove a claim of First Amendment retaliation, a plaintiff must prove that "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [plaintiff's] exercise of that right; and (3) the defendant's actions caused him some injury."  *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (alteration in original).  As discussed *infra*, there is no evidence that the BPCA Defendants acted in any way to undermine Plaintiff's constitutional rights, that the BPCA Defendants' actions were motivated in any way by Plaintiff's exercise of any of his rights, or that the BPCA Defendants' actions caused Plaintiff any injury.

1.)  Serpico's email to Rossi forwards an email that Serpico and Rossi (and others at Milford

Management, the BPCA, and the New York State Assembly) had received from Plaintiff just

minutes before, which states:

> As you are aware, the Second District Attorney, Preet Bharara, has
> informed state officials to not destroy any documents obtained in the
> Moreland Commission.  I will be subpoenaing emails and phone
> records from your offices relating to my retaliatory eviction.  If you
> delete any emails, digital video, etc you will be violating the law.

(*Id*.)  Plainly, Serpico's email to Rossi was prompted by Plaintiff's email, in which Plaintiff

specifically referenced his "retaliatory eviction," apprised Serpico and Rossi of the fact that he

would be "subpoenaing emails and phone records from your offices" relating to his eviction, and

warned them against "violating the law."  Moreover, Serpico's email was sent in May 2014,

months after the decision not to renew Plaintiff's lease had already been made.  Accordingly, this

email, standing alone, cannot possibly support a reasonable inference that Serpico and Rossi

entered into an agreement of any kind, let alone that they conspired to remove Plaintiff from his

apartment.  Nor can the fact that Serpico and Rossi were friendly and met over coffee several

times per year (*see* 56.1 ¶ 79) support such an inference.  *See, e.g.*, *Fisk v. Letterman*, 401 F.

Supp. 2d 362, 377 (S.D.N.Y. 2005) ("Alleging merely that a private party regularly interacts

with a state actor does not create an inference of agreement to violate a plaintiff's rights."); *see

also Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 154 (2d Cir. 2006) (same).  Given

the complete absence of any probative evidence to prove either the existence of an agreement

between the BPCA Defendants and the Landlord Defendants relating to Plaintiff in any way, or

any overt act in furtherance of such an agreement, Plaintiff's conspiracy claim necessarily fails.

Likewise, the record contains no probative evidence to support Plaintiff's claim that two

BPCA employees "confirmed" the existence of a conspiracy between Serpico and Rossi after-

the-fact.  (*See* Corrected Amended Complaint, ECF No. 85 ("CAC") ¶ 66.)  First, there is no proof that Serpico communicated in any way (let alone "confirmed") to then-BPCA employee Kirk Swanson that Serpico "was responsible for the non-renewal letter sent to Plaintiff."  (*Id.*)  In fact, Swanson testified merely that he "asked Bob [Serpico] if he had anything to do with Greer not getting his lease renewed, to which Bob visibly smirked, shrugged and didn't answer my question and walked away."[4]  (Tremonte Decl. ¶ 9, Ex. 8 ("Swanson Dep.") at 24:16–20.) Swanson then added:  "The subject *might have* come up in subsequent conversations and would have elicited a similar response, an eye roll *or something like that*."  (*Id.* at 30:5–8 (emphasis added).)  This testimony is nonsensical.  Even if Serpico did shrug and roll his eyes ("or something like that"), such behavior would neither support Plaintiff's conspiracy claim nor provide probative evidence that "confirms" the existence of an unlawful conspiracy.  To the contrary, these gestures "could have meant any number of things, or nothing at all."  *See Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 18 (1st Cir. 1994).  In *Smith*, an employment discrimination case, the First Circuit considered evidence that the plaintiff's supervisor had "shrug[ged] in response to her question about why she was being treated differently than a number of male managers."  *Id.* at 17.  The First Circuit held that the "shrug cannot be considered an admission of discrimination" and that, because a shrug "could have meant any number of things, or nothing at all," evidence of the shrug carried "absolutely no probative force whatsoever."  *Id.* at 18.  The same reasoning applies here.

---

[4]      Swanson is a disgruntled former employee of the BPCA who has filed his own federal lawsuit against the BPCA alleging wrongful termination.  *See Swanson v. Battery Park City Auth.*, No. 15-CV-6938 (JPO) (S.D.N.Y.).

Second, there is no evidence to support Plaintiff's allegation that another former BPCA employee, Vince McGowan, "confirmed that the Serpico [sic] was working with other Defendants to evict the Plaintiff by not renewing his lease." (CAC ¶ 59.) The only item produced in discovery that relates in any way to McGowan is an irrelevant, vague, and in any event inadmissible[5] email from McGowan to Plaintiff, dated January 12, 2014, which states: "it is good to see that you appreciate what we have on the West Side[.] Hope you can stay[.]" (Tremonte Decl. ¶ 16, Ex. 15.) Accordingly, there is simply no support in the record for Plaintiff's claim that anyone at all "confirms" Serpico (or anyone else from the BPCA) played a role in the alleged conspiracy behind the non-renewal of Plaintiff's lease.

