# Exhibit 4

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4

5

6    ----------------------------------------x

7    STEVEN E. GREER, M.D.,

8                             Plaintiff,

9               vs.

10   DENNIS MEHIEL, et al.,

11                            Defendants.

12   ----------------------------------------x

13

14

15

16        DEPOSITION OF DENNIS MEHIEL

17            New York, New York

18          Monday, April 3, 2017

19

20

21

22

23

24   Reported by:   David Henry

25   JOB NO. 122008

1

2

3

4                    April 3, 2017

5                    2:50 p.m.

6

7

8        Deposition of DENNIS MEHIEL, held

9   at the Federal Courthouse, 500 Pearl

10  Street, New York, New York, pursuant to

11  Notice, before David Henry, a Certified

12  Court Reporter and Notary Public of the

13  State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

1

2   A P P E A R A N C E S:

3

4       The Plaintiff Steven Greer, M.D.

5       appeared pro se

6

7       SHER TREMONTE

8       Attorneys for Defendant Battery Park

9       City Authority

10          90 Broad Street

11          New York, New York 10004

12      BY:  MICHAEL TREMONTE, ESQ.

13      AND: MICHAEL GIBALDI, ESQ.

14

15      ROSENBERG & ESTIS

16      Attorneys for all Defendants other

17      than Battery Park City Authority and

18      Defendant Serpico

19          733 Third Avenue

20          New York, New York 10017

21      BY:  DEBORAH RIEGEL, ESQ.

22

23   ALSO PRESENT:

24       ABBY GOLDENBERG, ESQ.

25       Battery Park City Authority

1     Mehiel

2  A. No. I don't read the

3 BatteryPark.TV.

4    MR. TREMONTE:  Focus on the

5   question.

6  Q. Were you aware -- and I just have

7 one or two more, so relax. I just have to

8 be thorough. I've got to go down all of

9 them.

10    Were you aware of my articles in

11 BatteryPark.TV that reported on conflicts

12 of interest between Governor Cuomo and IGY

13 Marina? And you know what IGY Marina is.

14    MR. TREMONTE:  Objection. Were

15   you aware?

16  A. No. I need to correct my answer

17 ever so slightly, okay? And I'm going to

18 say this in response to this entire series

19 of questions. From time to time someone on

20 my staff would send me an email, yack yack.

21 I'm going to tell you that 99.9 percent of

22 the time I do not open the attachment, I do

23 not read it, I have no interest in it. So

24 I'm not suggesting by my answers these

25 things didn't occur, I'm simply stating my

Mehiel

1

2      Q.   Okay, very good.  That's what I'm

3   getting to.

4           MR. TREMONTE:   Objection.

5      That's not a question.

6      A.   By the way, I can't remember

7   whether that discussion was with staff or

8   with the members.  But I know that we had

9   those conversations because --

10      Q.   And what would be the reason --

11           MR. TREMONTE:   Excuse me, let

12      the witness finish.

13      Q.   And what would be the reason for

14   barring me from a public meeting?

15      A.   Your behavior during the public

16   meeting.

17      Q.   Such as?

18      A.   Such as refusing to leave the

19   room when we went to executive session and

20   having our chief of staff tell you that he

21   was going to have to call security to evict

22   you if you didn't leave.

23      Q.   Okay, was that a public meeting?

24      A.   It was public until it was

25   executive session, which is non-public.

1                    Mehiel

2    and forth from Sherry Hyman to Alex

3    Pastilonik to Karen McCabe discussing how

4    the BPCA would go about not allowing me in

5    to board meetings by, for example, alerting

6    Brookfield Security?  Are you aware of many

7    e-mails back and forth among staff planning

8    and preparing for the next meeting to not

9    allow me in?

10             MR. TREMONTE:    Objection.

11        A.    No.

12        Q.    Okay.  Some of those emails might

13   have had your name on it, you're not aware?

14             MR. TREMONTE:    Objection, asked

15        and answered.

16        Q.    Okay, did you or anyone you know

17   of at the BPCA alert Brookfield Properties

18   or the NYPD warning them that Steven Greer,

19   however you referred to me, was basically a

20   scary threat that shouldn't be let in for

21   security purposes?

22             MR. TREMONTE:    Objection.

23        A.    Repeat the question.

24        Q.    Did you or anyone at the BPCA

25   that you are aware of notify Brookfield

Page 33

Mehiel

1                          Mehiel

2    Property National Security staff, the

3    people who were in your offices, or even

4    the New York Police Department warning them

5    that I, Steven Greer, am a threat that

6    should not be allowed into the board

7    meetings?

