# Exhibit 12

HUGH L. CAREY BATTERY PARK CITY AUTHORITY
Meeting of the Members
One World Financial Center, 24th Floor
New York, NY 10281
April 16, 2013

<u>Members Present</u>
Dennis Mehiel, Chairman/CEO
Frank J. Branchini, Member
Donald A. Capoccia, Jr., Member
Martha J. Gallo, Member
Fernando Mateo, Member
Carl Mattone, Member

Authority Staff in Attendance:
Demetrios A. Boutris, President/Chief Operating Officer
Megan Churnetski, Associate General Counsel and Assistant Corporate Secretary
Gwen Dawson, Senior Vice President, Real Estate Development & Management
Anne Fenton, Deputy Chief Operating Officer
Lapshan Fong, Director of Design
Luis Garcia, Assistant Treasurer
Angela Howard, Senior Project Manager
Kevin McCabe, Assistant to the President
Brenda McIntyre, Senior Vice President of Human Resources
Matthew Monahan, Senior Vice President, Public Information
Anthony Peterson, Director of Diversity Programs
Karl Koenig, Controller
Robert M. Serpico, Executive Vice President, Finance and Treasurer/Chief Financial Officer
Seema Singh, Senior Counsel
Kirk Swanson, Chief Administrative Officer, Internal Control Officer and Chief Contracting Officer
Phyllis Taylor, Executive Vice President/General Counsel, Corporate Secretary
Kenny Windman, Director, Real Property Development & Management

Others in Attendance:
Tessa Huxley, Battery Park City Parks Conservancy
Matthew Fenton, Battery Park City Broadsheet
Therese Loeb Kreuzer, Downtown Express
Roger Bagley, Hawkins, Delafield & Wood LLP
Nathaniel Herz, NY World
Steven Faber, PFM
Bob Cheddar, PFM

1

The meeting, called on public notice in accordance with the New York State Open Meetings Law, convened at 10:06 a.m.

* * *

The first item on the agenda was the approval of the minutes of the March 26, 2013 meeting. Upon a motion made by Mr. Mateo and seconded by Mr. Mattone, the following resolution was unanimously adopted:

## APPROVAL OF MINUTES OF THE MARCH 26, 2013 MEETING

BE IT RESOLVED, that the minutes of the meeting of the Members of the Hugh L. Carey Battery Park City Authority held on March 26, 2013 are hereby approved.

* * *

The Chairman then asked if there were Committee reports. Anthony Peterson presented an update on Diversity issues. He began by explaining that the report was just filed with Empire State Development for the fourth quarter of Fiscal Year 2012, which runs from January 1, 2013 to March 31, 2013. For this quarter the Authority was at a 37% M/WBE utilization rate, and for Fiscal Year 2012, the Authority was at a 29% utilization rate. Mr. Mehiel stated that we are almost double the state's requirement of 20% for the fourth quarter.

Ms. Gallo asked if this was a "one-time thing". Mr. Peterson replied "no, and the plan is to keep the percentage as high as possible". Ms. Gallo then asked if it was attributed to one major event. Mr. Peterson explained that during this quarter there were a number of new M/WBEs that were awarded a lot of the Authority's smaller contracts. Furthermore, a couple of big payments from the Pier A project to an MBE contractor also brought the numbers up.

Mr. Peterson also mentioned that although we are losing numbers in the construction area the Authority is picking up a lot of utilization in other areas, such as in legal and finance that the Authority never used to have. "So I think that's attributed to a lot of great hard work from everybody on staff," he stated. In Mr. Peterson's opinion "the goals would always stay at least about 25 percent to 30 percent for the year".

Mr. Peterson discussed the commencement of planning for the Competitive Edge Conference. This is a conference, he explained, hosted by city and state agencies "to help minority and women owned businesses with training, workshops, how to do business with the government" and other similar matters. Mr. Boutris stated that it was an honor that Mr. Peterson was named the conference chair, "for the third year in a row", Mr. Peterson added.

