# Exhibit 41

HUGH L. CAREY BATTERY PARK CITY AUTHORITY
Meeting of the Members
One World Financial Center, 24th Floor
New York, NY 10281
June 9, 2015

<u>Members Present</u>
Dennis Mehiel, Chairman/CEO
Frank Branchini, Member
Donald Capoccia, Member
Martha Gallo, Member
Lester Petracca, Member

Authority Staff in Attendance:   Shari C. Hyman, President/COO
Lauren Brugess, Paralegal/Assistant Corporate Secretary
Anthony Buquicchio, Director of Site Management
Marie Cornielle, Deputy Treasurer
Gwen Dawson, Vice President, Real Property
Robin Forst, Vice President, External Affairs
Cherish Hurley, Administrative Assistant to the General Counsel
Benjamin Jones, Vice President, Administration
Susie Kim, Associate General Counsel
Karl Koenig, Controller
Abigail Goldenberg, Special Counsel and Risk Officer
Kevin McCabe, Chief of Staff/Special Assistant to the Chairman/CEO
Brenda McIntyre, Vice President, Human Resources
Mia Pali, Director of Site & Property Management
Anthony Peterson, Director of Diversity Programs
Alix S. Pustilnik, General Counsel/Corporate Secretary
Jason Rachnowitz, Director of Financial Reporting
Robert M. Serpico, Chief Financial Officer
Seema Singh, Deputy General Counsel/Assistant Corporate Secretary
Alexis Torres, Special Advisor to the President/COO
Ken Windman, Director of Facilities & Infrastructure Management

Others in Attendance:

Betty Chin, Battery Park City Parks Conservancy Corporation
Tessa Huxley, Battery Park City Parks Conservancy Corporation
Therese Loeb Kreuzer, Downtown Post NYC
Matt Fenton, The Broadsheet
Steven Greer, batterypark.tv
Ira Neifeld, Cool Insuring Agency
Paul Hennessey, Cool Insuring Agency
Amanda Woods, Tribeca Trib
Sue Malesevic, Downtown Express

The meeting, called on public notice in accordance with the New York State Open Meetings Law, convened at 9:34 a.m.

1

BPCA001814

\*   \*   \*

The first item on the agenda was the approval of the minutes of the April 14, 2015 meeting. Upon a motion made by Ms. Gallo and seconded by Mr. Branchini, the following resolution was unanimously adopted:

## APPROVAL OF MINUTES OF THE APRIL 14, 2015 MEETING

BE IT RESOLVED, that the minutes of the meeting of the Members of the Hugh L. Carey Battery Park City Authority held on April 14, 2015 are hereby approved.

\*   \*   \*

The next item on the agenda was the M/WBE Report presented by Mr. Peterson. Mr. Peterson updated the Members on the Authority's and Conservancy's numbers for April 2015. He explained that 30% of the Authority's and Conservancy's total expenditures was paid to M/WBEs - 16% was paid to MBEs and 14% was paid to WBEs.

\*   \*   \*

Ms. Hyman and Mr. McCabe then informed the Members about the Website update.

\*   \*   \*

The next item on the agenda, presented by Mr. Jones, was the acceptance of the recommended insurance renewal program and authorization to pay insurance premiums.

Mr. Jones briefly explained the proposed recommendations for the renewal of polices that are to expire on June 30th and July 1st. These policies included property coverage for real estate, operations and general liability, umbrella liability coverage as well as management liability, public official's liability, prime coverage and workers compensation. Mr. Jones introduced Ira Neifeld and Paul Hennessey of Cool Insuring Agency to provide a brief explanation of the proposed insurance plan.

Upon a motion made by Mr. Capoccia and seconded by Ms. Gallo, the following resolution was unanimously approved:

## AUTHORIZATION TO ACCEPT THE JUNE/JULY INSURANCE PROGRAM AND AUTHORIZATION TO PAY THE RELATED INSURANCE PREMIUMS

BE IT RESOLVED, that the Members hereby authorize the President and Chief Operating Officer (the "President") of the Authority or her/his designee(s) be, and each of them hereby is, authorized and empowered to execute and deliver the June/July Insurance Programs and Schedule and related documentation and pay the Insurance Premiums, substantially in the form described at this Meeting, subject to such changes as the officer or officers, with the advice of counsel, shall approve as necessary and appropriate and in the best interest of the Authority; and be it further

RESOLVED, that the President of the Authority or her/his designee(s) be, and each of them hereby is, authorized and empowered to execute all such other and further documents and to take all such other

and further actions as may be necessary, desirable or appropriate in connection with the transactions contemplated in the foregoing resolution, and any such execution of documents and any other and further actions heretofore taken are hereby ratified and any actions hereafter taken are confirmed and approved.

