UNITED STATES DISTRICT COURT
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **STEVEN E. GREER**, MD | ) | **15-CV-6119  (AJN) (JLC)** |
| Plaintiff; | ) | |
| | ) | |
| v. | ) | **HON. ALLYSON J. NATHAN** |
| | ) | DISTRICT JUDGE |
| **Dennis Mehiel**, **Robert Serpico**, **The** | ) | |
| **Battery Park City Authority**, **Howard** | ) | **HON. JAMES L. COTT** |
| **Milstein**, **Steven Rossi**, **Janet Martin**, | ) | MAGISTRATE JUDGE |
| **Milford Management**, **Mariners Cove Site** | ) | |
| **B Associates** | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OPPOSITION TO BPCA'S LOCAL CIVIL RULE 56.1 STATEMENT**

Pursuant to Local Civil Rule 56.1, Plaintiff hereby submits this statement of the material facts opposing the alleged "facts" listed in the BPCA's Rule 56.1 statement (Dkt. No. 377). The exhibits referenced are from Plaintiff's memorandum of law. The following numbered paragraphs correspond with the paragraphs in the BPCA statement of facts.

**Formation and Governance of the BPCA**

1.      "Established in 1968, the BPCA is a New York State public benefit corporation created by statute.  (*See* N.Y. Pub. Auth. Law § 1970, *et seq.* (the "BPCA Act").)"

2.      "The BPCA Act provides that the membership of the BPCA shall consist of a board made up of "seven members to be appointed by the governor with the advice and consent of the senate" and that the "members shall elect the chairman of the authority from among their number."  (BPCA Act § 1973 (1)–(2).)" <span style="color:red">Of note, this might not be a fact soon. A new state bill awaiting Governor Cuomo's signature requires at least two of the board members to be local Battery Park residents. See Senate Bill S130A of the 2017 session.</span>

3.      "The BPCA Act further provides that "[a] majority of the members of the authority shall constitute a quorum for the transaction of any business or the exercise of any power or function of the authority.  The authority may delegate to one or more of its members, or to its officers, agents or employees, such powers and duties as it may deem proper."  (BPCA Act § 1973 (7).)" <span style="color:red">Note, the fact that the board does indeed delegate power to Chairman Mehiel, CFO Serpico, etc., which means they are the final decisionmakers of "official policy". The BPCA argues in their MOL that "municipal liability" under section 1983 does not apply because the actions to bar Plaintiff were not official policy.</span>

4.      "The BPCA has the authority to "lease, hold, mortgage and dispose of real property" under its jurisdiction, and to engage in contracts with private developers for "leases and subleases" of BPCA property.  (*See* BPCA Act § 1974 (3) & (8)).  However, the BPCA has no authority to enter, cancel, renew, or manage, in any way, the leases or mortgages of individual BPCA residents living in private residential buildings located within the BPCA.  (*See* BPCA Act § 1974.)"

5.        "Such decisions concerning individual resident leases or condominium mortgages are exclusively within the province of the private landlords that own and/or manage the residential buildings located in Battery Park City.  (*See* Declaration of Michael Tremonte ("Tremonte Decl.") ¶ 4, Ex. 3 ("McCabe Dep.") at 68:19 – 69:8.)". This is disputed. The BPCA is the "landlord" of the residential building managers (*See* BPCA Act § 1974). None of the real estate defendants actually own the land. It is all part of a 100-year lease. Therefore, the BPCA could exert power over those building managers to influence individual resident leases, as the BPCA did in this instant case before the Court (see Greer Decl. at ¶ 2).

6.        "Dennis Mehiel ("Mehiel") is the Chairman and Chief Executive Officer of the BPCA.  He has held these positions since his appointment was confirmed on June 20, 2012. (Declaration of Dennis Mehiel ("Mehiel Decl.") ¶ 1.)"

7.        "Shari C. Hyman ("Hyman") is the President and Chief Operating Officer of the BPCA.  Her appointment was approved by the BPCA board on January 28, 2014.  (Declaration of Shari C. Hyman ("Hyman Decl.") ¶ 1.)"

**Plaintiff's Tenancy at 200 Rector Place and the BatteryPark.TV Blog**

8.        "From 2002 until April 2014, Plaintiff leased apartment 35F (the "Apartment") in the residential building located at 200 Rector Place in Battery Park City.  200 Rector Place is owned by Milford Management.  (*See* Corrected Amended Complaint, ECF No. 85 ("CAC") ¶¶ 26, 33; Tremonte Decl. ¶ 6, Ex. 5 ("Milstein Dep.") at 8:5–15; Tremonte Decl. ¶ 7, Ex. 6 ("Rossi Dep.") at 11:4–9.)" This is disputed. A consortium of LLC companies collectively known as Mariners Cove Site B Associates, not Milford Management, owns the residential building at 200 Rector Place. Milford is just a separate company established by defendant

Milstein to earn revenue from the apartments that he never sold as condos and rented out (see Greer Decl. at ¶ 3).

9.      "In or about 2009, Plaintiff began operating an internet blog called BatteryPark.TV, which has the URL address www.batterypark.tv.  Plaintiff posted content on BatteryPark.TV concerning, among other things, Battery Park City and the BPCA.  (*See* CAC ¶ 29.)"

10.      "Milford Management leases the land on which 200 Rector Place is located from the BPCA, pursuant to the terms of a written ground lease.  (Hyman Decl. ¶ 5.)" This is disputed (see *supra* ¶ 8). Mariners Cove Site B Associates is the entity that leases the land.

11.      "The BPCA has no authority to enter, cancel, renew, or manage, in any way, the leases or mortgages of individual residents living in 200 Rector Place.  (*See* BPCA Act § 1974; Hyman Decl. ¶¶ 3–4.)" This is not a fact. This is disputed due to lack of evidence. The only evidence provided by the BPCA to support this disputed fact is in the form of the Hyman declaration. Hyman merely refers to "*See* BPCA Act § 1974" and states no specific section of that New York statute. In fact, nowhere in the BPCA act does it detail whether or not the BPCA could do such a thing.

12.      "Milford Management did not renew Plaintiff's lease, which expired in April 2014.  (*See* Rossi Dep. at 11:10–18; Tremonte Decl. ¶ 17, Ex. 16.)" This is disputed. Mariners Cove Site B Associates is the entity that controlled the lease (see *supra* ¶ 8).

13.      "After the expiration of Plaintiff's lease, Plaintiff "held over" and remained in the Apartment until he was ordered to vacate the Apartment pursuant to the terms of a final judgment and warrant of eviction, which were entered by the Civil Court of the City of New York Housing Part ("housing court") on or about January 28, 2016.  (*See* ECF No. 184-4 at 2.)

The housing court judgment and warrant of eviction were stayed temporarily, and Plaintiff

vacated the apartment on April 6, 2016.  (*See* Tremonte Decl. ¶ 20, Ex. 19.)"


**Plaintiff's Documented History of Harassing and Threatening Conduct**

14.     "During the time period at issue in this litigation, Plaintiff displayed a consistent

pattern of harassing and, at times, threatening behavior towards BPCA employees.  Reports

indicate that he has displayed a similar pattern of conduct towards Battery Park City residents.

(*See infra*.)" This is disputed. This is a not even a "statement" of fact because it is so vaguely

worded. For example, what is the "time period at issue"? The BPCA intentionally made this

statement vague because the only alleged misconduct by Plaintiff took place *well after* the

decision to retaliate against Plaintiff was made. The BPCA lawyers are trying to mislead this

court.

15.     "For example, in March 2013 the BPCA received a report from Captain Falcon,

the commanding officer of the Parks Enforcement Patrol ("PEP") – a division of the New York

City Department of Parks and Recreation that the BPCA had retained to supervise its parks and

public spaces to ensure compliance with applicable rules and regulations.  Specifically, Captain

Falcon forwarded an email from a PEP officer to then-BPCA General Counsel Phillis Taylor and

BPCA attorney Seema Singh ("Singh"), with a carbon copy to Serpico.  (*See* Tremonte Decl.

¶ 12, Ex. 11.)"

16.     "The email described an incident involving a Battery Park City resident, who had

approached Plaintiff at a local grocery store to discuss articles about the resident that Plaintiff

had written and published on BatteryPark.TV.  When the resident approached Plaintiff, Plaintiff

"start[ed] to yell and take his camera phone out to videotape her," at which point the resident

called 911.  When the responding officer arrived, Plaintiff approached the officers and began "yelling and screaming" at them.  When the officers tried to take a statement from Plaintiff, Plaintiff began videotaping the PEP and NYPD officers, at which point they ceased questioning him.  (*Id.*)"

This is disputed. This is not an admissible fact because it is hearsay, per Federal Rules of Evidence 802, and part of the obvious smear campaign being used as a defense strategy. This alleged incident is also unrelated to any interaction with a BPCA employee and irrelevant. Therefore, it is inadmissible per FRE 401 and 403. It is also a plain attempt to destroy Plaintiff's character with irrelevant innuendo, and inadmissible per FRE 405.

