Page 1

1

2            UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
3

   STEVEN E. GREER, M.D.,              )
4                                      )
                   Plaintiff,          )
5                                      )
           vs.                    )15CIV.6119
6                                 )(AJN)(JLC)
   DENNIS MEHIEL; ROBERT SERPICO; THE )
7  BATTERY PARK CITY AUTHORITY; HOWARD)
   MILSTEIN; STEVEN ROSSI; JANET       )
8  MARTIN; MILFORD MANAGEMENT, a New   )
   York Corporation; and MARINERS COVE)
9  SITE B ASSOCIATES,                  )
                                       )
10                 Defendants.         )
   ----------------------------------)
11

12

13

14         DEPOSITION OF ALLYSON FORD
15             New York, New York
16          Wednesday, April 12, 2017
17

18

19

20

21

22

23

24  Reported by:
   Philip Rizzuti
25  JOB NO. 122010

Page 2

April 12, 2017
1:04 p.m.

Deposition of ALLYSON FORD, held
at the United States District Court,
Southern District of New York, 500
Pearl Street, New York, New York,
pursuant to subpoena, before Philip
Rizzuti, a Notary Public of the State
of New York

Page 3

A P P E A R A N C E S:

STEVEN E. GREER, Pro Se
4674 Tatersall COurt
Columbus, Ohio 43230

SHER TREMONTE, LLP
Attorneys for Defendants Robert Serpico
and Battery Park City Authority
90 Broad Street, 23rd Floor
New York, New York 10004
BY:  MICHAEL TREMONTE, ESQ.
MICHAEL W. GIBALDI, ESQ.

ROSENBERG & ESTIS
Attorneys for Defendants Milstein,
Rossi, Martin, Milford, and Mariners
Cove
733 Third Avenue
New York, New York 10017
BY:  DEBORAH RIEGEL, ESQ.

Page 4

A P P E A R A N C E S:

ABBY GOLDENBERG, ESQ.
Special Counsel and Risk Officer
Battery Park City Authority
200 Liberty Street
New York, New York 10281

Page 5

Ford
A L L Y S O N  F O R D, called as a witness,
having been duly sworn by a Notary
Public, was examined and testified as
follows:
EXAMINATION BY
MR. GREER:
Q.   What is your name?
A.   Allyson Ford.
Q.   How long did you work for the
Battery Park City Authority?
A.   From 2010 through 2014.
Q.   And what was your official job
title?
A.   I was employed as special counsel
and then I was promoted to EEO officer in
addition to the special counsel position about
approximately a year later.
Q.   What does that mean, EEO officer?
A.   Equal opportunity officer.
Q.   So would you field complaints from
internal employees who might have a complaint
about the workplace?
A.   That is correct.
Q.   Robert Serpico is a defendant, do

Page 6

Ford

1  you know Robert Serpico?
2      A.  I do.
3      Q.  Would you see him how often at
4  work, every day, once a month?
5      A.  I was in the office every day.  If
6  Mr. Serpico was in the office I would see him
7  if he was passing by in the hallway, at
8  meetings, or if I had a meeting with him.
9      Q.  Did your job role require frequent
10 meetings with Mr. Serpico at work?
11     A.  I would say not frequent.
12     Q.  When you did have a meeting what
13 was the nature of it, how did it take place,
14 in his office, a meeting with other people?
15     A.  It would depend upon the nature of
16 the meeting.  If I can expand, if I had a
17 question in particular about for instance a
18 history at Battery Park City or a finance
19 issue I would go to Mr. Serpico.  There were
20 occasions when there were general office
21 meetings or staff meetings where everyone at
22 the agency was present including Robert
23 Serpico.  I had meetings with Mr. Serpico
24 pertaining to legal matters that involved

Page 7

Ford

1  finance issues.  I had meetings with
2  Mr. Serpico about legal matters that concerned
3  EEO issues and personnel matters on occasion.
4      Q.  You left the Battery Park City
5  Authority in 2014, why?
6      A.  I was terminated in 2014.
7      Q.  Did they give you a reason?
8      A.  The reason was alleged leaking of
9  confidential information.
10     Q.  To whom did you leak did they
11 allege?
12     A.  There was actually no particular
13 person specified.
14     Q.  Do you know of anyone else in the
15 BPCA around that time who was fired?
16     A.  Yes.
17     Q.  Who would that be?
18     A.  Kirk Swanson was fired at that
19 time.  I would characterize -- well that is my
20 opinion.  Formally Kirk Swanson I knew of was
21 terminated.
22     Q.  Do you know Nancy Harvey, was she
23 terminated?
24     A.  I do.  Nancy Harvey in my opinion

Page 8

Ford

1  was constructively terminated, although she
2  left of her own free will formally.
3      Q.  Do you know who I am, and if so
4  when did you become aware of me?
5      A.  I do know who you are and I became
6  aware of you very recently after I was first
7  hired through the blog that you do through
8  Battery Park City TV.
9      Q.  Have you heard of Battery Park TV?
10     A.  I have, not prior to my employment
11 at the Battery Park City Authority, but yes I
12 do.
13     Q.  Do you know that I run Battery
14 Park TV?
15     A.  I do.
16     Q.  Were there any -- I report on a
17 wide variety of things, many of them on the
18 Battery Park City Authority, were any
19 inaccurate or misleading that come to mind?
20     MS. RIEGEL:  Objection.
21     A.  I am confused by the question.
22     Q.  Was my reporting on Battery Park
23 TV in your opinion ever wrong?
24     MS. RIEGEL:  Objection.

Page 9

Ford

1      A.  In my opinion based upon the
2  matters that I was personally involved in I
3  would say no.  I base that opinion on the
4  matters that I was personally involved in.
5      Q.  Was Steven Greer or the, quote
6  unquote, blogger or Battery Park TV, were
7  those the topic of discussion amongst the
8  office at the Battery Park City Authority to
9  put it in like watercooler chat or were
10 they official conversations at official
11 meetings, did my name ever come up?
12     MS. RIEGEL:  Objection.
13     A.  Yes.
14     Q.  Can you recall any specifics or
15 how that happened, how often that happened?
16     A.  With regard to, quote unquote,
17 watercooler conversations, frequently, daily
18 as often as the blog came out.
19     With regard to formal meetings,
20 your blog and the topics of your blog were
21 mentioned at a formal meeting more than one
22 time.
23     Q.  Who would be in attendance at that
24 formal meeting?

Ford

1
2    A.    Full staff.
3    Q.    Would that include Robert Serpico?
4    A.    Yes.
5    Q.    Would that include Dennis Mehiel?
6    A.    Not at the meetings that I
7 attended, Dennis was not there.
8    Q.    Would that include Brenda
9 McIntyre?
10   A.    Yes.
11   Q.    Would that include Shari Hyman?
12   A.    I don't recall whether Shari was
13 in attendance at the meetings that I am
14 referring to.
15   Q.    Do you recall anyone, any of those
16 people that you just mentioned that were
17 discussing the blog, did any of those BPCA
18 staff become angry over my reporting?
19   A.    In my opinion yes.
20   Q.    Did Robert Serpico become angry
21 and can you elaborate if he did?
22   A.    In my opinion yes.  The specific
23 example I will refer to is a full staff
24 meeting where Robert Serpico, this is not
25 verbatim, this is based upon my firsthand

Ford

1
2 recollection, but Robert Serpico publicly
3 announced that the blogs were not credible,
4 that we should not read them, and that we
5 should stay away from reading or looking at
6 the blogs at all because they are not truthful
7 nor helpful.
8    Q.    When did that occur, what year,
9 what month approximately; was it 2013, was it
10 2012?
11   A.    It was --
12   Q.    Was he acting president at the
13 time?
14        MS. TREMONTE:  Objection.
15        MS. RIEGEL:  Objection.
16   A.    To the best of my recollection he
17 was acting president at the time based upon
18 the fact that he was heading the meeting and I
19 do not recall Shari being there.
20   Q.    That helps.
21        MR. TREMONTE:  Objection.
22   Q.    Did Mr. Serpico, any other
23 examples of Mr. Serpico getting upset with
24 Battery Park TV or Steven Greer or the
25 blogger?

Ford

1
2    A.    Based on my recollection those
3 incidents were not formal and would be
4 characterized as, quote unquote, watercooler
5 talk.  But based upon those recollections,
6 yes.
7    Q.    How would he become upset, would
8 he yell, scream; how would he exhibit his
9 anger?
10   A.    In my opinion it was a dismissal
11 of the substance of the blog itself.
12   Q.    Do you recall any of the topics
13 that upset him; stories about himself or the
14 BPCA in general?
15        MS. RIEGEL:  Objection.
16   A.    I cannot recall.
17   Q.    Did Chairman CEO Dennis Mehiel
18 ever show signs of anger or being upset about
19 my reporting of Battery Park TV?
20   A.    Not to me, none that I witnessed
21 personally.
22   Q.    Who is Linda Soriero?
23   A.    Linda Soriero was Bob Serpico's
24 secretary.
25   Q.    Did you ever see Linda Soriero or

Ford

1
2 observe her being deceptive, lying or acting
3 in a fraudulent way?
4        MS. RIEGEL:  Objection.
5        MR. TREMONTE:  Objection.
6    A.    No.
7    Q.    Who is Kirk Swanson?
8    A.    Kirk Swanson was the, to the best
9 of my recollection of his title, the vice
10 president of administration.  I don't recall
11 his title exactly.
12   Q.    And likewise did you ever see Kirk
13 Swanson behave in a deceptive, lying or
14 fraudulent way?
15   A.    No.
16   Q.    Who is Steve Rossi?
17   A.    Steve Rossi is one of the
18 condominium owners.  I did not have personal
19 interaction with him.
20   Q.    Does he manage properties for the
21 Howard Milstein Corporation?
22   A.    Yes.
23        MR. TREMONTE:  Objection.
24        MS. RIEGEL:  Objection.
25   A.    Yes.

Ford

1
2    Q.   Did you ever see or hear any
3  Battery Park City Authority employee or board
4  member meeting with Steve Rossi or other
5  members of the Howard Milstein real estate
6  family?
7    A.   Not personally.
8    Q.   Did you ever see Robert Serpico
9  and Steve Rossi meet?
10        MR. TREMONTE:  Objection.
11    A.   Not personally.
12    Q.   Not personally, but did you hear
13  of it secondhand?
14    A.   Yes.
15        MS. RIEGEL:  Objection.
16    Q.   How did you hear about it?
17    A.   Through legal memoranda, through
18  mentionings in legal meetings.
19    Q.   Can you recall the year and time
20  of the year when a legal meeting like that
21  might have taken place that was evidence of
22  their meetings, Steve Rossi and Serpico
23  meeting?
24    A.   During my employment.
25    Q.   Was it while Mr. Serpico was

Ford

1
2  acting president?
3    A.   I do not recall.
4    Q.   Was it before 2014?
5    A.   Yes.
6    Q.   Did you ever hear of Steven Greer,
7  my issue of my personal residential apartment
8  lease at the building at 200 Rector Place, did
9  the topic of Steven Greer's apartment lease
10  ever come up that you recall?
11    A.   Yes.
12    Q.   When did that place?
13    A.   Prior to 2014.
14    Q.   Can you describe who was talking
15  about it, how it came up?
16    A.   Based on my recollection it would
17  be characterized as watercooler discussion
18  with specific references to Mr. Serpico,
19  Mr. Rossi, that's it.
20    Q.   Did they mention that my lease was
21  not going to be renewed?
22    A.   I do not recall.
23    Q.   Did they mention anything about me
24  being evicted?
25    A.   I do not recall.

