Page 1

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3    - - - - - - - - - - - - - - - - -x
    STEVEN E. GREER, MD
4   an individual,

5                            Plaintiff,

6            -against-

7   Dennis Mehiel, an individual, Robert
    Serpico, an individual, The Battery Park
8   City Authority, a New York State authority,
    Howard Milstein, an individual, Steven
9   Rossi, an individual, Janet Martin, an
    individual, Milford Management, a New York
10  Corporation, and Mariners Cove Site B
    Associates, a New York corporation.

11

                             Defendants.
12

     - - - - - - - - - - - - - - - - -x
13

14

                  CONFIDENTIAL
15

16

17  DEPOSITION OF KIRK SWANSON
    New York, New York
18  March 21, 2017
19

20

21

22

23

    Reported by:
24  Pessi Goldstein
    JOB NO. 121382

25

Page 2

March 21, 2017
2:07 P.M.

DEPOSITION of KIRK SWANSON, a Non-Party Witness herein, held at the United States District Court, Southern District of New York, 500 Pearl Street, New York, NY 10007, taken before Pessi Goldstein, a shorthand reporter and Notary Public within and for the State of New York.

\* \* \*

Page 3

APPEARANCES:

STEVEN E. GREER, MD
    Plaintiff Pro Se

SHER TREMONTE
    Attorneys for Defendants
    Robert Michael Serpico
    Battery Park City Authority
    80 Broad Street
    New York, NY  10004
BY:  MICHAEL TREMONTE, ESQ.
    MICHAEL GIBALDI, ESQ.
    JUSTIN GUNNELL, ESQ.

ROSENBERG & ESTIS
    Attorneys for
    Remaining Defendants
    733 Third Avenue
    New York, NY  10017
BY:  DEBORAH RIEGEL, ESQ.

GISKAN SOLOTAROFF & ANDERSON
    Attorneys for the Witness
    11 Broadway
    New York, NY 10004
BY:  JASON SOLOTAROFF, ESQ.

ALSO PRESENT:
    ALIX S. PUSTILNIK
    General Counsel for BPCA

\* \* \*

Page 4

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

Page 5

KIRK SWANSON - CONFIDENTIAL
KIRK SWANSON,
    the witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:
EXAMINATION BY
DR. GREER:
    Q.   Please state your name for the record.
    A.   Kirk Swanson.
    Q.   Please state your address for the record.
    A.   350 East 52nd Street, Apartment 6G, New York, New York 10022.
    DR. GREER:  Just for the record, here's a thumb drive of the video of the Robert Serpico files.
    MR. TREMONTE:  Before you begin, just like last time, I just want to make a record here that the conduct of this deposition is subject to the order entered on February 8, 2017, by Judge Cott, in particular, beginning at page 6, the section of that order caption

2

1      KIRK SWANSON - CONFIDENTIAL
2 deposition conduct.
3     In advance of the deposition I
4 provided a copy to Mr. Swanson's
5 counsel Mr. Solotaroff and provide an
6 opportunity to read it and is familiar
7 with the Court's rulings.
8     The deposition is also subject to
9 a confidentiality order that was
10 entered by Judge Cott and I can also
11 provide a copy to Mr. Solotaroff of
12 that deposition -- that document as
13 well.  One of the provisions in there
14 specifies that the deposition
15 transcripts in their entirety are
16 marked confidential for 30 days pending
17 designations by the parties.
18     MR. SOLOTAROFF:  Let me just make
19 one statement.  So I've reviewed Judge
20 Cott's order and one issue I think that
21 needs to be flagged ahead of time is
22 that Mr. Swanson has his own case
23 against the defendants in this case,
24 and my understanding and my belief is
25 that this deposition is not, he is not

1      KIRK SWANSON - CONFIDENTIAL
2 being deposed on his own case but
3 rather on Mr. Greer's case.
4     And as a result, I am going to
5 object and direct Mr. Swanson not to
6 answer questions that have nothing to
7 do with the Greer case and are directed
8 at Mr. Swanson's own case.
9     Now, based on the order, I don't
10 believe, because it was presented to
11 Judge Cott, that Judge Cott has ruled
12 that questions about Mr. Swanson's own
13 case are off limits, however, I do
14 believe that those questions would be
15 improper.  And if a party persists on
16 asking questions about Mr. Swanson's
17 own case that are unrelated to the case
18 here, we'll just go and see Judge Cott
19 and get a ruling.
20     MR. TREMONTE:  I think a point
21 that may inform your thinking about
22 that, that I think is relevant, is in
23 the January 18th order issued by Judge
24 Cott at page 4 of 9, towards the bottom
25 of the page in connection with rulings

1      KIRK SWANSON - CONFIDENTIAL
2 that the Court was making at that time
3 on document request and I think it
4 applies to discovery generally that
5 Judge Cott held.  And this is a quote:
6 "In sum, any discovery that does
7 not directly relate to Greer's eviction
8 or to his exclusions from the BPCA
9 board of directors meeting in July 2015
10 will be found as here to be irrelevant
11 and not proportional to the remaining
12 claims in this case."
13     So you may hear us lodge an
14 objection in the event that the
15 questioning veers off course consistent
16 with that order and I think that may be
17 helpful to you in evaluating your
18 objection.
19     MR. SOLOTAROFF:  Yes, thank you.
20     DR. GREER:  Objection, that was
21 dealing specifically with document
22 requests and, in fact, it should be
23 stricken from the record, the entire
24 ruling.  The judge went out of his way
25 to say and I'm going to paraphrase, in

1      KIRK SWANSON - CONFIDENTIAL
2 this essence, Dr. Greer, I don't think
3 you understand that you can ask these
4 same questions in deposition, can't
5 you?
6     So that is an extremely
7 misleading summary of an order and it
8 absolutely does not, Judge Cott wants
9 me to ask the questions in deposition
10 so I strike all of that.  So can we
11 begin?
12     MR. TREMONTE:  You've made your
13 record and let me just make mine.
14     DR. GREER:  Objection.  Can we
15 begin?
16     MR. TREMONTE:  No, I'm going to
17 make the record.  In his February 8,
18 2017 order, page 7, the third bullet
19 point on the page, Judge Cott
20 specifically held, "Directions to the
21 deponent not to answer a question are
22 improper except on the basis of
23 privilege, on the grounds that the
24 Court has ordered that such information
25 is not subject to discovery, or to

Page 10

KIRK SWANSON - CONFIDENTIAL

1  enable a party or deponent to present a
2  motion to the Court or termination of
3  the deposition," and then it goes on.
4      It is clear as day to us that the
5  Court has held over the course of
6  multiple rulings that there are any
7  number of areas that are not subject to
8  discovery in this case, either document
9  discovery or testimony, and in our view
10 that is entirely consistent with the
11 section of the January 18th orders that
12 I read which limits discovery to only
13 items that directly relate to the
14 eviction or the exclusion from the
15 July 2015 meeting.
16     DR. GREER:  I need to remind you
17 that this order was just violated by
18 you.  The judge specifically said that
19 you are not supposed to speak other
20 than the word "objection," period.
21     MR. TREMONTE:  We made our
22 record.
23     DR. GREER:  And if you continue
24 to do that, you are flagrantly

Page 11

KIRK SWANSON - CONFIDENTIAL

1  violating, this is exactly what Judge
2  Cott wanted to preempt, a room full of
3  lawyers stalling a deposition.  You're
4  not supposed to say anything other than
5  the word "objection" and then why, and
6  that is in his ruling.  Okay?  Can we
7  begin?
8      Q.  Thank you for showing up, Mr.
9  Swanson.  When did you begin your employment
10 at the Battery Park City Authority?
11     A.  November of 2012.
12     Q.  What was your official job role
13 and could you characterize what that means?
14     A.  Initially deputy chief
15 administrative officer and internal control
16 officer.  Shortly thereafter, I also took on
17 the title of chief contracting officer and
18 then in early 2014, I became vice president
19 of administrative affairs.
20     Q.  And when you first started in
21 November who was your direct boss, who did
22 you directly report to and did that change?
23     A.  Direct report was to Phyllis
24 Taylor who was the general counsel at the

Page 12

KIRK SWANSON - CONFIDENTIAL

1  time.
2      Q.  And did that stay the same while
3  you were employed there or did --
4      A.  Well, it changed when Phyllis
5  retired or resigned, rather.
6      Q.  And who did you report to after
7  that?
8      A.  Well, Bob Serpico was the acting
9  president, it would have been Bob Serpico.
10     Q.  So in what approximate time frame
11 did you report to Robert Serpico?
12     A.  That would be from Phyllis's
13 retirement in the turn of the year until
14 Shari Hyman took office, which would be late
15 January, early February.
16     Q.  While he was acting president?
17     A.  Right.
18     Q.  If a Battery Park City Authority
19 employee came to you to lodge a work-related
20 complaint, how would you handle it?  To whom
21 would you relay it to?
22     A.  EEO officer or if it was
23 something I could handle myself, I would do
24 that.

Page 13

KIRK SWANSON - CONFIDENTIAL

1  officer?
2      Q.  Do you recall, who was the EEO
3  officer?
4      MS. RIEGEL:  Objection, just
5  preserving it, it is outside the scope.
6      THE WITNESS:  Do I answer?
7      MR. SOLOTAROFF:  You can answer.
8      DR. GREER:  Can she object too,
9  he's not her client.
10     MR. SOLOTAROFF:  It doesn't
11 matter, you can answer.
12     Q.  Who is the EEO officer, do you
13 recall?
14     A.  Nancy Harvey.
15     Q.  And in the course of doing this
16 job, did you have to relay and handle many
17 complaints from BPCA employees about other
18 BPCA employees, EEO type of complaints, did
19 you ever have to deal with that often?
20     MS. RIEGEL:  Objection, beyond
21 the scope of permitted discovery.
22     A.  Not too often, no.
23     Q.  I can't pronounce her name, Elsa
24 her real name is Elizabeth, but did Elsa or
25 Elizabeth and her last name I can't

KIRK SWANSON - CONFIDENTIAL

1
2 pronounce now, maybe you can clarify, did
3 she come to you with any complaints?
4          MS. RIEGEL:  Objection, beyond
5     the scope of permitted discovery.
6          MR. SOLOTAROFF:  Objection, don't
7     answer.  I think it's beyond the scope.
8     And, Dr. Greer, just so it's clear, I
9     have to protect Mr. Swanson's rights
10    and it's not in his interest to be
11    deposed on his case right now, so I'm
12    not trying to be difficult.
13    Q.  I understand.  It's relevant and
14 you will see why in a second.  Let's talk
15 about Robert Serpico.  At some point, to
16 your knowledge, what was his job role there
17 and how did it change, Robert Serpico?
18         MR. TREMONTE:  Objection to form.
19    Objection beyond the scope of permitted
20    discovery.
21         MR. SOLOTAROFF:  You can answer.
22    A.  Robert was the chief financial
23 officer and also for a while the acting
24 president.
25    Q.  And describe in detail how you

KIRK SWANSON - CONFIDENTIAL

1
2 would interact with him.  Did you see him
3 every day or would it be an occasional
4 meeting once a week, how often would you
5 interact with Mr. Serpico?
6    A.  Every day, often.
7    Q.  Would those be face-to-face
8 meetings or would they be interoffice
9 e-mails?
10    A.  Both.
11    Q.  Now, I would attend the BPCA
12 board meetings as a reporter.  When is the
13 first time you recall actually seeing me in
14 person, do you know?
15    A.  I can't recall the first time.  I
16 do recall you.
17    Q.  And we've never actually met,
18 though, like to my knowledge this is the
19 first time I've seen you in person.  Do you
20 recall us ever meeting and speaking before
21 today in person?
22    A.  I don't think so, no.  I remember
23 seeing you.  Again, I was not a public
24 affairs officer, so.
25    Q.  And you know me from, before I

KIRK SWANSON - CONFIDENTIAL

1
2 showed up at the BPCA board meetings, did
3 you know who I was and, if so, how or why?
4    A.  I became aware of you over time.
5    Q.  Through what medium?  Was it
6 through the BatteryPark.TV reporting?
7    A.  Just through staff.
8    Q.  Okay.  That's very interesting.
9 How would other staff at the BPCA alert you
10 to my existence?  How did that happen?
11    A.  Well, your blog would get
12 attention, people would talk about it.  And
13 your presence over time, I became aware of
14 your presence at the meetings, at the board
15 meetings.
16    Q.  Do you remember any specific
17 stories that come to mind or a specific
18 instance where something I did or wrote was
19 the talk of the office?
20    A.  That happened numerous times.
21    Q.  Can you recall any of the topics,
22 or was it a story about Robert Serpico or
23 something like that?
24    A.  I can't state a specific one but
25 there were numerous incidents.