Absent any evidence of an agreement related to Plaintiff's tenancy, or of any overt acts by Serpico (or anyone else) to advance this alleged conspiracy to evict Plaintiff, no reasonable jury could find that the BPCA Defendants participated in a conspiracy to remove Plaintiff from his apartment at all, much less in retaliation for the exercise of his First Amendment rights. Accordingly, the Court should enter summary judgment for the BPCA Defendants on Plaintiff's retaliatory eviction claim.[6]

---

[5]     As inadmissible hearsay, the Court should not consider this email in deciding the instant motion. *See, e.g.*, *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

[6]     Additionally, the BPCA Defendants adopt in their entirety all arguments made by the Landlord Defendants in support of summary judgment. In particular, the BPCA Defendants note that the record contains ample evidence that Plaintiff fell behind in his rent payments and was the subject of complaints by other residents and staff of 200 Rector Place. (*See* 56.1 ¶¶ 83–86.) Because the Landlord Defendants have shown that they would have taken the same actions against Plaintiff even if he had not engaged in protected First Amendment activity, Plaintiff's First Amendment retaliation claim cannot survive summary judgment. *See, e.g.*, *Isaac v. City of New York*, 701 F. Supp. 2d 477, 496–97 (S.D.N.Y. 2010) ("Because defendants have shown that they would have taken the same actions even if plaintiff had never filed the lawsuit, and plaintiff has failed to offer evidence of a causal connection, no rational fact finder could decide in plaintiffs favor . . . ."); *see also Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251–52 (2d Cir. 2006) (holding that, even if plaintiff provides evidence of First Amendment retaliation, "the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse . . . action even in the absence of the protected conduct" (internal quotation marks omitted)).

## II.  THE BPCA DEFENDANTS DID NOT VIOLATE PLAINTIFF'S FIRST AMENDMENT RIGHTS BY EXCLUDING HIM FROM THE BPCA BOARDROOM ON JULY 29, 2015

The undisputed facts demonstrate that Plaintiff was excluded from the July 29, 2015 BPCA board meeting (the "July Meeting") as a result of his well-documented history of threats and verbal abuse toward BPCA personnel and his disruptive behavior at a prior meeting, and not because of the content of his blog posts.  There is no evidence (although Plaintiff would certainly possess and have produced such evidence if it existed) that his exclusion meaningfully impacted his ability to gather the news; it is undisputed that Plaintiff was able to view and report on the July Meeting – as it happened, in real time – from a separate facility.  There is no evidence that this arrangement impaired Plaintiff's ability to gather information from members of the BPCA board; as a matter of policy, the BPCA board did not at any time relevant to this lawsuit respond to questions posed by members of the press and public at board meetings.  (*See* 56.1 ¶¶ 67–76.) Indeed, at the time of the July Meeting, members of the public were not permitted to comment during BPCA board meetings.  (*See id.* ¶ 67.)  Under these circumstances, given Plaintiff's documented history of threatening and abusive conduct, the decision to keep him physically separated from, but able to view and report on the July Meeting as it was happening, was justified, appropriately limited, and did not offend the First Amendment.

In the First Amendment context, the Second Circuit has articulated the requirement of equal access thus:  "once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media."[7]  *Am. Broadcasting Cos., Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977).  That requirement is not absolute,

---

[7]  In its September 30, 2016 Order, the Court construed Plaintiff's meeting exclusion claim as a First Amendment equal access claim.  Order at 10–12, ECF No. 177.

however.  *WPIX v. League of Women Voters*, 595 F. Supp. 1484, 1489 (S.D.N.Y. 1984).  *Accord Huminski v. Corsones*, 396 F.3d 53, 55–59 (2d Cir. 2005) (holding that the First Amendment right of access to court proceedings is subject to reasonable restrictions).  Crucially, the government may impose "a restriction which affords different degrees of access to members of the press" so long as that restriction is "not content-based," is "rationally related to the accomplishment of a legitimate governmental purpose" and "outweigh[s] the systemic benefits inherent in unrestricted (or lesser-restricted) access."  *Stevens v. N.Y. Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987) (citing *D'Amario v. Providence Civic Center Auth.*, 639 F. Supp. 1538, 1542 (D.R.I. 1986), *aff'd*, 815 F.2d 692 (1st Cir. 1987)); *see also Nicholas v. City of New York*, No. 15-CV-9592 (JPO), 2017 WL 766905, at *5 n.2 (S.D.N.Y. Feb. 27, 2017).[8]  As this Court agreed at the motion to dismiss stage, "certain restrictions on attendance at public meetings do not offend the First Amendment," so long as those restrictions are "'reasonably tailored to meet the legitimate goals of the exclusion.'"  Order at 11, ECF No. 177 (quoting *Huminski*, 396 F.3d at 59).

Here, the record is devoid of evidence that Plaintiff was excluded because of his First Amendment activities.  BPCA Chairman Dennis Mehiel – who made the decision to exclude Plaintiff from the BPCA boardroom – testified that he did not even read Plaintiff's blog.  (56.1 ¶ 66.)  And there is no evidence that Plaintiff was denied entry because of the content of his reporting.  To the contrary, other reporters who had previously published articles critical of the BPCA were allowed to attend the July Meeting.  (*See* 56.1 ¶¶ 64–65.)