8              MR. TREMONTE:    Objection.

9         A.   I instructed the chief of staff

10   to engage Brookfield Security when we had

11   public meetings to be certain that you

12   didn't enter the premises, at least not up

13   to the 24th floor.

14        Q.   Okay.  Did you also -- now we're

15   talking about the meeting of June 8, 2016.

16   That's where I attended.  Do you recall

17   that?

18             MR. TREMONTE:    Objection.

19        A.   June of 2016?  A public meeting

20   you came to, is that the one where Kevin

21   asked you to leave?

22        Q.   No, no, this would be --

23        A.   Because that's like a year later.

24        Q.   Yeah, no, this would be the first

25   meeting that I had attended for more than a

Mehiel

1

2      A.    I don't remember whether we had

3   it then.   I will concur that it was

4   crowded.

5      Q.    And then subsequent to that when

6   there were no crowds for other board

7   meetings, that's when I was given the

8   excuse that I couldn't enter, but you're

9   welcome to watch it on a video overflow

10  room down on West Thames.   Are you aware of

11  that?

12           MR. TREMONTE:    Objection.

13      A.    I am aware that I barred you from

14  the meetings during that period.   I'm not

15  sure it had anything to do with crowds.

16      Q.    Okay, alright.   During board

17  meetings, it's -- either your previous law

18  firm or -- it's been discussed in briefs

19  that the BPCA board meetings officially are

20  not venues for taking questions from the

21  public or the press.   Is that a fair

22  characterization?   Is that fair?   Is that

23  accurate?

24           MR. TREMONTE:    Objection.

25      A.    We don't engage in public

1                    Mehiel
2  dialogue during the public meetings.  When
3  you say public dialogue, I mean, we do not
4  exchange -- we don't involve ourselves in
5  exchanges with, if you will, non-members
6  and non-staff during those meetings.  We
7  now allow public comment, but we don't
8  respond to it.
9      Q.   So even now, even with the public
10 comment sessions now, the BPCA is not
11 officially fielding questions, is that
12 correct?
13          MR. TREMONTE:   Objection.
14     A.   That is correct.
15     Q.   Have you ever fielded, answered
16 questions from the press or others during
17 board meetings in 2014, 2015?
18          MR. TREMONTE:   Objection.
19     A.   On occasion after a meeting is
20 over, a reporter has asked me a question or
21 two and I've answered it.  It's not common,
22 but it happens, and when it does I try to
23 respond.
24     Q.   After President Boutris left,
25 it's the February 22, 2014 board meeting,

1                      Mehiel

2           MR. TREMONTE:    Objection.

3      A.    Not to my knowledge.

4      Q.    If you wanted to, is there any

5  structure, law, regulation, in the bylaws

6  of the creation of the BPCA, do you have

7  any power to make a difference in the lease

8  agreement between a renter and a company

9  owner like Howard Milstein, could you as

10  the BPCA bypass someone like Howard

11  Milstein's organization and directly impact

12  whether a lease is renewed or not renewed?

13           MR. TREMONTE:    Objection.

14      A.    If I understand the question --

15           MR. TREMONTE:    If you don't

16      understand the question, ask him to

17      ask it again.

18      A.    No, because I want to put it in

19  my language and see if I'm answering the

20  right question, okay?

21           You're asking me if our ground

22  lease arrangements with an owner and

23  operator of a rental property would allow

24  us to direct or otherwise substantially

25  influence their individual renter tenant

1                      Mehiel

2   decisions.

3       Q.    Correct.

4       A.    I mean, to my knowledge

5   absolutely not.  You know, these ground

6   leases are this thick.  As far as I know,

7   the answer is no.

8       Q.    Very good.  And I've just got to

9   ask the obvious one.  To your knowledge,

10  did Robert Serpico or Sherry Hyman or

11  anyone collude, I think is the best word,

12  organize, work with, Steve Rossi or anyone

13  in the real estate companies of Howard

14  Milstein?  Did anyone from the Battery Park

15  City Authority work with Steve Rossi or any

16  other executive of Howard Milstein's group

17  to have my personal lease at 200 Rector

18  Place not renewed?

19          MR. TREMONTE:    Objection.

20      A.    Not to my knowledge.

21      Q.    While we're on it, do you know

22  how Howard Milstein?

23      A.    I do.

24      Q.    And does someone like Howard

25  Milstein or LeFrak, a large real estate