Lastly, Mr. Peterson mentioned feeling really proud of our program, but also feeling proud about helping other programs. He explained that the private contractors that work in Battery Park City also submit M/WBE reports, and the monies reported are private dollars that go to M/WBEs. The Authority received another $18 million for 2012 from private sources, which are not state dollars, but are private dollars going to M/WBE firms.

\* \* \*

The next item on the agenda was the Audit & Finance Committee report. Ms. Gallo began by reporting on the review of the two audit reports that had recently been issued by our external internal auditor.

The first item agreed upon was that the Internal Control Officer, Kirk Swanson, will put together a report that Management will use and that the Audit & Finance Committee will see every quarter that commits to implementation dates on issues that have been raised in the reports. The second item was that both the Authority's Internal Control Officer and the internal auditors will go back and take a look at the Inspector General's (the "IG") report and review the Authority's implementation of the recommendations received from the IG. Both reports will be submitted in writing when complete.

\* \* \*

The next item on the agenda was the Governance Committee report. Mr. Mattone reported that no formal action was taken on the proposed Board Governance documents and that the vote was being held off until the next meeting when the final revisions would be added to the documents and circulated for review.

\* \* \*

The next item on the agenda was a request for authorization to enter into a contract with Cutsogeorge Tooman & Allen Architects, PC ("CTA") for Irish Hunger Memorial Waterproofing Design Services. At this point, Mr. Capoccia recused himself from the discussion of, and vote on, this item, and left the meeting.

Ms. Dawson began by explaining that the Irish Hunger Memorial was built in 2002, and was intended to serve as a catalyst for addressing current issues of world hunger. In the fall of 2003, the Memorial began experiencing some leaks; repairs were made in 2005 but the leaks persisted and worsened. In addition, stains and cracks that have developed over time, and collectively these issues have necessitated a more thorough repair and waterproofing project for the Memorial.

Ms. Dawson stated that the plantings and the landscaping elements of the Memorial comprise the central organizing elements, and that care must be taken to actually remove the landscaping and the soil to preserve them in their existing state. After the repairs and waterproofing are complete, the soils and the landscaping must be restored to their previous specifications. The seasonal nature of this work requires that the work be done in accordance with a particular schedule, so that the plantings can be replaced at a time where it does not impact the growing season.

The Authority issued a request for proposals for consulting services to investigate the source of the leaks, to design a solution, and then to provide construction administration services

3

for the remediation work. Ms. Dawson mentioned that CTA submitted, upon the Authority's request, their best and final price which resulted in a lower cost than initially proposed.

Upon a motion made by Mr. Mattone and seconded by Ms. Gallo, the following resolution was unanimously adopted:

## AUTHORIZATION TO ENTER INTO CONTRACT WITH CUTSOGEORGE TOOMAN & ALLEN ARCHITECTS, PC ("CTA") FOR IRISH HUNGER MEMORIAL WATERPROOFING DESIGN SERVICES

BE IT RESOLVED, that the President/Chief Operating Officer (the "President") of the Authority or his designee(s) be, each of them hereby is, authorized and empowered to enter into a contract with Cutsogeorge Tooman & Allen Architects, PC for design and construction administration services for the waterproofing of the Irish Hunger Memorial in the amount of $260,000.00; and be it further

RESOLVED, that the President of the Authority or his designee(s), and each of them hereby is, authorized and empowered to execute and deliver the contract on behalf of the Authority, subject to such changes as the officer or officers executing the contract shall, with the advice of counsel, approve as necessary and appropriate and in the best interest of the Authority, such approval to be conclusive evidence by the execution and delivery of the contract; and be it further

RESOLVED, that the President of the Authority or his designee(s) be, and each of them hereby is, authorized and empowered to execute all such other and further documents, and to take all such other and further actions as may be necessary, desirable or appropriate, in connection with the transactions contemplated in the foregoing resolutions, and any such execution of documents and any other and further actions heretofore taken are hereby ratified and any actions hereafter taken are confirmed and approved.