*   *   *

The next item on the agenda, presented by Ms. Kim, was the approval of amendments to Battery Park City Parks Rules.

Ms. Kim began by stating that Battery Park City's existing park rules were enacted more than 20 years ago in 1992. Due to the length of time that has passed since the rules were enacted and the fact that there have been no amendments or review of the rules since inception, the Legal Department undertook a comprehensive review of Battery Park City's parks rules. The rules were compared to the rules and regulations of New York City's Parks and Recreations Department, as well as those of Hudson River Park and Brooklyn Bridge Park. Ms. Kim then provided a summary and description of the new and/or amended rules.

Upon a motion made by Mr. Branchini and seconded by Mr. Capoccia, the following resolution was unanimously approved:

## APPROVAL AND ADOPTION OF AMENDMENTS TO THE RULES AND REGULATIONS OF BATTERY PARK CITY PARKS

BE IT RESOLVED, that the amendments to the Rules and Regulations of Battery Park City Parks in the form attached hereto as Exhibit A (the "Amendments"), be, and hereby are approved and adopted; and be it further

RESOLVED, that the President and Chief Operating Officer of the Authority or her/his designee be, and hereby is, directed to file the Notice of Adoption with respect to the Amendments, together with any required certification(s), subject to such changes as the officer or officers filing the Notice of Adoption shall approve as necessary and appropriate and in the best interest of the Authority, with the New York State Department of State, with copies delivered to the officers specified in section 101-a of New York State Executive Law and section 202(6-a) of the State Administrative Procedure Act; and be it further

RESOLVED, that any and all actions taken by any officer of the Authority in connection with the preparation of the Amendments is hereby ratified, confirmed and approved; and be it further

RESOLVED, that the Secretary of the Authority be, and hereby is, directed to file the Amendments with the Minutes of this meeting.

*   *   *

The next item on the agenda, presented by Ms. Dawson, was an authorization to execute a lease amendment with Regatta Property, LLC.

Ms. Dawson began by explaining that the Lease for the Regatta Space was initially for a period of ten years, and it has been extended on two prior occasions, the most recent of which extended the

term of the Lease through December 31, 2014. The Authority has continued to pay the current lease rate for the months of January - April 2015, pending action by the Members to authorize a further amendment to the Lease. Management has begun to institute certain adjustments to the Battery Park City security program and personnel, and, as a result, Ms. Dawson added, the type, location and amount of support space required for the security functions may likewise warrant adjustment over the course of 2015. It is also expected that certain equipment and communication infrastructure upgrades will be necessary.

Ms. Dawson continued to explain that there is no comparable space available within Battery Park City which would provide, on a short-term basis, the required space, features, amenities and infrastructure that are currently required for the Authority's security functions as the Authority re-evaluates its longer-term space requirements. Moreover, pursuing a short-term relocation of all security functions to alternate space in advance of a final determination of the Authority's security-related space needs would conceivably place the Authority in the undesirable position of having to expend the time and incur the costs required to relocate twice rather than once.

Following negotiations between the Authority and the Regatta, Ms. Dawson stated, the Regatta has agreed to extend the Lease for one additional year (through December 31, 2015) at the same rate applicable to calendar year 2014 ($70.358/sf), with an option to extend for the 2016 calendar year upon 90 days' advance notice. During 2015, staff will focus on opportunities to streamline the security-related space needs of the Authority and will endeavor to identify options that have the potential to reduce the long-term costs associated with these needs. Should a preferred alternative be identified prior to the end of the year, the Lease allows the Authority to sublease all or a portion of the Regatta Space to others.

Ms. Gallo recused herself from voting on this item.