This disputed fact is nothing but the biased email of a PEP officer who would soon lose his job as a result of Plaintiff's press coverage. The PEP officers were the subjects of Plaintiff's original complaint. The Plaintiff had been reporting on corruption within the PEP ranks and they were retaliating against Plaintiff. As a result of that reporting, the BPCA cancelled the city contract for the PEP services and replaced them with private security (see Greer Decl. at ¶ 4).

The unnamed woman referenced in the email by the PEP captain is Karen McDermott, a Xerox sales executive at the time who used to live in Battery Park City. She was in fact an unstable woman with prior police reports filed against her for sending hate-speech emails to Plaintiff in response to his reporting on BatteryPark.TV (*see* Greer Decl. at ¶ 5). Plaintiff did not know the woman whatsoever prior to these attacks, but she apparently knew him. Her unsolicited emails to Plaintiff were graphic and used homophobic slurs (*see* Greer Decl. at ¶ 5). The police incident mentioned in the email occurred after the deranged woman stalked and confronted Plaintiff inside a grocery store. When Plaintiff told the police officers about the woman, they called and verified that she had police reports filed on her. That is why they dropped the

investigation and drove away. Detective Tommy Moran of the NYPD First Precinct handled the matter. (*see* Greer Decl. at ¶ 5).

17.     "As of the date of the incident described in this email, Plaintiff was in the habit of frequently calling the BPCA offices.  (*See infra*.)  During these calls, Plaintiff raised his voice, used foul and abusive language, and generally treated the BPCA staff in an offensive and demeaning manner.  (McCabe Dep. at 33:4–11; Tremonte Decl. ¶ 8, Ex. 7 ("Serpico Dep.") at 39:4–13.)" These are disputed facts and Plaintiff strongly refutes them. The evidence provided is nothing more than the biased testimony from the defendants, which a jury would find to be not credible. It is all part of the smear campaign. There is no actual evidence to support these claims other than their testimony. Plaintiff cannot provide evidence to dispute these because he cannot disprove a negative. The lack of evidence provided by the defendants is the proof needed. In the following paragraphs, the BPCA presents "call log" evidence. They will be refuted individually.

18.     "The BPCA staff maintained a call log that documented in writing Plaintiff's calls to the BPCA offices and the details of his inappropriate behavior on those calls.  (*See* Hyman Decl. ¶ 22, Ex. 12.)" This is disputed. This "call log" is nothing but handwritten anonymous notes. Unlike emails, for example, these notes are impossible to date and could easily have been written after Plaintiff filed this lawsuit. This evidence would be inadmissible hearsay during a trial, per FRE 802. It is all part of the smear tactics strategy.

19.     "The call log contains the following entries, among others, concerning Plaintiff's behavior toward the BPCA staff over the phone in 2013 and 2014:

    a.     *November 26, 2013*:  Plaintiff hung up on the BPCA staff.  He called back shortly thereafter "*screaming*" at the BPCA receptionist to never "*put me on hold until I give you permission to*."  (Hyman Decl. ¶ 22(a) (emphasis added).) This is

disputed. On page 6 of Hyman's Exhibit 12, the handwritten log note is not signed by anyone and there is no declaration to verify it. The same goes for the following log pages (b)-(g). These are *ex post facto* concocted evidence as part of a desperate defense strategy. This evidence would be inadmissible hearsay during a trial, per FRE 802. It is all part of the smear tactics strategy. Plaintiff never called anyone at the BPCA on November 26, 2013 (*see* Greer Decl. at ¶ 17).

b.      *March 22, 2014*:  When Plaintiff was told that a certain BPCA executive was in a meeting and could not take his call, Plaintiff began cursing at the BPCA administrative staff, stating, "*Aww fu\*\*, that's bullsh\*\*.*"  (Hyman Decl. ¶ 22(b) (emphasis added).)  This is disputed. First, there is no log sheet entry dated March 22, 2014 in the referenced Exhibit 12. However, there is an entry on page 8 from March 11th. It is by an anonymous person writing "for Robin Forst" and there is no declaration from the mystery author. There is no phone number of the caller recorded either. This evidence would be considered hearsay during a trial, per FRE 801, and inadmissible per FRE 802. Plaintiff never called anyone at the BPCA on November 26, 2013 (*see* Greer Decl. at ¶ 17).

Why might Robin Forst not have actually made the log note herself? Robin Forst was fired by the BPCA in April of 2016 (*see* Greer Decl. at ¶ 6), long before this Hyman declaration was created recently in June of 2017. It is possible that Forst was not around when this bogus log entry was created in 2017 and then post-dated to appear as if it were written on March 11, 2014.

8

Why did the BPCA use handwritten logs rather than verifiable emails? Perhaps this is because *Ex post facto* emails would be more traceable. In fact, the BCA did begin using emails to document calls (*infra* at ¶ 21-25).

*May 29, 2014*:  When Plaintiff was told that a BPCA executive was unavailable to take Plaintiff's call, Plaintiff accused the BPCA receptionist of lying and instructed her to "*fu\*\*ing put her on the phone now*."  (Hyman Decl. ¶ 22(c) (emphasis added).)  This is disputed. On page 10 of Exhibit 12, the log entry again is not signed and dated, but rather made by an anonymous person on behalf of Robin Forst. Therefore, this log entry is defined as hearsay by FRE 801 and inadmissible per FRE 802.  Plaintiff never called anyone at the BPCA on November 26, 2013 (*see* Greer Decl. at ¶ 17).

c.    *October 2, 2014*:  Plaintiff became upset after he was told that Hyman was unavailable to take his call; he berated the BPCA secretary, stating:  "*What the fu\*\* do you mean she's not available? She's getting paid to sit on her a\*\* all day?  She's making money and she's not fu\*\*ing available*? . . . *What the fu\*\* do you guys do all day?  . . .  [Y]ou guys are fu\*\*ing crooks and I hope you know who you're working for.*"  (Hyman Decl. ¶ 22(d) (emphasis added).)  This is disputed. On page 13 of Exhibit 12, the log entry again is not signed and dated, but rather made by an anonymous person. Plaintiff is not mentioned by name, but rather "a man called", and no phone number of the caller is listed. There is no declaration from the unknown author. Therefore, this log entry is defined as hearsay by FRE 801 and inadmissible per FRE 802.  Plaintiff never called anyone at the BPCA on November 26, 2013 (*see* Greer Decl. at ¶ 17).

d.      *October 20, 2014*:  After being told Serpico was not available to take his call, Plaintiff threatened the BPCA secretary that she would be "*going to jail*" if she was "lying" about Serpico's availability.  (Hyman Decl. ¶ 22(e) (emphasis added).)  This is disputed. There is no name of the log entry author nor any declaration from the author. Hyman intentionally does not mention the name of the "receptionists". Therefore, this log entry is defined as hearsay by FRE 801 and inadmissible per FE 802. Plaintiff never called anyone at the BPCA on November 26, 2013 (*see* Greer Decl. at ¶ 17).

e.      *October 21, 2014*:  One day later, Plaintiff called the BPCA again asking to speak to several members of the BPCA staff.  At one point, Plaintiff stated, "*Let me speak to Robin, the one that gets paid to sit on her ass.*"  (Hyman Decl. ¶ 22(f) (emphasis added).)  This is disputed. There is no name of the log entry author nor any declaration from the author. Hyman intentionally does not mention the name of the "receptionists". Plaintiff's name is not listed, but rather "Anonymous caller" is listed. Nowhere in the log entry is it written that Plaintiff stated, "*Let me speak to Robin, the one that gets paid to sit on her ass.*" Therefore, this log entry is defined as hearsay by FRE 801 and inadmissible per FRE 802. Plaintiff never called anyone at the BPCA on November 26, 2013 (*see* Greer Decl. at ¶ 17).

Of note, there is nothing in this log entry that would qualify as harassing behavior.

f.      *October 23, 2014*: "He asked me if my name was Cherish and that now I have made myself apart of all of this and then he hung up."  (Hyman Decl.