Ford

1
2    Q.   So when they discussed my lease
3  what were they discussing?
4        MR. TREMONTE:  Objection.
5    A.   Based on my recollection, again
6  this was watercooler discussion, they were
7  general employees, general discussions about
8  the topic itself, and speculation as to what
9  would happen in the event of such a situation
10  occurring.
11    Q.   They were discussing a potential
12  eviction hypothetical?
13        MR. TREMONTE:  Objection.
14    A.   Again watercooler discussions,
15  general people, the discussion about that
16  topic took place.
17    Q.   Can you list any of the people who
18  were having these discussions, was it
19  Mr. Serpico, was it Kevin McCabe?
20        MR. TREMONTE:  Objection.
21    A.   I do not recall.
22    Q.   Do you recall any other instances
23  of any other resident in Battery Park City who
24  was a residential apartment renter, do you
25  recall any other examples of staff of the BPCA

Ford

1
2  discussing that type of matter, individual
3  leases?
4    A.   No.
5    Q.   So you have testified that you
6  have heard Mr. Serpico discussing me in 2013,
7  speculation of what would happen if I were
8  evicted.  Do you believe --
9        MR. TREMONTE:  Objection.
10        MS. RIEGEL:  Objection.
11    Q.   Do you believe -- can I finish the
12  question please.
13        So did you ever see any E-mail
14  communications in your various meetings -- you
15  have already answered that.  Scratch that.
16        Do you believe that Steve Rossi
17  and Robert Serpico in your opinion worked
18  together to make sure that my lease was not
19  renewed?
20        MR. TREMONTE:  Objection.
21    A.   In my opinion I believe that that
22  could be a possibility.
23        MS. TREMONTE:  Move to strike the
24  answer as non-responsive.
25    Q.   Can you say yes or no in your

Page 18

Ford

1  opinion whether you think Mr. Serpico and Mr.
2  Rossi conspired or colluded to get me evicted
3  from my apartment?
4           MR. TREMONTE:  Objection.
5      A.  I cannot say conclusively.
6           MR. GREER:  That is all I have.
7           MS. TREMONTE:  Give us two
8  minutes.  Off the record.
9           (Recess taken.)
10 EXAMINATION BY
11 MR. TREMONTE:
12     Q.   My name is Michael Tremonte, I
13 represent the BPCA and Mr. Serpico.
14          We have not met; correct?
15     A.   No we have not.
16     Q.   We served you recently with a
17 subpoena, are you aware of that?
18     A.   I am here, yes.
19     Q.   We subpoenaed documents from you,
20 are you aware of that?
21     A.   No.
22     Q.   You did receive the subpoena that
23 we served on you from the Battery Park City
24 Authority and Mr. Serpico; is that correct?

Page 19

Ford

1      A.   I received a subpoena, yes.
2      Q.   When did you receive the subpoena?
3      A.   It was -- actually I received two
4  subpoenas, both secondhand.  I received one
5  subpoena from my husband who I am separated
6  from, and that was late last week, it went to
7  his address.  And then I received a second
8  subpoena from my job, the Liro Group, which
9  was sent to them with a different date and a
10 different location mentioned, both of which I
11 have with me, and I received that on Monday.
12     Q.   Let me first mark this for
13 identification as Defendant's Exhibit 1,
14 subpoena.
15          (Defendant's Exhibit 1, subpoena,
16          marked for identification, as of this
17          date.)
18     Q.   So I am going to show you what was
19 marked for identification as Defendant's
20 Exhibit 1, and I am handing a copy also to Mr.
21 Greer.  Take a minute to look at that and let
22 me know when you are done?
23     A.   Okay.
24     Q.   Keep that in front of you if you

Page 20

Ford

1  would?
2      A.   Yes.
3      Q.   Have you seen that before?
4      A.   I want to say yes, but I have to
5  see the other one honestly to compare it.  I
6  want to say yes.
7      Q.   So as you sit here right now you
8  are not sure?
9      A.   I am not sure, but if I could see
10 the other one, but unfortunately I don't have
11 it, but it is possible I did, but I honestly
12 don't recall.  The appearance for this is -- I
13 may have seen this before, yes.
14     Q.   If you could turn to the last page
15 which is numbered at the bottom page 2, it is
16 the last page of the document, it's the second
17 page of the rider at the end, so really the
18 last page of the document.
19     A.   Yes.
20     Q.   Directing your attention to where
21 it says request for production, do you see
22 that?
23     A.   Yes.
24     Q.   The first request references

Page 21

Ford

1  documents and communications concerning
2  meetings between Robert Serpico and Steve
3  Rossi.
4          Do you see that?
5      A.   Yes.
6      Q.   Do you have any such documents in
7  your possession?
8      A.   I do not.
9      Q.   And by possession I mean broadly
10 possession, custody or control?
11     A.   I do not.
12     Q.   Turning to the second numbered
13 paragraph there it says documents and
14 communications concerning the non-renewal of
15 plaintiff's lease and plaintiff's eviction
16 from 200 Rector Place.
17          Do you see that?
18     A.   Yes.
19     Q.   Do you have any such documents?
20     A.   I do not.
21     Q.   Number 3, all documents and
22 communications with plaintiff concerning
23 plaintiff's lawsuit.
24          Do you have any such documents?

Page 22

Ford

1
2    A.  Plaintiff meaning Steven Greer?
3    Q.  I am sorry, good question.
4         Yes, plaintiff meaning Steven
5    Greer?
6    A.  I do not.
7    Q.  Have you ever communicated -- you
8    can set that aside if you like -- have you
9    ever communicated with Mr. Greer about this
10   lawsuit?
11   A.  Yes.
12        MR. GREER:  Objection.
13   Q.  So for example you just met with
14   Mr. Greer a few minutes ago and discussed the
15   lawsuit; is that correct?
16        MR. GREER:  Objection.
17   A.  Yes.
18   Q.  What did you discuss?
19        MR. GREER:  Objection.
20   A.  Location of where the deposition
21   was going to take place.  Postponement of the
22   deposition based on my eye infection.
23   Inability to postpone it.  That is about it.
24   Q.  Anything else?
25   A.  General discussion about my

Page 23

Ford

1
2    willingness to tell only what I knew, and
3    whether or not it was relevant was out of my
4    control, so I would tell the truth of what I
5    knew.
6    Q.  Did you discuss in advance of your
7    testimony today what you were going to testify
8    to?
9    A.  No.
10        MR. GREER:  Objection.
11   A.  No.
12   Q.  You met with Mr. Greer just a few
13   minutes ago during the break; correct?
14   A.  Yes.
15   Q.  What did you discuss during the
16   break?
17   A.  How I knew Deborah Riegel and
18   liked her very much, and I hoped that it would
19   not be a problem, and that I thought you all
20   should know my current title of what I am
21   currently doing for the record.
22   Q.  What are you currently doing and
23   what is your title?
24   A.  Associate vice president and
25   senior counsel at the Liro Group.

Page 24

Ford

1
2    Q.  When did you begin working in that
3    position?
4    A.  2015.
5    Q.  Did you take that position
6    immediately after you left Battery Park City
7    Authority?
8    A.  I took that position eleven months
9    after I left Battery Park City Authority.
10   Q.  Were you employed during those
11   eleven months?
12   A.  No I was not.
13   Q.  Getting back to communications
14   with Dr. Greer about this lawsuit, did you
15   communicate at all by E-mail?
16   A.  No.
17   Q.  Did you communicate at all by any
18   other means?
19   A.  Yes.
20   Q.  How else did you communicate?
21   A.  Via text.
22   Q.  Tell us about those texts?
23   A.  I asked for the location of where
24   the deposition was going to take place.
25   Confirmed that I had to actually come to the

Page 25

Ford

1
2    deposition.  And that I was only going to tell
3    the truth of what I knew which may or may not
4    be helpful.
5    Q.  Did you talk to anybody else about
6    your testimony here today?
7    A.  No.
8    Q.  No one else in your family?
9    A.  My father.
10   Q.  What did you discuss with your
11   father?
12   A.  That I had to appear per a
13   subpoena to testify probably based on what I
14   knew about Battery Park City, and the subject
15   of the subpoena or the deposition was Robert
16   Serpico.  That Battery Park City, in
17   particular Robert Serpico, Brenda, Shari, the
18   administration that I worked under were people
19   who were untruthful and had done very bad
20   things to many people, and that I was not
21   surprised that I was being called for a
22   subpoena -- per subpoena for this deposition,
23   and that I didn't want to go because I left it
24   behind me.  But that I would certainly avail
25   myself of these types of hearings to give

Page 26

Ford

1  whatever truthful information I could because
2  I do believe that there has been quite a bit
3  of wrongdoing toward many, many, many people.
4  However that is not particularly relevant, but
5  that was a topic of my discussion.
6      Q.   Anything else?
7      A.   No.
8      Q.   Did you talk to a lawyer in
9  anticipation of your testimony?
10     A.   No.
11     Q.   Let me finish my question, it
12 would be easier for the court reporter to get
13 it down.
14          Did you talk to any former BPCA
15 employees in anticipation of your testimony
16 today?
17     A.   Yes.
18     Q.   What former BPCA employees did you
19 speak to?
20     A.   Kirk Swanson.
21     Q.   How many times did you speak to
22 Mr. Swanson?
23     A.   I did not speak to Mr. Swanson, it
24 was via text.