KIRK SWANSON - CONFIDENTIAL

1
2    Q.  And describe the nature -- when
3 you would hear about me, what does that
4 mean?  Would it be at the water cooler,
5 would it be during an official meeting?
6 Could you try to be a little more detailed
7 how you heard about me through discussion?
8    A.  It would come up in any number of
9 situations, yes.
10    Q.  Do you recall any e-mails going
11 back and forth that mentioned me or
12 BatteryPark.TV?
13    A.  E-mails, I can't say certainly --
14    Q.  Okay, now sometime --
15    A.  -- that I was part of, I can't
16 say with certainty.
17    Q.  All right.
18    A.  I'm sure you probably were on one
19 or two.
20    Q.  At some point I asked Mr. Serpico
21 before I have the dates, but late 2013 up
22 until like March of 2014, Mr. Serpico was
23 the acting president.  During that time did
24 you either hear directly, see an e-mail
25 indirectly, did you have any evidence in

Page 18

KIRK SWANSON - CONFIDENTIAL

1
2  late '13, early '14, that Mr. Serpico was
3  discussing the status of my residential
4  apartment lease, whether it was going to be
5  renewed or not, whether I was late in
6  payment, whether I was going to be evicted.
7  Do you recall anything?
8       MR. TREMONTE:  Objection to form.
9       A.  Repeat the question.
10      Q.  Do you recall Robert Serpico in
11  late 2013, early 2014, discussing Steven
12  Greer's apartment at 200 Rector Place, 35F?
13  For example, he heard I was going to, the
14  lease would not be renewed or I was going to
15  be evicted or something like that.  Do you
16  recall that?
17      MR. TREMONTE:  Objection to form.
18      A.  I can't say with certainty, no.
19      Q.  You don't recall Mr. Serpico
20  saying, "Ah, Greer's going to be evicted,"
21  or something of that nature?
22      MR. TREMONTE:  Objection.
23      MS. RIEGEL:  Objection, asked and
24  answered.
25      A.  In a general sense, yes.  I can't

Page 19

KIRK SWANSON - CONFIDENTIAL

1
2  think of a specific -- well, I can't say
3  with certainty a specific moment, no.
4       Q.  When did you first learn that
5  Milford Management or Steve Rossi or
6  Mariners Cove Site B would not be renewing
7  my lease at my apartment?
8       MR. TREMONTE:  Objection to form.
9       A.  I found out about that, I'm
10  fairly certain the date was January 21,
11  2014.  I was approached by Kevin McCabe who
12  informed me that Steven Greer's lease was
13  not going to be renewed and that he would
14  be, I paraphrase, kicked out of his
15  apartment.
16      Q.  Do you recall how that happened?
17  Was it in a face-to-face meeting, in an
18  office or over an e-mail?
19      A.  It was, I can recall specifically
20  it was leaving Robin Forst's office, Kevin
21  approached me and just told me the news.
22      Q.  Can you recall any other incident
23  where people at the Battery Park City
24  Authority level of management would be
25  acutely aware of the details of an

Page 20

KIRK SWANSON - CONFIDENTIAL

1
2  individual resident's lease, a residential
3  lease, was this a common practice for people
4  in the office to talk about individual
5  residential leases, can you --
6       MR. TREMONTE:  Objection to form.
7       A.  No.
8       Q.  This is the only time you can
9  recall that the BPCA executives were
10  discussing an individual tenant and how he
11  was not being renewed lease or something?
12      MR. TREMONTE:  Objection to form.
13      A.  There were discussions about
14  tenants who would ditch their apartment.
15      Q.  Condo?
16      A.  Yes, condo apartments and were
17  paying their rent.  But, no, there were no
18  other incidents of what you're talking
19  about.
20      Q.  Okay.  Do you know who Linda
21  Soriero is, was she a co-worker of yours?
22      A.  Yes.
23      Q.  What did she do, what was her job
24  role?
25      A.  She was Bob's assistant.

Page 21

KIRK SWANSON - CONFIDENTIAL

1
2       Q.  Do you know who Steve Rossi is?
3       A.  Yes.
4       Q.  What does he do?
5       A.  He was a rep for real estate
6  entity and had dealings with the Battery
7  Park City Authority.
8       Q.  Do you recall hearing about any
9  evidence at all, either directly, or
10  witnessing it or seeing a memo, or anything,
11  do you have any evidence that Steve Rossi
12  and Robert Serpico met in person?
13      MR. TREMONTE:  Objection to form.
14      A.  Oh, I would see them having lunch
15  all the time.
16      Q.  Do you recall if you saw that
17  happening in 2013?
18      A.  Yes.
19      Q.  Where do you recall it might have
20  happened?
21      A.  I have one vivid recollection,
22  two vivid recollections, in Au Bon Pain down
23  at the lobby of the --
24      Q.  In 2013.
25      A.  Yes.

Page 22

KIRK SWANSON - CONFIDENTIAL
1
2       Q.   Did that happen to be in the fall
3   or September or October, do you recall?
4       A.   Sure, yes.
5       Q.   I may have asked this a little
6   bit, but did any of my BatteryPark.TV
7   stories, I run the blog BatteryPark.TV and I
8   would write about scandals or issues going
9   on at the BPCA.  Do you recall any of those
10  that really upset anyone in the office?
11      MR. TREMONTE:  Objection to form.
12      A.   Well, most of them did.
13      Q.   Any one in particular, like one
14  that might have dealt with Robert Serpico's
15  issues?
16      A.   You know I can't state anything
17  specifically other than general umbrage
18  taken at various meetings.
19      Q.   Who is Seema Singh?
20      A.   She was an attorney at the
21  Battery Park City Authority.
22      Q.   And did you and her ever have any
23  conflicts or was she ever upset with how you
24  were doing your job?
25      MS. RIEGEL:  Objection, beyond

Page 23

KIRK SWANSON - CONFIDENTIAL
1
2   the scope of permitted discovery.
3       MR. SOLOTAROFF:  I'm going to
4   direct him not to answer.
5       Q.   Well, this address you mention
6   it, tell me what you can, what your lawyer
7   is comfortable with, you're suing the BPCA,
8   why?  Whatever you're --
9       MS. RIEGEL:  Objection, beyond
10  the scope of permitted discovery.
11      DR. GREER:  It's public
12  information.
13      MR. SOLOTAROFF:  Yes, again, I
14  don't want Mr. Swanson somehow to say
15  something that would be held against
16  him in his own deposition.
17      DR. GREER:  Sure, I'm just trying
18  to put it on the record.
19      Q.   Is it true that you were fired
20  from the BPCA and you are now suing?
21      A.   Yes.
22      DR. GREER:  That is all I have
23  for now.
24      MR. TREMONTE:  Can we take a
25  quick break?

Page 24

KIRK SWANSON - CONFIDENTIAL
1
2       MR. SOLOTAROFF:  Sure.
3                    ***
4              (Whereupon, a recess was taken
5          at this time.)
6                    ***
7       Q.   Mr. Swanson, I didn't quite ask
8   this right.  Do you believe, is it your
9   opinion that Robert Serpico was involved in
10  my eviction or non-renewal of my lease, and
11  if so, why?
12      MR. TREMONTE:  Objection to form.
13      A.   Yes, almost immediately
14  afterwards Kevin and I were down at the far
15  end of that hall closer to Bob's office and
16  Bob crossed our path.  And I asked Bob if he
17  had anything to do with Greer not getting
18  his lease renewed, to which Bob visibly
19  smirked, shrugged and didn't answer my
20  question and walked away.
21      Q.   Was that January 21st?
22      A.   That was that same day.
23      Q.   Thank you.
24      A.   Shortly after Kevin approached
25  me.

Page 25

KIRK SWANSON - CONFIDENTIAL
1
2       DR. GREER:  Do you have any
3   questions?
4       MR. TREMONTE:  Are you done?
5       DR. GREER:  Yes.
6   EXAMINATION BY
7   MR. TREMONTE:
8       Q.   Just following up on asking you
9   about that same event that you just
10  testified about.  Just so I have it right,
11  so you had just spoken with Mr. McCabe; is
12  that correct?
13      A.   Yes.
14      Q.   And was Mr. McCabe still with you
15  when you encountered Mr. Serpico?
16      A.   He was.
17      Q.   Was anyone else present?
18      A.   It was just the three of us.
19      Q.   And where was this in the
20  offices?
21      A.   Short of Bob's office, probably
22  closer to where Linda sits.  I think it
23  might have been outside of Robert Nesmith's
24  door, but I can't recall.  But it was in
25  that area.