There is abundant evidence, however, that Plaintiff consistently engaged in disruptive, abusive, and threatening behavior towards BPCA personnel and members of the Battery Park

---

[8]     Citing *D'Amario*, the Sixth Circuit has adopted the same standard of reviewing restrictions on a reporter's access.  *See S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553, 560 (6th Cir. 2007).

City community, and that this conduct factored into Mehiel's decision to exclude Plaintiff from the boardroom – a decision that bore a clear rational relationship to the legitimate governmental purposes of ensuring the orderly conduct of the BPCA board's business (which is integral to the smooth continued operations of BPCA) and the safety of BPCA staff and board members.  First, Plaintiff's exclusion followed his particularly disruptive behavior at the immediately preceding board meeting on June 9, 2015 (the "June Meeting").  After the public portion of that board meeting had ended, Kevin McCabe, the BPCA's Chief of Staff, began clearing the room so that the BPCA board could enter executive session.  (56.1 ¶ 43.)  Plaintiff refused to leave even though everyone else, as Plaintiff put it, "obeyed like sheep." (*Id.* ¶ 47.)  Plaintiff then began shouting questions at Chairman Mehiel, even as McCabe told Plaintiff that he needed to leave the room.  (*Id.* ¶ 47.)  Plaintiff left the BPCA boardroom only after McCabe warned Plaintiff that McCabe would call the police.  (*Id.* ¶ 48.)  Even after Plaintiff left the boardroom, he lingered in the BPCA reception area and walked around the BPCA's private offices without authorization, photographing, and filming those areas without permission.  (*Id.* ¶ 50.)  Plaintiff's disruptive behavior at the June Meeting is undisputed – indeed Plaintiff admitted it in his deposition (*see* 56.1 ¶ 47) – and provided ample justification for Mehiel's decision to restrict Plaintiff's physical access to the BPCA boardroom at the following meeting of the BPCA board.

Second, Mehiel was well aware of Plaintiff's documented history of abusive and threatening conduct when he made the decision to exclude Plaintiff from the BPCA boardroom. That history included, among other things, reports that Greer had stalked a summer camp director (*see* 56.1 ¶ 20(a)), harassed children for playing soccer on a park lawn (*see id.* ¶ 20(b)), used abusive and threatening language in communications with BPCA staff – such as calling a receptionist a "lying piece of trash" (*id.* ¶ 26) – and contacted BPCA staff on their personal cell

phones (*id.* ¶¶ 21–25, 33–36).  In addition, in 2015, McCabe felt physically threatened by

Plaintiff when he leaned his shoulder into McCabe and asked, "Do you have a problem?"  (*Id.*

¶ 30.)  On another occasion, Plaintiff called BPCA attorney Seema Singh a "cunt" – language so

abusive that, according to Serpico, Singh was visibly upset.  (*Id.* ¶ 28.)

      The limited restriction imposed upon Plaintiff – requiring him to view the July Meeting

from a separate room – was reasonably tailored to achieve the goal of ensuring the business of

the BPCA board could be conducted in an orderly fashion, and the record contains no evidence

that it impaired Plaintiff's ability to gather the news in any way.  Plaintiff asserts that he was

unable to ask questions from the viewing room, but this claim is specious; it is undisputed that

the BPCA did not allow its members to answer public questions or respond to comments from

the community.[9]  Moreover, the evidence proves that Plaintiff knows full well he would not have

been able to ask questions; as he himself reported, on May 3, 2016, "BPCA Chairman [Mehiel]

still refuses to allow public questions at board meeting."  (*See id.* ¶ 71.)  Thus, the record is

devoid of support for – and indeed contradicts – Plaintiff's allegation that he could have asked

questions at the July Meeting, had he been permitted inside the boardroom.

      Moreover, Plaintiff has admitted that he did not need to be physically present at BPCA

board meetings to effectively report on them (*see* 56.1 ¶¶ 60–62), and there is no evidence that

his reporting benefitted from his physical presence at BPCA board meetings.  Although Plaintiff

complains of his inability to videotape the meetings, the BPCA streams its board meetings in in

real time over the Internet (*see id.* ¶ 57); in any event, Plaintiff himself admitted that it was not

necessary to film BPCA board meetings that he attended because "I know it is being web cast."

---

[9]     The BPCA also did not allow public comments during its board meetings until a change of policy in
October 2016 – well after the July 29, 2015 board meeting.  (*See* 56.1 ¶ 67, 73.)  Indeed, Plaintiff took credit for the
change in policy in a blog post on October 19, 2016.  (*See id.* ¶ 75.)

(*See* 56.1 ¶ 62.)  Indeed, "[c]ourts have generally held that there is no constitutional right to videotape public proceedings, particularly where the public has an alternative means of gathering information, such as making an audio recording or taking notes."  *Malta v. Slagle*, No. 05-CV-342S, 2007 WL 952045, at *5 (W.D.N.Y. Mar. 29, 2007) (citing cases).  Moreover, the evidence indicates that Plaintiff posted still photographs that were related to the content of the articles, but that did not depict board meetings.  (*See* 56.1 ¶ 63.)