\* \* \*

Mr. Capoccia rejoined the meeting at this time.

The next item on the agenda was a request for authorization to enter into a contract with D'Onofrio General Contractor Corp. ("D'Onofrio") for the Pier A Plaza Construction Services. Ms. Dawson began by stating we are about to conclude the core & shell phase of the construction of the Pier A building. However, we also are obliged to construct the adjacent upland plaza.

Ms. Dawson reported that the Authority entered into a contract last spring with Ove Arup & Partners and Rogers Marvel Architects to create a design for the plaza. It has since been approved by the Department of City Planning, which is a requirement that must be met for waterfront zoning. The Pier A Plaza design was also taken through the Public Design Commission ("PDC") process, and approved by PDC.

The Authority issued a request for proposals for the Pier A Plaza construction on March 13, 2013. Following the pre-award meetings, the analysis of the proposals and based on the

4

established criteria, the evaluation committee evaluated D'Onofrio as the highest scoring proposal. Although D'Onofrio was not the lowest priced proposal, Ms. Dawson explained, they had a very good understanding of the project and the complexities associated with it, which include a high degree of coordination and logistical planning.

After a discussion of the Pier A Plaza space and logistics concluded, Mr. Mehiel asked Mr. Serpico whether the $3.5 million needed to complete the Pier A Plaza construction is a BPCA Capital Project. Mr. Serpico replied that it is on our current capital plan, which we are discussing with both OMB and the Comptroller. He stated that we would need "both approvals going forward". Mr. Serpico continued to explain that the Board approved a resolution that allowed the use of our monies with the assumption that it will be approved by the City, we will get financing in the fall, and we will replace the monies spent.

Mr. Mehiel asked "what's our protocol or do we require approval of the Comptroller and the Administration for the capital expenditure itself"? Mr. Serpico stated "we do and the inducement resolution that was approved by the Board says that we can go ahead and use our money with the assumption that it will be approved by the City". Mr. Mehiel said that the Members should go ahead and vote on D'Onofrio, but that this would be a "conditional approval of the Board if we vote it in, subject to the appropriate process with the City".

Upon a motion made by Mr. Capoccia and seconded by Mr. Mateo, the following resolution was unanimously adopted:

## AUTHORIZATION TO ENTER INTO A CONTRACT WITH D'ONOFRIO GENERAL CONTRACTOR CORP. ("D'ONOFRIO") FOR PIER A PLAZA CONSTRUCTION SERVICES

BE IT RESOLVED, that in accordance with the materials presented to this meeting, the President/Chief Operating Officer (the "President") of the Authority or his designee(s) be, and each of them hereby is, authorized to enter into a contract with D'Onofrio for general contractor services at Pier A Plaza in the amount of $3,413,000, subject to the approvals of the Mayor of New York City (the "City") and the City Comptroller; and be it further

RESOLVED, that the President of the Authority or his designee(s) be, and each of them hereby is, authorized and empowered to execute and deliver the contract on behalf of the Authority, subject to such changes as the officer or officers executing the contract shall, with the advice of counsel, approve as necessary and appropriate and in the best interests of the Authority, such approval to be conclusively evidenced by the execution and delivery each contract; and be it further

RESOLVED, that the President of the Authority or his designee(s) be, and each of them hereby is, authorized and empowered to execute all such other and further documents, and then take all such other and further actions as may be necessary, desirable or appropriate, in connection with the transactions contemplated in the foregoing resolution, and any such execution of documents and any other further actions heretofore taken are hereby ratified and any actions hereafter taken are confirmed and approved.

BPCA001720

\* \* \*

The next item on the agenda was a request for the ratification, confirmation and approval of actions taken by the Authority's Emergency Contracts Sub-Committee. Ms. Dawson distributed an updated memo for the Superstorm Sandy recovery work, and then, she presented an update on Superstorm Sandy remediation efforts. Ms. Dawson stated that the ballfields, Community Center and Pier A were all moving along on schedule. "The Board's delegated Sub-Committee has approved storm-related change orders, contracts and contract amendments in the total amount of $10,648,555.26."