Upon a motion made by Mr. Petracca and seconded by Mr. Capoccia, the following resolution was unanimously approved:

## AUTHORIZATION TO AMEND THE LEASE WITH REGATTA PROPERTY, LLC

BE IT RESOLVED, that in accordance with the materials presented to this meeting, the President and Chief Operating Officer (the "President") of the Authority or her/his designee(s) be, and each of them hereby is authorized to execute an amendment (the "Lease Amendment") to the Lease with Regatta Property, LLC; and be it further

RESOLVED, that the President of the Authority or her/his designee(s) be, and each of them hereby is authorized and empowered to execute and deliver the Lease Amendment on behalf of the Authority, subject to such changes as the officer or officers executing the Lease Amendment, shall, with the advice of counsel, approve as necessary and appropriate and in the best interests of the Authority, such approval to be conclusively evidenced by the execution and delivery of the Lease Amendment; and be it further

RESOLVED, that the President of the Authority or her/his designee(s) be, and each of them hereby is, authorized and empowered to execute all such other and further documents and to take all such other and further actions as may be necessary, desirable or appropriate in connection with the transactions contemplated in the foregoing resolutions, and any such execution of documents and any other further

BPCA001817

actions heretofore taken are hereby ratified and any actions hereafter taken are confirmed and approved.

\*   \*   \*

The next item on the agenda, presented by Ms. Dawson, was an authorization to execute a contract with Stantec Consulting Services, Inc. ("Stantec") for the South End Avenue and West Thames Street Streetscape Design Services.

Ms. Dawson began by explaining that this project relates to a study that focuses on the south neighborhood, which was developed as the first phase of Battery Park City and constructed in accordance with the master plan and the design guidelines.

Ms. Dawson explained that over time there have been a great number of changes to the neighborhood that relate to the build out of Battery Park City: the growth and evolution of Lower Manhattan, increase in vehicular, bicycle and pedestrian traffic, a shifting mix of residential, retail and commercial tenants and an enormous growth in tourism. In light of these changes and in recognition of certain concerns and issues that have arisen regarding pedestrian safety and traffic related issues, the Authority desires to evaluate the current condition of the project area, this streetscape, and identify areas in which it may be improved or enhanced in support of the interests of the community.

Ms. Dawson said that the proposals received were evaluated in accordance with the criteria listed in the Board memo. Based upon the proposal scoring and the interviews, Stantec was the highest technically rated firm.

Upon a motion made by Ms. Gallo and seconded by Mr. Petracca, the following resolution was unanimously approved:

## AUTHORIZATION TO EXECUTE A CONTRACT WITH STANTEC CONSULTING SERVICES INC. FOR THE SOUTH END AVENUE AND WEST THAMES STREET STREETSCAPE DESIGN SERVICES

BE IT RESOLVED, that the President and Chief Operating Officer (the "President") of the Authority or her/his designee(s) be, and each of them hereby is, authorized and empowered to enter into a contract with Stantec Consulting Services Inc. for the South End Avenue and West Thames Street Streetscape Design Services in the amount of $247,514, and be it further

RESOLVED, that the President or her/his designee(s) be, and each of them hereby is, authorized and empowered to execute and deliver the contract on behalf of the Authority, subject to such changes as the officer or officers executing the contract shall, with the advice of counsel, approve as necessary and appropriate and in the best interest of the Authority, such approval to be conclusive evidence by the execution and delivery of the contract; and be it further

RESOLVED, that the President or her/his designee(s) be, and each of them hereby is, authorized and empowered to execute all such other and further documents, and to take all such other and further actions as may be necessary, desirable or appropriate, in connection with the transactions contemplated in the foregoing resolutions, and any such execution of documents and any other and further actions heretofore taken are hereby ratified and any actions hereafter taken are confirmed and approved.

\*   \*   \*

BPCA001818

The next item on the agenda, presented by Ms. Dawson, was an authorization to execute a contract with D'Onofrio General Contractors Corp. ("D'Onofrio") for the phase 4 pile remediation – North Cove Marina Construction Services.

During summer 2015, the pile remediation program will focus on the piles that are under the southern half of the North Cove Marina. This part of the pile remediation program is being conducted at this time so that it does not interrupt future operations at the North Cove Marina. In addition, phase 4 of the pile remediation program will include some repair work to several caissons that are leaking located under the Esplanade Plaza.