¶ 22(g))" This is disputed. There is no name of the log entry author nor any declaration from the author. Hyman intentionally does not mention the name of the "receptionists". Therefore, this log entry is defined as hearsay by FRE 801 and inadmissible per FRE 802. Plaintiff never called anyone at the BPCA on November 26, 2013 (*see* Greer Decl. at ¶ 17). Of note, there is nothing alleged in this log entry that would qualify as harassing behavior.

20.     "During 2014, Battery Park City residents complained to BPCA officials about Plaintiff's harassing and threatening conduct.  These complaints included:

        a.     *July 11, 2014*:  A Battery Park City resident who organized a summer camp program for local elementary and middle school students wrote to Hyman, Serpico and other BPCA executives about Plaintiff's conduct, noting that Greer had "continually harassed" him, made "insulting and angry calls to [his] staff," and made personal inquiries about the location of his residence and his wife. (Hyman Decl. ¶ 6, Ex. 1.)" This is disputed. Even if this is an indisputable fact, it is irrelevant to this case and nothing but a smear campaign. Therefore, Plaintiff's alleged behavior is irrelevant as a defense for them, per FRE 401, and inadmissible per FRE 402.

        Also, the "summer camp organizer" is Bob Townley who lives in Tribeca, not Battery Park City. Townley, Like Forst, was a political operative and part of the vast web controlled by Sheldon Silver. Plaintiff had reported on many occasions evidence of graft and corruption associated with Mr. Townley's community center. For example, Plaintiff discovered that the BPCA was awarding Townley annual grants of $250,000, despite Townley and his community center

not even being located within Battery Park. As a result of the reporting,

Townley's ill-gotten grants were cut off (*see* Greer Decl. at ¶ 7).

b.      "*August 15, 2014*:  Another Battery Park City resident wrote the following

email to Captain Falcon, which was then forwarded to Hyman and other BPCA

executives:

> In the last week alone, my children have been accused twice of playing 'organized games' on the lawn. . . .  Dr. Greer and I have had prior heated discussions when he has personally tried to kick parents/kids off the grass if he perceived it looked like 'organized' play (I.e [*sic*] if you own a soccer ball, have a pop goal or cones and more than 2 children, you are accused of 'teaching a class').  He has tried to video children playing on the lawn because they were 'destroying the grass' without parental consent.  He has followed parents into the playground area to which I have reminded him, to his indignation, that he is not allowed without a child.  He has had altercations with other parents.  This individual has no children and therefore has no idea what a family playing looks like. He also has no right to harass children which in my opinion is what he is doing by constantly phoning complaints. My eldest son (11 yrs) knows who he is and is intimidated when in the elevator with him.  He witnessed Greer yelling at me over the lawn issue last summer.  If complaints should be made, I believe they should be made against this man for harassment of children and false reporting to the park police."

(Hyman Decl. ¶ 7, Ex. 2 (emphasis added).)"

This is disputed and all part of a smear campaign that is irrelevant to this case. The

incident described took place a mile from the BPCA boardroom, had nothing to do with BPCA

meetings, and is of no consequence to the BPCA barring Plaintiff from board meetings.

Therefore, per FRE 401, it is irrelevant, and per FRE 402, inadmissible. Per FRE 403, it is

inadmissible too because it is meant to mislead the jury by confusing the issue.

Since Plaintiff never acted inappropriately during any board meeting to justify the BPCA barring him from public meetings, the lawyers are now at this late stage engaging in a smear campaign to sway this Court. They provide no verifiable or relevant evidence.

(Note: If this anonymous inadmissible email is indeed genuine, then it confirms Plaintiff's reporting on BatteryPark.TV that a local "soccer mom" living in the same building at 200 Rector Place as Plaintiff was conspiring with the BPCA to remove "green space" of the lawn, which is protected by state and federal environment laws, and replace it with dangerous artificial turf. She succeeded. After the intentional destruction of two sod grass fields[1], destroyed by her children wearing soccer cleats, the BPCA used that as an excuse to award a rigged RFP contract to a crony of the governor to install the artificial turf. The BPCA violated city, state, and federal laws that regulate how protected park space is to be used when they installed the artificial turf (*see* Greer Decl. at ¶ 8).

***Plaintiff's Harassing Conduct Leading up to the BPCA Board Meeting on June 9, 2015***

21.     "In or about December 2014, Plaintiff obtained a list containing the personal cell phone numbers of BPCA staff members.  (Tremonte Decl. ¶ 3, Ex. 2 ("Greer Dep.") at 208:17 – 210:18; Hyman Decl. ¶ 18.)" This is disputed. In Plaintiff's deposition testimony referenced above, he clearly states that he does "not recall" details about this list of numbers (see Greer Dep. at 209:13-15).

22.     "After obtaining that list (Hyman Decl. ¶ 18), Plaintiff frequently called the personal cell phone numbers of BPCA staff members (*see* Greer Dep. at 209:16 – 210:14.) and spoke to them in an abusive and harassing manner, as described below." This is disputed and

---

[1] See story on BatteryPark.TV http://batterypark.tv/real-estate/soccer-mom-destroys-other-half-of-west-thames-grass-field.html

there is no exhibit or evidence whatsoever provided to proof that Plaintiff was "abusive" or "harassing". Nothing in the Greer deposition referenced supports this. In fact, in Exhibit 4 referenced by Hyman in her declaration, <u>Plaintiff sent an email to memorialize his call to her.</u> He had nothing to hide. The purpose of this memorialization was to document how the BPCA was violating Plaintiff's freedom of the press by singling him out to not communicate with him while the BPCA was still communicate with other members of the press.

23.    "On December 5, 2014, Plaintiff called Hyman on her personal cell phone multiple times.  He then wrote Hyman an email confirming he had called her on her "cell" and "recorded the call."  (Hyman Decl. ¶ 19, Ex. 4; Greer Dep. at 209:19 – 210:14.)" This is a fact. However, Plaintiff was forced to do this after the BPCA stopped communicating with Plaintiff through their official press point of contact, Robin Forst, or any other landline official number. The BPCA staff had been instructed to ignore Plaintiff. Plaintiff left a message on the cell phones informing them that they were violating the First Amendment by singling out Plaintiff and not returning his calls, while they maintained communications with other reporters.

24.    "This incident upset Hyman, as she had never provided Plaintiff her personal cell phone number nor authorized anyone else to do so, and she contacted the Manhattan District Attorney's office.  (*See* Hyman Decl. ¶ 20.)" This is disputed. Hyman provides no evidence that she was "troubled" enough to warrant calling the Manhattan DA. There are no copies of a complaint filed. There is no witness who saw Hyman become "troubled". This would be inadmissible per FRE 403 because it is meant to mislead the jury by confusing the issue.

Of note, this tale seems to be fictional drama inspired by real-life incidents that took place previously within the BPCA. Over a period of many years, Serpico's secretary, Linda Soriero, was receiving graphic prank calls from a colleague of Serpcio. When the culprit was

caught, Soriero prosecuted him through the Manhattan DA's office. However, the BPCA and Hyman refused to assist in her prosecution despite Hyman having formerly worked at the DA's office (*see* Greer Decl. at ¶ 9).

25.     "One month later, on January 20, 2015, Plaintiff called another BPCA employee, Brenda McIntyre, on her personal cell phone, while obscuring his own phone number from the recipient's caller identification screen.  He left a voicemail stating that "Deshay was out of line with the security at the marina" and letting Ms. McIntyre know that she had "been informed." (*See* Hyman Decl. ¶ 11, Ex. 5.)" This is disputed. The BPCA had stopped answering their official landline phones (*supra* ¶ 22). The incident in question related to the BPCA illegally barring the operator of the BPC marina from entering his own boats. Two days later on January 22nd, the BPCA board meeting was attended by approximately 100 members of the public outraged over the eviction of the marina operator who was replaced by a crony of the governor (*see* Greer Decl. at ¶ 10).

26.     "On March 17, 2015, Plaintiff called the BPCA office and told a BPCA administrative assistant that she was a "*lying piece of trash*" after the administrative assistant informed Plaintiff that one of the BPCA executives was unavailable to take Plaintiff's call.  (*See* Hyman Decl. ¶ 12, Ex. 6.)" This is disputed. Hyman is referencing an alleged call made to a third person named Julissa Garcia but provides no declaration from Garcia. Garcia was not listed as a witness and Plaintiff did not depose her. This email was generated by Garcia who is a subordinate to Hyman. The BPCA was already aware by this time that Plaintiff was pursuing litigation relating to a conspiracy to evict. In summary, the details of the phone call provided in the email are inadmissible hearsay by Hyman, per FRE 802. Plaintiff never called anyone at the BPCA on November 26, 2013 (*see* Greer Decl. at ¶ 17).