Page 27

Ford

1      Q.   Describe those communications to
2  us?
3      A.   I got a subpoena from Steven
4  Greer, I don't know how to get in touch with
5  me, do I need to really go.  Can you get in
6  touch with Steven so I can confirm that I have
7  to go.
8      Q.   Did Mr. Swanson respond to those
9  texts?
10     A.   He did.
11     Q.   How did he respond?
12     A.   I called Steven, he will be
13 calling you.
14     Q.   So Mr. Swanson texted to you that
15 he had called Steven Greer and that Steven
16 Greer would be calling you?
17     A.   Correct.
18     Q.   Anything else?
19     A.   No.
20     Q.   Did you talk to Mr. Swanson by
21 phone?
22     A.   No.
23     Q.   Did you talk to him in person?
24     A.   As I stated I spoke to him via

Page 28

Ford

1  text.
2      Q.   And not by E-mail?
3      A.   Not to my recollection.
4  RQ  Q.   I would ask that you voluntarily
5  produce those text messages to us and any
6  E-mails you may have, for example you are not
7  recalling now, we will serve you with a
8  subpoena to that effect as well, but we can
9  avoid that by voluntary production.
10         Did you speak to any other former
11 BPCA employees about your testimony?
12     A.   No.
13     Q.   Have you had any other
14 conversations with Mr. Swanson about Mr.
15 Greer's lawsuit?
16     A.   Mr. Greer's lawsuit?
17     Q.   Yes.
18     A.   No.
19     Q.   Have you spoken to any other
20 former BPCA employees about Mr. Greer's
21 lawsuit?
22     A.   No.
23     Q.   Did you speak to any current BPCA
24 employees in anticipation of your testimony

Page 29

Ford

1  today?
2      A.   No.
3      Q.   Have you ever spoken to any
4  current BPCA employee about Mr. Greer's
5  lawsuit?
6      A.   No.
7      Q.   When did you first learn of Mr.
8  Greer; when did he first come to your
9  knowledge?
10         MR. GREER:  Objection.  That is
11 not my name.
12     A.   Between 2010 and 2011 when I first
13 was employed at BPCA.
14     Q.   How did you first learn about Dr.
15 Greer?
16     A.   To the best of my recollection
17 reading a blog in the Battery Park City TV.
18     Q.   How did you come to read those
19 blogs?
20     A.   To the best of my recollection the
21 authority, Battery Park City Authority, had
22 regular newspapers laying around and the blog
23 was in them and people would talk about them.
24     Q.   During the course of your

Page 30

```
1              Ford
2   employment with BPCA did Mr. Greer ever
3   attempt to contact you?
4          MR. GREER:  Objection.  That is
5   not my name.
6    A.   Not to my recollection.
7    Q.   Did Dr. Greer ever try to call you
8   during the time that you were employed by
9   BPCA?
10   A.   No.
11   Q.   Were you aware of Dr. Greer trying
12  to contact other people at the BPCA when you
13  were employed there?
14         MR. GREER:  Objection.
15   A.   No.
16   Q.   Did you ever --
17         MR. GREER:  Objection.  You just
18  said something as if it were fact when it
19  is not fact.
20   Q.   Did you ever contact Dr. Greer
21  during the course of your employment at BPCA?
22   A.   No.
23   Q.   Actually let me ask that a
24  different way.
25         During the time when you were
```

Page 31

```
1              Ford
2   employed at the BPCA did you ever contact Dr.
3   Greer?
4    A.   No.
5    Q.   Did you ever provide Dr. Greer
6   with any documents at any time?
7    A.   No.
8    Q.   Did you ever provide Dr. Greer
9   with information of any kind at any time?
10         MR. TREMONTE:  Objection.
11  Redundant.
12   A.   No.
13   Q.   During the time that you were
14  employed at the BPCA were you aware that any
15  other BPCA employees were supplying
16  information of any kind to Dr. Greer?
17   A.   It is not a yes or no answer.  So
18  to the best of my recollection there was lots
19  of watercooler talk about employees who have
20  consistently supplied Mr. Greer with
21  information about the comings and goings of
22  Battery Park City Authority life, experiences.
23  These discussions about employees who were
24  providing that information predates my
25  employment.
```

Page 32

```
1              Ford
2          So to the best of my recollection
3   what I recall hearing from employees at
4   Battery Park City Authority while I was
5   employed was that long before my employment
6   there have always been people who have been
7   reporting incidents that have occurred at
8   Battery Park City Authority to Steven Greer.
9    Q.   What specific names if any came up
10  as individuals who had supplied information to
11  Dr. Greer?
12   A.   That would only be speculation.
13   Q.   Well --
14   A.   I don't have any conclusive
15  answer.
16   Q.   I am not asking you for
17  speculation, I am just asking you whether or
18  not in this watercooler talk that you
19  participated in to some extent if any specific
20  names came up as names of people who have
21  supposedly supplied information to Dr. Greer?
22   A.   Robert Serpico, that is the only
23  one that comes to mind.
24   Q.   What did you hear about Robert
25  Serpico supplying information to Dr. Greer?
```

Page 33

```
1              Ford
2    A.   Again to the best of my
3   recollection, and again under the premise that
4   this was watercooler talk and that I do not
5   have firsthand knowledge of Robert Serpico
6   telling me that he did this, that what I heard
7   was that Robert Serpico ironically was a,
8   quote unquote, mole, and was providing
9   information to Steven Greer long before my
10  employment at BPCA, and that he was a source
11  of information, and that was what I heard.
12   Q.   Was there any discussion in these
13  watercooler conversations about the type of
14  information that was supplied to Dr. Greer by
15  Robert Serpico?
16   A.   To the best of my recollection the
17  topics would include the topics that were
18  reported on by Steven Greer in his blog.
19   Q.   Such as which topics?
20   A.   For example the alleged scandals
21  with Wilson Kimball and the former president,
22  I am really having to dial back, Jim
23  Cavanaugh.  That is what I can remember.
24   Q.   You don't remember any other such
25  topics?
```

Page 34

Ford

A.   Not with regard to Robert Serpico personally being the supplier of the information.

Q.   Were others rumored to be suppliers of information that you can remember other than Robert Serpico?

A.   Yes, but I don't have any specific names.

Q.   You don't recall?

A.   No.

Q.   Just back to Robert Serpico, who said during these watercooler conversations that Robert Serpico had supplied information to Dr. Greer?

A.   Many Battery Park City Conservatory people, employees, as well as Battery Park City Authority people.  I do not recall who.

Q.   You don't recall the name of any Battery Park City Conservatory employees who told you about Bob Serpico's supplying information to Dr. Greer?

A.   I don't recall the names.

Q.   And you don't recall the names of

Page 35

Ford

any Battery Park City Authority employees who told you that Robert Serpico had supplied information to Dr. Greer?

A.   No.

Q.   To your knowledge did Kirk Swanson ever supply any type of information to Dr. Greer at any time?

A.   I don't recall.  For Mr. Greer I don't recall.

Q.   Did Kirk Swanson ever tell you that he had supplied information of any kind to Dr. Greer?

A.   No.

Q.   Are you aware of Linda Soriero ever supplying any information to Dr. Greer?

A.   No.

Q.   When you were employed at the Authority did you speak with Linda Soriero from time to time?

A.   Yes.

Q.   What did you talk to Ms. Linda Soriero about?

A.   General conversations setting up meetings.  How she was.  Particular meetings

Page 36

Ford

she had with me about EEO complaints.

Q.   Did you ever talk to Ms. Soriero when she was employed by the BPCA about Dr. Greer; when I say about Dr. Greer, I mean about Dr. Greer or his blog or any business or entity that he is associated with?

A.   No.

Q.   Just to be clearer still let me ask the question more broadly.

Have you ever discussed Dr. Greer in any way, shape or form with Linda Soriero?

A.   Not that I can recall.

Q.   Did you ever exchange an E-mail with Linda Soriero about Dr. Greer or his lawsuit or his blogs?

A.   No.

Q.   Did you ever communicate with, aside from the text exchange that you testified about earlier, did you ever talk to Kirk Swanson about Dr. Greer or his blogs or his business?

A.   Yes.

Q.   Tell us about those conversations?

A.   General conversations about the

Page 37

Ford

credibility of the content and the questioning or guessing of where the information was coming from.  Who might have supplied the information.  General conversations about the observations of staff who were in clear objection of the exposure of the information.  General conversations about their reaction to the information that was being supplied to the blog.  General conversations and speculations about why there was such anger and attempts to discredit the information coming through the blogs by those who were being accused of wrongdoing in the blogs.  Those were the topics.

Q.   When you were working at BPCA did Kirk Swanson ever indicate to you that he was in contact with Dr. Greer?

A.   I don't recall.

Q.   You testified earlier that you had a text exchange with Kirk Swanson of a practical nature where you were trying to get in touch with Dr. Greer and you were seeking his assistance; is that correct?

A.   Correct.

Page 38

Ford

1
2      Q.    Why did you reach out to him, why
3  did you think he could help you to connect
4  with Dr. Greer?
5      A.    Because I am aware of Kirk's
6  lawsuit against BPCA, and I am aware of other
7  people's lawsuits against BPCA, and Kirk and I
8  are in communication and he would naturally be
9  the person from BPCA that I would call about
10 this because he is the person that I speak
11 with -- if I speak with anyone from BPCA
12 outside of the topics of BPCA it would be
13 Kirk.
14      MR. GREER:  I just need to
15   interject.  I called the witness, Ms.
16   Ford, and said that this process would
17   last less than an hour.  It is now 1:52
18   and she has an appointment for a medical
19   doctor, so you should probably be less
20   redundant and get to the point.
21      Q.    You say you are aware that Kirk
22 Swanson has a lawsuit against the BPCA.  Just
23 generally what is that about; what is your
24 understanding of the nature of his lawsuit?
25      A.    Grievances against BPCA.

Page 39

Ford

1
2      Q.    But his lawsuit and the grievances
3  against the BPCA don't have anything to do
4  with Dr. Greer; is that correct?
5      A.    Correct.
6      Q.    Again why did you think based on
7  the fact that Kirk Swanson is suing the BPCA
8  on stuff that has nothing to do with Dr.
9  Greer, that he would be able to help you get
10 in touch with Dr. Greer?
11      A.    Well the common denominator with
12 most of these grievances somehow ties back to
13 in general, and when I say most of these
14 grievances I mean the plurality of people that
15 have grievances against the Battery Park City
16 Authority, somehow in some way, shape or form
17 are connected in some way to the blog and
18 information out of the blog.  So I assume that
19 Kirk might have an ability to connect me with
20 Mr. Greer.
21      MR. GREER:  I need to ask a
22   question about this evidence you entered,
23   the subpoena before we run out of time.
24   If you can go back to this --
25      MS. TREMONTE:  When I am done --

Page 40

Ford

1
2      MR. GREER:  Excuse me, we are
3  running out of time.
4      MS. TREMONTE:  We are not running
5  out of time, the witness will stay as
6  long as in necessary to answer our
7  questions.
8      MR. GREER:  No she will not.
9      MS. TREMONTE:  She certainly will.
10      MR. GREER:  No.  You can leave
11 whenever you want.
12      THE WITNESS:  Can we move it here,
13 I am willing to answer questions, but can
14 we move it along here.
15      MR. GREER:  I need to ask you
16 about this subpoena if you look here,
17 these documents.  Did you -- they are
18 asking for meetings, they are asking
19 for -- earlier in your testimony you said
20 that you recall seeing these.  Do you
21 recall seeing any of these documents in
22 the course of your meetings as counsel or
23 did they exist, did you --
24      THE WITNESS:  Not in my meetings.
25      MR. GREER:  Do you recall seeing

Page 41

Ford

1
2  documents that mentioned 200 Rector
3  Place, 35-F, at all; you don't have them
4  in your possession, but do you recall
5  seeing them?
6      THE WITNESS:  Addresses frequently
7  appeared in many legal documents, none
8  with regard to the topic of your
9  particular lawsuit.
10      MR. GREER:  And you previously
11 testified today that you did see
12 evidence, I forgot how you said it, but
13 in the course of your meeting you said
14 you saw documents that showed that
15 Serpico and Rossi were meeting; is that
16 correct?
17      THE WITNESS:  I recall documents
18 being discussed.  I didn't personally see
19 documents with regard to that, to the
20 topic of Bob Serpico and Steve Rossi
21 meeting.
22      MR. GREER:  And I asked them to be
23 produced from the defendants and they
24 have not produced them, but you believe
25 they exist; is that correct?