Page 26

KIRK SWANSON - CONFIDENTIAL

1
2  Q.  But it was your testimony that no
3  one else was within earshot; is that
4  correct?
5      MR. SOLOTAROFF:  Objection to the
6  form.
7      Q.  Strike that.  Was anybody else
8  within earshot as far as you knew?
9      A.  People probably were in earshot.
10     Q.  Did you talk to anybody else
11 about this encounter with Mr. Serpico?
12     MR. SOLOTAROFF:  Hold on, other
13 than counsel, other than me.
14     MR. TREMONTE:  Yes, other than
15 counsel.
16     A.  You mean at the office?
17     Q.  I mean anyone at all.
18     A.  My wife.
19     Q.  Anyone other than your wife?
20     MR. SOLOTAROFF:  We are not
21 really supposed to consult.  The only
22 reason we can consult is if you have a
23 question about attorney-client
24 privilege.
25     MR. TREMONTE:  And I don't want

Page 27

KIRK SWANSON - CONFIDENTIAL

1
2  to invade privilege, so if you need to
3  clear that up and need to consult, I'm
4  not going to get in the way of that.
5      A.  Did I tell other people, yes.
6      Q.  Did you tell other people close
7  in time to the event?
8      A.  Yes.
9      Q.  Who else did you tell?
10     A.  Um.
11     MR. SOLOTAROFF:  Let me interject
12 to try to be helpful.  I think you
13 should be careful about BPCA's own
14 attorney-client privilege here.
15     MR. TREMONTE:  Understood.  And
16 so for now, I just want to know the
17 names of the people he spoke to and not
18 the substance of communication and then
19 we'll double back.
20     MR. SOLOTAROFF:  Okay.
21     A.  I'm not sure that -- I can't say,
22 actually, I can't state certainly that I did
23 say anything to anybody else.
24     Q.  You don't remember at this time?
25     A.  I can't clearly recall.  I know

Page 28

KIRK SWANSON - CONFIDENTIAL

1
2  it came up in conversations afterwards.  Not
3  at that specific time, I can't say that
4  clearly.
5      Q.  Let's just stay with that
6  specific time for the moment.  Did you have
7  further discussions with Mr. McCabe about --
8      A.  Sure, yes.
9      Q.  When did you have further
10 discussions with Mr. McCabe?
11     A.  It would be over drinks, it would
12 be at the office that came up numerous time.
13     Q.  And so what did you and Mr.
14 McCabe discuss on those occasions?
15     A.  Um, nothing specific.  It's
16 something that would come up in
17 conversation, um, other than it came up, I
18 can't say.
19     Q.  Do you remember what in sum and
20 substance --
21     A.  Well, you have to understand.
22 I'm going to, I was serving as the internal
23 control officer and at the time as vice
24 president of administration.  And I have a
25 CFO, who I'm at the time convinced has

Page 29

KIRK SWANSON - CONFIDENTIAL

1
2  colluded with somebody else to remove a
3  blogger, even a disagreeable one at that,
4  from his place of residence.  I found that
5  objectionable and that's something that I
6  brought up in conversation.
7      Q.  And this conviction that you
8  formed, I believe you said you became
9  convinced; correct?
10     A.  The second I saw Bob's reaction
11 to my question, yes.
12     Q.  Did you become convinced based on
13 anything else that Bob said or did?
14     A.  You would have to, over a pattern
15 of behavior over my tenure at the BPCA, it's
16 certainly something that I would place in
17 his capacity.
18     Q.  You placed in his capacity but I
19 asked you a different question.  Did
20 anything else that Mr. Serpico did after
21 that encounter in the hallway -- let's just
22 break this down.  Did he say anything
23 further to you that further supported the
24 conclusion that you drew from your gesture?
25     A.  No.

Page 30

KIRK SWANSON - CONFIDENTIAL

1
2    Q.  Did he do anything else that
3  further supported your conclusion from his
4  gesture?
5    A.  The subject might have come up in
6  subsequent conversations and would have
7  elicited a similar response, an eye roll or
8  something like that.
9    Q.  You're saying "would have."  Do
10  you remember any specific instances?
11    A.  I can remember one in his office,
12  yes.
13    Q.  Why don't you tell us about that.
14    A.  The most I can recall is it would
15  be sitting on his couch in his office and
16  Mr. Greer came up in some offhand
17  conversation and almost joking, it would be
18  him getting kicked out of his apartment.
19  And then some body language to the effect
20  that I would take as confirming what I had
21  seen previously from him.
22    Q.  Do you remember the date of that --
23    A.  No, I don't.
24    Q.  Do you remember the time of year?
25    A.  It would have been probably

Page 31

KIRK SWANSON - CONFIDENTIAL

1
2  within two weeks.
3    Q.  Of the encounter that you
4  described earlier?
5    A.  Yes.
6    Q.  Was anyone else in the room?
7    A.  I can't say certainly but I have
8  a hunch Karl Koenig was, but I can't say
9  that --
10    Q.  And I apologize --
11    A.  Karl Koenig, he's the controller.
12    Q.  He was the controller at the
13  time?
14    A.  Yes.
15    Q.  Did you have a discussion with
16  Mr. Koenig afterwards about that?
17    A.  No.
18    Q.  Did Mr. Koenig say anything to
19  you?
20    A.  No, not that I could recall.
21    Q.  Was anyone else there other than
22  you and Mr. Koenig and Mr. Serpico?
23    A.  I can't even state definitely
24  that Karl was there but my recollection was
25  that he may have been there.

Page 32

KIRK SWANSON - CONFIDENTIAL

1
2    Q.  Do you remember anything else?
3  Was it early in the day, middle of the day,
4  late in the day?
5    A.  I can't recall.
6    Q.  Do you recall any other topic
7  that came up during that course of that
8  conversation?
9    A.  Maybe FEMA.
10    Q.  Do you remember that with any
11  degree of certainty or are you guessing?
12    A.  That was probably a guess.
13  Talked a lot about FEMA with Bob.
14    Q.  Understood.  Do you remember any
15  other detail at all from that conversation?
16    A.  No.
17    Q.  Do you remember anything further
18  about the subject matter of that
19  conversation?
20    A.  No.
21    Q.  Did you react to this body
22  language that you described by Mr. Serpico?
23    A.  Did I react, no.
24    MR. SOLOTAROFF:  Objection to the
25    form.  You can answer.

Page 33

KIRK SWANSON - CONFIDENTIAL

1
2    A.  No.
3    Q.  Did you say anything to him about
4  the conclusion that you had drawn from his
5  gestures?
6    A.  No.
7    Q.  All right, so that's Mr. Serpico.
8  Any further conversations with Mr. Serpico
9  or involving Mr. Serpico where this came up?
10    A.  No, not that I can recall.
11  There's a lot of banter and back and forth
12  in any office so I can't state specifically
13  that it did or didn't happen.
14    Q.  You have no specific
15  recollections of conversations with Mr.
16  Serpico on this topic beyond what you've
17  described to us?
18    A.  No, I would not be surprised if I
19  could go back in time and see instances, but
20  those are the two that I can recall.
21    Q.  And you can't recall any others
22  specifically?
23    A.  No.
24    Q.  And for the court reporter's
25  benefit, it's easier for Madam Court

1           KIRK SWANSON - CONFIDENTIAL
2    Reporter if you let me finish my question
3    and then start your answer.
4           A.  Sure.
5           Q.  All right, so that's Mr. Serpico.
6    Did you discuss Mr. Serpico's gestures and
7    the conclusions you drew from those gestures
8    with anyone else?  I believe you said you
9    had a conversation with your wife.
10          A.  Yes.
11          Q.  When was that?
12          A.  Shortly thereafter.
13          Q.  And what do you remember from
14   that conversation?
15          A.  I can't recall specifically.
16          Q.  You don't recall any of the
17   specific details?
18          A.  No.
19          Q.  Do you recall her reaction?
20          A.  You know, she thought it was bad.
21          Q.  And what gave that you
22   impression?
23          A.  Well, I've been with the woman
24   for 28 years.  I understand her responses.
25          Q.  So you don't remember her

1           KIRK SWANSON - CONFIDENTIAL
2    specific response?
3           A.  I don't remember a specific
4    response.  I do know I told her and I know
5    she reacted negatively.
6           Q.  And, again, I don't mean to be
7    out of line but it's hard for the court
8    reporter --
9           MR. SOLOTAROFF:  Let me just say
10   this.  Generally and Dr. Greer doesn't
11   know this but generally we give
12   instructions at the beginning and the
13   most important instruction is for you
14   to make sure that you wait for the
15   attorney to finish asking the question
16   before you answer it, so nobody is
17   speaking over each other.  I should
18   have given you that before we started,
19   my fault.
20          Q.  Any further conversations with
21   your wife on this topic?
22          A.  Hundreds.
23          Q.  That you specifically recall?
24          A.  That I specifically recall.  How
25   do you recall specifically hundreds of

1           KIRK SWANSON - CONFIDENTIAL
2    conversations, um, no.
3           Q.  With anyone else, did you have a
4    conversation with anyone other than Mr.
5    Serpico, Mr. McCabe or your wife about Mr.
6    Serpico's gestures and the conclusions you
7    drew from them?
8           MR. SOLOTAROFF:  Other than me
9    and do you want, you're okay if it's
10   BPCA counsel.
11          Q.  It's a yes or no.  Did you have
12   conversations with other people on the same
13   topic, including lawyers, anyone in the
14   world?
15          MR. SOLOTAROFF:  Other than me.
16          Q.  Other than Mr. Solotaroff.
17          A.  I would have to say no.
18          Q.  Did you ever send an e-mail on
19   this topic?
20          A.  No.
21          Q.  Did you ever write anything
22   concerning this topic?
23          MR. SOLOTAROFF:  Other than, I'm
24   sorry, I should have objected, an
25   e-mail to anyone other than me and a

1           KIRK SWANSON - CONFIDENTIAL
2    writing to anyone other than me.
3           A.  No.
4           Q.  And you have spoken to Mr. Greer
5    about this; correct?
6           A.  Yes.
7           DR. GREER:  Objection, about
8    what?
9           Q.  You have spoken to Mr. Greer
10   about the conversation you had with Mr.
11   McCabe, the encounter with Mr. Serpico, his
12   gestures and the conclusion you drew from
13   that; correct?
14          MR. SOLOTAROFF:  Objection.  You
15   can answer.
16          A.  Yes.
17          Q.  Okay, when?
18          A.  Oh, I can't specifically date it.
19          Q.  Approximately?
20          A.  I would say a year ago, maybe.
21          Q.  And did Mr. Greer reach out to
22   you or did you reach out to him?
23          A.  Mr. Greer reached out to me.
24          Q.  How did he reach out to you?
25          A.  Mr. Greer e-mails, texts and

KIRK SWANSON - CONFIDENTIAL

1
2  phones.
3      Q.  Did he reach out to you by text?
4      MR. SOLOTAROFF:  Objection to the
5  form.
6      Q.  We can cut to the chase.  How did
7  he reach out to you?
8      A.  About what?
9      Q.  About the subject matter of your
10  testimony --
11      A.  This would come out in phone
12  conversation.
13      Q.  Were you having frequent phone
14  conversations at the time about a year ago?
15      A.  Not frequent.
16      Q.  About how often?
17      A.  Well, there would be stretches
18  where there weren't any calls and then there
19  would be stretches where he would call me
20  three or four times a week.
21      Q.  Did those calls begin when you
22  were still employed by the BPCA?
23      A.  No, I didn't, no.
24      MS. RIEGEL:  Can I note for the
25  record that Dr. Greer is making head

KIRK SWANSON - CONFIDENTIAL

1
2  gestures while the witness is
3  testifying and I would request that you
4  not do that, given that the witness is
5  testifying about you.
6      MR. SOLOTAROFF:  Let me just
7  state for the record that I think Mr.
8  Swanson was looking past Dr. Greer
9  during that, so I want to make sure
10  there is no --
11      MS. RIEGEL:  My issue was not
12  with Mr. Swanson.
13      MR. SOLOTAROFF:  Okay.
14      DR. GREER:  Objection.  I was not
15  shaking my head no.
16      Q.  So Mr. Swanson, your phone
17  conversations with Mr. Greer began after you
18  left the BPCA; correct?
19      A.  Yes.
20      Q.  Did you initiate those?
21      A.  No.
22      Q.  Mr. Greer initiated them?
23      A.  Yes.
24      Q.  Do you remember how he initiated
25  them?