In a similar context, the Second Circuit has held that "officials must at least have the ability to close the courtroom door to any person whom they reasonably think may pose a threat to person, property, or decorum."  *Huminski*, 396 F.3d at 86–87.  Outside this Circuit, other courts have upheld similar restrictions upon access to public proceedings to promote public safety and preserve decorum.  *See, e.g.*, *Mesa v. Hudson Cty. Bd. of Chosen Freeholders*, No. CIV.A. 09-3576 KSH, 2011 WL 4592390, at *6 (D.N.J. Sept. 30, 2011) (holding that the plaintiff's "repeated outbursts [were] the kind of "truculent" and "disruptive" behaviors that justify removing a citizen from a public meeting to maintain order and decorum and to prevent a speaker from hijacking a meeting" (internal citations and quotation marks omitted)); *Thornton v. City of Kirkwood*, No. 07-CV-79 (CDP), 2008 WL 239575, at *5 (E.D. Mo. Jan. 28, 2008) ("Thornton's comments were irrelevant and repetitive, and his truculent attitude was disruptive to the city council meeting.  As such, the restraint on his speech was constitutional."); *see also* Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev. 927, 954 (1992) ("[A]n individual member of the press can and should be barred at least temporarily if he engages in disruptive behavior . . . .").[10]  Similarly, in this case, the record establishes that

---

[10]      Similarly, in *Eichenlaub v. Township of Indiana*, the Third Circuit evaluated a meeting exclusion claim within the framework of a forum analysis, and held that the plaintiff's "repetitive and truculent" behavior during a public meeting was the sort of restriction "that passes muster under the most stringent scrutiny for a public forum." 385 F.3d 274, 281 (3d Cir. 2004).

the decision to exclude Plaintiff from the BPCA July Meeting was content neutral, rationally related to the legitimate governmental purposes of maintaining safety, order, and the smooth continued operations of a governmental entity, and outweighed the benefits inherent in unrestricted access.  Accordingly, the Court should grant summary judgment on this claim in favor of the BPCA Defendants.

### III.   THE BPCA AND SERPICO (IN HIS OFFICIAL CAPACITY) ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE NEITHER OF THE ALLEGED CONSTITUTIONAL VIOLATIONS WERE COMMITTED PURSUANT TO AN OFFICIAL POLICY OR CUSTOM

Even if this Court determines that a triable issue of fact exists as to whether Plaintiff's constitutional rights have been violated by the BPCA Defendants – and there is not – summary judgment should be entered in favor of the BPCA and Serpico (in his official capacity) on both of Plaintiff's remaining claims because Plaintiff cannot prove that the alleged constitutional violations were committed pursuant to an official BPCA policy or custom.

Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), a municipality may be held liable under 42 U.S.C. § 1983 only "for constitutional violations caused by acts committed pursuant to 'official policy.'"  *Turpin v. Mailet*, 619 F.2d 196, 197 (2d Cir. 1980).  Thus, "a municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.  This limitation on municipal liability under § 1983 applies equally to public benefit corporations such as the BPCA.[11]

---

[11]     *See, e.g.*, *Estes-El v. State Dep't of Motor Vehicles Office of Admin. Adjudication Traffic Violation Bureau*, No. 95-CV-3454 (JFK), 1997 WL 342481, at *4 (S.D.N.Y. June 23, 1997) (holding that liability of a public benefit corporation "is governed by the principles set forth in *Monell*"); *see also Byrd v. Metro. Transit Auth.*, No. 15-CV-1364 (JG)(RLM), 2015 WL 4546718, at *2 (E.D.N.Y. July 28, 2015); *Eslin v. Hous. Auth. of Town of Mansfield*, No. 11-CV-134 (JCH), 2012 WL 113666, at *3 (D. Conn. Jan. 13, 2012).

As an initial matter, Plaintiff's Corrected Amended Complaint fails to allege that the alleged constitutional violations were committed pursuant to any "official policy" of the BPCA. For this reason alone, the Court should dismiss the claims against the BPCA.  However, even if the Court is inclined to look beyond the pleadings, summary judgement should be granted with respect to the claims against the BPCA, for the reasons set forth below.

An "official policy" can take one of four forms:  "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees."  *Allan v. City of New York*, 386 F. Supp. 2d 542, 545 n.3 (S.D.N.Y. 2005) (internal citations omitted).  Only the first two forms of official policy are conceivably relevant here, as Plaintiff has never suggested that he was the victim of either a consistent and widespread practice or a failure to train or supervise subordinates amounting to "deliberate indifference."[12]  As discussed more fully below, because Plaintiff cannot prove either: (1) the existence of a formal policy; or (2) that any official responsible for establishing BPCA policy caused the alleged deprivation of his rights, the BPCA is entitled to summary judgment.

First, there is no evidence whatsoever that the BPCA has any officially approved, formal policy that caused the alleged retaliatory conspiracy to evict plaintiff from his apartment; nor is

---

[12]      In any event, nothing in the record supports either of these theories of *Monell* liability.

there any evidence that the BPCA has any officially approved, formal policy that caused Plaintiff's exclusion from in-person attendance at the July 29, 2015 BPCA board meeting.