Ms. Dawson then stated that it is anticipated that the storm-related expenditure commitments will likely exceed the Board's current authorization limit of $13.5 million prior to the Board's May 2013 meeting. "It's anticipated that the total storm-related expenditure commitments would reach approximately $16 million prior to the end of May compared to total estimates of storm damage of $17,841,897."

In addition to ratifying the approvals that have been provided by the Sub-Committee since the March 26th meeting, Ms. Dawson requested that the Board increase the authority delegated to the Emergency Contracts Subcommittee from $13.5 million to $16 million, with the understanding that the payment of the emergency contracts would be made first from the Authority's insurance reserve account and then if necessary from other corporate reserve accounts of the Authority.

Ms. Gallo thanked the team and management for keeping on the aggressive schedule and commended the "really high quality work [that] is being done". The Chairman seconded Ms. Gallo's appreciation. Ms. Gallo then suggested a tour of the ballfields, the Community Center and Pier A, to see all the work that's actually been done.

Mr. Mehiel asked for a motion to increase the aggregate authority of the Emergency Contracts Sub-Committee, and a motion to retroactively ratify the approvals of the Sub-Committee. Upon a motion made by Ms. Gallo and seconded by Mr. Branchini, the following resolutions were unanimously adopted:

**DELEGATION OF AUTHORITY TO THE EMERGENCY CONTRACTS SUB-COMMITTEE TO APPROVE EMERGENCY CONTRACTS IN AN AGGREGATE AMOUNT NOT-TO-EXCEED $16 MILLION**

WHEREAS, the Members approved a delegation of authority to the Emergency Contracts Sub-Committee on January 29, 2013 to approve Emergency Contracts, as such terms are defined in the attached Resolution of the Board, dated December 4, 2012, in an aggregate amount not-to-exceed $13.5 million, payable from corporate insurance reserves and advances on insurance proceeds; and

WHEREAS, the Members wish to delegate additional approval authority to the Emergency Contracts Sub-Committee.

BPCA001721

NOW THEREFORE BE IT RESOLVED, that the Members hereby delegate authority to the Emergency Contracts Sub-Committee to approve Emergency Contracts in the aggregate not-to-exceed amount of $16 million, payable first from the Authority's insurance reserve account, as augmented and replenished by the receipt and deposit of insurance proceeds, and then, if and as necessary, from other corporate reserve accounts of the Authority; and

BE IT FURTHER RESOLVED, that the President of the Authority or his designee(s) be, and each of them hereby is, authorized and empowered to execute all such other and further documents, and then take all such other and further actions as may be necessary, desirable or appropriate, in connection with the transactions contemplated in the foregoing resolutions, and any such execution of documents and any other further actions heretofore taken are hereby ratified and any actions hereafter taken are confirmed and approved.

## RATIFICATION, CONFIRMATION AND AUTHORIZATION OF ACTIONS TAKEN BY THE BATTERY PARK CITY AUTHORITY EMERGENCY CONTRACTS SUB-COMMITTEE, AS SET FORTH ON ATTACHMENT " A"

WHEREAS, the Members approved a delegation of authority to the Emergency Contracts Sub-Committee on January 29, 2013 to approve Emergency Contracts, as such terms are defined in the attached Resolution of the Board, dated December 4, 2012, in an aggregate amount not-to-exceed $13.5 million, payable from corporate insurance reserves and advances on insurance proceeds; and

WHEREAS, pursuant to the delegation, the Emergency Contracts Sub-Committee has approved Emergency Contracts in the total amount of $10,648,555.26 through April 16, 2013.