A single proposal was received from D'Onofrio, Ms. Dawson said, which was evaluated according to the technical requirements delineated in the request for proposals. Ms. Dawson mentioned that the Authority has prior experience with D'Onofrio since it was the contractor for phase 3 of the pile remediation program. The Authority has been happy with D'Onofrio's work and so the evaluation committee's technical conclusion was that D'Onofrio was qualified to perform the phase 4 pile remediation.

Upon a motion made by Mr. Capoccia and seconded by Mr. Branchini, the following resolution was unanimously approved:

## **AUTHORIZATION TO ENTER INTO A CONTRACT WITH DONOFRIO GENERAL CONTRACTORS CORP. FOR THE PHASE 4 PILE REMEDIATION - NORTH COVE MARINA PROJECT**

BE IT RESOLVED, that the President and Chief Operating Officer of the Authority (the "President") or her/his designee(s) be, and each of them hereby is, authorized and empowered to enter into a contract (the "Contract") with D'Onofrio General Contractors Corp., for the Phase 4 Pile Remediation – North Cove Marina Project in the amount of $4,700,000; and be it further

RESOLVED, that the President or her/his designee(s) be, and each of them hereby is, authorized and empowered to execute and deliver the Contract on behalf of the Authority, subject to such changes as the officer or officers executing the Contract shall, with the advice of counsel, approve as necessary and appropriate and in the best interest of the Authority, such approval to be conclusive evidence by the execution and delivery of the Contract; and be it further

RESOLVED, that the President or her/his designee(s) be, and each of them hereby is, authorized and empowered to execute all such other and further documents, and to take all such other and further actions as may be necessary, desirable or appropriate, in connection with the transactions contemplated in the foregoing resolutions, and any such execution of documents and any other and further actions heretofore taken are hereby ratified and any actions hereafter taken are confirmed and approved.

\*  \*  \*

The next item on the agenda, presented by Ms. Dawson, was an authorization to execute an amendment with Athletic Fields of America, Inc. ("AFA") for the ball fields maintenance.

Ms. Dawson explained that in March 2013, the Authority completed the replacement of the artificial turf ball fields that are located south of Warren Street and north of Murray Street which were

destroyed during Superstorm Sandy. The replacement turf for the ball fields is an AstroTurf project and requires periodic testing and specialized maintenance in order to maintain the Authority's warranty. The Authority's service provider is AFA and it is the only provider in the New York and New Jersey that is authorized by AstroTurf to maintain the turf.

Ms. Dawson explained that the Authority entered into a sole source contract in July 2013, which covers the twice yearly testing and maintenance of the ball fields and the seasonal realignment of the poles that form the boundaries of the ball fields. The poles that need to be moved, Ms. Dawson added, require equipment that neither the Authority nor the Conservancy own. The Authority has been pleased with AFA's performance and recommends an amendment to the contract extending the term through November 30, 2017 and increasing the contract value by a total of $50,337.50.

Upon a motion made by Mr. Petracca and seconded by Mr. Capoccia, the following resolution was unanimously approved:

### AUTHORIZATION TO EXECUTE AN AMENDMENT WITH ATHLETIC FIELDS OF AMERICA FOR THE BATTERY PARK CITY BALL FIELDS MAINTENANCE

BE IT RESOLVED, that the President and Chief Operating Officer (the "President") of the Authority or her/his designee(s) be, and each of them hereby is, authorized and empowered to enter into an amendment with Athletic Fields of America for the Battery Park City Ball Fields Maintenance extending the term through November 30, 2017 and increasing the amount of the contract by a total of $50,337.50, to a new total value of $108,287.50 and be it further

RESOLVED, that the President or her/his designee(s) be, and each of them hereby is, authorized and empowered to execute and deliver the amendment on behalf of the Authority, subject to such changes as the officer or officers executing the amendment shall, with the advice of counsel, approve as necessary and appropriate and in the best interest of the Authority, such approval to be conclusive evidence by the execution and delivery of the amendment; and be it further

RESOLVED, that the President or her/his designee(s) be, and each of them hereby is, authorized and empowered to execute all such other and further documents, and to take all such other and further actions as may be necessary, desirable or appropriate, in connection with the transactions contemplated in the foregoing resolutions, and any such execution of documents and any other and further actions heretofore taken are hereby ratified and any actions hereafter taken are confirmed and approved.