27.     "Also on March 17, 2015, a caller who refused to give his name called BPCA attorney Seema Singh.  Singh promptly reported by email to Ms. Hyman and others that the caller "had a rambling story about potentially fake posts that people were trying to get him to make involving me."  Approximately seven minutes after receiving this report from Ms. Singh, Ms. Hyman responded to Ms. Singh's email, and reported that she, too, had received an anonymous call, and that the caller "started to speak about fake posts by Bob Serpico."  Ms. Hyman and Ms. Singh recognized the caller as Plaintiff.  Ms. Singh noted that, during her call with Plaintiff, Plaintiff had "*called me a cunt*, and then I hung up."  (*See* Hyman Decl. ¶ 13, Ex. 7 (emphasis added).)" This is disputed. Hyman does not even claim that Plaintiff is the culprit. Instead, she states, "a caller who refused to give his name" There is no declaration or affidavit from Singh. It is nothing but a smear campaign by the BPCA. Plaintiff never called anyone at the BPCA on November 26, 2013 (*see* Greer Decl. at ¶ 17).

References in the Exhibit 7 email of "for the file" clearly show that the BPCA had instructed its staff to collect incriminating evidence against Palintiff. These were not spontaneously generated emails. This evidence would be inadmissible at trial due to the hearsay rule per FRE 802.

It is important for this Court to put in perspective any evidence related to Ms. Singh. She was the target of Plaintiff's investigative reporting and is also the subject of a federal lawsuit by Kirk Swanson (*Swanson v BPCA* 15-cv-6938). Ms. Singh, who is a lawyer and officer of this Court, has been reported to the disciplinary committee of the First Appellate Division of New York (*see* Greer Decl. at ¶ 11) for engaging in criminal rigging of RFP contracts, and assisting Serpico in destroying his human resources file (*see* Greer Decl. at ¶ 12).

As a result of Plaintiff's reporting, Singh was essentially fired from the BPCA. She was relocated to another state authority job at the MTA, likely to appease her and prevent her from becoming a flipped witness for Swanson and Plaintiff or suing the BPCA (*see* Greer Decl. at ¶ 12).

Of note, the accusation that Plaintiff used the word "cunt" has no evidence to support it and again seems to be fictional drama inspired by the real-world experiences within the BPCA. It is Serpico who is infamous for screaming vulgar obscenities to women within the BPCA offices (*see* Greer Decl. at ¶ 13).

28.    "Serpico observed Singh directly after she hung up the phone with Plaintiff on March 17, 2015, and noted that Singh was "visibly upset" by Plaintiff's offensive remark.  (*See* Serpico Dep. at 39:4 – 40:10.)" This is disputed. There is no affidavit from the alleged victim, Seema Singh, likely because Singh was ousted by the BPCA for assisting Serpico with illegal destruction of documents, etc. (*supra* ¶ 27). This evidence would be inadmissible at trial due to the rules against hearsay in FRE 802. Plaintiff never called anyone at the BPCA on November 26, 2013 (*see* Greer Decl. at ¶ 17).

Serpico has been known to fabricate elaborate lies to hurt his opponents, such as Plaintiff in this case. He even acted as an anonymous tipster "mole" feeding fake stories to Plaintiff to get press coverage in BatteryPark.TV to harm his BPCA opponents who wanted him fired (*see* Greer Decl. at ¶ 14).  Serpico himself was fired by the BPCA as a result of this federal complaint and Plaintiff's press coverage of his scandals (*see* Greer Decl. at ¶ 15).

Therefore, if this disputed fact were admissible, a jury would likely disregard it as unreliable testimony from a biased witness. This Court has the right to block obviously misleading and unsubstantiated testimony, such as Serpico's, during trial per FRE 611.

29.     "According to Serpico, the language used by Plaintiff in this exchange was typical of the language Plaintiff used when communicating with BPCA staff.  (Serpico Dep. at 39:14– 40:6.)" This is disputed. "According to Serpico" is the operative phrase here. Mr. Serpico was fired from the BPCA as a result of Plaintiff's actions and is a defendant in this case (*see* Greer Decl. at ¶ 15).  His testimony on Plaintiff's alleged harassing behavior is nothing but a transparent attempt to create a defense. Plaintiff never called anyone at the BPCA on November 26, 2013 (*see* Greer Decl. at ¶ 17).

A reasonable jury would likely not find Serpico to be a credible witness on this matter. This Court has the right to block obviously misleading and unsubstantiated testimony, such as Serpico's, during trial per FRE 611.

30.     "Several weeks later, during the BPCA's May 2015 community board meeting, Plaintiff had an in-person encounter with Mehiel's chief of staff, Kevin McCabe ("McCabe"), during which McCabe felt physically threatened.  Specifically, after McCabe declined to answer certain questions posed to him by Plaintiff, Plaintiff leaned his shoulder into McCabe and asked: "*Do you have a problem*?"  (*See* McCabe Dep. at 42:25 – 44:8 (emphasis added).)" This is disputed. Plaintiff never harassed or threatened McCabe at the May of 2015 CB1 meeting (*see* Greer Decl. at ¶ 18). The incident did not happen and McCabe provides no evidence other than his biased testimony. Even if the alleged incident did happen, it is inadmissible as irrelevant (per FRE 402) to this case since McCabe claims it took place miles away at a Community Board 1 office. Moreover, McCabe does not even claim that Plaintiff did anything other than ask a question, and the testimony would be inadmissible because it is meant to mislead the jury (per FRE 403). This Court has the right to block obviously misleading and unsubstantiated testimony during trial per FRE 611.

31.     "On Friday, May 1, 2015, Hyman was informed that Plaintiff had been acting in a harassing manner towards the artist of the Irish Hunger Memorial – a memorial commissioned by the BPCA to commemorate the Great Irish Famine.  (Hyman Decl. ¶ 14.)" This is disputed. It is a vague smear using hot-button legal phrases, such as "harassing manner". Hyman was "informed by" whom? In fact, no such incident ever occurred and no evidence was proffered other than the biased testimony of Hyman. Hyman produced no one else as a witness.

In fact, Plaintiff attended a tour of the Irish Memorial days later on May 3rd whereby the "artist", a man named Brian Tolle, was giving a talk. Plaintiff posted a story on BatteryPark.TV about the event. But on May 1st, Plaintiff had never met the artist before in his life (see Greer Decl. at ¶ 16).

Even if this disputed fact did occur, it is irrelevant and inadmissible per FRE 401 and 402 because it has nothing to do with BPCA board meetings, and also because it is meant to mislead the jury, per FRE 403. This Court has the right to block obviously misleading and unsubstantiated testimony during trial per FRE 611.

"The artist had been scheduled to give a tour of the memorial the following Sunday, May 3, 2015.  As a consequence of Plaintiff's conduct, Hyman requested that PEP officers be stationed near the tour in the event that Plaintiff became disruptive.  (Id.)" This is disputed. Plaintiff was present for this tour and reported on it in BatteryPark.TV (see Greer Decl. at ¶ 16). However, PEP officers are always present for events in the park. There was no indication that any PEP officer was there to protect the artist from Plaintiff.

Even if this act did occur, it is irrelevant and inadmissible per FRE 401 and 402 because it has nothing to do with BPCA board meetings. This Court has the right to block obviously misleading and unsubstantiated testimony during trial per FRE 611.

32.     "On May 19, 2015, Plaintiff called another BPCA executive, Robin Forst, on her personal cell phone.  (Hyman Decl. ¶ 15, Ex. 8.)" This is not disputed. However, it supports Plaintiff's case rather than the BPCA's arguments. <u>Forst admits in Hyman Exhibit 8 that Plaintiff was merely calling as a member of the press in order to inquire about BPCA board meeting dates, and was in no way harassing.</u> A board meeting had been abruptly cancelled on the day of the call and Forst was not answering her landline, shirking her duties once again.

33.     "On June 3, 2015, Greer called Craig Hudon, the Director of Parks Programing for the BPCA, ten times on his personal cell phone, during which Plaintiff "started screaming "threatening [Hudon's] f'ing job."  (Hyman Decl. ¶ 16, Ex. 9.)" This is disputed. Plaintiff did call Mr. Hudon because it is his job duty to deal with the public and the press on events taking place in the park, such as Shakespeare, etc. However, Hudon was rude and hung up the phone for no justifiable reason (*see* Greer Decl. at ¶ 19).