Ford
1
2       MS. RIEGEL:  Objection.
3       THE WITNESS:  I heard of matters
4  discussed in relation to those topics.  I
5  have not seen those documents.
6       MR. GREER:  You said a few minutes
7  ago, you said there was quote, quite a
8  bit of wrongdoing at the BPCA.  What did
9  you mean by that?
10      MS. RIEGEL:  Objection.
11      THE WITNESS:  It has been alleged
12  by many employees that they have been the
13  subject of ill behavior by Battery Park
14  City Authority.
15      MR. GREER:  For example were they
16  firing people who were just simply doing
17  their job and investigating sexual
18  harassment charges?
19      MS. RIEGEL:  Objection.
20      MR. TREMONTE:  Objection.  This is
21  beyond the scope of permissible
22  discovery.  In fact Judge Cott has
23  specifically directed you not to take
24  discovery on this topic and related
25  topics in connection with this

Ford
1
2  proceeding.
3       MR. GREER:  Why were you fired,
4  what were you investigating that made
5  them fire you?
6       MR. TREMONTE:  Objection.  Same
7  objection.
8       MR. GREER:  You are allowed to
9  answer.
10      THE WITNESS:  I was terminated for
11  allegedly leaking confidential
12  information relating to an investigation.
13      MR. GREER:  That is all I have.
14  You are my witness, you have a medical
15  meeting, you are free to leave.  They
16  have no control over you.  If they want
17  to continue questions they will have to
18  take it up with the judge.
19      MS. RIEGEL:  I do have some
20  questions, but I will keep them brief.
21  EXAMINATION BY
22  MS. RIEGEL:
23      Q.   Allyson we have met before;
24  correct?
25      A.   Yes.

Ford
1
2       Q.   Can you describe how we met
3  before?
4       A.   While employed at Battery Park
5  City Authority in my capacity as a member of
6  the legal team, special counsel, we worked on
7  matters, real estate matters regarding
8  properties and real estate issues regarding
9  properties and legal issues at Battery Park
10  City.
11      Q.   During your tenure you were
12  familiar, if you are not still, you were
13  familiar with the ground lease structure as
14  relates to Battery Park City condominiums,
15  were you not?
16      A.   Yes.
17      Q.   Do you recall the process for
18  enforcement of deficiencies by individual
19  condominium unit owners, in general?
20      A.   Vaguely, yes.
21      Q.   And is it fair to say that
22  pursuant to the ground leases both Battery
23  Park City and the individual condominiums had
24  differing enforcement rights and capacities
25  with respect to defaulting condominium unit

Ford
1
2  owners?
3       MR. GREER:  Objection.
4  Irrelevant.  Condominium owners have
5  nothing to do with residential renters.
6       A.   I don't recall specifically.  But
7  in general yes I do recall.  But I don't
8  recall specifically.
9       Q.   The condominiums paid ground rent
10  and pilot to Battery Park City Authority; is
11  that correct?
12      A.   Yes.
13      Q.   And that money was collected by
14  the individual condominiums; correct?
15      A.   Correct.
16      Q.   If a condominium unit owner
17  defaulted in that obligation as well as it's
18  obligation to the condominium, both the
19  Authority and the condominium would be seeking
20  payment; is that correct?
21      MR. GREER:  Objection.  Completely
22  far afield, has nothing to do with my
23  residential renting lease.  She is trying
24  to imply that powers over condo owners
25  have anything to do whatsoever with a

Page 46

Ford

1
2      renter.
3             MS. RIEGEL:  Dr. Greer I am going
4      to remind you that Judge Cott
5      specifically directed that you simply
6      state that you have an objection without
7      colloquy, and since you seem very
8      concerned about getting Ms. Ford out of
9      here quickly you would accomplish that by
10     simply noting your objection and letting
11     us move on.
12        A.   Could you repeat the question.
13        Q.   Please read back the question.
14             (Record read.)
15        A.   To the best of my recollection,
16     yes.
17        Q.   Are you familiar with Milford
18     Management?
19        A.   Yes.
20        Q.   And did Milford Management during
21     your tenure manage various condominiums within
22     Battery Park City?
23        A.   Yes.
24        Q.   And as managing agent for those
25     condominiums do you recall that Milford

Page 47

Ford

1
2      Management was involved in recovery of
3      deficiencies from defaulting condominium unit
4      owners?
5             MR. GREER:  Objection.  Completely
6         irrelevant to this case.  Badgering of
7         the witness.  You are free to leave for
8         your medical meeting.
9         A.   In general yes.
10        Q.   You testified earlier you know
11     that Steve Rossi is employed by Milford
12     Management; is that correct?
13        A.   Yes.
14        Q.   And in that capacity do you recall
15     that Mr. Rossi was involved in collections
16     with respect to various condominium owners'
17     deficiencies?
18        A.   I don't recall.
19        Q.   If Mr. Rossi was involved in
20     collecting deficiencies from condominium
21     owners -- withdrawn.
22             MR. GREER:  Objection.
23         Hypothetical.
24        Q.   Mr. Serpico on the Battery Park
25     City side was involved in collection of

Page 48

Ford

1
2      deficiencies to Battery Park City from the
3      condominiums, was he not?
4         A.   Yes.
5         Q.   So if there were deficiencies with
6      respect to condominiums Mr. Serpico on one
7      side and Mr. Rossi on the other side would be
8      involved on a business level in collecting
9      those deficiencies, would they not?
10        A.   Yes.
11        Q.   And that would necessitate that
12     they communicate with each other, would it
13     not?
14        A.   Yes.
15        Q.   And do you recall seeing me in
16     Battery Park City's offices from time to time
17     during your tenure there?
18        A.   Yes.
19        Q.   Do you recall the purpose of those
20     meetings generally?
21        A.   Deficiency related.
22        Q.   Go ahead.
23        A.   Related to matters of units with
24     deficiencies.
25             MS. RIEGEL:  I have no other

Page 49

Ford

1
2      questions.
3             MS. TREMONTE:  Just a handful.
4      EXAMINATION BY
5      MR. TREMONTE:
6         Q.   You testified earlier that, and
7      you can tell me if I have this right, that you
8      were involved in meetings where memos were
9      discussed that referenced meetings between on
10     the one hand Bob Serpico and on the other hand
11     Milstein people; is that correct?
12        A.   Yes.
13        Q.   Do you recall what the subject
14     matter of those memos was?
15        A.   I can't recall.
16        Q.   Do you recall any discussion as to
17     the reason why Bob Serpico was meeting with
18     Milstein people on the occasions described in
19     the memos?
20        A.   I can't recall.
21             MR. TREMONTE:  Nothing further.
22             MR. GREER:  One final question.
23     EXAMINATION BY
24     MR. GREER:
25        Q.   If Mr. Serpico and Mr. Rossi were

Page 50

Ford

1
2  meeting for official business relating to
3  delinquent condominium owners would it be
4  standard in your opinion as a lawyer for the
5  Battery Park City Authority for them to meet
6  at a coffee house rather than in the BPCA
7  offices?
8        MS. RIEGEL:  Objection.
9        A.   I don't know.
10       Q.   Do you find it strange that they
11 met frequently one-on-one in coffee shops?
12       MS. RIEGEL:  Objection.
13       A.   I don't know.
14       MR. GREER:  That is all I have.
15 It is 2:05.
16       (Time noted:  2:05 p.m.)
17       MS. TREMONTE:  If we can reopen
18 the record for a minute.
19       So Dr. Greer can speak to the
20 details, but we note for the record that
21 there were depositions scheduled,
22 additional depositions scheduled for
23 today, both noticed by Dr. Greer.  The
24 first which was supposed to happen, or
25 supposed to take place at 10 a.m., Nancy

Page 51

Ford

1
2  Harvey, and the second deposition that
3  was supposed to take place but which
4  apparently is not was scheduled for 3
5  p.m., and that would have been the
6  deposition of Linda Soriero also noticed
7  by Dr. Greer, and Dr. Greer can make a
8  record as to his attempts to communicate
9  with them, to serve them, and what he
10 heard about their attendance.
11       MR. GREER:  Ms. Soriero has a
12 lawyer now and he was going to attend the
13 meeting, and he at the last minute
14 claimed he was ill with something that
15 seems like what Mr. Tremonte has, an
16 upper respiratory infection, and so they
17 called it off.  But we are going to do
18 written depositions instead.  That's it.
19       _____
20       ALLYSON FORD
21
22 Subscribed and sworn to before me
23 this ___ day of _____, 2017
24
25 _____

Page 52

1
2        C E R T I F I C A T E
3  STATE OF NEW YORK   )
4               : ss.
5  COUNTY OF NEW YORK   )
6
7        I, Philip Rizzuti, a Notary
8  Public within and for the State of New
9  York, do hereby certify:
10       That ALLYSON FORD, the witness
11 whose deposition is hereinbefore set forth,
12 was duly sworn by me and that such
13 deposition is a true record of the
14 testimony given by the witness.
15       I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that I am
18 in no way interested in the outcome of this
19 matter.
20       IN WITNESS WHEREOF, I have
21 hereunto set my hand this 24th day of
22 April, 2017.
23
24       _____
25       PHILIP RIZZUTI

Page 53

1
2  ----------------- I N D E X ----------------
3  WITNESS        EXAMINATION BY        PAGE
4  ALLYSON FORD   Mr. Greer          5
5             Mr. Tremonte    18, 49
6             Ms. Riegel      43, 49
7
8  ------------ INFORMATION REQUESTS -----------
9  DIRECTIONS:     None
10 RULINGS:        None
11 TO BE FURNISHED:  None
12 REQUESTS:       28
13 MOTIONS:        None
14
15 ----------------- EXHIBITS -----------------
16 Defendant's Exhibit 1, subpoena,   19
17
18
19
20
21
22
23
24
25