KIRK SWANSON - CONFIDENTIAL

1
2      A.  By phone, left message.
3      Q.  He would call you up and say he
4  wanted to talk?
5      A.  Yes.
6      Q.  And when did this subject
7  relating to Mr. Serpico come up for the
8  first time?
9      A.  I can't state with any certainty,
10  probably sometime in 2015.
11      Q.  How did it come up?
12      A.  He asked me.
13      Q.  And so you related to him the
14  substance of the testimony you gave today?
15      A.  Yes.
16      Q.  Anything else on that topic?
17      A.  On that topic?  On -- I don't
18  understand.
19      Q.  Did you have any further
20  discussion about the topic of Mr. Greer's
21  eviction?
22      A.  There was, he would go off on
23  various tangents, yes.
24      Q.  Like what?
25      A.  I can't definitely recall.

KIRK SWANSON - CONFIDENTIAL

1
2      Q.  Did he ask you for information?
3      A.  Sure.
4      Q.  And did you provide him with any
5  documents?
6      A.  No.
7      Q.  Have you since provided him with
8  any documents?
9      A.  No.
10      Q.  Have you ever provided him with
11  any documents?
12      A.  I have not.
13      MR. TREMONTE:  I ask that we take
14  another short break.
15      DR. GREER:  I have some
16  questions.
17  FURTHER EXAMINATION BY
18  DR. GREER:
19      Q.  I forgot to ask you, remind me
20  again, you left the BPCA when, what year,
21  it's 015; right?
22      A.  No, '14.
23      Q.  014, in what month?
24      A.  Terminated while I was fired in
25  April and I had a telecommuting group in

Page 42

1       KIRK SWANSON - CONFIDENTIAL
2   May, May 22nd, I believe.
3       Q.   While you were still there, did
4   you ever see the BPCA not allow me into a
5   board meeting?  I'm losing track of time.
6       A.   No.
7       Q.   That happened later, okay.
8       MR. TREMONTE:  Okay.  We'll take
9   a break, I'm not sure if we have more
10  questions but we may.
11          ***
12      (Whereupon, a recess was taken
13      at this time.)
14          ***
15      DR. GREER:  I have nothing.
16      MR. TREMONTE:  I have no further
17  questions.
18      MS. RIEGEL:  I have questions.
19  EXAMINATION BY
20  MS. RIEGEL:
21      Q.   Mr. Swanson, you testified
22  earlier, I believe, that you know Steve
23  Rossi?
24      A.   I've met him, I'm acquainted with
25  him, I don't know him intimately or in a

Page 43

1       KIRK SWANSON - CONFIDENTIAL
2   friendly manner.
3       Q.   Could you tell me approximately
4   how many times you think you've met him?
5       A.   A couple of dozen.
6       Q.   And most recently do you recall
7   when that was?
8       A.   No, I couldn't tell you the most
9   recent occasion.
10      Q.   And could you tell me if you
11  recall approximately when you first met him?
12      A.   It was shortly after I started.
13      Q.   Did you have any conversations
14  with Mr. Rossi with respect to Dr. Greer's
15  eviction?
16      A.   No.
17      Q.   Do you know Howard Milstein?
18      A.   No.
19      Q.   Never met him?
20      A.   No.
21      Q.   Never spoke to him?
22      A.   Not unless, no, I mean, no.
23      Q.   Do you know Janet Martin?
24      A.   No.
25      Q.   Never met her or spoken to her

Page 44

1       KIRK SWANSON - CONFIDENTIAL
2   either?
3       A.   I met a lot of people.  I can't
4   put a name to the face.
5       Q.   But that you recall, you've never
6   met or spoken to her?
7       A.   Right.
8       Q.   But then would it be true that
9   you have never spoken to either Howard
10  Milstein or Janet Martin about Dr. Greer's
11  eviction?
12      A.   I have not.
13      DR. GREER:  When do I reply to
14  your questions?
15      MS. RIEGEL:  When I'm finished.
16      MR. SOLOTAROFF:  Everybody gets
17  their chance.
18      Q.   Over the course of your tenure at
19  the Battery Park City Authority, you
20  received various e-mails from Dr. Greer; is
21  that fair to say?
22      A.   No, while I was at BPCA I don't
23  think I got any e-mails from Dr. Greer.
24      Q.   And once you left BPCA, did you
25  receive e-mails from Dr. Greer?

Page 45

1       KIRK SWANSON - CONFIDENTIAL
2       A.   After some time, yes.
3       Q.   And approximately how many
4   e-mails would you say you've received from
5   Dr. Greer?
6       A.   Hundreds, if not thousands.  I
7   think, but I mean he's got a blast list so
8   there's a lot of e-mails.
9       Q.   So is it fair to say that the
10  hundreds, if not thousands, of e-mails that
11  you got from Dr. Greer were not necessarily
12  solicited e-mails?
13      A.   No, they weren't solicited.
14      Q.   What e-mail address were those
15  e-mails sent to, do you recall?
16      A.   I have a Gmail address.
17      Q.   And is that the only e-mail
18  address you use?
19      A.   I also have the Roadrunner e-mail
20  but I use primarily the Gmail address.
21      Q.   Could you tell what those two
22  e-mail addresses are?
23      A.   Kirkaswanson@gmail.com,
24  kjswanson@nyc.rr.com.
25      MR. SOLOTAROFF:  On the record,

Page 46

1    KIRK SWANSON - CONFIDENTIAL
2    let me just request that that portion
3    of the transcript be marked as
4    confidential.
5         MS. RIEGEL:  No objection.
6         MR. TREMONTE:  No objection.
7         Q.  Have you ever used an e-mail
8    address mrcoffee53@gmx.com?
9         A.  No.
10        Q.  And have you ever used a screen
11   name or an internet, or any kind of internet
12   presence in the name of Juan Valdez,
13   J-u-a-n, V-a-l-d-e-z?
14        A.  No.
15        Q.  So with respect to the conspiracy
16   that you believe was formed between Battery
17   Park City and the real estate defendants,
18   you don't have any information with respect
19   to any action on the real estate defendant's
20   side, your conclusion is based on your
21   interaction with Mr. Serpico; correct?
22        MR. SOLOTAROFF:  Objection to the
23   form.  You can answer.
24        A.  Repeat the question.
25        Q.  You don't have any information

Page 47

1    KIRK SWANSON - CONFIDENTIAL
2    with respect to the conspiracy that you
3    believe existed from the real estate
4    defendants' side, and by that I mean
5    Milford, Mr. Milstein, Mr. Rossi.  Your
6    conclusion is based on the reactions that
7    you observed from Mr. Serpico; correct?
8         MR. SOLOTAROFF:  Objection to the
9    form.  You can answer.
10        A.  Well, apart from observing Mr.
11   Rossi and Bob having conversations, no.
12        Q.  You are aware that Milford
13   Management manages multiple buildings --
14        MS. RIEGEL:  Withdrawn.
15        Q.  Are you aware that Milford
16   Management managed multiple buildings during
17   your tenure in Battery Park City Authority;
18   correct?
19        A.  Yes.
20        Q.  And you're aware that as the
21   managing agent for many of those buildings,
22   which are condominiums, Mr. Rossi was
23   responsible for the collection of ground
24   rent, PILOT and civic facilities charges due
25   to Battery Park City Authority; correct?

Page 48

1    KIRK SWANSON - CONFIDENTIAL
2         MR. SOLOTAROFF:  Objection.
3         A.  Yes.
4         Q.  And you are also aware that Mr.
5    Serpico in his capacity as CFO was
6    responsible for the collection of those
7    charges; right?
8         A.  Yes.
9         Q.  You testified just now that you
10   got hundreds, if not thousands, of e-mails
11   from Dr. Greer.  How many e-mails, if you
12   recall, did you send to Dr. Greer or how
13   many times did you respond to Dr. Greer's
14   e-mails?
15        A.  E-mails, probably less than ten
16   if not less than five.
17        Q.  And do you have copies of those
18   e-mails?
19        A.  Jason has it.
20        MS. RIEGEL:  I'm going to call
21   for their production, if you have them
22   here with you.
23        MR. TREMONTE:  We subpoenaed
24   them.
25        MR. SOLOTAROFF:  I don't have

Page 49

1    KIRK SWANSON - CONFIDENTIAL
2    them in paper form.
3         MR. TREMONTE:  My understanding
4    is we're making arrangements to get
5    them.
6         MR. SOLOTAROFF:  I will forward
7    them to you.
8         MS. RIEGEL:  That's fine.
9         MR. TREMONTE:  Okay.
10        MS. RIEGEL:  I think I'm done.
11   FURTHER EXAMINATION BY
12   DR. GREER:
13        Q.  Is Steve Rossi the only building
14   manager or whatever title you prefer to call
15   him -- if somebody works for a private
16   sector or landlord real estate company such
17   as Mariners Cove, Steve Rossi was a senior
18   executive in that, but there are other
19   condos within Battery Park City Authority,
20   other buildings not controlled by Howard
21   Milstein and so forth.
22        Is Steve Rossi pretty much the
23   only one you saw Robert Serpico interacting
24   with or did you see other landlord-related
25   people?

Page 50

KIRK SWANSON - CONFIDENTIAL

1
2    A.  Oh, I saw other landlord-related
3  people.
4    Q.  Okay, has the Battery Park City
5  Authority ever exerted any authority, if it
6  exists, to evict an individual residential
7  tenant without the approval or cooperation
8  of the building owner?
9       MR. TREMONTE:  Objection to form.
10      MS. RIEGEL:  Objection.
11      MR. SOLOTAROFF:  You can answer.
12    A.  Repeat the question one more
13  time.
14    Q.  Has the Battery Park City
15  Authority, to your knowledge, ever bypassed
16  someone such as Howard Milstein, Mariners
17  Cove, Milford Management and directly
18  evicted an individual residential tenant
19  without the cooperation of the landlord?
20    A.  No.
21      MR. TREMONTE:  Same objection.
22    Q.  Do you know if that possibility
23  or power would even exist for the Battery
24  Park City Authority to evict someone like
25  myself without the cooperation of someone

Page 51

KIRK SWANSON - CONFIDENTIAL

1
2  like Steve Rossi?
3      MS. RIEGEL:  Objection.
4      MR. TREMONTE:  Objection.
5    A.  If that power exists, I don't
6  know, it would be very troubling.
7      DR. GREER:  That's all.
8      MR. TREMONTE:  That's all I have.
9      MS. RIEGEL:  We're done.
10      MR. SOLOTAROFF:  Thank you
11  everyone.
12         ***
13    (Whereupon, the deposition of
14  Kirk Swanson was concluded at 3:08
15  p.m.)