Second, there is no evidence that either of the alleged constitutional violations were the result of an action of a BPCA official responsible for establishing the BPCA policies, as defined by law. This second species of "official policy" arises only where an official possessing "final authority" over the government's policies "with respect to the action ordered," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), directs the alleged violation. As the Supreme Court and Second Circuit have emphasized, "the critical inquiry is not whether an official *generally* has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker *with respect to the particular conduct challenged in the lawsuit*." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (emphasis added).

With respect to the supposedly unconstitutional non-renewal of his lease, there is no evidence that anyone at BPCA, whether a final policymaker or not, took any action related to the non-renewal of Plaintiff's lease. *See* Point I, *supra*. Even if this Court were to determine that there was a triable issue of fact in this regard (which it should not), Plaintiff's "retaliatory conspiracy" claim against BPCA should be dismissed because Plaintiff does not even allege any involvement on the part of a final policymaker. Plaintiff contends that his eviction was the result of an alleged conspiracy between Robert Serpico of the BPCA and Steve Rossi of Milford Management. (*See* Tremonte Decl. ¶ 3, Ex. 2 ("Greer Dep.") at 98:23 – 104:14.) Rossi, of course, was not a BPCA official at all. With respect to Serpico, the BPCA's Chief Financial Officer at the time (*see* 56.1 ¶ 78), as a matter of law, neither Serpico nor any other single person at the BPCA possessed the final policymaking or legal authority to cause the non-renewal of a lease between any Battery Park City landlord and an individual tenant, or to cause the eviction of

15

an individual tenant from his apartment, as such authority lies solely with the Landlord Defendants.  (*See* 56.1 ¶¶ 4–5.)  Thus, even assuming the existence of proof that Serpico conspired with others to evict him (and there is none), Serpico's alleged role in the conspiracy cannot establish liability on the part of the BPCA.

Likewise, Plaintiff's exclusion from the July Meeting was not the result of an action by someone with "final authority" over such matters.  The evidence shows that Mehiel, acting in his capacity as Chairman of the BPCA board, denied Plaintiff access to the BPCA boardroom during the July Meeting based on Plaintiff's disruptive conduct at the prior board meeting, as well as Mehiel's awareness of Plaintiff's prior history of inappropriate and harassing behavior.  (*See* 56.1 ¶¶ 51, 53.)  That Mehiel acted within the scope of his authority does not by itself create liability for the BPCA.  Under *Monell*, "[i]t does not suffice for these purposes that the official has been granted discretion in the performance of his duties."  *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000).  Instead, "a policymaker has 'final' authority over official policy under *Monell only* if her power to act is *unreviewable* under state law."  *Guan N. v. NYC Dep't of Educ.*, No. 11-CV-4299 (AJN), 2014 WL 1275487, at *14 (S.D.N.Y. Mar. 24, 2014) (Nathan, J.) (emphasis added).  While Mehiel correctly acted within the scope of his authority in deciding to exclude the Plaintiff from the July Meeting based on Plaintiff's disruptive behavior, the BPCA board could have, if it so chose, reviewed Mehiel's decision.  (*See* 56.1 ¶ 54; N.Y. Pub. Auth. Law §1970, *et seq*.)  Accordingly, as a matter of law, Plaintiff cannot establish *Monell* liability against the BPCA on his exclusion claim.  *See, e.g.*, *Birmingham v. Ogden*, 70 F. Supp. 2d 353, 374 (S.D.N.Y. 1999) (granting summary judgment where, given the absence of "some evidence of state law that vests final authority in the Board of Police Commissioners to establish personnel policy for the City of Middletown . . . , plaintiff has failed to raise a disputed issue of fact as to

16

whether the defendant City dismissed him pursuant to an unconstitutional policy or practice");
*Ramos v. City of New York*, No. 96-CV-3787, 1997 WL 410493, at *3 (S.D.N.Y. July 2, 1997)
(granting summary judgment in favor of defendant New York City Housing Authority because
the Authority's board, rather than its chairman, who allegedly discriminated against plaintiff, had
final policymaking authority).

For these reasons, under *Monell*, the BPCA is entitled to summary judgment on both of
Plaintiff's remaining claims. *See, e.g.*, *Carter v. Cty. of Suffolk*, No. 12-CV-1191 (JFB) (ARL),
2013 WL 6224283, at *4 (E.D.N.Y. Dec. 2, 2013) ("Because there is absolutely no evidence of
an unconstitutional policy, practice, or custom by the County, the Court concludes that the
County is entitled to summary judgment on plaintiffs' Section 1983 claim."); *Sheikh v. City of
New York, Police Dep't*, No. 03-CV-6326 (NGG), 2008 WL 5146645, at *12 (E.D.N.Y. Dec. 5,
2008) (granting summary judgment for municipal defendant where "Plaintiff [had] not, after
considerable discovery, identified any actual policies or customs of the New York City Police
Department . . . that caused an alleged deprivation of her constitutional rights").[13]

## IV.   EVEN IF PLAINTIFF COULD ESTABLISH A VIOLATION OF HIS FIRST AMENDMENT RIGHTS, THERE IS NO EVIDENCE TO SUPPORT AN AWARD GREATER THAN NOMINAL DAMAGES