NOW THEREFORE BE IT RESOLVED, that in accordance with the materials presented at this meeting, the actions of the Emergency Contract Sub-Committee, as set forth in the attached "Schedule A," are hereby ratified, confirmed and authorized; and

BE IT FURTHER RESOLVED, that the President of the Authority or his designee(s) be, and each of them hereby is, authorized and empowered to execute all such other and further documents, and then take all such other and further actions as may be necessary, desirable or appropriate, in connection with the transactions contemplated in the foregoing resolutions, and any such execution of documents and any other further actions heretofore taken are hereby ratified and any actions hereafter taken are confirmed and approved.

\* \* \*

The final item on the agenda was a request to fund the West Thames Street Bridge project. The Chairman stated that there has been dialogue, but no resolution about the allocation of risk among the parties for potential project cost overruns. Furthermore, the design of the bridge is still a question at this point.

The Lower Manhattan Development Corporation ("LMDC") has agreed to fund the $2.02 million design budget for the project. The Authority has agreed to be the funding conduit for this

portion of the larger West Thames Street Bridge project. The risk of LMDC failing to come through with the money once it is all approved would be relatively small.

Mr. Mehiel noted that once the design is agreed upon, then the parties will be in a better position to negotiate with the City about the allocation of risk. At that time, we would come back to the Board with the assessment and what the recommendation would be in relation to the larger West Thames Street Bridge project. "At that point we will have the opportunity then to approve or disapprove whatever project comes out of that process," he concluded.

Mr. Mateo strongly questioned the advisability of using significant taxpayer dollars for a pedestrian bridge, and wondered if sufficient analysis had been undertaken relating to the need for such a bridge.

Upon a motion made by Mr. Capoccia and seconded by Ms. Gallo, the following resolution was adopted by a vote of 5 to 1, with Mr. Mateo objecting:

## AUTHORIZATION TO FUND UP TO $2.02 MILLION FOR THE WEST THAMES STREET BRIDGE PROJECT

BE IT RESOLVED, that the President and Chief Operating Officer (the "President") of the Battery Park City Authority (the "Authority") or his designee(s) be, each of them hereby is, authorized and empowered to enter into one or more written agreements with the City of New York, acting through the New York City Economic Development Corporation, and the Lower Manhattan Development Corporation (collectively, the "Agreements") to fund up to $2.02 million for the design phase of the West Thames Street Bridge Project (the "Bridge Project"), subject to: 1) a written commitment from LMDC to reimburse BPCA for its $2.02 million expenditure; 2) approval by the Mayor and the City Comptroller for the $2.02 million expenditure for the Bridge Project; and 3) execution of documentation acceptable to BPCA to effectuate the transfer of funds from the Authority to EDC, and to further obligate LMDC to reimburse BPCA in the full amount of $2.02 million; and be it further

RESOLVED, that the President of the Authority or his designee(s) be, and each of them hereby is, authorized and empowered to execute and deliver the Agreements on behalf of the Authority, subject to such changes as the officer or officers executing the Agreements shall, with the advice of counsel, approve as necessary and appropriate and in the best interest of the Authority, such approval to be conclusive evidence by the execution and delivery of the Agreements; and be it further

RESOLVED, that the President of the Authority or his designee(s) be, and each of them hereby is, authorized and empowered to execute all such other and further documents, and to take all such other and further actions as may be necessary, desirable or appropriate, in connection with the transactions contemplated in the foregoing resolutions, and any such execution of documents and any other and further actions heretofore taken are hereby ratified and any actions hereafter taken are confirmed and approved.

\*   \*   \*

Next, Mr. Mehiel discussed governance matters with the Members, and updated the Members about Project Sunlight and Downtown Alliance.

\* \* \*

There being no further business, upon a motion by Mr. Capoccia and seconded by Mr. Branchini, the Members unanimously voted to adjourn the meeting. The meeting thereupon adjourned at 11:30 a.m.

Respectfully submitted,

*Phyllis Taylor*
Phyllis Taylor
Corporate Secretary

BPCA001724