*   *   *

The next item on the agenda, presented by Ms. Hyman, was an authorization to enter into an agreement with the Alliance for Downtown New York, Inc. (the "Downtown Alliance").

Ms. Hyman stated that the current operator for the Downtown Alliance bus service's contract expired, and a new public procurement was conducted, which resulted in the selection of Golden Touch. Golden Touch will run seven buses Monday – Friday and five buses Saturday and Sunday. Ms. Hyman requested that the Board authorize $632,000 toward the cost of the operations of the bus service, as has been authorized in the recent past service. There are 18 stops in Battery Park City with 49% of traffic ending in Battery Park City and 45% of ridership beginning in Battery Park City.

BPCA001820

Upon a motion made by Ms. Gallo and seconded by Mr. Capoccia, the following resolution was unanimously approved:

## AUTHORIZATION TO ENTER INTO AN AGREEMENT WITH THE ALLIANCE FOR DOWNTOWN NEW YORK, INC.

BE IT RESOLVED, that in accordance with the materials presented to this meeting, the President & Chief Operating Officer (the "President") of the Authority, or her/his designees be, and each of them hereby is, authorized and empowered to execute an agreement providing for a payment to The Alliance for Downtown New York, Inc. in the amount of $632,000 for calendar year 2015; and be it further

RESOLVED, that the President of the Authority, or her/his designees be, and each of them hereby is, authorized and empowered to execute all such other and further documents, and take all such other and further actions as may be necessary, desirable or appropriate in connection with the transaction contemplated in the foregoing resolution, and any such execution of documents and any other and further actions heretofore taken are hereby ratified and any actions hereafter taken are confirmed and approved.

\*   \*   \*

The next item on the agenda, presented by Ms. Hyman, was an authorization to amend the Large Scale Commercial Development Plan (the "LSCDP") and to Issue a Determination of Non-Significance relating to the Eighth Amendment of the LSCDP.

Ms. Hyman mentioned that the Board had previously discussed and approved a reallocation of commercial square footage for Saks Fifth Avenue ("Saks") to open into what is now Brookfield Place. The Authority was subsequently approached by Saks to approve a 140 square foot vestibule to be attached to the outside of 225 Liberty Street in order to allow a valet to operate in the cul-de-sac. After design meetings with Saks, it was decided that the vestibule will extend about six feet out from the side of the building into space that is considered public space under the Authority's large scale commercial development plan. The Authority must ensure that 20% of the site area in this part of Battery Park City (approximately three acres) is retained for public space, and this small vestibule will not affect that 20%.

Ms. Hyman noted that Management does not believe that the proposed Eighth Amendment to the LSCDP is a major modification of the plan, and added that the City Planning Commission concurs with this determination. In addition, there is no adverse environmental impact as a result of the proposed Eighth Amendment, and Management recommends issuing a Negative Declaration.

Upon a motion made by Ms. Gallo and seconded by Mr. Petracca, the following resolution was unanimously approved:

## AUTHORIZATION TO ENTER INTO AN AMENDMENT TO THE LARGE SCALE COMMERCIAL DEVELOPMENT PLAN FOR BROOKFIELD PLACE (FORMERLY KNOWN AS THE WORLD FINANCIAL CENTER (THE "WFC")), DATED AS OF JUNE 10, 1980 (AS AMENDED, THE "LSCDP").

WHEREAS, the commercial center of Battery Park City, of which the WFC is the principal component, is governed by the LSCDP, which controls use, bulk and other land use requirements; and

WHEREAS, an amendment to the LSCDP to permit the building of an approximately 140-square foot vestibule to be used primarily as a valet entrance to a retail tenant's storefront in an area currently designated in the LSDCP as public open space is required; and

WHEREAS, the Authority's management has determined that permitting the building of the vestibule in an area designated in the LSDCP as public open space is not a "major modification" to the LSCDP.