Mr. Hudon was likely acting as ordered by the leaders of the BPCA who had instructed the BPCA staff to not speak with Plaintiff. Hudon's claims that Plaintiff's behavior (i.e. screaming and threatening his job) justified his hanging up are not substantiated by any declaration or evidence from Hudon. The defendants never brought this up during their deposition of Plaintiff, thereby not allowing Plaintiff to impeach under oath the Hudon claims.

Therefore, the Hyman allegations that Hudon was harassed by Plaintiff are inadmissible hearsay per FRE 802. They are also irrelevant to the BPCA boardroom venue from which Plaintiff was barred and inadmissible per FRE 401 and 402. Mr. Hudon worked outdoors in the parks far away from the BPCA boardroom. This Court has the right to block obviously misleading and unsubstantiated testimony during trial per FRE 611.

This alleged Hudon incident is just part of the BPCA's efforts to collect incriminating evidence on Plaintiff to support their claims that barring him from the next meeting, which was in June, were "content neutral" and not a violation of his First Amendment rights.

34.      "On June 3, 2015, Julissa Garcia, a BPCA employee, reported that Plaintiff had called the BPCA office and yelled, "I NEED TO SPEAK TO ROBIN!"  (Hyman Decl. ¶ 17, Ex. 10.)" This is disputed. Plaintiff likely did call Robin Forst's landline and it was likely answered by her assistant, Ms. Garcia, because Forst's job role is to deal with members of the press and public. However, as clearly detailed in Hyman's Exhibit 10, Forst was derelict in her duties and screening her calls, instructing Garcia to not pass through calls from Plaintiff, violating the First Amendment.

There is no evidence that Plaintiff was inappropriately harassing or screaming at Ms. Garcia (*see* Greer Decl. at ¶ 20). There is no declaration from Garcia or any transcript of the call. Hyman is merely inserting her opinion that Plaintiff "yelled". Garcia never claimed this. As such, Hyman's "fact" in her ¶ 35 is inadmissible hearsay per FRE 802. It is also irrelevant to their defense strategy that claims Plaintiff was a harassing menace worthy of being barred from meeting. Therefore, it is inadmissible per FRE 401 and 402. This Court has the right to block obviously misleading and unsubstantiated testimony during trial per FRE 611.

35.      "On June 5, 2015, Greer again called Hyman on her personal cell phone and stated, "Hey, did you hear the good news?  [Community Board member and Battery Park City resident] Jeff Galloway is going to prison."  (Hyman Decl. ¶ 21, Ex. 11.)" This is disputed. Hyman did not even know for sure who was calling. Hyman just "recognized" the voice. Cell phones have caller ID, and yet no reference to the incoming call number was made. Plaintiff did not call Hyman on this date (*see* Greer Decl. at ¶ 17). This is inadmissible speculation and

hearsay per FRE 802. It is also irrelevant to the BPCA's defense and inadmissible per FRE 401 and 402 because nothing in the alleged phone call constitutes even remotely "harassing" behavior by Plaintiff.

Of note, it is a fact that Mr. Galloway, a member of the New York establishment and benefactor of BPCA money though his law firm, was sent to prison for tax evasion and later disbarred. Galloway was a vocal opponent of Plaintiff and BatteryPark.TV (*see* Greer Decl. at ¶ 21). Nevertheless, this Galloway matter is irrelevant to this case.

***Plaintiff's Disruptive Conduct at the June 9, 2015 Board Meeting***

36.    "The BPCA periodically convenes board meetings.  (Mehiel Decl. ¶ 2; Hyman Decl. ¶ 23.)"

37.    "BPCA board meetings typically consist of two sessions:  a public session and an executive session.  Public sessions are open to the public; executive sessions, which are convened only to the extent that the topics to be discussed are permitted by law to be discussed in executive session, are private.  (*See* McCabe Dep. at 35:4–15; Tremonte Decl. ¶ 5, Ex. 4 ("Mehiel Dep.") at 29:13–25; Mehiel Decl. ¶ 3.)"

38.    "The BPCA reception area and boardroom, which are inside the BPCA offices, are generally open to the public.  However, during BPCA board meetings, the public is asked to leave the boardroom when the board goes into executive session.  (Mehiel Decl. ¶ 4; Tremonte Decl. ¶ 2, Ex. 1.)"

39.    "The BPCA convened a board meeting on June 9, 2015, at approximately 9:30 a.m. (the "June Meeting").  (Mehiel Decl. ¶ 5; Tremonte Decl. ¶ 42, Ex. 41.)"

40.    "Plaintiff arrived nearly a half hour before the June Meeting was scheduled to begin and was asked to wait in the hallway immediately outside the BPCA office.  Plaintiff

became agitated and demanded to be let in early.  (*See* Tremonte Decl. ¶ 30, Ex. 29.)  Plaintiff

was permitted to enter shortly before the June Meeting began, at the same time as other members

of the public were permitted to enter.  (*Id.*)" This is disputed. The June 29, 2015 BPCA board

meeting started late. Plaintiff was not early. Plaintiff was not "agitated" or "demanding" as is

proven by video footage (*see* Greer Decl. at ¶ 22).

     41.    "Plaintiff attended the June Meeting.  (Mehiel Decl. ¶ 6.)" This is indeed an

undisputed fact and is crucial evidence to refute the string of falsehoods listed above. <u>If

Plaintiff's alleged harassing behavior on phone calls prior to the June meeting was so bad as to

warrant him being barred from meetings, then why was Plaintiff allowed into the June meeting?

All of the "harassing calls" allegedly took place long before this June 2015 meeting.</u>

     At the end of this meeting, when the BPCA went into closed-door executive session,

violating New York Open Meeting law, Plaintiff challenged Chairman Mehiel on the legitimacy

of the executive session.

     Hours later at 5:00 PM on June 29, 2015, Mehiel personally sent an email to Brookfield

security to bar Plaintiff from future meetings (*infra* at ¶ 51). Clearly, it was Plaintiff's

questioning of the legality of the executive session of this June meeting that incited Mehiel to bar

Plaintiff. The phone calls had nothing to do with the decision.

     42.    "Upon completion of the public session of the June Meeting, Mehiel's chief of

staff, McCabe, began clearing the boardroom in preparation for the executive session. (McCabe

Dep. at 36:8 – 37:22; Mehiel Decl. ¶ 7; Hyman Decl. ¶ 26.)"

     43.    "Plaintiff remained in the boardroom after every other member of the public had

left.  McCabe asked Plaintiff to leave the boardroom.  (McCabe Dep. at 32:8–20; 36:8 – 37:22;

Mehiel Decl. ¶¶ 8–9; Hyman Decl. ¶ 27.)"

44.     "Plaintiff ignored this request, refused to leave the boardroom, and began shouting.  In particular, Plaintiff shouted at Mehiel, referring to Mehiel was [sic] "*the guy that I wanted the answers from*."  (Greer Dep. at 135:12 – 136:7, 138:20 – 139:12 (emphasis added); Mehiel Decl. ¶ 9; Hyman Decl. ¶ 28.)" This is disputed. Plaintiff did not "begin shouting" whatsoever and there is no video evidence on the webcast archives to prove this. Plaintiff's deposition testimony also conflicts with Mehiel's version of events. Plaintiff calmly stood up and said "Excuse me, but why are you going into executive session?" (see Greer Dep. At 135:17-21).

Also, Hyman was not present in the boardroom at the time of this June 9, 2015 occurrence. McCabe could not recall seeing Hyman. Mehiel and Koenig also made no mention of Hyman being present at this occurrence during their depositions (*see* Greer Decl. at ¶ 23). Therefore, Hyman's declaration on this matter is inadmissible hearsay (if not perjury) per FRE 802.

The portion of the Greer deposition cited that states *"the guy that I wanted the answers from*." was just Plaintiff's recollection during his deposition. He did not testify that those words were used during the board meeting. Moreover, the Greer deposition is inadmissible evidence since the entire Greer deposition should be stricken from the record. The defendants forgot to serve Plaintiff with a notice of deposition. Plaintiff made this objection several times during the deposition (Greer Dep. at 6:16 – 7:24).

45.     "McCabe continued to request that Plaintiff to [sic] leave the boardroom, but Plaintiff refused to leave.  (McCabe Dep. at 32:8–20; 36:8 – 37:22; Mehiel Decl. ¶ 10; Hyman Decl. ¶ 29.)" This is disputed. Hyman was not present (*supra* ¶ 44) and her declaration on this is inadmissible hearsay (if not perjury) per FRE 802.