Page 54

1
2          *** ERRATA SHEET ***
3
4    NAME OF CASE: Greer v. Mehiel, et al.
     DATE OF DEPOSITION:  April 12, 2017
5    NAME OF WITNESS:   ALLYSON FORD
     PAGE  LINE     FROM              TO
6    ____|____|____|_____|_____
7    ____|____|____|_____|_____
8    ____|____|____|_____|_____
9    ____|____|____|_____|_____
10   ____|____|____|_____|_____
11   ____|____|____|_____|_____
12   ____|____|____|_____|_____
13   ____|____|____|_____|_____
14   ____|____|____|_____|_____
15   ____|____|____|_____|_____
16   ____|____|____|_____|_____
17   ____|____|____|_____|_____
18   ____|____|____|_____|_____
19   ____|____|____|_____|_____
20         _____
21            ALLYSON FORD
22   Subscribed and sworn to before me
23   this _____ day of _____, 2017.
24   _____  _____
25   (Notary Public)     My Commission Expires:

**A**

**a.m (1)**
50:25
**ABBY (1)**
4:5
**ability (1)**
39:19
**able (1)**
39:9
**accomplish (1)**
46:9
**accused (1)**
37:13
**acting (4)**
11:12,17 13:2 15:2
**action (1)**
52:17
**addition (1)**
5:17
**additional (1)**
50:22
**address (1)**
19:8
**Addresses (1)**
41:6
**administration (2)**
13:10 25:18
**advance (1)**
23:6
**afield (1)**
45:22
**agency (1)**
6:23
**agent (1)**
46:24
**ago (3)**
22:14 23:13 42:7
**ahead (1)**
48:22
**AJN (1)**
1:6
**al (1)**
54:4
**allege (1)**
7:12
**alleged (3)**
7:9 33:20 42:11
**allegedly (1)**
43:11
**allowed (1)**
43:8
**Allyson (9)**
1:14 2:8 5:9 43:23
   51:20 52:10 53:4
   54:5,21
**anger (3)**

12:9,18 37:11
**angry (2)**
10:18,20
**announced (1)**
11:3
**answer (6)**
17:24 31:17 32:15
   40:6,13 43:9
**answered (1)**
17:15
**anticipation (3)**
26:10,16 28:25
**anybody (1)**
25:5
**apartment (4)**
15:7,9 16:24 18:4
**apparently (1)**
51:4
**appear (1)**
25:12
**appearance (1)**
20:13
**appeared (1)**
41:7
**appointment (1)**
38:18
**approximately (2)**
5:18 11:9
**April (4)**
1:16 2:5 52:22 54:4
**aside (2)**
22:8 36:19
**asked (2)**
24:23 41:22
**asking (4)**
32:16,17 40:18,18
**assistance (1)**
37:24
**Associate (1)**
23:24
**associated (1)**
36:7
**ASSOCIATES (1)**
1:9
**assume (1)**
39:18
**attempt (1)**
30:3
**attempts (2)**
37:11 51:8
**attend (1)**
51:12
**attendance (3)**
9:24 10:13 51:10
**attended (1)**
10:7

**attention (1)**
20:21
**Attorneys (2)**
3:10,19
**authority (26)**
1:7 3:11 4:7 5:11 7:6
   8:12,19 9:9 14:3
   18:25 24:7,9 29:22
   29:22 31:22 32:4,8
   34:18 35:2,19 39:16
   42:14 44:5 45:10,19
   50:5
**avail (1)**
25:24
**Avenue (1)**
3:22
**avoid (1)**
28:10
**aware (10)**
8:5,7 18:18,21 30:11
   31:14 35:15 38:5,6
   38:21

**B**

**B (1)**
1:9
**back (6)**
24:13 33:22 34:12
   39:12,24 46:13
**bad (1)**
25:19
**Badgering (1)**
47:6
**base (1)**
9:4
**based (10)**
9:2 10:25 11:17 12:2
   12:5 15:16 16:5
   22:22 25:13 39:6
**Battery (44)**
1:7 3:11 4:7 5:11 6:19
   7:5 8:9,10,12,14,19
   8:23 9:7,9 11:24
   12:19 14:3 16:23
   18:24 24:6,9 25:14
   25:16 29:18,22
   31:22 32:4,8 34:16
   34:18,21 35:2 39:15
   42:13 44:4,9,14,22
   45:10 46:22 47:24
   48:2,16 50:5
**behave (1)**
13:13
**behavior (1)**
42:13
**believe (6)**

17:8,11,16,21 26:3
   41:24
**best (9)**
11:16 13:8 29:17,21
   31:18 32:2 33:2,16
   46:15
**beyond (1)**
42:21
**bit (2)**
26:3 42:8
**blog (13)**
8:8 9:19,21,21 10:17
   12:11 29:18,23
   33:18 36:6 37:10
   39:17,18
**blogger (2)**
9:7 11:25
**blogs (7)**
11:3,6 29:20 36:16,21
   37:13,14
**blood (1)**
52:17
**board (1)**
14:3
**Bob (5)**
12:23 34:22 41:20
   49:10,17
**bottom (1)**
20:16
**BPCA (33)**
7:16 10:17 12:14
   16:25 18:14 26:15
   26:19 28:12,21,24
   29:5,14 30:2,9,12
   30:21 31:2,14,15
   33:10 36:4 37:16
   38:6,7,9,11,12,22
   38:25 39:3,7 42:8
   50:6
**break (2)**
23:13,16
**Brenda (2)**
10:8 25:17
**brief (1)**
43:20
**Broad (1)**
3:12
**broadly (2)**
21:10 36:10
**building (1)**
15:8
**business (4)**
36:6,22 48:8 50:2

**C**

**C (4)**

3:2 4:2 52:2,2
**call (2)**
30:7 38:9
**called (6)**
5:2 25:21 27:13,16
   38:15 51:17
**calling (2)**
27:14,17
**capacities (1)**
44:24
**capacity (2)**
44:5 47:14
**case (2)**
47:6 54:4
**Cavanaugh (1)**
33:23
**CEO (1)**
12:17
**certainly (2)**
25:24 40:9
**certify (2)**
52:9,15
**Chairman (1)**
12:17
**characterize (1)**
7:20
**characterized (2)**
12:4 15:17
**charges (1)**
42:18
**chat (1)**
9:10
**City (37)**
1:7 3:11 4:7 5:11 6:19
   7:5 8:9,12,19 9:9
   14:3 16:23 18:24
   24:6,9 25:14,16
   29:18,22 31:22 32:4
   32:8 34:16,18,21
   35:2 39:15 42:14
   44:5,10,14,23 45:10
   46:22 47:25 48:2
   50:5
**City's (1)**
48:16
**claimed (1)**
51:14
**clear (1)**
37:6
**clearer (1)**
36:9
**coffee (2)**
50:6,11
**collected (1)**
45:13
**collecting (2)**

47:20 48:8
**collection (1)**
47:25
**collections (1)**
47:15
**colloquy (1)**
46:7
**colluded (1)**
18:3
**Columbus (1)**
3:6
**come (6)**
8:20 9:12 15:10 24:25
29:9,19
**comes (1)**
32:23
**coming (2)**
37:4,12
**comings (1)**
31:21
**Commission (1)**
54:25
**common (1)**
39:11
**communicate (6)**
24:15,17,20 36:18
48:12 51:8
**communicated (2)**
22:7,9
**communication (1)**
38:8
**communications (6)**
17:14 21:2,15,23
24:13 27:2
**compare (1)**
20:6
**complaint (1)**
5:22
**complaints (2)**
5:21 36:2
**Completely (2)**
45:21 47:5
**concerned (2)**
7:3 46:8
**concerning (3)**
21:2,15,23
**conclusive (1)**
32:14
**conclusively (1)**
18:6
**condo (1)**
45:24
**condominium (11)**
13:18 44:19,25 45:4
45:16,18,19 47:3,16
47:20 50:3

**condominiums (8)**
44:14,23 45:9,14
46:21,25 48:3,6
**confidential (2)**
7:10 43:11
**confirm (1)**
27:7
**Confirmed (1)**
24:25
**confused (1)**
8:22
**connect (2)**
38:3 39:19
**connected (1)**
39:17
**connection (1)**
42:25
**Conservatory (2)**
34:17,21
**consistently (1)**
31:20
**conspired (1)**
18:3
**constructively (1)**
8:2
**contact (5)**
30:3,12,20 31:2 37:18
**content (1)**
37:2
**continue (1)**
43:17
**control (3)**
21:11 23:4 43:16
**conversations (11)**
9:11,18 28:15 33:13
34:13 35:24 36:24
36:25 37:5,8,10
**copy (1)**
19:21
**Corporation (2)**
1:8 13:21
**correct (19)**
5:24 18:15,25 22:15
23:13 27:18 37:24
37:25 39:4,5 41:16
41:25 43:24 45:11
45:14,15,20 47:12
49:11
**Cott (2)**
42:22 46:4
**counsel (6)**
4:6 5:15,17 23:25
40:22 44:6
**COUNTY (1)**
52:5
**course (4)**

29:25 30:21 40:22
41:13
**court (4)**
1:2 2:9 3:5 26:13
**Cove (2)**
1:8 3:21
**credibility (1)**
37:2
**credible (1)**
11:3
**current (3)**
23:20 28:24 29:5
**currently (2)**
23:21,22
**custody (1)**
21:11

_____

**D**

**D (2)**
5:2 53:2
**daily (1)**
9:18
**date (3)**
19:10,18 54:4
**day (5)**
6:5,6 51:23 52:21
54:23
**Deborah (2)**
3:24 23:17
**deceptive (2)**
13:2,13
**defaulted (1)**
45:17
**defaulting (2)**
44:25 47:3
**defendant (1)**
5:25
**Defendant's (4)**
19:14,16,20 53:16
**defendants (4)**
1:10 3:10,19 41:23
**deficiencies (8)**
44:18 47:3,17,20 48:2
48:5,9,24
**Deficiency (1)**
48:21
**delinquent (1)**
50:3
**Dennis (4)**
1:6 10:5,7 12:17
**denominator (1)**
39:11
**depend (1)**
6:16
**deposition (13)**
1:14 2:8 22:20,22

24:24 25:2,15,22
51:2,6 52:11,13
54:4
**depositions (3)**
50:21,22 51:18
**describe (3)**
15:14 27:2 44:2
**described (1)**
49:18
**details (1)**
50:20
**dial (1)**
33:22
**different (3)**
19:10,11 30:24
**differing (1)**
44:24
**directed (2)**
42:23 46:5
**Directing (1)**
20:21
**DIRECTIONS (1)**
53:9
**discovery (2)**
42:22,24
**discredit (1)**
37:12
**discuss (3)**
22:18 23:6,15 25:10
**discussed (6)**
16:2 22:14 36:11
41:18 42:4 49:9
**discussing (5)**
10:17 16:3,11 17:2,6
**discussion (8)**
9:8 15:17 16:6,15
22:25 26:6 33:12
49:16
**discussions (4)**
16:7,14,18 31:23
**dismissal (1)**
12:10
**District (4)**
1:2,2 2:9,10
**doctor (1)**
38:19
**document (2)**
20:17,19
**documents (16)**
18:20 21:2,7,14,20,22
21:25 31:6 40:17,21
41:2,7,14,17,19
42:5
**doing (3)**
23:21,22 42:16
**Dr (36)**