Page 52

A C K N O W L E D G M E N T

1
2
3
4    I, Kirk Swanson, hereby certify
5  that I have read the transcript of my
6  testimony taken under oath in my deposition
7  of March 21, 2017; the transcript is a true,
8  complete record of my testimony and that the
9  answers on the record as given by me are
10  true and correct.
11
12  _____
13    KIRK SWANSON
14
15  _____
16  Subscribed and sworn to
17  before me this _____
18  day of _____,
19  2017.
20
21  _____
22    Notary Public
23
24
25

Page 53

I N D E X

1
2
3  WITNESS:     KIRK SWANSON
4  EXAMINATION BY   DR. GREER          5
5  EXAMINATION BY   MR. TREMONTE       25
6  EXAMINATION BY   DR. GREER          41
7  EXAMINATION BY   MS. RIEGEL         42
8  EXAMINATION BY   DR. GREER          49
9
10
11         E X H I B I T S
12              PAGE LINE
13      ..............................
14
15
16         REQUESTS
17      Page    Line
18      48      20
19
20
21
22
23
24
25

Page 54

CERTIFICATION

1
2
3
4      I, Pessi Goldstein, a Notary Public for and within the
5  State of New York, do hereby certify:
6      That the witness whose testimony as herein set forth, was
7  duly sworn by me; and that the within transcript is a true record
8  of the testimony given by said witness.
9      I further certify that I am not related to any of the
10 parties to this action by blood or marriage, and that I am in no
11 way interested in the outcome of this matter.
12     IN WITNESS WHEREOF, I have hereunto set my hand this 24th day
13 of March 2017.
14
15

    _____
16      PESSI GOLDSTEIN
17
18
19
20
21
22
23
24
25

Page 55

ERRATA SHEET

1
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg. No. Now Reads   Should Read   Reason
6  ___ ___ _____   _____   _____
7  ___ ___ _____   _____   _____
8  ___ ___ _____   _____   _____
9  ___ ___ _____   _____   _____
10 ___ ___ _____   _____   _____
11 ___ ___ _____   _____   _____
12 ___ ___ _____   _____   _____
13 ___ ___ _____   _____   _____
14 ___ ___ _____   _____   _____
15 ___ ___ _____   _____   _____
16 ___ ___ _____   _____   _____
17 ___ ___ _____   _____   _____
18 ___ ___ _____   _____   _____
19 ___ ___ _____   _____   _____
20

           _____
21
           Signature of Deponent
22
   SUBSCRIBED AND SWORN BEFORE ME
23 THIS ____ DAY OF _____, 2017.
24 _____
25 (Notary Public)   MY COMMISSION EXPIRES:_____

**A**

**absolutely (1)**
9:8
**acquainted (1)**
42:24
**acting (4)**
12:9,17 14:23 17:23
**action (2)**
46:19 54:10
**acutely (1)**
19:25
**address (7)**
5:12 23:5 45:14,16,18
45:20 46:8
**addresses (1)**
45:22
**administration (1)**
28:24
**administrative (2)**
11:16,20
**advance (1)**
6:3
**affairs (2)**
11:20 15:24
**against- (1)**
1:6
**agent (1)**
47:21
**ago (2)**
37:20 38:14
**AGREED (3)**
4:5,10,14
**Ah (1)**
18:20
**ahead (1)**
6:21
**alert (1)**
16:9
**ALIX (1)**
3:22
**allow (1)**
42:4
**ANDERSON (1)**
3:17
**answer (16)**
7:6 9:21 13:6,7,11
14:7,21 23:4 24:19
32:25 34:3 35:16
37:15 46:23 47:9
50:11
**answered (1)**
18:24
**answers (1)**
52:9
**anybody (3)**
26:7,10 27:23

**apart (1)**
47:10
**apartment (7)**
5:14 18:4,12 19:7,15
20:14 30:18
**apartments (1)**
20:16
**apologize (1)**
31:10
**applies (1)**
8:4
**approached (3)**
19:11,21 24:24
**approval (1)**
50:7
**approximate (1)**
12:11
**approximately (4)**
37:19 43:3,11 45:3
**April (1)**
41:25
**area (1)**
25:25
**areas (1)**
10:8
**arrangements (1)**
49:4
**asked (6)**
17:20 18:23 22:5
24:16 29:19 40:12
**asking (3)**
7:16 25:8 35:15
**assistant (1)**
20:25
**Associates (1)**
1:10
**attend (1)**
15:11
**attention (1)**
16:12
**attorney (2)**
22:20 35:15
**attorney-client (2)**
26:23 27:14
**attorneys (4)**
3:7,13,18 4:5
**Au (1)**
21:22
**authority (16)**
1:8,8 3:8 11:11 12:19
19:24 21:7 22:21
44:19 47:17,25
49:19 50:5,5,15,24
**Avenue (1)**
3:14
**aware (7)**

16:4,13 19:25 47:12
47:15,20 48:4

**B**

**B (3)**
1:10 19:6 53:11
**back (4)**
17:11 27:19 33:11,19
**bad (1)**
34:20
**banter (1)**
33:11
**based (4)**
7:9 29:12 46:20 47:6
**basis (1)**
9:22
**Battery (15)**
1:7 3:8 11:11 12:19
19:23 21:6 22:21
44:19 46:16 47:17
47:25 49:19 50:4,14
50:23
**BatteryPark.TV (4)**
16:6 17:12 22:6,7
**began (1)**
39:17
**beginning (2)**
5:24 35:12
**behavior (1)**
29:15
**belief (1)**
6:24
**believe (9)**
7:10,14 24:8 29:8
34:8 42:2,22 46:16
47:3
**benefit (1)**
33:25
**beyond (7)**
13:20 14:4,7,19 22:25
23:9 33:16
**bit (1)**
22:6
**blast (1)**
45:7
**blog (2)**
16:11 22:7
**blogger (1)**
29:3
**blood (1)**
54:10
**board (5)**
8:9 15:12 16:2,14
42:5
**Bob (8)**
12:9,10 24:16,16,18

29:13 32:13 47:11
**Bob's (4)**
20:25 24:15 25:21
29:10
**body (2)**
30:19 32:21
**Bon (1)**
21:22
**boss (1)**
11:22
**bottom (1)**
7:24
**BPCA (19)**
3:22 8:8 13:17,18
15:11 16:2,9 20:9
22:9 23:7,20 29:15
36:10 38:22 39:18
41:20 42:4 44:22,24
**BPCA's (1)**
27:13
**break (4)**
23:25 29:22 41:14
42:9
**Broad (1)**
3:9
**Broadway (1)**
3:18
**brought (1)**
29:6
**building (2)**
49:13 50:8
**buildings (4)**
47:13,16,21 49:20
**bullet (1)**
9:18
**bypassed (1)**
50:15

**C**

**C (2)**
3:2 52:2
**call (4)**
38:19 40:3 48:20
49:14
**calls (2)**
38:18,21
**capacity (3)**
29:17,18 48:5
**caption (1)**
5:25
**careful (1)**
27:13
**case (13)**
6:22,23 7:2,3,7,8,13
7:17,17 8:12 10:9
14:11 55:2

**certain (1)**
19:10
**certainly (4)**
17:13 27:22 29:16
31:7
**certainty (5)**
17:16 18:18 19:3
32:11 40:9
**certification (2)**
4:7 54:1
**certify (3)**
52:4 54:5,9
**CFO (2)**
28:25 48:5
**chance (1)**
44:17
**change (2)**
11:23 14:17
**changed (1)**
12:5
**characterize (1)**
11:14
**charges (2)**
47:24 48:7
**chase (1)**
38:6
**chief (3)**
11:15,18 14:22
**City (15)**
1:8 3:8 11:11 12:19
19:23 21:7 22:21
44:19 46:17 47:17
47:25 49:19 50:4,14
50:24
**civic (1)**
47:24
**claims (1)**
8:12
**clarify (1)**
14:2
**clear (3)**
10:5 14:8 27:3
**clearly (2)**
27:25 28:4
**client (1)**
13:9
**close (1)**
27:6
**closer (2)**
24:15 25:22
**co-worker (1)**
20:21
**collection (2)**
47:23 48:6
**colluded (1)**
29:2

**come (8)**
14:3 16:17 17:8 28:16
  30:5 38:11 40:7,11
**comfortable (1)**
23:7
**COMMISSION (1)**
55:25
**common (1)**
20:3
**communication (1)**
27:18
**company (1)**
49:16
**complaint (1)**
12:21
**complaints (3)**
13:17,18 14:3
**complete (1)**
52:8
**concerning (1)**
36:22
**concluded (1)**
51:14
**conclusion (6)**
29:24 30:3 33:4 37:12
  46:20 47:6
**conclusions (2)**
34:7 36:6
**condo (2)**
20:15,16
**condominiums (1)**
47:22
**condos (1)**
49:19
**conduct (2)**
5:21 6:2
**confidential (50)**
1:14 5:1 6:1,16 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1
  20:1 21:1 22:1 23:1
  24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1
  36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1
  44:1 45:1 46:1,4
  47:1 48:1 49:1 50:1
  51:1
**confidentiality (1)**
6:9
**confirming (1)**
30:20
**conflicts (1)**
22:23

**connection (1)**
7:25
**consistent (2)**
8:15 10:11
**conspiracy (2)**
46:15 47:2
**consult (3)**
26:21,22 27:3
**continue (1)**
10:24
**contracting (1)**
11:18
**control (2)**
11:16 28:23
**controlled (1)**
49:20
**controller (2)**
31:11,12
**conversation (11)**
28:17 29:6 30:17 32:8
  32:15,19 34:9,14
  36:4 37:10 38:12
**conversations (11)**
28:2 30:6 33:8,15
  35:20 36:2,12 38:14
  39:17 43:13 47:11
**conviction (1)**
29:7
**convinced (3)**
28:25 29:9,12
**cooler (1)**
17:4
**cooperation (3)**
50:7,19,25
**copies (1)**
48:17
**copy (2)**
6:4,11
**corporation (2)**
1:10,10
**correct (11)**
25:12 26:4 29:9 37:5
  37:13 39:18 46:21
  47:7,18,25 52:10
**Cott (10)**
5:24 6:10 7:11,11,18
  7:24 8:5 9:8,19 11:3
**Cott's (1)**
6:20
**couch (1)**
30:15
**counsel (6)**
3:22 6:5 11:25 26:13
  26:15 36:10
**couple (1)**
43:5

**course (5)**
8:15 10:6 13:15 32:7
  44:18
**court (10)**
1:2 2:7 4:17 8:2 9:24
  10:3,6 33:24,25
  35:7
**Court's (1)**
6:7
**Cove (4)**
1:10 19:6 49:17 50:17
**crossed (1)**
24:16
**cut (1)**
38:6

---

**D**

**D (2)**
52:2 53:1
**date (4)**
19:10 30:22 37:18
  55:3
**dates (1)**
17:21
**day (10)**
10:5 15:3,6 24:22
  32:3,3,4 52:18
  54:12 55:23
**days (1)**
6:16
**deal (1)**
13:19
**dealing (1)**
8:21
**dealings (1)**
21:6
**dealt (1)**
22:14
**DEBORAH (1)**
3:15
**defendant's (1)**
46:19
**defendants (5)**
1:11 3:7,13 6:23
  46:17
**defendants' (1)**
47:4
**definitely (2)**
31:23 40:25
**degree (1)**
32:11
**Dennis (1)**
1:7
**deponent (4)**
9:21 10:2 55:4,21
**deposed (2)**