For the reasons set forth above, the BPCA Defendants cannot be held liable on either of
Plaintiff's remaining claims. However, even assuming *arguendo* that either of Plaintiff's claims
were supported by sufficient evidence to proceed to trial – and they are not – the Court should
limit Plaintiff to nominal damages, because there is simply no evidence that any of Plaintiff's

---

[13]     For the same reasons, Serpico is also entitled to summary judgment to the extent he is sued in his official capacity. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding that "in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law" because an official capacity suit "is not a suit against the official personally, for the real party in interest is the entity"); *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) ("[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality – or an individual sued in his official capacity – the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom" (internal citation omitted))

17

claimed damages were proximately caused by the alleged constitutional violations. *See, e.g.*, *Kerman v. City of New York*, 374 F.3d 93, 123 (2d Cir. 2004) (holding that plaintiff who cannot prove compensable injury "is entitled only to nominal damages").

The Supreme Court has instructed courts to consider the common law of torts in shaping principles of damages under § 1983. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986); *Carey v. Piphus*, 435 U.S. 247, 258–59 (1978). As a general matter, "[a] finding that the plaintiff has been deprived of a constitutional right does not automatically entitle him to a substantial award of damages." *Kerman*, 374 F.3d at 123. Instead, the plaintiff must prove that the constitutional violation was the proximate cause of an actual injury. *See, e.g.*, *Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994); *McCann v. Coughlin*, 698 F.2d 112, 126 (2d Cir. 1983).[14] "If the causal connection between the constitutional violation alleged and the deprivation of property is 'too tenuous,' then the deprivation of property is not a proximate cause of the injury alleged." *Phillips v. City of New York*, 871 F. Supp. 2d 200, 206 (E.D.N.Y. 2012).

### A.    There is No Evidence to Support Plaintiff's Claims for Lost Profits and Lost Income Damages

Plaintiff claims that the BPCA Defendants' actions caused his companies BatteryPark.TV and The Healthcare Channel to lose between $7 and $100 million in value. (*See* Tremonte Decl. ¶ 10, Ex. 9 at 5.) He also claims an additional $20 million in "[r]eputation damage" based upon his asserted earning potential as a medical doctor. (*Id.*) These claims are entirely speculative, unsupported by evidence, and too attenuated from the alleged constitutional violations to support an award of compensatory damages.

---

[14]    "For example, when a defendant has deprived the plaintiff of liberty or property without affording him a hearing as required by the Due Process Clause, but the defendant proves that the adverse action would have been taken even if a proper and timely hearing had been held, the plaintiff has not proved compensable injury and is entitled only to nominal damages." *Kerman*, 374 F.3d 123 (citing *Carey*, 435 U.S. a 260–63).

Lost profits or a loss in a company's value, like other categories of compensable injuries, "must be proven with sufficient certainty and not be speculative." *H & P Research, Inc. v. Liza Realty Corp.*, 943 F. Supp. 328, 331 (S.D.N.Y. 1996). *See, e.g.*, *Stanczyk v. City of New York*, 752 F.3d 273, 278 (2d Cir. 2014) (holding that district court properly instructed jury not to award compensatory damages for "speculative injuries"); *Wallace v. Suffolk Cty. Police Dep't*, 809 F. Supp. 2d 73, 82 (E.D.N.Y. 2011) ("To recover damages for lost income, plaintiff must prove by a preponderance of the evidence that the causal connection between defendants' retaliatory action and his injury is 'sufficiently direct.'" (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998))). Thus, to recover lost profits under New York law, "a business must have been established and in operation for a definite period of time *and calculations based on other similar businesses are too speculative and will not satisfy the requirement that a reasonable means of calculating the amount be provided*." *H & P Research*, 943 F. Supp. at 331 (emphasis added, and internal brackets and quotation marks omitted).

Here, Plaintiff has failed to produce any admissible evidence supporting his outlandish figures of lost business value ($7 to $100 million) or lost profits ($20 million). Plaintiff premises these figures exclusively upon comparisons between his companies and purportedly comparable businesses and medical practices.[15]  (*See* Greer Dep. at 231:12 – 232:6, 234:19 – 239:12.)

---

[15]    At his deposition, Plaintiff claimed that The Healthcare Channel was comparable to a company called everyday Health, but that Plaintiff's company did not have the same valuation as everyday Health because "they got $10 million thrown their way or something and could hire staff, and I have not." (Greer Dep. at 218:18–22.) However, when asked whether Plaintiff had sought financing, Plaintiff refused to answer the question. (*Id.* at 222:23 – 223:8.) By failing to answer basic questions about his own companies, Plaintiff has failed to produce sufficient evidence to support a claim for compensatory damages based upon any losses in his companies' values.

Moreover, although Plaintiff was evasive about his history as a medical doctor during his deposition, it appears that Plaintiff has not practiced medicine – with the exception that he continues to write prescriptions for himself, friends, and family members – for the past seventeen years. (*See* Greer Dep. at 270:24 – 273:4.) Thus, the alleged $20 million medical practice would be a new venture for Plaintiff, and any valuation of this business would be wholly speculative. *See, e.g.*, *RMLS Metals, Inc. v. Int'l Bus. Machines Corp.*, 874 F. Supp. 74, 76 (S.D.N.Y. 1995) (holding that it was "impossible to calculate lost profits" because the venture at issue "was in essence a new business for plaintiff").