NOW, THEREFORE, BE IT RESOLVED, that the President and Chief Operating Officer (the "President") of the Authority, or her/his designee(s) be, and each of them hereby is, authorized and empowered to execute and deliver the amendment to the LSCDP in the form presented to this meeting, subject to such changes as the officer or officers executing such amendment shall, with the advice of counsel, approve as necessary and appropriate and in the best interest of the Authority, such approval to be conclusively evidenced by the execution and delivery of such documents; and be it further

RESOLVED, that the President of the Authority, or her/his designee(s) be, and each of them hereby is, authorized and empowered to execute all such other and further documents, and take all such other and further actions as may be necessary, desirable or appropriate, in connection with the transaction contemplated in the foregoing resolutions, and any such execution of documents and any other further actions heretofore taken are hereby ratified and any actions hereafter taken are confirmed and approved.

**AUTHORIZATION TO ISSUE A NEGATIVE DECLARATION RELATING TO THE AMENDMENT OF THE LARGE SCALE COMMERCIAL DEVELOPMENT PLAN FOR BROOKFIELD PLACE (FORMERLY KNOWN AS THE WORLD FINANCIAL CENTER (THE "WFC")), DATED AS OF JUNE 10, 1980 (AS AMENDED, THE "LSCDP").**

WHEREAS, the WFC is the commercial center of Battery Park City and is governed by the LSCDP, which controls use, bulk and other land use requirements; and

WHEREAS, an amendment to the LSCDP (the "LSCDP Amendment") to permit the building of an approximately 140-square foot vestibule to be used primarily as a valet entrance to a retail tenant's storefront in an area currently designated in the LSDCP as public open space is required; and

WHEREAS, the Authority's management has determined that the LSCDP Amendment is not a "major modification" to the LSCDP; and

WHEREAS, the LSCDP Amendment requires certain approvals by the Members, and such approvals are actions subject to the New York State Environmental Quality Review Act ("SEQRA") and the City Environmental Quality Review ("CEQR"); and

WHEREAS, the Authority declared its intent to the New York City Planning Commission (the "City Planning Commission") (the only other involved agency) to serve as lead agency for purposes of conducting the environmental review of the LSCDP Amendment required under SEQRA and CEQR; and

WHEREAS, having received no objection from the City Planning Commission, the Authority has prepared a Short Environmental Assessment Form (the "EAF") to examine the potential environmental impacts of the LSCDP Amendment; and

WHEREAS, the EAF examines the LSCDP Amendment's potential to result in significant adverse impacts in the following areas: land use, zoning and public policy; community facilities; open space; historic resources; urban design and visual resources; natural resources; hazardous materials; water and sewer infrastructure; solid waste and sanitation services; energy; transportation; air quality; greenhouse gas emissions; noise; public health; neighborhood character; and construction impacts; and

WHEREAS, as stated in the EAF, no significant adverse impacts would occur as a result of amending the LSCDP to permit the building of an approximately 140-square foot vestibule to be used primarily as a valet entrance to a retail tenant's storefront in an area currently designated in the LSDCP as public open space.

NOW, THEREFORE, BE IT RESOLVED, that the Notice of Determination of No Significance for the LSCDP Amendment is hereby approved.

\*   \*   \*

Mr. Capoccia made a motion to enter Executive Session to discuss matters pertaining to the proposed acquisition, sale or lease of real property and litigation, which was seconded by Mr. Mehiel. The Members entered Executive Session at 11:05 a.m.

\*   \*   \*

The Members exited Executive Session at 11:54 a.m. and resumed the public meeting.

\*   \*   \*

There being no further business, upon a motion made by Mr. Branchini and seconded by Mr. Petracca, the Members unanimously voted to adjourn the meeting. The meeting thereupon adjourned at 11:54 a.m.

Respectfully submitted,

*Lauren Brugess*
Lauren Brugess
Assistant Corporate Secretary

BPCA001823

**Exhibit A**

CHAPTER 21
PART 9003
AMENDED BATTERY PARK CITY PARKS RULES & REGULATIONS

Section 9003.7(e) is added as follows:

(e) No person shall use a metal detector in any park except under a permit issued by ParksCorp or BPCA.

Section 9003.11 is amended as follows:

No person, except a police officer or other peace officer, shall bring into or have in his possession in any park, any firearms, slingshots, firecrackers, missile propelling instruments, air rifles, air pistols, paintball guns, or explosives, including any substance, compound, or mixture having properties or such a character that alone or in combination with other substances, compounds, mixtures, propel missiles, explode or decompose to produce flames, combustion, noise or noxious or dangerous odors, except as specifically permitted by ParksCorp or BPCA. Nothing in this section shall be construed to prohibit the proper use of [cigarette lighters,] matches or of charcoal lighter fluid in proper containers in picnic grills where permissible pursuant to the provisions of these rules.