46.     "According to Plaintiff, the "*non-employees obeyed like sheep*" when asked to leave the boardroom, but "*I was tired of this scam* where [the BPCA was] keeping the public out," so while McCabe was "telling people you have to leave . . . *I stood there and I challenged them*, and I don't remember how I said it, but I said what is the reason for executive session." (Greer Dep. at 126:2 – 128:5; 136:18–24 (emphasis added)).)" This is disputed. This deposition testimony is inadmissible, per *supra* ¶ 44.

47.     "Plaintiff did not leave the boardroom until McCabe advised him several times that the police would be called if Plaintiff remained.  (McCabe Dep. at 36:8 – 37:22; Mehiel Decl. ¶ 11; Hyman Decl. ¶ 30.)" This is disputed. McCabe did merely "advise" that he could call the police, but never needed to do so because Plaintiff left the boardroom promptly. McCabe did not repeatedly have to make threats of calling the police (*see* Greer Decl. at ¶ 24). Also, Hyman was not present in the boardroom at this time (*see* Greer Decl. at ¶ 24) and her comments on this incident are inadmissible hearsay per FRE 802.

48.     "Following Plaintiff's departure from the boardroom, he remained in the reception area of the BPCA offices.  (*See* Tremonte Decl. ¶ 30, Ex. 29 at 00:25 – 00:29.)" This is disputed. The board meeting was not yet concluded and it is routine for Plaintiff and other attendees to wait until the meeting opens to the public after executive session. However, on this occasion, Plaintiff promptly left and did not wait for the open sessions to resume (*see* Greer Decl. at ¶ 25).

49.     "Plaintiff then, without authorization, walked into the areas where BPCA staff offices are located, took photographs of those areas, and filmed those areas without permission. (*See id.*)" This is disputed. There are no walls keeping public away from the office cubicles near the boardroom. This is public space and no signs are posted. Plaintiff did not do anything

"unauthorized" Also, Plaintiff promptly left the BPCA offices the building. He did not linger in the reception room waiting for the open sessions to resume (*see* Greer Decl. at ¶ 25).

***Mehiel's Decision to Bar Plaintiff's Physical Presence at the Next BPCA Board Meeting***

50.     "Based on Plaintiff's refusal to leave the June 9 Meeting at the conclusion of the public session until McCabe indicated he would call the police to remove him, and based on Plaintiff's history of harassing and threatening conduct, Mehiel – in consultation with Hyman and McCabe – directed BPCA staff to exclude Plaintiff from the BPCA's offices.  The BPCA arranged to provide Plaintiff a live video feed of the public session of future board meetings, located in a room at 75 Battery Place, a building located a few blocks away from the BPCA main offices.  (*See* Hyman Decl. ¶ 32; Mehiel Decl. ¶ 12–15, Mehiel Dep. at 29:13–22, 32:24 – 33:13; McCabe Dep. at 32:8 – 33:22, 49:10 – 50:10, 58:16 – 59:10.)" This is disputed. First, the video overflow room where Plaintiff was sent after being rejected from the July 29, 2015 BPCA meeting was in the PEP office headquarters located at 398 West Thames Street (also known as 21 South End Ave.), not at 75 Battery Place (*see* Greer Decl. at ¶ 26, video of Plaintiff walking to the video viewing room). This glaring mistake casts into doubt the reliability of the declaration and testimony that supports this entire disputed fact of this paragraph.

Secondly, the entire series of events cannot be verified. The only proof that Mehiel consulted with Hyman and McCabe and then decided to bar Plaintiff "based on Plaintiff's history of harassing and threatening conduct" is from their own biased testimony as defendants. They provided no documents, such as minutes of a board meeting or interoffice email, to prove that the decision to bar Plaintiff took place as they claim.

In reality, the evidence contradicts the BPCA's statement of fact. Mehiel made this decision to bar Plaintiff in a fit of anger and arrogance, just hours after Plaintiff challenged his

authority in the boardroom on June 9, 2015. That decision had nothing to do with Plaintiff's alleged history of calling and harassing staff.

Mehiel admitted during his deposition (Ex. 18 at 28:22-29:22) that he made the decision to bar Plaintiff based on, "Your behavior during public meetings" and "Such as [Greer] refusing to leave the room when we went to executive session and having our chief of staff tell you that he was going to have to call security to evict you if you didn't leave.", clearly referring only to the June 9, 2015 incident. Mehiel made no mention of Plaintiff harassing staff over the phone (*see* Greer Decl. at ¶ 27).

Also, in Hyman's declaration, in her Ex. 13, she provides an email from Mehiel to Brookfield security's head of security, Joseph Caparosa, written just hours after Plaintiff embarrassed and challenged Mehiel's authority on the boardroom on June 9, 2015. The email instructed Caparosa to bar Plaintiff from entering in the future (*see* Greer Decl. at ¶ 28).

All of this proves that the BPCA's decision to bar Plaintiff from meetings was not content neutral. During his act of reporting as a member of the press, as a result of asking Chairman Mehiel to justify a closed-door executive session, The BPCA decided to single out Plaintiff, violating the first Amendment.

51.   "Following the June Meeting, Mehiel sent an email to Joseph Caparosa, the Security Supervisor at Brookfield Place, instructing building security to "deny Steven Greer access to the BPCA offices."  The email explained: "Consistent hostile behavior on [Plaintiff's] part has caused our concerns for the safety and security of our staff and visitors."  (Hyman Decl. ¶ 33, Ex. 13.)" This is not disputed. It is a crucial admission that is the basis for Plaintiff's motion and relief to have Mehiel added back to the list of defendants.

This also contradicts ¶ 50 where they claim that the decision was made by a panel in a rational manner. In fact, the Exhibit 13 email shows that Mehiel fired it off, personally from his own computer, just hours after Plaintiff challenged him in the boardroom on June 9, 2015. It seems highly unusual for the Chairman and CEO to do this directly, rather than have Hyman or McCabe do it. This clearly was the action of a man with a big ego trying to exert dominance and retaliate against Plaintiff, violating the First Amendment.

52.     "Mehiel made this decision, in his capacity as Chairman of the BPCA, to ensure the safety of the BPCA staff and to preserve the ability of the BPCA board to timely and effectively conduct the business necessary to ensure the BPCA's continued smooth operations. (Mehiel Decl. ¶ 15.)" This is disputed, as discussed above (*supra* ¶ 50). It also conflicts with Mehiel's own testimony during his deposition. Mehiel never gave any such rational explanation for barring Plaintiff during his deposition (see Mehiel Dep. Exhibit 18, at 31:15-33:13). Mehiel now asserts in his declaration (written by his lawyers) that his decision was well thought out and made for the best concern of the baord, which is nothing but an *ex post facto* concocted explanation.

53.     "The BPCA board could have, if it so chose, reviewed Mehiel's decision. However, it did not do so. (*See* Mehiel Decl. ¶ 16.)" This is disputed. Mehiel is the Chairman of the Board and CEO. Never once has a BPCA board member opposed Mehiel on any issue up for a vote. In fact, nothing in the N.Y. Pub. Auth. Law §1970 states that the BPCA board can overturn or block an official policy created by the chairman, and the BPCA points to no such section in the law. To the contrary, in §7 of the law, it states that a quorum of the BPCA board may conduct business or "delegate to one or more of its members, or to its officers, agents or employees, such powers and duties as it may deem proper." (*see* Greer Decl. at ¶ 29).

54.    "Subsequently, in or about May 2016, Plaintiff was permitted to attend BPCA board meetings in person, at the BPCA offices.  (*See* Order, ECF No. 166.)" This is not disputed. However, it is a misleading statement because it leaves out the fact that the BPCA was forced to allow Plaintiff in only after Your Honor signed a federal order (*see* Greer Decl. at ¶ 30).

**Plaintiff's Ability to Gather the News Was Not Materially Affected**

55.    "Plaintiff observed the July 29, 2015 BPCA board meeting (the "July Meeting") by means of the live video feed provided by the BPCA.  The video feed was projected onto a large screen, in full color, with live audio.  (*See* Greer Dep. at 146:17 – 149:22.)" This is disputed as being completely false. Nowhere in Plaintiff's deposition cited above (see Greer Dep. at 146:17 – 149:22.) does it state that he stayed and watched the video. In fact, Plaintiff promptly left video room and filmed his departure (*see* Greer Decl. at ¶ 26).

56.    "As happens at all BPCA board meetings, the public session of the July Meeting was recorded and made available to the public on the BPCA public website, both in the form of a live simulcast and as a downloadable video file for later viewing.  (*See* https://batteryparkcity. granicus.com/ViewPublisher.php?view_id=1.)" This is disputed. The quality of the webcast online video is of such low resolution, and the angle of the camera obstructs the faces of most of the board members so much, that in reality the board meetings are not properly filmed and archived for the purposes of a member of the press (*see* Greer Decl. at ¶ 31).