24:14 29:15 30:7,11
30:20 31:2,5,8,16
32:11,21,25 33:14
34:15,23 35:4,7,13
35:16 36:4,5,6,11
36:15,21 37:18,23
38:4 39:4,8,10 46:3
50:19,23 51:7,7
**duly (2)**
5:3 52:12

_____

**E**

**E (9)**
1:3 3:2,2,4 4:2,2 52:2
52:2 53:2
**E-mail (4)**
17:13 24:15 28:3
36:14
**E-mails (1)**
28:7
**earlier (5)**
36:20 37:20 40:19
47:10 49:6
**easier (1)**
26:13
**EEO (4)**
5:16,19 7:4 36:2
**effect (1)**
28:9
**elaborate (1)**
10:21
**eleven (2)**
24:8,11
**employed (12)**
5:15 24:10 29:14 30:8
30:13 31:2,14 32:5
35:18 36:4 44:4
47:11
**employee (2)**
14:3 29:5
**employees (15)**
5:22 16:7 26:16,19
28:12,21,25 31:15
31:19,23 32:3 34:17
34:21 35:2 42:12
**employment (7)**
8:11 14:24 30:2,21
31:25 32:5 33:10
**enforcement (2)**
44:18,24
**entered (1)**
39:22
**entity (1)**
36:7
**Equal (1)**
5:20

**ERRATA (1)**
54:2
**ESQ (4)**
3:14,15,24 4:5
**estate (3)**
14:5 44:7,8
**ESTIS (1)**
3:18
**et (1)**
54:4
**event (1)**
16:9
**evicted (3)**
15:24 17:8 18:3
**eviction (2)**
16:12 21:16
**evidence (3)**
14:21 39:22 41:12
**exactly (1)**
13:11
**EXAMINATION (6)**
5:6 18:11 43:21 49:4
49:23 53:3
**examined (1)**
5:4
**example (5)**
10:23 22:13 28:7
33:20 42:15
**examples (2)**
11:23 16:25
**exchange (3)**
36:14,19 37:21
**Excuse (1)**
40:2
**exhibit (5)**
12:8 19:14,16,21
53:16
**EXHIBITS (1)**
53:15
**exist (2)**
40:23 41:25
**expand (1)**
6:17
**experiences (1)**
31:22
**Expires (1)**
54:25
**exposure (1)**
37:7
**extent (1)**
32:19
**eye (1)**
22:22

_____
              **F**
_____
**F (2)**

5:2 52:2
**fact (5)**
11:18 30:18,19 39:7
42:22
**fair (1)**
44:21
**familiar (3)**
44:12,13 46:17
**family (2)**
14:6 25:8
**far (1)**
45:22
**father (2)**
25:9,11
**field (1)**
5:21
**final (1)**
49:22
**finance (2)**
6:19 7:2
**find (1)**
50:10
**finish (2)**
17:11 26:12
**fire (1)**
43:5
**fired (3)**
7:16,19 43:3
**firing (1)**
42:16
**first (8)**
8:7 19:13 20:25 29:8
29:9,13,15 50:24
**firsthand (2)**
10:25 33:5
**Floor (1)**
3:12
**follows (1)**
5:5
**Ford (57)**
1:14 2:8 5:1,9 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1,16
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
46:8 47:1 48:1 49:1
50:1 51:1,20 52:10
53:4 54:5,21
**forgot (1)**
41:12

**form (2)**
36:12 39:16
**formal (4)**
9:20,22,25 12:3
**formally (2)**
7:21 8:3
**former (5)**
26:15,19 28:11,21
33:21
**forth (1)**
52:11
**fraudulent (2)**
13:3,14
**free (3)**
8:3 43:15 47:7
**frequent (2)**
6:10,12
**frequently (3)**
9:18 41:6 50:11
**front (1)**
19:25
**full (2)**
10:2,23
**FURNISHED (1)**
53:11
**further (2)**
49:21 52:15

_____
              **G**
_____
**general (15)**
6:21 12:14 16:7,7,15
22:25 35:24 36:25
37:5,8,10 39:13
44:19 45:7 47:9
**generally (2)**
38:23 48:20
**getting (2)**
11:23 24:13 46:8
**GIBALDI (1)**
3:15
**give (3)**
7:8 18:8 25:25
**given (1)**
52:14
**go (6)**
6:20 25:23 27:6,8
39:24 48:22
**going (9)**
15:21 19:19 22:21
23:7 24:24 25:2
46:3 51:12,17
**goings (1)**
31:21
**GOLDENBERG (1)**
4:5
**good (1)**

22:3
**Greer (92)**
1:3 3:4 5:7 9:6 11:24
15:6 18:7 19:22
22:2,5,9,12,14,16
22:19 23:10,12
24:14 27:5,16,17
29:9,11,16 30:2,4,7
30:11,14,17,20 31:3
31:5,8,16,20 32:8
32:11,21,25 33:9,14
33:18 34:15,23 35:4
35:8,9,13,16 36:5,5
36:6,11,15,21 37:18
37:23 38:4,14 39:4
39:9,10,20,21 40:2
40:8,10,15,25 41:10
41:22 42:6,15 43:3
43:8,13 45:3,21
46:3 47:5,22 49:22
49:24 50:14,19,23
51:7,7,11 53:4 54:4
**Greer's (5)**
15:9 28:16,17,21 29:5
**grievances (5)**
38:25 39:2,12,14,15
**ground (3)**
44:13,22 45:9
**Group (2)**
19:9 23:25
**guessing (1)**
37:3

_____
              **H**
_____
**hallway (1)**
6:8
**hand (3)**
49:10,10 52:21
**handful (1)**
49:3
**handing (1)**
19:21
**happen (3)**
16:9 17:7 50:24
**happened (2)**
9:16,16
**harassment (1)**
42:18
**Harvey (3)**
7:23,25 51:2
**heading (1)**
11:18
**hear (5)**
14:2,12,16 15:6 32:24
**heard (6)**
8:10 17:6 33:6,11

42:3 51:10
**hearing (1)**
32:3
**hearings (1)**
25:25
**held (1)**
2:8
**help (2)**
38:3 39:9
**helpful (2)**
11:7 25:4
**helps (1)**
11:20
**hereinbefore (1)**
52:11
**hereunto (1)**
52:21
**hired (1)**
8:8
**history (1)**
6:19
**honestly (2)**
20:6,12
**hoped (1)**
23:18
**hour (1)**
38:17
**house (1)**
50:6
**Howard (3)**
1:7 13:21 14:5
**husband (1)**
19:6
**Hyman (1)**
10:11
**hypothetical (2)**
16:12 47:23

_____
              **I**
_____
**identification (3)**
19:14,17,20
**ill (2)**
42:13 51:14
**immediately (1)**
24:6
**imply (1)**
45:24
**Inability (1)**
22:23
**inaccurate (1)**
8:20
**incidents (2)**
12:3 32:7
**include (5)**
10:3,5,8,11 33:17
**including (1)**

6:23
**indicate (1)**
37:17
**individual (4)**
17:2 44:18,23 45:14
**individuals (1)**
32:10
**infection (2)**
22:22 51:16
**information (28)**
7:10 26:2 31:9,16,21
  31:24 32:10,21,25
  33:9,11,14 34:4,6
  34:14,23 35:4,7,12
  35:16 37:3,5,7,9,12
  39:18 43:12 53:8
**instance (1)**
6:18
**instances (1)**
16:22
**interaction (1)**
13:19
**interested (1)**
52:18
**interject (1)**
38:15
**internal (1)**
5:22
**investigating (2)**
42:17 43:4
**investigation (1)**
43:12
**involved (9)**
6:25 9:3,5 47:2,15,19
  47:25 48:8 49:8
**ironically (1)**
33:7
**irrelevant (2)**
45:4 47:6
**issue (2)**
6:20 15:7
**issues (4)**
7:2,4 44:8,9

**J**

**JANET (1)**
1:7
**Jim (1)**
33:22
**JLC (1)**
1:6
**job (5)**
1:25 5:13 6:10 19:9
  42:17
**judge (3)**
42:22 43:18 46:4

**K**

**keep (2)**
19:25 43:20
**Kevin (1)**
16:19
**Kimball (1)**
33:21
**kind (3)**
31:9,16 35:12
**Kirk (16)**
7:19,21 13:7,8,12
  26:21 35:6,11 36:21
  37:17,21 38:7,13,21
  39:7,19
**Kirk's (1)**
38:5
**knew (6)**
7:21 23:2,5,17 25:3
  25:14
**know (12)**
6:2 7:15,23 8:4,6,14
  19:23 23:20 27:5
  47:10 50:9,13
**knowledge (3)**
29:10 33:5 35:6

**L**

**L (2)**
5:2,2
**late (1)**
19:7
**lawsuit (14)**
21:24 22:10,15 24:14
  28:16,17,22 29:6
  36:16 38:6,22,24
  39:2 41:9
**lawsuits (1)**
38:7
**lawyer (3)**
26:9 50:4 51:12
**laying (1)**
29:23
**leak (1)**
7:11
**leaking (2)**
7:9 43:11
**learn (2)**
29:8,15
**lease (8)**
15:8,9,20 16:2 17:18
  21:16 44:13 45:23
**leases (2)**
17:3 44:22
**leave (3)**
40:10 43:15 47:7
**left (5)**

7:5 8:3 24:6,9 25:23
**legal (8)**
6:25 7:3 14:17,18,20
  41:7 44:6,9
**letting (1)**
46:10
**level (1)**
48:8
**Liberty (1)**
4:8
**life (1)**
31:22
**liked (1)**
23:18
**likewise (1)**
13:12
**Linda (9)**
12:22,23,25 35:15,19
  35:22 36:12,15 51:6
**LINE (1)**
54:5
**Liro (2)**
19:9 23:25
**list (1)**
16:17
**LLP (1)**
3:9
**location (2)**
19:11 22:20 24:23
**long (4)**
5:10 32:5 33:9 40:6
**look (2)**
19:22 40:16
**looking (1)**
11:5
**lots (1)**
31:18
**lying (2)**
13:2,13

**M**

**M.D (1)**
1:3
**manage (2)**
13:20 46:21
**Management (5)**
1:8 46:18,20 47:2,12
**managing (1)**
46:24
**Mariners (2)**
1:8 3:20
**mark (1)**
19:13
**marked (2)**
19:17,20
**marriage (1)**