**7:2 14:11**
**deposition (18)**
1:17 2:5 4:14 5:22 6:2
  6:3,8,12,14,25 9:4,9
  10:4 11:4 23:16
  51:13 52:6 55:3
**deputy (1)**
11:15
**describe (2)**
14:25 17:2
**described (3)**
31:4 32:22 33:17
**designations (1)**
6:17
**detail (2)**
14:25 32:15
**detailed (1)**
17:6
**details (2)**
19:25 34:17
**different (1)**
29:19
**difficult (1)**
14:12
**direct (4)**
7:5 11:22,24 23:4
**directed (1)**
7:7
**Directions (1)**
9:20
**directly (6)**
8:7 10:14 11:23 17:24
  21:9 50:17
**directors (1)**
8:9
**disagreeable (1)**
29:3
**discovery (11)**
8:4,6 9:25 10:9,10,13
  13:21 14:5,20 23:2
  23:10
**discuss (2)**
28:14 34:6
**discussing (3)**
18:3,11 20:10
**discussion (3)**
17:7 31:15 40:20
**discussions (3)**
20:13 28:7,10
**District (4)**
1:2,2 2:7,7
**ditch (1)**
20:14
**document (4)**
6:12 8:3,21 10:9
**documents (3)**

**41:5,8,11**
**doing (2)**
13:15 22:24
**door (1)**
25:24
**double (1)**
27:19
**dozen (1)**
43:5
**Dr (38)**
5:8,16 8:20 9:2,14
  10:17,24 13:8 14:8
  23:11,17,22 25:2,5
  35:10 37:7 38:25
  39:8,14 41:15,18
  42:15 43:14 44:10
  44:13,20,23,25 45:5
  45:11 48:11,12,13
  49:12 51:7 53:4,6,8
**drawn (1)**
33:4
**drew (4)**
29:24 34:7 36:7 37:12
**drinks (1)**
28:11
**drive (1)**
5:17
**due (1)**
47:24
**duly (2)**
5:4 54:7

---

**E**

**E (8)**
1:3 3:2,2,4 52:2,2
  53:1,11
**e-mail (9)**
17:24 19:18 36:18,25
  45:14,17,19,22 46:7
**e-mails (17)**
15:9 17:10,13 37:25
  44:20,23,25 45:4,8
  45:10,12,15 48:10
  48:11,14,15,18
**earlier (2)**
31:4 42:22
**early (5)**
11:19 12:16 18:2,11
  32:3
**earshot (3)**
26:3,8,9
**easier (1)**
33:25
**East (1)**
5:14
**EEO (4)**

12:23 13:2,12,18
**effect (2)**
4:16 30:19
**either (5)**
10:9 17:24 21:9 44:2
44:9
**elicited (1)**
30:7
**Elizabeth (2)**
13:24,25
**Elsa (2)**
13:23,24
**employed (2)**
12:4 38:22
**employee (1)**
12:20
**employees (2)**
13:17,18
**employment (1)**
11:10
**enable (1)**
10:2
**encounter (4)**
26:11 29:21 31:3
37:11
**encountered (1)**
25:15
**entered (2)**
5:23 6:10
**entire (1)**
8:23
**entirely (1)**
10:11
**entirety (1)**
6:15
**entity (1)**
21:6
**ERRATA (1)**
55:1
**ESQ (5)**
3:10,10,11,15,19
**essence (1)**
9:2
**estate (5)**
21:5 46:17,19 47:3
49:16
**ESTIS (1)**
3:12
**evaluating (1)**
8:17
**event (3)**
8:14 25:9 27:7
**Everybody (1)**
44:16
**evict (2)**
50:6,24

**evicted (4)**
18:6,15,20 50:18
**eviction (6)**
8:7 10:15 24:10 40:21
43:15 44:11
**evidence (3)**
17:25 21:9,11
**exactly (1)**
11:2
**EXAMINATION (...**
5:7 25:6 41:17 42:19
49:11 53:4,5,6,7,8
**examined (1)**
5:5
**example (1)**
18:13
**exclusion (1)**
10:15
**exclusions (1)**
8:8
**executive (1)**
49:18
**executives (1)**
20:9
**exerted (1)**
50:5
**exist (1)**
50:23
**existed (1)**
47:3
**existence (1)**
16:10
**exists (2)**
50:6 51:5
**EXPIRES (1)**
55:25
**extremely (1)**
9:6
**eye (1)**
30:7

---

**F**

**face (1)**
44:4
**face-to-face (2)**
15:7 19:17
**facilities (1)**
47:24
**fact (1)**
8:22
**fair (2)**
44:21 45:9
**fairly (1)**
19:10
**fall (1)**
22:2

**familiar (1)**
6:6
**far (2)**
24:14 26:8
**fault (1)**
35:19
**February (3)**
5:23 9:17 12:16
**FEMA (2)**
32:9,13
**files (1)**
5:18
**filing (1)**
4:6
**financial (1)**
14:22
**fine (1)**
49:8
**finish (2)**
34:2 35:15
**finished (1)**
44:15
**fired (2)**
23:19 41:24
**first (8)**
5:3 11:21 15:13,15,19
19:4 40:8 43:11
**five (1)**
48:16
**flagged (1)**
6:21
**flagrantly (1)**
10:25
**following (1)**
25:8
**follows (1)**
5:6
**force (1)**
4:16
**forgot (1)**
41:19
**form (17)**
4:11 14:18 18:8,17
19:8 20:6,12 21:13
22:11 24:12 26:6
32:25 38:5 46:23
47:9 49:2 50:9
**formed (2)**
29:8 46:16
**Forst's (1)**
19:20
**forth (4)**
17:11 33:11 49:21
54:6
**forward (1)**
49:6

**found (3)**
8:10 19:9 29:4
**four (1)**
38:20
**frame (1)**
12:11
**frequent (2)**
38:13,15
**friendly (1)**
43:2
**full (1)**
11:3
**further (15)**
4:9,13 28:7,9 29:23
29:23 30:3 32:17
33:8 35:20 40:19
41:17 42:16 49:11
54:9

---

**G**

**G (1)**
52:2
**general (4)**
3:22 11:25 18:25
22:17
**generally (3)**
8:4 35:10,11
**gesture (2)**
29:24 30:4
**gestures (6)**
33:5 34:6,7 36:6
37:12 39:2
**getting (2)**
24:17 30:18
**GIBALDI (1)**
3:10
**GISKAN (1)**
3:17
**give (1)**
35:11
**given (4)**
35:18 39:4 52:9 54:8
**Gmail (2)**
45:16,20
**go (3)**
7:18 33:19 40:22
**goes (1)**
10:4
**going (15)**
7:4 8:25 9:16 17:10
18:4,6,13,14,20
19:13 22:8 23:3
27:4 28:22 48:20
**Goldstein (4)**
1:24 2:9 54:4,16
**Greer (47)**

1:3 3:4 5:8,16 7:7
8:20 9:2,14 10:17
10:24 13:8 14:8
23:11,17,22 24:17
25:2,5 30:16 35:10
37:4,7,9,21,23,25
38:25 39:8,14,17,22
41:15,18 42:15
44:13,20,23,25 45:5
45:11 48:11,12
49:12 51:7 53:4,6,8
**Greer's (9)**
7:3 8:7 18:12,20
19:12 40:20 43:14
44:10 48:13
**ground (1)**
47:23
**grounds (1)**
9:23
**group (1)**
41:25
**guess (1)**
32:12
**guessing (1)**
32:11
**GUNNELL (1)**
3:11

---

**H**

**H (1)**
53:11
**hall (1)**
24:15
**hallway (1)**
29:21
**hand (1)**
54:12
**handle (3)**
12:21,24 13:16
**happen (3)**
16:10 22:2 33:13
**happened (4)**
16:20 19:16 21:20
42:7
**happening (1)**
21:17
**hard (1)**
35:7
**Harvey (1)**
13:14
**head (2)**
38:25 39:15
**hear (1)**
8:13 17:3,24
**heard (2)**
17:7 18:13

**hearing (1)**
21:8
**held (5)**
2:6 8:5 9:20 10:6
23:15
**helpful (2)**
8:17 27:12
**hereunto (1)**
54:12
**Hold (1)**
26:12
**Howard (5)**
1:8 43:17 44:9 49:20
50:16
**hunch (1)**
31:8
**hundreds (5)**
35:22,25 45:6,10
48:10
**Hyman (1)**
12:15

_____
**I**
_____
**immediately (1)**
24:13
**important (1)**
35:13
**impression (1)**
34:22
**improper (2)**
7:15 9:22
**incident (1)**
19:22
**incidents (2)**
16:25 20:18
**including (1)**
36:13
**indirectly (1)**
17:25
**individual (11)**
1:4,7,7,8,9,9 20:2,4
20:10 50:6,18
**inform (1)**
7:21
**information (5)**
9:24 23:12 41:2 46:18
46:25
**informed (1)**
19:12
**Initially (1)**
11:15
**initiate (1)**
39:20
**initiated (2)**
39:22,24
**instance (1)**

16:18
**instances (2)**
30:10 33:19
**instruction (1)**
35:13
**instructions (1)**
35:12
**interact (2)**
15:2,5
**interacting (1)**
49:23
**interaction (1)**
46:21
**interest (1)**
14:10
**interested (1)**
54:11
**interesting (1)**
16:8
**interject (1)**
27:11
**internal (2)**
11:16 28:22
**internet (2)**
46:11,11
**interoffice (1)**
15:8
**intimately (1)**
42:25
**invade (1)**
27:2
**involved (1)**
24:9
**involving (1)**
33:9
**irrelevant (1)**
8:10
**issue (2)**
6:20 39:11
**issued (1)**
7:23
**issues (2)**
22:8,15
**items (1)**
10:14

_____
**J**
_____
**J-u-a-n (1)**
46:13
**Janet (3)**
1:9 43:23 44:10
**January (5)**
7:23 10:12 12:16
19:10 24:21
**Jason (2)**
3:19 48:19

**job (6)**
1:24 11:13 13:16
14:16 20:23 22:24
**joking (1)**
30:17
**Juan (1)**
46:12
**judge (13)**
5:23 6:10,19 7:11,11
7:18,23 8:5,24 9:8
9:19 10:19 11:2
**July (2)**
8:9 10:16
**JUSTIN (1)**
3:11

_____
**K**
_____
**K (1)**
52:2
**Karl (3)**
31:8,11,24
**Kevin (4)**
19:11,20 24:14,24
**kicked (2)**
19:14 30:18
**kind (1)**
46:11
**Kirk (55)**
1:17 2:5 5:1,2,11 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1,14 52:4,13
53:3
**Kirkaswanson@gm....**
45:23
**kjswanson@nyc.rr....**
45:24
**knew (1)**
26:8
**know (18)**
15:14,25 16:3 20:20
21:2 22:16 27:16,25
34:20 35:4,4,11
42:22,25 43:17,23
50:22 51:6
**knowledge (3)**
14:16 15:18 50:15