Plaintiff did not disclose an expert willing to testify on these matters.  The Federal Rules of

Evidence do not permit Plaintiff to testify of these matters as a lay witness.  *See* Fed. R. Evid.

701, 702.  Indeed, comparable businesses, even in the hands of an expert, "can rarely provide a

stable basis for a damages calculation because 'the ultimate conclusions are still projections' that

rely on 'known or unknown factors.'"  *Washington v. Kellwood Co.*, No. 05-CV-10034 (SN),

2016 WL 3920348, at *8 (S.D.N.Y. July 15, 2016) (quoting *Kenford Co. v. Erie Cty.*, 493

N.E.2d 234, 236 (N.Y. 1986)).  To the extent Plaintiff possesses any factual support for his

figures, he has expressly refused to produce it.  At Plaintiff's deposition, he refused to provide

any information about the profitability of his companies or the details of his planned medical

practice, claiming that these issues are irrelevant and not discoverable.  (*See* Greer Dep. at 36:19

– 37:8, 43:4 – 45:14, 48:11 – 50:4, 117:21 – 119:6, 222:3 – 224:3, 227:16 – 229:14.)  Thus, there

is no evidence to suggest Plaintiff's damages figures are anything more than speculation and

guesswork.

    Because no rational factfinder could determine the lost value or profits claimed by

Plaintiff with "reasonable certainty," the Court should grant summary judgment for the BPCA

Defendants with respect to Plaintiff's claim for lost profits and the lost value of his media

companies.  *See, e.g.*, *Dockery v. Tucker*, No. 97-CV-3584 (ARR) (RLM), 2006 WL 5893295, at

*26 (E.D.N.Y. Sept. 6, 2006) (recommending "that defendants be granted summary judgment

with respect to plaintiff's damages claim for lost profits" because "no rational fact-finder could

calculate with 'reasonable certainty' the profits that would be owed to plaintiff as a result of any

wrongful conduct by defendants"), *report & recommendation adopted in part*, 2008 WL

2673307 (E.D.N.Y. June 26, 2008).

### B.    There Is No Evidence to Support Plaintiff's Claimed Mental Anguish

Plaintiff claims that he suffered "mental anguish" as the result of the BPCA Defendants'
actions. (*See generally* Tremonte Decl. ¶ 11, Ex. 10.)  Yet the evidence of mental anguish in the
summary judgment record falls far short of the standard set forth by the Second Circuit, which
holds that "[a] plaintiff's subjective testimony, standing alone, is generally insufficient to sustain
an award of emotional distress damages." *Patrolmen's Benevolent Ass'n of City of New York v.
City of New York*, 310 F.3d 43, 55 (2d Cir. 2002).  "Rather, the plaintiff's testimony of emotional
injury must be substantiated by other evidence that such an injury occurred, such as the
testimony of witnesses to the plaintiff's distress, or the objective circumstances of the violation
itself." *Id.* (internal citations omitted).

First, Plaintiff's claims of public humiliation are not supported by any evidence of
physical or emotional symptoms.  Plaintiff asserts that the decision to exclude him from the
BPCA boardroom on July 29, 2015, caused him "mental anguish" because he "was publicly
humiliated . . . by being singled out in the lobby of the BPCA offices." (*See* Tremonte Decl.
¶ 11, Ex. 10 at 3.)[16]  No evidence supports this conclusory assertion of public humiliation, which
does not suffice as a matter of law in light of *Annis v. County of Westchester*, 136 F.3d 239 (2d
Cir. 1998).  In *Annis*, the plaintiff "testified that she was humiliated by the discrimination she
endured," *id.* at 244, but the Second Circuit held that such testimony was "insufficient to warrant
an award of compensatory damages" for emotional distress, *id.* at 249.  Similarly, in this case,
Plaintiff cannot recover emotional distress damages as compensation for "humiliation" stemming
from his exclusion from the BPCA boardroom on July 29, 2015. *Cf. Uddin v. New York City /*

---

[16]    Plaintiff has not provided any other evidence of emotional damages allegedly caused by the boardroom
exclusion.  Indeed, at his deposition, Plaintiff refused to answer questions about alleged mental anguish.  (*See* Greer
Dep. at 268:5–19.)

*Admin. for Children's Servs.*, No. 99-CV-5843 (GEL), 2001 WL 1512588, at *6 (S.D.N.Y. Nov.
28, 2001) ("Unlike in *Annis*, where the plaintiff only testified to being humiliated and
embarrassed, Uddin pointed to concrete emotional problems having tangible physical
consequences . . . .").

Plaintiff has provided only minimally more detail concerning the mental anguish
allegedly caused by his eviction; at his deposition, Plaintiff testified in general terms that he
suffers from high blood pressure, depression, and trouble sleeping. (*See* Greer Dep. at 261:17–
20, 269:8–11.) Yet Plaintiff has failed to testify about his symptoms in any detail, failed to
produce any medical records documenting his symptoms, and, indeed, failed to come forward
with any evidence corroborating his vague deposition testimony. In other words, other than
Plaintiff's vague and subjective testimony, there is no evidence to support Plaintiff's claim for
mental anguish damages. Under *Patrolmen's Benevolent Association*, this evidence is
insufficient to support an award of damages for claimed mental anguish.