Section 9003.12 is amended as follows:

(a)   No person shall within any park molest, chase, wound, trap, hunt, shoot, throw [missiles] objects at, kill, or remove [or have in his possession] any [undomesticated] animal or have in his possession any undomesticated animal, or any significant portion of the remains of any [undomesticated] animal, or any nest, [or the young of any undomesticated animal] or the eggs of any [undomesticated animal] amphibian, reptile or bird; or knowingly buy, receive, have in his possession, sell or give away any such [undomesticated] animal or egg taken from or killed within any park.

(b)   No person shall feed animals in any park except where specifically authorized by ParksCorp. ParksCorp may also designate certain areas where all feeding of animals is prohibited. It is a violation of this section to feed animals in any area where such feeding is prohibited.

Section 9003.14 is amended as follows:

No person owning or being custodian or having control of any animal shall cause or allow such animal to be unleashed in any park, except under the express terms of a permit granted by ParksCorp. or within designated animal run areas. Any such animal found at large may be seized and impounded.

11

Properly licensed dogs and cats, restrained by a leash not exceeding six feet in length may be brought into the parks, except in no event are dogs or other animals be allowed to enter any playground, park building, dog free zone or any other area where they are prohibited by ParksCorp. Nothing in this section shall be construed to prohibit [seeing eye or hearing ear dogs in these areas] <u>persons with disabilities from bringing into such areas service animals, including guide dogs, signal dogs, or other animals individually trained to do work or perform acts for the benefit of an individual with a disability, including but not limited to guiding individuals with impaired vision, alerting individuals with impaired hearing to intruders or sound, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items. Nothing herein shall limit the rights of persons with disabilities under City, State, and Federal law.</u>

Section 9003.17 is amended as follows:

<u>It is prohibited for any person to engage in disorderly behavior in any park</u>. Any person in any park, including any park street, shall be guilty of disorderly behavior who:

Sections (a) through (j) of Section 9003.17 remain unchanged.

Section 9003.18 is amended as follows:

<u>It is prohibited for any person to engage in loitering for illegal purposes in any park</u>. Any person in any park, including any park street, shall be guilty of loitering who:

(a) loiters or remains in a park for the purpose of engaging, or soliciting another person to engage in sexual activity; or

(b) loiters or remains in any park with one or more persons for the purpose of unlawfully using, possessing, distributing, selling or soliciting <u>marijuana or</u> a controlled substance, as defined in section 220.00 of the New York State Penal Law.

Section 9003.23(a) is amended as follows:

(a) No person shall engage in any commercial activity or commercial speech in any park, including any park street, except pursuant to a permit issued under section 9003.[25]<u>31</u> and/or section 9003.[26]<u>32</u> of this Part.

New Sections 9003.25, 9003.26, 9003.27, 9003.28, 9003.29 and 9003.30 are added as follows and Sections 9003.25, et seq. of 21 NYCRR are renumbered as Sections 9003.31, et seq.

BPCA001825

Section 9003.25. Urination and Defecation in Parks.

No person shall urinate or defecate in any park, or in or upon any park building, monument or structure, except in a facility which is specifically designed for such purpose.

Section 9003.26. Unlawful Exposure.

It shall be a violation of these rules to appear in public on property under the jurisdiction of ParksCorp in such a manner that one's genitalia are unclothed or exposed.

Section 9003.27. Smoking.

Smoking is prohibited in all public areas within any park, except as may be designated by ParksCorp or BPCA.

Section 9003.28. Marijuana; controlled substances.

No person shall bring, possess, distribute, sell, solicit or consume marijuana or any controlled substance, as defined in §220.00 of the New York State Penal Law, in any park or other park property or facility.

Section 9003.29. Unlawful Distribution of Products and Materials.