57.    "Accordingly, Plaintiff was able to report on the BPCA board's activities and discussions as they occurred in real time, just as any other member of the public viewing the July Meeting either in person or via the live video feed could have done.  (*See* Hyman Decl. ¶ 32.)" This is disputed. The live webcast video quality and camera positions are intentionally so poor that viewers literally cannot determine which members are in attendance or not (*see* Greer Decl.

at ¶ 31).  This can be seen by viewing a few minutes of these archived videos in the URL listed in ¶ 56.

Moreover, Plaintiff was unable to ask questions of members of the audience, who are often speakers during the meetings as guest accountants, etc. The BPCA members also field and answer questions from people physically present at the meetings (*see* Greer Decl. at ¶ 32). Therefore, Plaintiff was cut out of that data gathering process required for proper press coverage.

58.    "Likewise, Plaintiff was able to take photographs or video recordings of what occurred in real time, just as any other member of the public viewing the July Meeting either in person or via the live video feed could have done.  (*See id.*)" This is disputed. How could Plaintiff take video or photos if he were half a mile away their "video viewing room" or at home viewing the video if the video quality was too poor? (*see* Greer Decl. at ¶ 31). Plaintiff previously explained that the video quality was too poor. (*supra* ¶ 56)

59.    "Indeed, Plaintiff often reported on BPCA board meetings by viewing the publicly available live streams and did not attend the meetings in person.  For example, Plaintiff published articles on BatteryPark.TV concerning the BPCA board meetings that were convened on April 16, 2013, June 18, 2013, and July 30, 2013.  The audio-visual content posted in connection with these articles consists of clips from the live stream made publicly available by the BPCA.  (*See* Tremonte Decl. ¶¶ 32–35, Exs. 31–34.)" This is a disputed statement of fact based on *non sequitur* logic. Plaintiff did not "often" skip meetings (*see* Greer Decl. at ¶ 33). In fact, the BPCA proves this below, in ¶ 60 below, by showing in Exhibits 12-14 that Plaintiff only missed three meetings in one year. The absence of Plaintiff from some BPCA meetings is in no way evidence that in-person attendance is superfluous.

60.     "The minutes for the April, June, and July 2013 meetings confirm that Plaintiff did not attend these meetings in person.  (*See* Tremonte Decl. ¶¶ 13–15, Exs. 12–14.)"

61.     "As Plaintiff testified at his deposition, "*I don't always videotape because . . . I know it is being web cast. So I don't always film*."  (Greer Dep. at 137:11–17 (emphasis added).)" This is disputed. It is an irrelevant and inadmissible statement (per FRE 401, 402, 403) meant to mislead. Plaintiff stopped video recording BPCA meetings at which he attended because by being there in person and taking some still photos were often sufficient for press coverage. He did not stop filming because the webcast video is an adequate surrogate. By actually sitting in the board room, Plaintiff can tell which board members have been fired, which are derelict of duty and not attending, who is speaking, etc. However, the video quality from the BPCA webcasts is too poor to determine these details (*see* Greer Decl. at ¶ 31).

62.     "Moreover, Plaintiff's own posts show that photographs of BPCA board meetings were not necessary for Plaintiff to report on the BPCA board's activities.  For example, Plaintiff's articles about the March 26, 2013, October 22, 2013, June 17, 2014, and July 31, 2014 meetings were accompanied with still photographs that were related to the content of the articles, but did not depict board meetings.  (*See* Tremonte Decl. ¶¶ 36–38, Exs. 35–37.)" This is disputed and just silly. It is irrelevant *non sequitur* that is inadmissible per FRE 401 and 402. Just because Plaintiff does not use photos from the boardroom from every meeting does not imply that his being in attendance is unnecessary (*see* Greer Decl. at ¶ 34).

***Mehiel's Decision was Not Based on the Content of Plaintiff's Blog Posts***

63.     "Other reporters, including Matt Fenton of the *Broadsheet*, Sue Malesevic of *Downtown Express*, and Carl Glassman of the *Tribeca Trib*, attended the July Meeting.  (*See* Tremonte Decl. ¶ 43, Ex. 42.)"

"The *Broadsheet*, *Downtown Express* and the *Tribecca Trib* all published articles that were critical of the BPCA before the July Meeting, and reporters from these publications were not excluded from the BPCA's board meetings. (Tremonte Decl. ¶¶ 27–29, Exs. 26–28.)" This is disputed. It is a misleading and inadmissible (per FRE 403) statement based on faulty analogies. None of the other local "newspapers" referenced in Tremonte's declaration have ever reported with even remotely the same degree of veracity as Plaintiff's BatteryPark.TV. The BPCA cites a benign article by the Broadsheet that mentioned troubles with a geothermal well. The BPCA cites only one article from DowtownExpress from 2010, which is long before the Mehiel administration of the BPCA started. Likewise, they cite a Tribeca Tribune article from 2011, before Mehiel began (*see* Greer Decl. at ¶ 35).

In stark contrast, Plaintiff's BatteryPark.TV muckraking of BPCA scandals has been relentless, with scores and scores of articles exposing sexual harassment scandals, crooked rigging of RFP government contracts, wasteful spending, etc. Subsequent to BatteryPark.TV reporting, three presidents of the BPCA abruptly "resigned" (including Robert Serpico), three press communications officers were fired, and several board members mysteriously "resigned" (*see* Greer Decl. at ¶ 36).

64.     "Mehiel testified that he did not even read BatteryPark.TV.  (Mehiel Dep. at 23:2–3.)" This is disputed and false. It is contradicted by the testimony of Mehiel during his deposition. Mehiel admitted to reading BatteryPark.TV stories and that his Chief of Staff forwarded to him many articles routinely (see Mehiel Dep. at 23:16-24:2).

***The BPCA's Board Does Not Respond to Public Comments and Questions at Board Meetings***

65.     "At all times relevant to this lawsuit, in keeping with established practice, the BPCA board did not take questions or respond to public comments from the press or members of

the public during board meetings. (Hyman Decl. ¶ 34.)" This is disputed. The BPCA routinely fielded questions during meeting (*see* Greer Decl. at ¶ 32).

66. "During a board meeting on January 22, 2015 (the "January Meeting"), Plaintiff interrupted the board proceedings in an attempt to ask Mehiel a question. Mehiel declined to take the question, and stated that the BPCA did not permit public comment at its board meetings:

> Unfortunately, I apologize for this but . . . due to the protocols there are no public comments and we can't change that precedent unfortunately I do understand your interest and I will try to be as complete as I can in my explanation.

(Tremonte Decl. ¶ 31, Ex. 30; *see also* Greer Dep. at 153:20 – 155:18.)" This is disputed and is contradicted by video evidence. Mehiel did indeed answer several questions that day (*see* Greer Decl. at ¶ 32).

67. "When Plaintiff continued to pose questions to Mehiel, Mehiel confirmed that "*[w]e do not have public comment during the meetings*." (Tremonte Decl. ¶ 31, Ex. 30 (emphasis added).)" This is disputed and is contradicted by video evidence. Mehiel did indeed answer several questions that day (*see* Greer Decl. at ¶ 32).

68. "If not before, by the close of the January Meeting, Plaintiff was well aware the BPCA did not respond to comments or take questions from the press or members of the public at its board meetings. He specifically acknowledged it in the following editorial note, which he appended to the video of the January Meeting (which he posted on YouTube): "During the January 22, 2015 BPCA board meeting, Chairman and CEO *Dennis Mehiel admitted on video record that he does not allow questions from the public* . . . ." (*Id.* (emphasis added).)" This is disputed. Plaintiff was merely reporting on the official policy of the BPCA, and not the reality of the meetings where questions were indeed answered by Mehiel (*see* Greer Decl. at ¶ 32).

69.     "Plaintiff acknowledged this policy in several posts on BatteryPark.TV (*see* Tremonte Decl. ¶¶ 39–41, Exs. 38–40), including a post titled "BPCA Chairman still refuses to allow public questions at board meeting" (*id.* ¶ 39, Ex. 38)." This is disputed. Plaintiff was merely reporting on the official policy of the BPCA, not the reality of the meetings where questions were answered by Mehiel (*see* Greer Decl. at ¶ 32).

70.     "Plaintiff testified at his deposition that he was aware that BPCA policy did not permit public questions at BPCA board meetings.  (Greer Dep. at 153:20 – 155:18.)" This is disputed. In Plaintiff's deposition, he discusses in detail examples of Mehiel fielding questions from reporters, including the New York Times, after President Boutris was fired, etc. (Greer Dep. at 157:9-159:25).