52:17
**Martin (2)**
1:8 3:20
**matter (3)**
17:2 49:14 52:19
**matters (9)**
6:25 7:3,4 9:3,5 42:3
  44:7,7 48:23
**McCabe (1)**
16:19
**McIntyre (1)**
10:9
**mean (5)**
5:19 21:10 36:5 39:14
  42:9
**meaning (2)**
22:2,4
**means (1)**
24:18
**medical (3)**
38:18 43:14 47:8
**meet (2)**
14:9 50:5
**meeting (19)**
6:9,13,15,17 9:22,25
  10:24 11:18 14:4,20
  14:23 41:13,15,21
  43:15 47:8 49:17
  50:2 51:13
**meetings (22)**
6:9,11,22,22,24 7:2
  9:12,20 10:6,13
  14:18,22 17:14 21:3
  35:25,25 40:18,22
  40:24 48:20 49:8,9
**Mehiel (4)**
1:6 10:5 12:17 54:4
**member (2)**
14:4 44:5
**members (1)**
14:5
**memoranda (1)**
14:17
**memos (3)**
49:8,14,19
**mention (2)**
15:20,23
**mentioned (4)**
9:22 10:16 19:11 41:2
**mentionings (1)**
14:18
**messages (1)**
28:6
**met (6)**
18:15 22:13 23:12
  43:23 44:2 50:11

**Michael (3)**
3:14,15 18:13
**Milford (6)**
1:8 3:20 46:17,20,25
  47:11
**Milstein (6)**
1:7 3:19 13:21 14:5
  49:11,18
**mind (2)**
8:20 32:23
**minute (3)**
19:22 50:18 51:13
**minutes (4)**
18:9 22:14 23:13 42:6
**misleading (1)**
8:20
**mole (1)**
33:8
**Monday (1)**
19:12
**money (1)**
45:13
**month (2)**
6:5 11:9
**months (2)**
24:8,11
**MOTIONS (1)**
53:13
**move (4)**
17:23 40:12,14 46:11

**N**

**N (4)**
3:2 4:2 5:2 53:2
**name (8)**
5:8 9:12 18:13 29:12
  30:5 34:20 54:4,5
**names (6)**
32:9,20,20 34:9,24,25
**Nancy (3)**
7:23,25 50:25
**naturally (1)**
38:8
**nature (4)**
6:14,16 37:22 38:24
**necessary (1)**
40:6
**necessitate (1)**
48:11
**need (4)**
27:6 38:14 39:21
  40:15
**New (17)**
1:2,8,15,15 2:10,11
  2:11,14 3:13,13,23
  3:23 4:9,9 52:3,5,8

**newspapers (1)**
29:23
**non-renewal (1)**
21:15
**non-responsive (1)**
17:24
**Notary (4)**
2:13 5:3 52:7 54:25
**note (1)**
50:20
**noted (1)**
50:16
**noticed (2)**
50:23 51:6
**noting (1)**
46:10
**Number (1)**
21:22
**numbered (2)**
20:16 21:13

**O**

**O (2)**
5:2,2
**objection (44)**
8:21,25 9:13 11:14,15
   11:21 12:15 13:4,5
   13:23,24 14:10,15
   16:4,13,20 17:9,10
   17:20 18:5 22:12,16
   22:19 23:10 29:11
   30:4,14,17 31:10
   37:7 42:2,10,19,20
   43:6,7 45:3,21 46:6
   46:10 47:5,22 50:8
   50:12
**obligation (2)**
45:17,18
**observations (1)**
37:6
**observe (1)**
13:2
**occasion (1)**
7:4
**occasions (2)**
6:21 49:18
**occur (1)**
11:8
**occurred (1)**
32:7
**occurring (1)**
16:10
**office (5)**
6:6,7,15,21 9:9
**officer (4)**
4:6 5:16,19,20

**offices (2)**
48:16 50:7
**official (4)**
5:13 9:11,11 50:2
**Ohio (1)**
3:6
**Okay (1)**
19:24
**once (1)**
6:5
**one-on-one (1)**
50:11
**opinion (12)**
7:21,25 8:24 9:2,4
   10:19,22 12:10
   17:17,21 18:2 50:4
**opportunity (1)**
5:20
**outcome (1)**
52:18
**outside (1)**
38:12
**owner (1)**
45:16
**owners (9)**
13:18 44:19 45:2,4,24
   47:4,16,21 50:3

**P**

**P (4)**
3:2,2 4:2,2
**p.m (3)**
2:6 50:16 51:5
**page (7)**
20:15,16,17,18,19
   53:3 54:5
**paid (1)**
45:9
**paragraph (1)**
21:14
**Park (44)**
1:7 3:11 4:7 5:11 6:19
   7:5 8:9,10,12,15,19
   8:23 9:7,9 11:24
   12:19 14:3 16:23
   18:24 24:6,9 25:14
   25:16 29:18,22
   31:22 32:4,8 34:16
   34:18,21 35:2 39:15
   42:13 44:4,9,14,23
   45:10 46:22 47:24
   48:2,16 50:5
**participated (1)**
32:19
**particular (5)**
6:18 7:13 25:17 35:25

41:9
**particularly (1)**
26:5
**parties (1)**
52:16
**passing (1)**
6:8
**payment (1)**
45:20
**Pearl (1)**
2:11
**people (17)**
6:15 10:16 16:15,17
   25:18,20 26:4 29:24
   30:12 32:6,20 34:17
   34:18 39:14 42:16
   49:11,18
**people's (1)**
38:7
**permissible (1)**
42:21
**person (4)**
7:14 27:24 38:9,10
**personal (2)**
13:18 15:7
**personally (8)**
9:3,5 12:21 14:7,11
   14:12 34:3 41:18
**personnel (1)**
7:4
**pertaining (1)**
6:25
**Philip (4)**
1:24 2:12 52:7,24
**phone (1)**
27:22
**pilot (1)**
45:10
**place (11)**
6:14 14:21 15:8,12
   16:16 21:17 22:21
   24:24 41:3 50:25
   51:3
**plaintiff (4)**
1:4 21:23 22:2,4
**plaintiff's (3)**
21:16,16,24
**please (2)**
17:12 46:13
**plurality (1)**
39:14
**point (1)**
38:20
**position (4)**
5:17 24:3,5,8
**possession (4)**

21:8,10,11 41:4
**possibility (1)**
17:22
**possible (1)**
20:12
**postpone (1)**
22:23
**Postponement (1)**
22:21
**potential (1)**
16:11
**powers (1)**
45:24
**practical (1)**
37:22
**predates (1)**
31:24
**premise (1)**
33:3
**present (1)**
6:23
**president (6)**
11:12,17 13:10 15:2
   23:24 33:21
**previously (1)**
41:10
**prior (2)**
8:11 15:13
**Pro (1)**
3:4
**probably (2)**
25:13 38:19
**problem (1)**
23:19
**proceeding (1)**
43:2
**process (2)**
38:16 44:17
**produce (1)**
28:6
**produced (2)**
41:23,24
**production (2)**
20:22 28:10
**promoted (1)**
5:16
**properties (3)**
13:20 44:8,9
**provide (2)**
31:5,8
**providing (2)**
31:24 33:8
**Public (4)**
2:13 5:4 52:8 54:25
**publicly (1)**
11:2

**purpose (1)**
48:19
**pursuant (2)**
2:12 44:22
**put (1)**
9:10

**Q**

**question (10)**
6:18 8:22 17:12 22:3
   26:12 36:10 39:22
   46:12,13 49:22
**questioning (1)**
37:2
**questions (5)**
40:7,13 43:17,20 49:2
**quickly (1)**
46:9
**quite (2)**
26:3 42:7
**quote (5)**
9:6,17 12:4 33:8 42:7

**R**

**R (4)**
3:2 4:2 5:2 52:2
**reach (1)**
38:2
**reaction (1)**
37:8
**read (4)**
11:4 29:19 46:13,14
**reading (2)**
11:5 29:18
**real (3)**
14:5 44:7,8
**really (3)**
20:18 27:6 33:22
**reason (3)**
7:8,9 49:17
**recall (44)**
9:15 10:12,15 11:19
   12:12,16 13:10
   14:19 15:3,10,22,25
   16:21,22,25 20:13
   32:3 34:10,19,20,24
   34:25 35:9,10 36:13
   37:19 40:20,21,25
   41:4,17 44:17 45:6
   45:7,8 46:25 47:14
   47:18 48:15,19
   49:13,15,16,20
**recalling (1)**
28:8
**receive (2)**
18:23 19:3

**received (5)**
19:2,4,5,8,12
**Recess (1)**
18:10
**recollection (15)**
11:2,16 12:2 13:9
    15:16 16:5 28:4
    29:17,21 30:6 31:18
    32:2 33:3,16 46:15
**recollections (1)**
12:5
**record (7)**
18:9 23:21 46:14
    50:18,20 51:8 52:13
**recovery (1)**
47:2
**Rector (3)**
15:8 21:17 41:2
**redundant (2)**
31:11 38:20
**refer (1)**
10:23
**referenced (1)**
49:9
**references (2)**
15:18 20:25
**referring (1)**
10:14
**regard (5)**
9:17,20 34:2 41:8,19
**regarding (2)**
44:7,8
**regular (1)**
29:23
**related (4)**
42:24 48:21,23 52:16
**relates (1)**
44:14
**relating (2)**
43:12 50:2
**relation (1)**
42:4
**relevant (2)**
23:3 26:5
**remember (3)**
33:23,24 34:6
**remind (1)**
46:4
**renewed (2)**
15:21 17:19
**rent (1)**
45:9
**renter (2)**
16:24 46:2
**renters (1)**
45:5

**renting (1)**
45:23
**reopen (1)**
50:17
**repeat (1)**
46:12
**report (1)**
8:17
**reported (2)**
1:24 33:18
**reporter (1)**
26:13
**reporting (4)**
8:23 10:18 12:19 32:7
**represent (1)**
18:14
**request (2)**
20:22,25
**REQUESTS (2)**
53:8,12
**require (1)**
6:10
**resident (1)**
16:23
**residential (4)**
15:7 16:24 45:5,23
**respect (3)**
44:25 47:16 48:6
**respiratory (1)**
51:16
**respond (2)**
27:9,12
**rider (1)**
20:18
**Riegel (21)**
3:24 8:21,25 9:13
    11:15 12:15 13:4,24
    14:15 17:10 23:17
    42:2,10,19 43:19,22
    46:3 48:25 50:8,12
    53:6
**right (2)**
20:8 49:7
**rights (1)**
44:24
**Risk (1)**
4:6
**Rizzuti (4)**
1:24 2:13 52:7,24
**Robert (24)**
1:6 3:10 5:25 6:2,3
    10:3,20,24 11:2
    14:8 17:17 21:3
    25:15,17 32:22,24
    33:5,7,15 34:2,7,12
    34:14 35:3

**role (1)**
6:10
**ROSENBERG (1)**
3:18
**Rossi (18)**
1:7 3:20 13:16,17
    14:4,9,22 15:19
    17:16 18:3 21:4
    41:15,20 47:11,15
    47:19 48:7 49:25
**RQ (1)**
28:5
**RULINGS (1)**
53:10
**rumored (1)**
34:5
**run (2)**
8:14 39:23
**running (2)**
40:3,4