**Koenig (5)**
31:8,11,16,18,22

_____
**L**
_____
**L (2)**
4:2 52:2
**landlord (2)**
49:16 50:19
**landlord-related (2)**
49:24 50:2
**language (2)**
30:19 32:22
**late (6)**
12:15 17:21 18:2,5,11
32:4
**lawyer (1)**
23:6
**lawyers (2)**
11:4 36:13
**learn (1)**
19:4
**lease (9)**
18:4,14 19:7,12 20:2
20:3,11 24:10,18
**leases (1)**
20:5
**leaving (1)**
19:20
**left (4)**
39:18 40:2 41:20
44:24
**let's (3)**
14:14 28:5 29:21
**level (1)**
19:24
**limits (2)**
7:13 10:13
**Linda (2)**
20:20 25:22
**line (3)**
35:7 53:12,17
**list (1)**
45:7
**little (2)**
17:6 22:5
**lobby (1)**
21:23
**lodge (2)**
8:13 12:20
**looking (1)**
39:8
**losing (1)**
42:5
**lot (4)**
32:13 33:11 44:3 45:8
**lunch (1)**

21:14

_____
**M**
_____
**M (1)**
52:2
**Madam (1)**
33:25
**making (3)**
8:2 38:25 49:4
**managed (1)**
47:16
**management (6)**
1:9 19:5,24 47:13,16
50:17
**manager (1)**
49:14
**manages (1)**
47:13
**managing (1)**
47:21
**manner (1)**
43:2
**March (5)**
1:18 2:2 17:22 52:7
54:13
**Mariners (4)**
1:10 19:6 49:17 50:16
**marked (2)**
6:16 46:3
**marriage (1)**
54:10
**Martin (3)**
1:9 43:23 44:10
**matter (4)**
13:11 32:18 38:9
54:11
**McCabe (8)**
19:11 25:11,14 28:7
28:10,14 36:5 37:11
**MD (2)**
1:3 3:4
**mean (7)**
17:4 26:16,17 35:6
43:22 45:7 47:4
**means (1)**
11:14
**medium (1)**
16:5
**meeting (7)**
8:9 10:16 15:4,20
17:5 19:17 42:5
**meetings (6)**
15:8,12 16:2,14,15
22:18
**Mehiel (1)**
1:7

**memo (1)**
21:10
**mention (1)**
23:5
**mentioned (1)**
17:11
**message (1)**
40:2
**met (9)**
15:17 21:12 42:24
  43:4,11,19,25 44:3
  44:6
**Michael (3)**
3:8,10,10
**middle (1)**
32:3
**Milford (6)**
1:9 19:5 47:5,12,15
  50:17
**Milstein (6)**
1:8 43:17 44:10 47:5
  49:21 50:16
**mind (1)**
16:17
**mine (1)**
9:13
**misleading (1)**
9:7
**moment (2)**
19:3 28:6
**month (1)**
41:23
**motion (1)**
10:3
**mrcoffee53@gmx.c...**
46:8
**multiple (3)**
10:7 47:13,16

_____
**N**

**N (5)**
3:2 4:2 52:2,2 53:1
**name (8)**
5:9 13:23,24,25 44:4
  46:11,12 55:2
**names (1)**
27:17
**Nancy (1)**
13:14
**nature (2)**
17:2 18:21
**necessarily (1)**
45:11
**need (3)**
10:17 27:2,3
**needs (1)**

6:21
**negatively (1)**
35:5
**Nesmith's (1)**
25:23
**never (6)**
15:17 43:19,21,25
  44:5,9
**New (16)**
1:2,8,9,10,17,17 2:8,8
  2:11 3:9,14,19 5:5
  5:15,15 54:5
**news (1)**
19:21
**Non-Party (1)**
2:6
**non-renewal (1)**
24:10
**Notary (6)**
2:10 4:15 5:4 52:22
  54:4 55:25
**note (1)**
38:24
**November (2)**
11:12,22
**number (2)**
10:8 17:8
**numerous (3)**
16:20,25 28:12
**NY (4)**
2:8 3:9,14,19

_____
**O**

**O (2)**
4:2 52:2
**oath (1)**
52:6
**object (2)**
7:5 13:8
**objected (1)**
36:24
**objection (40)**
8:14,18,20 9:14 10:21
  11:6 13:4,20 14:4,6
  14:18,19 18:8,17,22
  18:23 19:8 20:6,12
  21:13 22:11,25 23:9
  24:12 26:5 32:24
  37:7,14 38:4 39:14
  46:5,6,22 47:8 48:2
  50:9,10,21 51:3,4
**objectionable (1)**
29:5
**objections (1)**
4:10
**observed (1)**

47:7
**observing (1)**
47:10
**occasion (1)**
43:9
**occasional (1)**
15:3
**occasions (1)**
28:14
**October (1)**
22:3
**offhand (1)**
30:16
**office (13)**
12:15 16:19 19:18,20
  20:4 22:10 24:15
  25:21 26:16 28:12
  30:11,15 33:12
**officer (9)**
11:16,17,18 12:23
  13:3,12 14:23 15:24
  28:23
**offices (1)**
25:20
**official (2)**
11:13 17:5
**Oh (3)**
21:14 37:18 50:2
**okay (12)**
11:7 16:8 17:14 20:20
  27:20 36:9 37:17
  39:13 42:7,8 49:9
  50:4
**once (2)**
15:4 44:24
**opinion (1)**
24:9
**opportunity (1)**
6:6
**order (10)**
5:22,25 6:9,20 7:9,23
  8:16 9:7,18 10:18
**ordered (1)**
9:24
**orders (1)**
10:12
**outcome (1)**
54:11
**outside (2)**
13:5 25:23
**owner (1)**
50:8

_____
**P**

**P (3)**
3:2,2 4:2

**p.m (2)**
2:2 51:15
**page (7)**
5:24 7:24,25 9:18,19
  53:12,17
**Pain (1)**
21:22
**paper (1)**
49:2
**paraphrase (2)**
8:25 19:14
**Park (15)**
1:7 3:8 11:11 12:19
  19:23 21:7 22:21
  44:19 46:17 47:17
  47:25 49:19 50:4,14
  50:24
**part (1)**
17:15
**particular (2)**
5:24 22:13
**parties (3)**
4:6 6:17 54:10
**party (2)**
7:15 10:2
**path (1)**
24:16
**pattern (1)**
29:14
**paying (1)**
20:17
**payment (1)**
18:6
**Pearl (1)**
2:8
**pending (1)**
6:16
**people (11)**
16:12 19:23 20:3 26:9
  27:5,6,17 36:12
  44:3 49:25 50:3
**period (1)**
10:21
**permitted (5)**
13:21 14:5,19 23:2,10
**persists (1)**
7:15
**person (4)**
15:14,19,21 21:12
**Pessi (1)**
1:24 2:9 54:4,16
**Pg (1)**
55:5
**phone (4)**
38:11,13 39:16 40:2
**phones (1)**

38:2
**Phyllis (2)**
11:24 12:5
**Phyllis's (1)**
12:13
**PILOT (1)**
47:24
**place (3)**
18:12 29:4,16
**placed (1)**
29:18
**Plaintiff (2)**
1:5 3:4
**Please (2)**
5:9,12
**point (4)**
7:20 9:19 14:15 17:20
**portion (1)**
46:2
**possibility (1)**
50:22
**power (2)**
50:23 51:5
**practice (1)**
20:3
**preempt (1)**
11:3
**prefer (1)**
49:14
**presence (3)**
16:13,14 46:12
**present (3)**
3:21 10:2 25:17
**presented (1)**
7:10
**preserving (1)**
13:5
**president (6)**
11:19 12:10,17 14:24
  17:23 28:24
**pretty (1)**
49:22
**previously (1)**
30:21
**primarily (1)**
45:20
**private (1)**
49:15
**privilege (4)**
9:23 26:24 27:2,14
**Pro (1)**
3:4
**probably (7)**
17:18 25:21 26:9
  30:25 32:12 40:10
  48:15

**production (1)**
48:21
**pronounce (2)**
13:23 14:2
**proportional (1)**
8:11
**protect (1)**
14:9
**provide (3)**
6:5,11 41:4
**provided (3)**
6:4 41:7,10
**provisions (1)**
6:13
**public (8)**
2:10 4:15 5:4 15:23
23:11 52:22 54:4
55:25
**PUSTILNIK (1)**
3:22
**put (2)**
23:18 44:4

**Q**

**question (11)**
4:11 9:21 18:9 24:20
26:23 29:11,19 34:2
35:15 46:24 50:12
**questioning (1)**
8:15
**questions (12)**
7:6,12,14,16 9:4,9
25:3 41:16 42:10,17
42:18 44:14
**quick (1)**
23:25
**quite (1)**
24:7
**quote (1)**
8:5

**R**

**R (1)**
3:2
**reach (5)**
37:21,22,24 38:3,7
**reached (1)**
37:23
**react (2)**
32:21,23
**reacted (1)**
35:5
**reaction (2)**
29:10 34:19
**reactions (1)**
47:6

**read (4)**
6:6 10:13 52:5 55:5
**Reads (1)**
55:5
**real (6)**
13:24 21:5 46:17,19
47:3 49:16
**really (2)**
22:10 26:21
**reason (2)**
26:22 55:5
**recall (42)**
13:2,13 15:13,15,16
15:20 16:21 17:10
18:7,10,16,19 19:16
19:19,22 20:9 21:8
21:16,19 22:3,9
25:24 27:25 30:14
31:20 32:5,6 33:10
33:20,21 34:15,16
34:19 35:23,24,25
40:25 43:6,11 44:5
45:15 48:12
**receive (1)**
44:25
**received (2)**
44:20 45:4
**recess (2)**
24:4 42:12
**recollection (2)**
21:21 31:24
**recollections (2)**
21:22 33:15
**record (15)**
5:10,13,16,21 8:23
9:13,17 10:23 23:18
38:25 39:7 45:25
52:8,9 54:7
**Rector (1)**
18:12
**relate (2)**
8:7 10:14
**related (2)**
40:13 54:9
**relating (1)**
40:7
**relay (2)**
12:22 13:16
**relevant (2)**
7:22 14:13
**remaining (2)**
3:13 8:11
**remember (16)**
15:22 16:16 27:24
28:19 30:10,11,22
30:24 32:2,10,14,17

34:13,25 35:3 39:24
**remind (2)**
10:17 41:19
**remove (1)**
29:2
**renewed (5)**
18:5,14 19:13 20:11
24:18
**renewing (1)**
19:6
**rent (2)**
20:17 47:24
**rep (1)**
21:5
**Repeat (3)**
18:9 46:24 50:12
**reply (1)**
44:13
**report (4)**
11:23,24 12:7,12
**Reported (1)**
1:23
**reporter (4)**
2:10 15:12 34:2 35:8
**reporter's (1)**
33:24
**reporting (1)**
16:6
**request (3)**
8:3 39:3 46:2
**requests (2)**
8:22 53:16
**reserved (1)**
4:11
**residence (1)**
29:4
**resident's (1)**
20:2
**residential (5)**
18:3 20:2,5 50:6,18
**resigned (1)**
12:6
**respect (4)**
43:14 46:15,18 47:2
**respective (1)**
4:6
**respond (1)**
48:13
**response (3)**
30:7 35:2,4
**responses (1)**
34:24
**responsible (2)**
47:23 48:6
**result (1)**
7:4