### C.     Plaintiff Cannot Recover Expenses Incurred After His Eviction

Plaintiff claims various "moving" costs, but the claimed expenses are well beyond what
any factfinder would regard as reasonably foreseeable costs of being evicted. *See, e.g.*, *Monette
v. Cty. of Nassau*, No. 11-CV-539 (JFB) (AKT), 2015 WL 1469982, at *18 (E.D.N.Y. Mar. 31,
2015) (holding that "§ 1983 defendants remain responsible only for damages that are
reasonabl[y] foreseeable"). Specifically, Plaintiff claims $50,000 in moving costs, which
includes the cost of a Mercedes-Benz sedan for $19,089.25, an oil change and car service for
$2,239.55, and the costs of four moves – including long-term stays at the Ritz Carlton and Hyatt
hotels – until Plaintiff ultimately settled in Ohio. (*See* Tremonte Decl. ¶ 10, Ex. 9 at 5; Greer
Dep. at 246:16 – 248:21, 249:2–22.) Such expenses cannot be regarded as reasonably

foreseeable consequences of an eviction and, consequently, are not recoverable.  If anything, they demonstrate that Plaintiff has not satisfied his duty to mitigate his damages – a duty that applies with full force to § 1983 plaintiffs.  *See Miller v. Lovett*, 879 F.2d 1066, 1070 (2d Cir. 1989).  The duty to mitigate "encourages a plaintiff to react sensibly and cautiously to the harm imposed by the defendant."  *Ridgeview Partners, LLC v. Entwistle*, 354 F. Supp. 2d 395, 403 (S.D.N.Y. 2005).[17]

Similarly, Plaintiff cannot recover the ethereal personal value he placed on the lease itself.  Plaintiff claims $1 million in damages for the loss of his apartment lease.  Plaintiff's premise, however, that the value of his lease equals the "sale value" of the apartment (*see* Tremonte Decl. ¶ 10, Ex. 9 at 5) is obviously flawed.  There is no evidence that Plaintiff was unable to find a replacement lease for a similar apartment on similar terms; indeed, following his eviction, Plaintiff admittedly never made an effort to rent another apartment in Battery Park City at all.  (*See* Greer Dep. at 256:25 – 258:17.)  The record contains no evidence supporting this category of damages or Plaintiff's $1 million valuation.

Finally, Plaintiff cannot recover damages to compensate him for the back rent that the New York Housing Court ordered him to pay.  Plaintiff would have paid this amount in rent had he not been evicted and continued to live in the Battery Park City apartment.  Thus, an award of back rent would place Plaintiff in a *better* position than he would have been but-for his eviction, and would therefore violate the most basic principle of compensatory damages.  *See Figueroa-Rodriguez v. Aquino*, 863 F.2d 1037, 1046 (1st Cir. 1988) (holding that award of damages that

---

[17]     For instance, Plaintiff claims that his "litigation costs" include meals at Bobby Van's ($33.31), the NoMad ($86.71), Augustine ($54.36), Upland ($34.30), Chinese Tuxedo ($73.24), the Clocktower ($86.37), Jean Georges ($58.22), and the Writing Room ($135.41).  (*See* Tremonte Decl. ¶¶ 24–25, Exs. 23–24.)  The BPCA Defendants reserve the right to contest Plaintiffs' costs and fees should Plaintiff prevail in this litigation.

put § 1983 plaintiff "in a better position than had his rights not been violated" was "both

inappropriate and unnecessary").

> **D.      As a Public Benefit Corporation, the BPCA Is Immune from Punitive Damages under 42 U.S.C. § 1983**

Finally, Plaintiff seeks punitive damages against the BPCA.  *See* CAC ¶ Relief 1.

However, it is well established that a public benefit corporation enjoys immunity from punitive

damages under 42 U.S.C. § 1983.  *See, e.g.*, *Tanvir v. LaPorte*, No. 93-CV-6923 (JGK), 1997

WL 473084, at *3–4 (S.D.N.Y. June 13, 1997); *Majer v. Metro. Transp. Auth.*, No. 90-CV-4608

(LLS), 1992 WL 110995, at *4 (S.D.N.Y. May 7, 1992); *see also City of Newport v. Fact*

*Concerts, Inc.*, 453 U.S. 247, 271 (1981).  Accordingly, the Court should dismiss Plaintiff's

claim for punitive damages against the BPCA.

## CONCLUSION

For the reasons set forth above, the Court should grant the BPCA Defendants' Motion for

Summary Judgment in its entirety.

Dated:      June 19, 2017
            New York, New York

SHER TREMONTE LLP

By:   /s/ Justin J. Gunnell
        Michael Tremonte
        Justin J. Gunnell
        Michael W. Gibaldi
        90 Broad Street, 23rd Floor
        New York, New York 10004
        Tel:  212.202.2600
        Fax:  212.202.4156
        E-mail:  mtremonte@shertremonte.com

        *Attorneys* for *the* Hugh *L. Carey Battery*
        *Park City Authority and Robert Serpico*

24