No person shall engage in the non-commercial distribution of products and/or material (other than printed or similarly expressive material) without a permit issued by ParksCorp or BPCA. A permit shall be issued only upon ParksCorp's or BPCA's determination that said distribution will be conducted in a manner consistent with the public's use and enjoyment of the park or park facility in question. In making this determination, ParksCorp or BPCA will consider the nature of the product or material; whether the product or material is compatible with customary park uses; whether the product or material is intended to be used in the park or park facility; the age of the targeted audience for the product or material; and whether the area in the park or park facility where the distribution will take place is appropriate for such distribution, considering, e.g., its proximity to areas designed for children, quiet zones or other areas designed for activities not compatible with such distribution. In connection with the foregoing, ParksCorp may consult with parental or other groups that are involved with the park or park facility where a permit for distribution is requested. ParksCorp or BPCA may also impose conditions upon the distribution of products and materials consistent with the concerns reflected by the factors listed above. Products and/or materials may be distributed only upon an indication of interest by the recipient, and only from a fixed location specified in the permit.

BPCA001826

Section 9003.30. Geocaching; Treasure Hunting Games.

Geocaching or other treasure hunting games, activities, devices, logbooks, trinkets, or other materials, are not allowed within any park except as may be expressly permitted by ParksCorp.

Former Section 9003.30, which has been renumbered as Section 9003.36 pursuant to these amendments, is amended as follows:

Alcoholic beverages[; controlled substances]

(a) No person shall bring, possess, distribute, sell, solicit or consume alcoholic beverages [or unlawfully bring, possess, distribute, sell, solicit or consume any controlled substance, as defined in section 220.00 of the New York State Penal Law], in any park, including any park street, playground, or other park property or facility, except [in the case of alcoholic beverages,] where specifically permitted by the ParksCorp or BPCA and applicable law.

Former Section 9003.33, which has been renumbered as Section 9003.39 pursuant to these amendments, is amended as follows:

(a) Any person bringing a bicycle, scooter, skateboard, roller skates or roller blades into any park shall obey all park signs pertaining to the use of such bicycles, scooters, roller skates, skateboard or roller blades. No bicycle, scooter, roller skates, skateboard or roller blades shall be ridden, skated, operated or otherwise used on the grass, or on the upper level of the esplanade, or between the rail and the immediately adjacent benches of the esplanade, or in any sitting or play area, or playground. Bicycles, scooters, roller skates, skateboards and roller blades may be ridden, skated, operated and used in the parks, but only at the times, and in the areas, specifically designated by ParksCorp. No person shall ride, skate, operate or use a bicycle, scooter, roller skates, skateboard or roller blades in a reckless manner. Skateboards or scooters shall not be skated or operated or used on park property, fixtures or equipment in a manner likely to cause damage or injury to persons or property.

(b) Persons operating or using bicycles, scooters, skateboards, roller skates or roller blades shall yield to pedestrians in any part of the parks.

(c) It is prohibited for any person to ride or operate a bicycle to carry more persons at one time than the number for which it is designed and equipped, except that children may be carried in seats securely attached to a bicycle. It is prohibited for any person riding a bicycle to attach himself or his bicycle to the outside of any motor vehicle being operated in any park.

BPCA001827

Former Section 9003.41, which has been renumbered as Section 9003.47 pursuant to these amendments, is amended as follows:

No person shall store or leave personal belongings unattended within or adjacent to any park. <u>Personal property left unattended within any park in violation of this section is subject to removal by ParksCorp. ParksCorp will give notice to the owner of the property prior to such removal if the identity of and an address for such person are reasonably ascertainable. The cost of the removal and storage of such property will be charged to the owner and must be paid prior to release of the property. Any personal property that is unclaimed after 30 days will be deemed to be abandoned and will be turned over to the police property clerk for disposal pursuant to law.</u>

Section 9003.47, which has been renumbered as Section 9003.53 pursuant to these amendments, is amended as follows:

Any violation of these rules, [but only to the extent that these rules are consistent with] <u>provided such violation would also violate any of the provisions of the Administrative Code of the City of New York or</u> the rules and regulations in effect for [all] <u>the</u> parks of the City of New York, shall be a misdemeanor triable in a court with competent jurisdiction and punishable by not more than 90 days imprisonment or by a fine of not more than $1,000, or by both in accordance with section 533(a)(9) of chapter 21 of the New York City Charter, and the violator of these rules shall also be subject to criminal prosecution and civil penalties as permitted by law and the penalties imposed pursuant to section 202(d) and (e) of the New York Not-for-Profit Corporation Law.