71.     "On October 19, 2016, well after the events at issue in this lawsuit, the BPCA board adopted a policy that provides for, with certain limitations, public comments at board meetings (the "October Policy").  Contrary to Plaintiff's claims, the October Policy is not a result of this action, or Plaintiff's "reporting."  The October Policy provides that time may be allocated for up to ten individuals to address the BPCA board at each meeting.  An individual who wishes to address the board must make a request in advance of the meeting in writing, including a description of the topic that she would like to address.  If approved, that individual's time for comment is added to the meeting agenda.  (*See* Hyman Decl. ¶ 35, Ex. 14.)" This is disputed. Hyman provides no proof, other than her declaration. In Hyman's own Exhibit 14 of the minutes of the meeting, it states that the BPCA was implementing the public comment policy after meeting with the elected officials. Those same officials embarked on their campaign to reform how the BPCA board meetings transpire after Plaintiff began his reporting in the press (*see* Greer Decl. at ¶ 37).

72.     "Even under the October Policy, the BPCA board does not take or respond to questions or otherwise respond to comments from the press or members of the public during board meetings.  (*See* Mehiel Dep. at 38:16 – 39:14; Hyman Decl. ¶ 35, Ex. 14.)"

73.     "On November 9, 2016, Plaintiff authored and posted an article on BatteryPark.TV purporting to take credit for the October Policy.  The article is entitled: "BatteryPark.TV efforts directly cause BPCA to allow public comments at meetings." (Tremonte Decl. ¶ 40, Ex. 39.)"

74.     "The October Policy went into effect on December 7, 2016.  On that date, Plaintiff posted the following on BatteryPark.TV: "Today was the first BPCA board meeting since the decision to allow heavily screened questions from public members to be read aloud. There was no Q&A since the BPCA did not reply to the speakers."  (Tremonte Decl. ¶ 41, Ex. 40.)"

***Steven Rossi and Robert Serpico Did Not Conspire to Remove Plaintiff from His Apartment***

75.     "Steven Rossi ("Rossi") is a vice president and director of management services at Milford Management.  (*See* Rossi Dep. at 6:13–21.)"

76.     "Because Milford Management leases land from the BPCA, Serpico (in his capacity as CFO of the BPCA, which position he held at all times relevant to this lawsuit) interacted with Rossi professionally.  (*See* Serpico Decl. ¶¶ 1–2.)"

77.     "Serpico and Rossi also met several times per year over coffee to discuss both business and personal matters.  (*See* Rossi Dep. at 13:17 – 14:12; Serpico Dep. at 34:8 – 35:5; Serpico Decl. ¶ 3.)"

78.     "In January 2014, Rossi instructed Clive Spagnoli, the Director of Leasing Services for Milford Management, to send Plaintiff a letter informing Plaintiff that Milford

Management had decided not to renew Plaintiff's lease.  (*See* Rossi Dep. at 12:18–21; Tremonte Decl. ¶ 17, Ex. 16.)"

79.     "Rossi, acting on behalf of Milford Management, made the decision not to renew Plaintiff's lease.  No one, including Serpico, instructed Rossi to make that determination.  (*See* Rossi Dep. 11:15–23.)"

This is disputed. In the Swanson deposition, he states that he witnessed Serpico gloating in the BPCA offices about the decision to not renew Plaintiff's lease before Plaintiff even knew about. When asked whether he was responsible, Serpico confirmed that he was behind the conspiracy with a shrug and smirk (see Swanson Dep., Ex 20 at 24:7-22).

Serpico's secretary of 18-years, Linda Soriero, told Plaintiff that she saw an email on Serpico's computer asking Rossi to find an excuse to evict Plaintiff. The BPCA did not produce that email in discovery and quashed a subpoena of a computer server (*see* Greer Decl. at ¶ 38).

The egregious spoliation of email and other document evidence warrants sanction that would prevent the BPCA from arguing that the retaliatory eviction did not take place. FRCP 37(c) gives this Court the explicit authority to sanction the defendants for their failure to provide the information required under FRCP 26(e).

Allyson Ford, a former in-house lawyer for the BPCA, testified under deposition on April 12, 2017 shedding light on the motive for Serpico to retaliating against Plaintiff (see Ex. 16 at 9:16-11:13), she explained how the then-acting president Robert Serpico would discuss Plaintiff and his press coverage in BatteryPark.TV during official board meetings. Serpico instructed staff to not read or believe what was on the news site. This occurred in 2013 prior to Plaintiff learning that his lease would not be renewed. Ford also testified that Serpico was the source of anonymous information being leaked to Plaintiff in order for negative press to be written about

Serpico's enemies within the BPCA. *Id.* 33:2-23. Clearly, Serpico was obsessed with Plaintiff and his reporting.

80.    "Rossi made his decision not to renew Plaintiff's lease in consultation with Loraine Doyle, a property manager for Milford Management, following a review of the facts surrounding Plaintiff's rental history, which showed that Plaintiff had failed to timely pay rent and was in arrears.  This review also showed that other residents at 200 Rector Place and Milford Management staff had lodged complaints about Plaintiff's conduct.  (*See* Rossi Dep. at 18:16–17; 19:24 – 20:21; 27:2 – 29:3; 40:20 – 41:6; 42:2–7.)" This is disputed. (*see* Greer Decl. at ¶ 39).

81.    "As of the beginning of January 2014, when Milford Management informed Plaintiff that his lease would not be renewed, Plaintiff was in arrears in the amount of $8,212. (*See* Tremonte Decl. ¶ 26, Ex. 25; Tremonte Decl. ¶ 18, Ex. 17; CAC at 85-1, at 1.)" This is disputed. Tremonte's Ex. 17 is a complex accounting document given to him by a third-party and cannot be analyzed with forensic accounting. It is inadmissible due to the FRE 802 against hearsay, *inter alia*.

The real estate defendants are infamous for inaccurate accounting that generates invoices that are off by months of rent (*see* Greer Decl. at ¶ 40). A quick glance at Tremonte's Ex. 17 proves that this accounting spreadsheet is either wildly inaccurate or the landlord accepted huge running balances that ran unpaid for long periods of time. For spans of entire years, there are running balances equal to two-months or more of rent.

In reality, this "running balance" reflects whatever the lagging accounting system indicates. If Milford Management was late in processing payments, which was common, then two months of rent in the balance would show up. Tremonte refers menacingly to this "$8,212"

as being "in arrears" when in fact it is simply an inaccurate lagging balance tabulation. <u>If Plaintiff were truly failing to pay rent for two-months at a time, as seems to be indicated by this inadmissible spreadsheet, then why did the defendants renew Plaintiff's lease in 2012 and 2013?</u>

82.     "The complaints that Rossi took into account included complaints made in late 2013 and early 2014 by residents of an adjacent apartment in that Plaintiff was regularly playing loud music in the early hours of the morning and interfering with their ability to sleep.  (*See* Rossi Dep. 27:2 – 29:3, 30:15 – 31:6.)" This is disputed. There is no evidence to support it other than the biased testimony of a defendant. In fact, never did the building staff of 200 Rector Place notify Plaintiff in any manner that his adjacent neighbors were complaining of noise in the years 2013 or 2014 (*see* Greer Decl. at ¶ 39).

83.     "Milford Management staff, including doormen and porters, also complained about improper conduct by Plaintiff's that intimidated them. (*See* Rossi Dep. 32:9–25, 35:17–24, 38:10 – 39:5.)" This is disputed. It is a misleading statement irrelevant to this case and contradicted by the Rossi. During the Rossi deposition, when asked about specific examples of Plaintiff causing trouble, he could not think of any details or specific dates. Rossi only made vague references to alleged noise complaints some time during 2013 and 2014 made by Plaintiff's neighbors (see Rossi Dep. Ex. 21, at 31:12-24). In fact, Plaintiff never received any notification of any kind about these complaints and the defendants provided no documents to prove they took place. Therefore, they in no way gave the defendants a justification for evicting Plaintiff in January of 2014.

84.     "Serpico played no role whatsoever in in [sic] Rossi's decision not to renew Plaintiff's lease on the Apartment.  (Serpico Decl. ¶ 4.)" This is highly disputed. A mountain of

evidence points to Serpico as the instigator of a conspiracy to retaliate against Plaintiff (*supra* ¶ 79 as one example).

Signed this 17th day of July, 2017

Signature of Plaintiff _____

Steven Greer
4674 Tatersall Court
Columbus, Ohio 43230
(212) 945-7252
steve@batterypark.tv