—————————————
**S**
—————————————
**S (3)**
3:2 4:2 5:2
**saw (1)**
41:14
**says (2)**
20:22 21:14
**scandals (1)**
33:20
**scheduled (3)**
50:21,22 51:4
**scope (1)**
42:21
**Scratch (1)**
17:15
**scream (1)**
12:8
**Se (1)**
3:4
**second (4)**
19:8 20:17 21:13 51:2
**secondhand (2)**
14:13 19:5
**secretary (1)**
12:24
**see (14)**
6:4,7 12:25 13:12
    14:2,8 17:13 20:6
    20:10,22 21:5,18
    41:11,18
**seeing (5)**
40:20,21,25 41:5
    48:15
**seeking (2)**
37:23 45:19

**seen (3)**
20:4,14 42:5
**senior (1)**
23:25
**sent (1)**
19:10
**separated (1)**
19:6
**Serpico (46)**
1:6 3:10 5:25 6:2,7,11
    6:20,24,24 7:3 10:3
    10:20,24 11:2,22,23
    14:8,22,25 15:18
    16:19 17:6,17 18:2
    18:14,25 21:3 25:16
    25:17 32:22,25 33:5
    33:7,15 34:2,7,12
    34:14 35:3 41:15,20
    47:24 48:6 49:10,17
    49:25
**Serpico's (2)**
12:23 34:22
**serve (2)**
28:8 51:9
**served (2)**
18:17,24
**set (3)**
22:8 52:11,21
**setting (1)**
35:24
**sexual (1)**
42:17
**shape (2)**
36:12 39:16
**Shari (4)**
10:11,12 11:19 25:17
**SHEET (1)**
54:2
**SHER (1)**
3:9
**shops (1)**
50:11
**show (2)**
12:18 19:19
**showed (1)**
41:14
**side (3)**
47:25 48:7,7
**signs (1)**
12:18
**simply (3)**
42:16 46:5,10
**sit (1)**
20:8
**SITE (1)**
1:9

**situation (1)**
16:9
**Soriero (11)**
12:22,23,25 35:15,19
    35:23 36:3,12,15
    51:6,11
**sorry (1)**
22:3
**source (1)**
33:10
**Southern (2)**
1:2 2:10
**speak (9)**
26:20,22,24 28:11,24
    35:19 38:10,11
    50:19
**special (4)**
4:6 5:15,17 44:6
**specific (5)**
10:22 15:18 32:9,19
    34:8
**specifically (4)**
42:23 45:6,8 46:5
**specifics (1)**
9:15
**specified (1)**
7:14
**speculation (2)**
16:8 17:7 32:12,17
**speculations (1)**
37:10
**spoke (1)**
27:25
**spoken (2)**
28:20 29:4
**ss (1)**
52:4
**staff (6)**
6:22 10:2,18,23 16:25
    37:6
**standard (1)**
50:4
**state (4)**
2:13 46:6 52:3,8
**stated (1)**
27:25
**States (2)**
1:2 2:9
**stay (2)**
11:5 40:5
**Steve (9)**
13:16,17 14:4,9,22
    17:16 21:3 41:20
    47:11
**Steven (17)**
1:3,7 3:4 9:6 11:24

15:6,9 22:2,4 27:4,7
27:13,16,16 32:8
33:9,18
**stories (1)**
12:13
**strange (1)**
50:10
**Street (3)**
2:11 3:12 4:8
**strike (1)**
17:23
**structure (1)**
44:13
**stuff (1)**
39:8
**subject (3)**
25:14 42:13 49:13
**subpoena (18)**
2:12 18:18,23 19:2,3
19:6,9,15,16 25:13
25:15,22,22 27:4
28:9 39:23 40:16
53:16
**subpoenaed (1)**
18:20
**subpoenas (1)**
19:5
**Subscribed (2)**
51:22 54:22
**substance (1)**
12:11
**suing (1)**
39:7
**supplied (9)**
31:20 32:10,21 33:14
34:14 35:3,12 37:4
37:9
**supplier (1)**
34:3
**suppliers (1)**
34:6
**supply (1)**
35:7
**supplying (4)**
31:15 32:25 34:22
35:16
**supposed (3)**
50:24,25 51:3
**supposedly (1)**
32:21
**sure (3)**
17:18 20:9,10
**surprised (1)**
25:21
**Swanson (19)**
7:19,21 13:7,8,13

26:21,23,24 27:9,15
27:21 28:15 35:6,11
36:21 37:17,21
38:22 39:7
**sworn (4)**
5:3 51:22 52:12 54:22

———————
T

**T (2)**
52:2,2
**take (9)**
6:14 19:22 22:21 24:5
24:24 42:23 43:18
50:25 51:3
**taken (2)**
14:21 18:10
**talk (13)**
12:5 25:5 26:9,15
27:21,24 29:24
31:19 32:18 33:4
35:22 36:3,20
**talking (1)**
15:14
**Tatersall (1)**
3:5
**team (1)**
44:6
**tell (7)**
23:2,4 24:22 25:2
35:11 36:24 49:7
**telling (1)**
33:6
**tenure (3)**
44:11 46:21 48:17
**terminated (5)**
7:7,22,24 8:2 43:10
**testified (7)**
5:4 17:5 36:20 37:20
41:11 47:10 49:6
**testify (2)**
23:7 25:13
**testimony (8)**
23:7 25:6 26:10,16
28:12,25 40:19
52:14
**text (6)**
24:21 26:25 28:2,6
36:19 37:21
**texted (1)**
27:15
**texts (2)**
24:22 27:10
**things (2)**
8:18 25:20
**think (3)**
18:2 38:3 39:6

**Third (1)**
3:22
**thought (1)**
23:19
**ties (1)**
39:12
**time (20)**
7:16,20 9:23 11:13,17
14:19 30:8,25 31:6
31:9,13 35:8,20,20
39:23 40:3,5 48:16
48:16 50:16
**times (1)**
26:22
**title (5)**
5:14 13:9,11 23:20,23
**today (6)**
23:7 25:6 26:17 29:2
41:11 50:23
**told (2)**
34:22 35:3
**topic (8)**
9:8 15:9 16:8,16 26:6
41:8,20 42:24
**topics (10)**
9:21 12:12 33:17,17
33:19,25 37:15
38:12 42:4,25
**touch (4)**
27:5,7 37:23 39:10
**Tremonte (29)**
3:9,14 11:14,21 13:5
13:23 14:10 16:4,13
16:20 17:9,20,23
18:5,8,12,13 31:10
39:25 40:4,9 42:20
43:6 49:3,5,21
50:17 51:15 53:5
**true (1)**
52:13
**truth (2)**
23:4 25:3
**truthful (2)**
11:6 26:2
**try (1)**
30:7
**trying (3)**
30:11 37:22 45:23
**turn (1)**
20:15
**Turning (1)**
21:13
**TV (8)**
8:9,10,15,24 9:7
11:24 12:19 29:18
**two (2)**

18:8 19:4
**type (3)**
17:2 33:13 35:7
**types (1)**
25:25

———————
U

**understanding (1)**
38:24
**unfortunately (1)**
20:11
**unit (4)**
44:19,25 45:16 47:3
**United (2)**
1:2 2:9
**units (1)**
48:23
**unquote (4)**
9:7,17 12:4 33:8
**untruthful (1)**
25:19
**upper (1)**
51:16
**upset (4)**
11:23 12:7,13,18

———————
V

**v (1)**
54:4
**Vaguely (1)**
44:20
**variety (1)**
8:18
**various (3)**
17:14 46:21 47:16
**verbatim (1)**
10:25
**vice (2)**
13:9 23:24
**voluntarily (1)**
28:5
**voluntary (1)**
28:10
**vs (1)**
1:5

———————
W

**W (1)**
3:15
**want (5)**
20:5,7 25:23 40:11
43:16
**watercooler (11)**
9:10,18 12:4 15:17
16:6,14 31:19 32:18
33:4,13 34:13

**way (7)**
13:3,14 30:24 36:12
39:16,17 52:18
**Wednesday (1)**
1:16
**week (1)**
19:7
**went (1)**
19:7
**whatsoever (1)**
45:25
**WHEREOF (1)**
52:20
**wide (1)**
8:18
**willing (1)**
40:13
**willingness (1)**
23:2
**Wilson (1)**
33:21
**withdrawn (1)**
47:21
**witness (17)**
5:2 38:15 40:5,12,24
41:6,17 42:3,11
43:10,14 47:7 52:10
52:14,20 53:3 54:5
**witnessed (1)**
12:20
**work (3)**
5:10 6:5,11
**worked (3)**
17:17 25:18 44:6
**working (2)**
24:2 37:16
**workplace (1)**
5:23
**written (1)**
51:18
**wrong (1)**
8:24
**wrongdoing (3)**
26:4 37:14 42:8

———————
X

**X (1)**
53:2

———————
Y

**Y (1)**
5:2
**year (4)**
5:18 11:8 14:19,20
**yell (1)**
12:8

**York (17)**
 1:2,8,15,15 2:10,11
 2:11,14 3:13,13,23
 3:23 4:9,9 52:3,5,9

---
**Z**
---

---
**0**
---

---
**1**
---
**1 (4)**
 19:14,16,21 53:16
**1:04 (1)**
 2:6
**1:52 (1)**
 38:17
**10 (1)**
 50:25
**10004 (1)**
 3:13
**10017 (1)**
 3:23
**10281 (1)**
 4:9
**12 (3)**
 1:16 2:5 54:4
**122010 (1)**
 1:25
**15CIV.6119 (1)**
 1:5
**18 (1)**
 53:5
**19 (1)**
 53:16

---
**2**
---
**2 (1)**
 20:16
**2:05 (2)**
 50:15,16
**200 (4)**
 4:8 15:8 21:17 41:2
**2010 (2)**
 5:12 29:13
**2011 (1)**
 29:13
**2012 (1)**
 11:10
**2013 (2)**
 11:9 17:6
**2014 (5)**
 5:12 7:6,7 15:4,13
**2015 (1)**
 24:4
**2017 (6)**
 1:16 2:5 51:23 52:22

 54:4,23
**23rd (1)**
 3:12
**24th (1)**
 52:21
**28 (1)**
 53:12

---
**3**
---
**3 (2)**
 21:22 51:4
**35-F (1)**
 41:3

---
**4**
---
**43 (1)**
 53:6
**43230 (1)**
 3:6
**4674 (1)**
 3:5
**49 (2)**
 53:5,6

---
**5**
---
**5 (1)**
 53:4
**500 (1)**
 2:10

---
**6**
---

---
**7**
---
**733 (1)**
 3:22

---
**8**
---

---
**9**
---
**90 (1)**
 3:12