**retired (1)**
12:6
**retirement (1)**
12:14
**reviewed (1)**
6:19
**RIEGEL (21)**
3:15 13:4,20 14:4
18:23 22:25 23:9
38:24 39:11 42:18
42:20 44:15 46:5
47:14 48:20 49:8,10
50:10 51:3,9 53:7
**right (10)**
12:18 14:11 17:17
24:8 25:10 33:7
34:5 41:21 44:7
48:7
**rights (1)**
14:9
**Roadrunner (1)**
45:19
**Robert (14)**
1:7 3:8 5:18 12:12
14:15,17,22 16:22
18:10 21:12 22:9
24:9 25:23 49:23
**Robin (1)**
19:20
**role (3)**
11:13 14:16 20:24
**roll (1)**
30:7
**room (2)**
11:3 31:6
**ROSENBERG (1)**
3:12
**Rossi (13)**
1:9 19:5 21:2,11
42:23 43:14 47:5,11
47:22 49:13,17,22
51:2
**ruled (1)**
7:11
**ruling (3)**
7:19 8:24 11:7
**rulings (3)**
6:7 7:25 10:7
**run (1)**
22:7

**S**

**S (5)**
3:2,22 4:2,2 53:11
**saw (4)**
21:16 29:10 49:23

50:2
**saying (2)**
18:20 30:9
**scandals (1)**
22:8
**scope (7)**
13:5,21 14:5,7,19
23:2,10
**screen (1)**
46:10
**Se (1)**
3:4
**sealing (1)**
4:7
**second (2)**
14:14 29:10
**section (2)**
5:25 10:12
**sector (1)**
49:16
**see (8)**
7:18 14:14 15:2 17:24
21:14 33:19 42:4
49:24
**seeing (3)**
15:13,23 21:10
**Seema (1)**
22:19
**seen (2)**
15:19 30:21
**send (2)**
36:18 48:12
**senior (1)**
49:17
**sense (1)**
18:25
**sent (1)**
45:15
**September (1)**
22:3
**Serpico (34)**
1:7 3:8 5:18 12:9,10
12:12 14:15,17 15:5
16:22 17:20,22 18:2
18:10,19 21:12 24:9
25:15 26:11 29:20
31:22 32:22 33:7,8
33:9,16 34:5 36:5
37:11 40:7 46:21
47:7 48:5 49:23
**Serpico's (3)**
22:14 34:6 36:6
**serving (1)**
28:22
**set (2)**
54:6,12

shaking (1)
39:15
Shari (1)
12:15
SHEET (1)
55:1
SHER (1)
3:7
short (2)
25:21 41:14
shorthand (1)
2:10
shortly (4)
11:17 24:24 34:12
43:12
showed (1)
16:2
showing (1)
11:9
shrugged (1)
24:19
side (2)
46:20 47:4
Signature (1)
55:21
signed (2)
4:15,16
similar (1)
30:7
Singh (1)
22:19
Site (2)
1:10 19:6
sits (1)
25:22
sitting (1)
30:15
situations (1)
17:9
smirked (1)
24:19
solicited (2)
45:12,13
Solotaroff (37)
3:17,19 6:5,11,18
8:19 13:7,10 14:6
14:21 23:3,13 24:2
26:5,12,20 27:11,20
32:24 35:9 36:8,15
36:16,23 37:14 38:4
39:6,13 44:16 45:25
46:22 47:8 48:2,25
49:6 50:11 51:10
somebody (2)
29:2 49:15
Soriero (1)

20:21
sorry (1)
36:24
Southern (2)
1:2 2:7
speak (1)
10:20
speaking (2)
15:20 35:17
specific (13)
16:16,17,24 19:2,3
28:3,6,15 30:10
33:14 34:17 35:2,3
specifically (12)
8:21 9:20 10:19 19:19
22:17 33:12,22
34:15 35:23,24,25
37:18
specifies (1)
6:14
spoke (2)
27:17 43:21
spoken (6)
25:11 37:4,9 43:25
44:6,9
staff (2)
16:7,9
stalling (1)
11:4
start (1)
34:3
started (3)
11:21 35:18 43:12
state (13)
1:8 2:11 5:5,9,12
16:24 22:16 27:22
31:23 33:12 39:7
40:9 54:5
statement (1)
6:19
States (2)
1:2 2:7
status (1)
18:3
stay (2)
12:3 28:5
Steve (8)
19:5 21:2,11 42:22
49:13,17,22 51:2
Steven (5)
1:3,8 3:4 18:11 19:12
STIPULATED (3)
4:4,9,13
stories (2)
16:17 22:7
story (1)

16:22
Street (3)
2:8 3:9 5:14
stretches (2)
38:17,19
stricken (1)
8:23
strike (2)
9:10 26:7
subject (8)
5:22 6:8 9:25 10:8
30:5 32:18 38:9
40:6
subpoenaed (1)
48:23
Subscribed (2)
52:16 55:22
subsequent (1)
30:6
substance (3)
27:18 28:20 40:14
suing (2)
23:7,20
sum (2)
8:6 28:19
summary (1)
9:7
supported (2)
29:23 30:3
supposed (3)
10:20 11:5 26:21
sure (11)
17:18 22:4 23:17 24:2
27:21 28:8 34:4
35:14 39:9 41:3
42:9
surprised (1)
33:18
Swanson (64)
1:17 2:5 5:1,2,11 6:1
6:22 7:1,5 8:1 9:1
10:1 11:1,10 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1,14
24:1,7 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1,8,12,16 40:1
41:1 42:1,21 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
51:14 52:4,13 53:3
Swanson's (5)
6:4 7:8,12,16 14:9

sworn (5)
4:16 5:4 52:16 54:7
55:22

_____
T
_____

T (4)
4:2,2 52:2 53:11
take (4)
23:24 30:20 41:13
42:8
taken (5)
2:9 22:18 24:4 42:12
52:6
talk (6)
14:14 16:12,19 20:4
26:10 40:4
Talked (1)
32:13
talking (1)
20:18
tangents (1)
40:23
Taylor (1)
11:25
telecommuting (1)
41:25
tell (9)
23:6 27:5,6,9 30:13
43:3,8,10 45:21
ten (1)
48:15
tenant (3)
20:10 50:7,18
tenants (1)
20:14
tenure (3)
29:15 44:18 47:17
Terminated (1)
41:24
termination (1)
10:3
testified (4)
5:6 25:10 42:21 48:9
testifying (2)
39:3,5
testimony (8)
10:10 26:2 38:10
40:14 52:6,8 54:6,8
text (1)
38:3
texts (1)
37:25
thank (4)
8:19 11:9 24:23 51:10
think (16)
6:20 7:20,22 8:3,16

9:2 14:7 15:22 19:2
25:22 27:12 39:7
43:4 44:23 45:7
49:10
thinking (1)
7:21
third (2)
3:14 9:18
thought (1)
34:20
thousands (3)
45:6,10 48:10
three (2)
25:18 38:20
thumb (1)
5:17
time (31)
4:12 5:20 6:21 8:2
12:2,11 15:13,15,19
16:4,13 17:23 20:8
21:15 24:5 27:7,24
28:3,6,12,23,25
30:24 31:13 33:19
38:14 40:8 42:5,13
45:2 50:13
times (4)
16:20 38:20 43:4
48:13
title (2)
11:18 49:14
today (2)
15:21 40:14
told (2)
19:21 35:4
topic (9)
32:6 33:16 35:21
36:13,19,22 40:16
40:17,20
topics (1)
16:21
track (1)
42:5
transcript (4)
46:3 52:5,7 54:7
transcripts (1)
6:15
TREMONTE (35)
3:7,10 5:19 7:20 9:12
9:16 10:22 14:18
18:8,17,22 19:8
20:6,12 21:13 22:11
23:24 24:12 25:4,7
26:14,25 27:15
41:13 42:8,16 46:6
48:23 49:3,9 50:9
50:21 51:4,8 53:5

trial (1)
4:12
troubling (1)
51:6
true (5)
23:19 44:8 52:7,10
54:7
try (2)
17:6 27:12
trying (2)
14:12 23:17
turn (1)
12:14
two (5)
17:19 21:22 31:2
33:20 45:21
type (1)
13:18

**U**

U (1)
4:2
um (4)
27:10 28:15,17 36:2
umbrage (1)
22:17
understand (5)
9:3 14:13 28:21 34:24
40:18
understanding (2)
6:24 49:3
Understood (2)
27:15 32:14
United (2)
1:2 2:6
unrelated (1)
7:17
upset (2)
22:10,23
use (2)
45:18,20

**V**

V-a-l-d-e-z (1)
46:13
Valdez (1)
46:12
various (3)
22:18 40:23 44:20
veers (1)
8:15
vice (2)
11:19 28:23
video (1)
5:17
view (1)

10:10
violated (1)
10:18
violating (1)
11:2
visibly (1)
24:18
vivid (2)
21:21,22

**W**

W (1)
52:2
wait (1)
35:14
waived (1)
4:8
walked (1)
24:20
want (6)
5:20 23:14 26:25
27:16 36:9 39:9
wanted (2)
11:3 40:4
wants (1)
9:8
water (1)
17:4
way (3)
8:24 27:4 54:11
we'll (3)
7:18 27:19 42:8
we're (2)
49:4 51:9
we've (1)
15:17
week (2)
15:4 38:20
weeks (1)
31:2
went (1)
8:24
weren't (2)
38:18 45:13
WHEREOF (1)
54:12
wife (5)
26:18,19 34:9 35:21
36:5
Withdrawn (1)
47:14
witness (10)
2:6 3:18 5:3 13:6 39:2
39:4 53:3 54:6,8,12
witnessing (1)
21:10

woman (1)
34:23
word (2)
10:21 11:6
work-related (1)
12:20
works (1)
49:15
world (1)
36:14
write (2)
22:8 36:21
writing (1)
37:2
wrote (1)
16:18

**X**

x (4)
1:3,12 53:1,11

**Y**

year (5)
12:14 30:24 37:20
38:14 41:20
years (1)
34:24
York (16)
1:2,8,9,10,17,17 2:8,8
2:11 3:9,14,19 5:5
5:15,15 54:5

**Z**

**0**

014 (1)
41:23
015 (1)
41:21

**1**

10004 (2)
3:9,19
10007 (1)
2:9
10017 (1)
3:14
10022 (1)
5:15
11 (1)
3:18
121382 (1)
1:24
13 (1)
18:2
14 (2)

18:2 41:22
18th (2)
7:23 10:12

**2**

2:07 (1)
2:2
20 (1)
53:18
200 (1)
18:12
2012 (1)
11:12
2013 (4)
17:21 18:11 21:17,24
2014 (4)
11:19 17:22 18:11
19:11
2015 (3)
8:9 10:16 40:10
2017 (8)
1:18 2:2 5:23 9:18
52:7,19 54:13 55:23
21 (4)
1:18 2:2 19:10 52:7
21st (1)
24:21
22nd (1)
42:2
24th (1)
54:12
25 (1)
53:5
28 (1)
34:24

**3**

3:08 (1)
51:14
30 (1)
6:16
350 (1)
5:14
35F (1)
18:12

**4**

4 (1)
7:24
41 (1)
53:6
42 (1)
53:7
48 (1)
53:18
49 (1)

53:8

**5**

5 (1)
53:4
500 (1)
2:8
52nd (1)
5:14

**6**

6 (1)
5:25
6G (1)
5:15

**7**

7 (1)
9:18
733 (1)
3:14

**8**

8 (2)
5:23 9:17
80 (1)
3:9

**9**

9 (1)
7:24