UNITED STATES DISTRICT COURT
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **STEVEN E. GREER**, MD ) | **15-CV-6119 (AJN) (JLC)** |
| Plaintiff; ) | |
| v. ) | **HON. ALISON J. NATHAN** |
| ) | DISTRICT JUDGE |
| **Dennis Mehiel**, **Robert Serpico**, **The Battery Park City Authority**, **Howard Milstein**, **Steven Rossi**, **Janet Martin**, **Milford Management**, **Mariners Cove Site B Associates** ) | **HON. JAMES L. COTT** MAGISTRATE JUDGE |
| Defendants. ) | |

_____ )

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO BPCA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Steven E. Greer, MD, pro se
4674 Tatersall Court
Columbus, Ohio 43230
(212) 945-7252
steve@batterypark.tv

# Table of Contents

**PRELIMINARY STATEMENT** ........................................................................... 1

**ARGUMENTS** ................................................................................................... 1

Count 1- Retaliatory Eviction Took Place .......................................................... 1

    1. The Swanson Testimony is Admissible ........................................................ 2

    2. The McGowan Email is Admissible ............................................................ 4

    3. The Soriero Testimony is Admissible ......................................................... 4

    4. Spoliation of Crucial Documents Occurred Warranting Sanctions ............ 5

    5. The BPCA Knew About Plaintiff's Eviction Before Plaintiff Knew .......... 6

    6. Plaintiff Paid His Rent On Time ................................................................. 6

    7. Plaintiff Was Not Disruptive to Neighbors ................................................ 7

    8. Defendants Decided to Renew Plaintiff's Lease Shortly Before the Eviction ....................... 7

    9. Defendants Eviction Proceedings Were Unprecedented ............................ 7

Count 2- Plaintiff Was Illegally Barred From Public Meetings .......................... 8

    1. There is No Dispute that the BPCA Barred Plaintiff From Public Meetings ......................... 8

    2. The Decision to Bar Plaintiff from Public Meetings was Indeed "Official Policy" ............. 10

    3. The Decision to Bar Plaintiff from Public Meetings Was Not Content Neutral ................... 12

    4. The Decision to Bar Plaintiff from Public Meetings Was Unjustified ................................ 13

    5. Plaintiff's Press Reporting Was Read by BPCA Defendants and was the Motive for

    Retaliation ................................................................................................... 17

6. Plaintiff's Ability to Report in the Press Was Impaired ................................................ 17

7. Rebuttal of BPCA's Case Law Regarding Count 2 ...................................................... 18

Compensatory Damages are Demonstrated and Not "Nominal" ...................................... 20

1. There is Evidence to Support Claims for "Lost Value" Damages ........................... 21

3. There Is Evidence to Support Mental Anguish Claims ........................................... 26

6. Plaintiff Can Recover Expenses Incurred After His Eviction ................................ 28

BPCA Is Not Immune from Punitive Damages ................................................................ 28

CONCLUSION ................................................................................................................... 29

# Table of Authorities

**Cases**

*Allan v. City of New York*, 386 F. Supp. 2d 542, 545 n.3 (S.D.N.Y. 2005)...................................10

*Am. Broadcasting Cos., Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977)...............................18

*Annis v. County of Westchester*, 136 F.3d 239 (2d Cir. 1998)......................................................27

*Brown v. United States*, 464 A.2d 120, 124 (D.C. Cir. 1983) ........................................................3

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 516 N.E.2d 190, 192, 521

    N.Y.S.2d 653 (N.Y. 1987),....................................................................................................29

*Dockery v. Tucker*, No. 97-CV-3584 (ARR) (RLM), 2006 WL 5893295, at *26 (E.D.N.Y. Sept.

    6, 2006)" ................................................................................................................................24

*Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998............................................................21

*Glenn E. Tagatz, Plaintiff-appellant, v. Marquette University, Defendant-appellee*, 861 F.2d

    1040 (7th Cir. 1988), .............................................................................................................25

*Guan N. v. NYC Dep't of Educ.*, No. 11-CV-4299 (AJN), 2014 WL 1275487, at *14 (S.D.N.Y.

    Mar. 24, 2014), .....................................................................................................................11

*Jackson v Dallas School District*: Case No. 3:12cv1903; (M.D. of Pennsylvania, 2015)............29

*John Grace & Co. v. State Univ. Constr. Fund*, 44 N.Y.2d 84, 375 N.E.2d 377, 379, 404

    N.Y.S.2d 316 (N.Y. 1978),....................................................................................................29

*Jones v. City of Key West, Fla.*, 679 F. Supp. 1547 (S.D. Fla. 1988);...........................................29

*Kenford Co. v. Erie Cty.*, 493 N.E.2d 234, 236 (N.Y. 1986)). ......................................................22

*Malta v. Slagle*, No. 05-CV-342S, 2007 WL 952045, at *5 (W.D.N.Y. Mar. 29, 2007) .............19

*Mancuso v. New York State Thruway Auth.*, 909 F.Supp. 133 (S.D.N.Y.1995),............................29

*Mancuso v. New York State Thruway Auth.*, No. 524, Docket 95-7443. (2nd Cir. 1996). ............29

*Mesa v. Hudson Cty. Bd. of Chosen Freeholders*, No. CIV.A. 09-3576 KSH, 2011 WL 4592390, at *6 (D.N.J. Sept. 30, 2011). ............................................................ 20

*Miller v. Lovett*, 879 F.2d 1066, 1070 (2d Cir. 1989); ................................................ 29

*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), ............ 10

*Monette v. Cty. of Nassau*, No. 11-CV-539 (JFB) (AKT), 2015 WL 1469982, at *18 (E.D.N.Y. Mar. 31, 2015); ................................................................................ 29

*New York City Unemployed & Welfare Council v. Brezenoff*, 677 F.2d 232 (2d Cir.1982) ........ 19

*Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002) ................................................................................ 26

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)…" .................................... 10

*Phillips v. City of New York*, 871 F. Supp. 2d 200, 206 (E.D.N.Y. 2012)................................ 20

Royal Capital Development LLC v. Maryland Cas. Co., ___ S.E.2d ___, 2012 WL 1909842 (Ga. May 29, 2012) ................................................................................ 23

*Royal Capital Development, LLC v. Maryland Casualty Company*, No. 10–15716, Court of Appeals, Eleventh Circuit, 2011 ................................................................ 23

*Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir.1977 ................................................ 19

*Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 18 (1st Cir. 1994)). ................................ 2, 3

*State Farm Mut. Auto. Ins. Co. v. Mabry*, 274 Ga. 498 (2001) ...................................... 24

*Taylor v. B. Heller and Company*, 364 F. 2d 608 - Court of Appeals, 6th Circuit 1966............. 23

*Thornton v. City of Kirkwood*, No. 07-CV-79 (CDP), 2008 WL 239575, at *5 (E.D. Mo. Jan. 28, 2008). ................................................................................ 20

*Uddin v. New York City / Admin. for Children's Servs.*, No. 99-CV-5843 (GEL), 2001 WL 1512588, at *6 (S.D.N.Y. Nov. 28, 2001) ................................................ 27

*United States v. Flecha*, 539 F.2d 874, 876–77 (2d Cir. 1976), ................................................... 2

*United States v. Miller*, 478 F.3d 48, 51 (1st Cir. 2007)................................................................. 3

*Wagenheim v. Alexander Grant Co.,* 19 Ohio App.3d 7, 19 O.B.R. 71, 482 N.E.2d 955, 967

    1983)......................................................................................................................................... 23

*Wallace v. Suffolk Cty. Police Dep't*, 809 F. Supp. 2d 73, 82 (E.D.N.Y. 2011........................... 21

*Washington v. Kellwood Co.*, No. 05-CV-10034 (SN), 2016 WL 3920348, at *8 (S.D.N.Y. July

    15, 2016)................................................................................................................................... 22

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)." .................................................. 1

*Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir. 1994)."........................................ 3

World Trade Center Lower Manhattan Disaster Site Litigation No. 15-2181 (2d Cir. 2017)...... 29

## Statutes

42 U.S.C.§1983........................................................................................................................... 10

New York Public Officers Law §104(4)....................................................................................... 20

U.S. SEC Form S-1, Registration Under the Securities Act of 1933: EVERYDAY HEALTH,

    INC. ......................................................................................................................................... 22

## Rules

Federal Rules of Civil Procedure 56 ............................................................................................. 1

Federal Rules of Evidence 701 ................................................................................................... 25

Federal Rules of Evidence 701 and 702 ..................................................................................... 25

Federal Rules of Civil Procedure 26(e) ........................................................................................ 6

Federal Rules of Civil Procedure 26(e). ....................................................................................... 6

Federal Rules of Civil Procedure 37(c) ........................................................................................ 6

Federal Rules of Evidence 801(d)(2)(B)....................................................................................... 2

**Treatises**

Bret Ruber, Comment, "*Adoptive Admissions and the Duty to Speak: A Proposal for an*

*Appropriate Test for the Admissibility of Silence in the Face of an Accusation*," Cardozo Law

Review, 36 Cardozo L. Rev. 299, 311 n. 84 (2014)..................................................................... 2

Kenneth S. Braun et al., *McCormick On Evidence* 405–06 (6th ed. 2006). ................................. 3

Kolaski and Kuga: Journal of Law and Commerce (Fall 1998): *Measuring Commercial Damages*

*via Lost Profits or Loss of Business Value: Are these Measures Redundant or Distinguishable?*

.................................................................................................................................................... 22

Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev. 927,

954 (1992)................................................................................................................................... 20

**Constitutional Provisions**

First Amendment ................................................................................................................... passim

Plaintiff Steven E. Greer, MD hereby submits this Memorandum of Law in Opposition to BPCA defendants' Motion for Summary Judgment. The facts underlying this opposition are fully set forth in Plaintiff's previously filed Rule 56.1 Statement of Undisputed Facts in Support of his Motion for Summary Judgment, dated June 7, 2017 (Dkt. No. 368), and in Plaintiff's Rule 56.1 Counter-Statement to the BPCA Rule 56.1 statement of facts (Dkt. No. 394).

## PRELIMINARY STATEMENT

The Battery Park City Authority defendants ("BPCA" or "defendants") are faced with overwhelming evidence that they did indeed violate Plaintiff's First Amendment rights in many ways. As a result, they are resorting to smear tactics as a defense strategy. Despite almost all of their "facts" listed in their rule 56.1 being in dispute, they are nevertheless attempting this motion for summary judgment supported by Memorandum of Law ("MOL").

Because the BPCA was unable to produce a defense using material facts with no genuine dispute, their motion for summary judgment must be dismissed. According to the BPCA's own opening arguments on page 3 of their MOL, "Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)."

## ARGUMENTS

### Count 1- Retaliatory Eviction Took Place

The BPCA's first argument on page 1 of their MOL is that there is no evidence to prove a conspiracy to evict Plaintiff ever took place. That is false. Moreover, due to sanctions applicable as a result of spoliation, the BPCA should not be allowed to argue that the retaliatory eviction did not occur.

**1. The Swanson Testimony is Admissible**

The BPCA led off their MOL (Dkt No. 372) by dismissing the Kirk Swanson deposition testimony

as inadmissible hearsay. On Page 1 of the MOL, they state:

> "Plaintiff would have this Court require the BPCA Defendants to stand trial based on
> nothing more than an eye roll and a shrug. One witness, former BPCA employee Kirk
> Swanson, testified that he asked Serpico if Serpico had been involved in the non-renewal of
> Plaintiff's lease, and that in response Serpico rolled his eyes and shrugged. This shrug and
> eye roll, which comprise the sum total of Plaintiff's evidence of any BPCA Defendant's
> role in his eviction, cannot support a reasonable inference of an unlawful conspiracy in
> violation of Plaintiff's constitutional rights."[1]

On Page 6 of the MOL, they cite one case law from the First Circuit for their rationale as to why a

nonverbal gesture by Serpico is inadmissible. *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 18 (1st

Cir. 1994). However, this instant case is in the Second Circuit not the First, and case law from the

Second Circuit, as well as Federal Rules of Evidence, clearly allow such testimony to be admissible.

In a 2014 Cardozo law review article[2] on the "Admissibility of Silence in the Face of an

Accusation", it states:

> "The Federal Rules of Evidence, enacted in 1975, codified the common law doctrine of tacit
> admissions in **Rule 801(d)(2)(B).** While the rule itself does not refer to silence, the advisory
> committee's notes explicitly state that silence in the face of an accusation can be considered
> an adoptive admission."

That actual federal rule committee notes state:

> "When silence is relied upon [i.e. Serpico's smirk and shrug in this instant case], the theory is
> that the person would, under the circumstances, protest the statement made in his presence, if
> untrue. The decision in each case calls for an evaluation in terms of probable human
> behavior. In civil cases, the results have generally been satisfactory."

From the Second Circuit, in the case of *United States v. Flecha*, 539 F.2d 874, 876–77 (2d Cir.

1976), "silence" [such as the nonverbal gestures by Serpico in this case] is admissible if, "…there

---

[1] Of note, the Swanson testimony never mentioned anything about a "roll of the eyes". Swanson stated,
"smirked and shrugged" (Swanson dep. Exhibit 1, at 24:16)

[2] Bret Ruber, Comment, "Adoptive Admissions and the Duty to Speak: A Proposal for an Appropriate Test for the
Admissibility of Silence in the Face of an Accusation," Cardozo Law Review, 36 Cardozo L. Rev. 299, 311 n. 84
(2014).

are circumstances which render it <u>more reasonably probable that a man would answer the charge made against him than that he would not</u>. (emphasis added)"

Serpico was the acting president of the BPCA and boss of Swanson at the time Mr. Swanson asked him on January 21st, 2014 whether he was behind the eviction of Plaintiff. In reply, Serpico was coy with Swanson, smiling and shrugging his shoulders. Therefore, it was "reasonably probable" that Serpico should have answered Swanson with a simple "No", or with indignation, such as "What are you talking about?" if Serpico were truly innocent of the First Amendment violations alleged in this complaint.

In the case of *United States v. Miller*, 478 F.3d 48, 51 (1st Cir. 2007) ("…a party's agreement with a fact stated by another may be inferred from (or 'adopted' by) silence." (citations omitted)); see also Kenneth S. Braun et al.., *McCormick On Evidence* 405–06 (6th ed. 2006). The belief that silence is probative in at least some instances was the decision in *Brown v. United States*, 464 A.2d 120, 124 (D.C. Cir. 1983).

To refute the case of *Smith v. Stratus Computer, Inc.* cited by the BPCA, that case is not similar to this instant case. The nonverbal shrug reply in *Smith* was not even addressing a direct question, unlike Swanson's direct questioning of Serpico in this instant case, which was:

> "I asked Bob [Serpico] if he had anything to do with Greer not getting his lease renewed, to which Bob visibly smirked, shrugged and didn't answer my question and walked away." (Swanson dep. **Exhibit 1**, at 24:16).

*Smith v. Stratus Computer, Inc.* also states, "Because we are reviewing a grant of summary judgment, we view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in plaintiff's favor. *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir. 1994)." Therefore, for the purposes of the BPCA's motion for summary judgment, Serpico's non-verbal response consisting of a smirk, shrug, and walking away from Swanson should be adopted as an admission of guilt for the purposes of this motion.

3

**2. The McGowan Email is Admissible**

On page 7 of the BPCA's MOL, they state:

> "The only item produced in discovery that relates in any way to McGowan is an
> irrelevant, vague, and in any event inadmissible email from McGowan to Plaintiff,
> dated January 12, 2014 [i.e. before Plaintiff knew he was being evicted], which states:
> "it is good to see that you appreciate what we have on the West Side[.] Hope you can
> stay[.]" (Tremonte Decl. ¶ 16, Ex. 15.) Accordingly, there is simply no support in the
> record for Plaintiff's claim that anyone at all "confirms" Serpico (or anyone else from
> the BPCA) played a role in the alleged conspiracy behind the non-renewal of Plaintiff's
> lease."

However, this email is not hearsay, it is admissible, and it is not irrelevant. McGowan was a

supervisor in the parks division of the BPCA until retiring in 2013. He still receives a pension from

the BPCA and remains close to the BPCA defendants (As seen in the group photo taken recently

with McGowan and Serpico together at a dining table (Greer Decl. Ex. 2)). He had direct

communications with Serpico and his email to Plaintiff is not hearsay.

After retiring, McGowan was the reliable anonymous source for many of Plaintiff's articles

in BatteryPark.TV relating to the controversial Pier-A development and secret plans of the BPCA to

dismantle the BPC Parks Conservancy, *inter alia*. (See Greer Dep., Ex. 3 of Greer Decl. at 182:10 –

189:23). He clearly has close contact with the BPCA.

Moreover, in a subsequent phone call with Mr. McGowan, Plaintiff was able to get

McGowan to confirm that he knew about Plaintiff's eviction, before Plaintiff did, from a discussion

he had with Serpico, and that that was the purpose of his taunting email (see *Id*. at 185:2-186:18).

Mr. McGowan lives in California and was not deposed. If this case goes to trial, he might be called

as a witness.

**3. The Soriero Testimony is Admissible**

A witness, Linda Soriero, who was Serpico's personal secretary for 18-years, can be heard on

an audio recording made by Plaintiff of a telephone call on March 12th, 2017 that she directly

witnessed an email on Serpico's computer at work in his office proving that Serpico conspired and

colluded with Rossi no less than a "year and a half ago" to retaliate against Plaintiff by using the eviction as the means.[3],[4]

In addition to the deleted emails above, one email was actually produced by witness Soriero helping to prove the conspiracy between Serpico and Rossi. Serpico had emailed Rossi after Plaintiff sent a cease-and-desist email to not destroy documents on May 28, 2014.[5] That date of May 28th is long before this instant federal case was filed. Rossi and Serpico were not yet co-defendants. Therefore, their conspiracy to evict Plaintiff is the likely explanation for the two men to be communicating in such a way at that early time.

## 4. Spoliation of Crucial Documents Occurred Warranting Sanctions

The egregious pattern of spoliation by the defendants warrants sanctions and/or a summary judgment in favor of Plaintiff. Sanctions should be in the form of precluding the defendants from denying that they evicted plaintiff in retaliation for his press coverage.

### A. The Acts of Spoliation

For a detailed discussion of the acts of spoliation, see Plaintiff's motion for summary judgment.[6] As a result of that email document spoliation, crucial evidence was not produced and Plaintiff has been severely prejudiced against proving his case.

Another piece of crucial evidence obtained by Plaintiff to help prove his case exists in the form of the September, 2013 letter from New York Inspector General Catherine Leahy Scott mandating managerial training for Serpico.[7] The letter was caused by Plaintiff's press coverage and was the "final straw" motivating Serpico to retaliate. However, during Serpico's deposition, lawyer

---

[3] See Plaintiff's MOL at 15 ¶2 (Dkt. No. 367)
[4] For a complete discussion of the statutes and case law that allow for this evidence to be admissible, see Plaintiff's motion for summary judgment at pages 15,16 (Dkt. No. 367)
[5] See Plaintiff's MOL at 16 ¶4 (Dkt. No. 367)
[6] See Plaintiff's MOL at 19-20 (Dkt. No. 367)
[7] See Plaintiff's MOL at 20 ¶3 (Dkt. No. 367)

Tremonte committed spoliation by inappropriately and in bad faith instructed his client to not answer any questions on the matter.[8]

### B. The Statutes and Case Law Supporting Sanctions

FRCP 37(c) gives this Court the explicit authority to sanction the defendants for their failure to provide the information required under FRCP 26(e). FRCP 37(c)(1), by its plain language, imposes a self-executing sanction unless the FRCP 26(e) violation "was substantially justified or is harmless."[9]

### 5. The BPCA Knew About Plaintiff's Eviction Before Plaintiff Knew

As previously detailed, several witnesses testified that the BPCA individuals knew about Plaintiff's pending eviction in early January of 2014, before Plaintiff even knew about it. Swanson was in his BPCA office and heard about the rumors, then confronted Serpico directly (*supra*, Count 1, §1). Linda Soriero, the long-time secretary of Serpico, knew all about the eviction as well (*supra*, Count 1, §3). Even a former employee no longer inside the BPCA, Vince McGowan, heard about Plaintiff's eviction before Plaintiff knew (*supra*, Count 1, §2).  Therefore, it is inconceivable that the BPCA was not colluding with the real estate defendants on this retaliatory eviction.

### 6. Plaintiff Paid His Rent On Time

On pages 1,3,4, and 7 of the BPCA's MOL, they claim that Plaintiff failed to pay rent, and that was the real reason he was evicted. However, the defendants failed to produce evidence to support their defense that Plaintiff was a deadbeat, non-rent-paying, harassing troublemaker, worthy of being evicted. Therefore, the eviction was a retaliatory act in response to Plaintiff's press coverage violating the First Amendment.

---

[8] See Plaintiff's MOL also at 20 ¶3 (Dkt. No. 367).
[9] For a complete discussion of statutes for sanctions, see Plaintiff's MOL at 20-21 (Dkt. No. 367).

Starting with the original housing court eviction petition, there was no mention whatsoever of Plaintiff being late in rent or causing any trouble in the apartment building. Only years later, when Plaintiff sued in federal court and the defendants needed a defense strategy, did they begin to concoct stories about Plaintiff harassing other residents.[10]

In housing court, when Judge Milin ordered on January 28, 2016 that Plaintiff pay $44,135 for rent that was in dispute, Plaintiff promptly paid in-full on February 2, 2016. Also, on page 22 of the BPCA's MOL, they accuse Plaintiff of spending wildly to buy a Mercedes in cash and stay in the Ritz-Carlton for months. Clearly, Plaintiff had ample cash flow and would not have needed to be late in paying his rent.

**7. Plaintiff Was Not Disruptive to Neighbors**

On page 4 of the MOL, they claim that other tenants and staff working in Plaintiff's apartment building lodged complaints about him, and that that was one factor in the decision to evict. However, during the Rossi deposition, when asked about specific examples of Plaintiff causing trouble, he could not think of any details or specific dates.[11]

**8. Defendants Decided to Renew Plaintiff's Lease Shortly Before the Eviction**

The defendants renewed Plaintiff's lease in May of 2013, just months before they decided to evict Plaintiff. This also helps prove that Plaintiff was in good standing regarding rent.[12] If Plaintiff were a deadbeat troublemaker, why did they renew his lease time after time?

**9. Defendants Eviction Proceedings Were Unprecedented**

There is also no evidence that the real estate defendants have ever evicted anyone else in the building for being slightly late in rent or creating stereo noise disturbances. When Rossi was asked during deposition to list examples of other evictions, he could not recall any. Likewise, during the

---

[10] For a complete discussion of Plaintiff's history of payment, see Plaintiff's MOL at 17 ¶2 - 18 (Dkt. No. 367).
[11] For a complete discussion of the Rossi testimony on this topic, see Plaintiff's MOL at 17 ¶3 - 18 (Dkt. No. 367).
[12] See Plaintiff's MOL at 18 (Dkt. No. 367).

Milstein deposition, he could not recall of any other similar evictions. During document production, the defendants could not produce any evidence of evictions for any reason, much less for the minor alleged infractions, such as stereo noise.[13]

The likely conclusion to be drawn from the above scenario is that <u>it would be highly irrational and unusual for this landlord defendant, operating in the high cost of living of Manhattan, to evict a tenant such as Plaintiff who was willing to pay the high rents</u> charged for their small apartments. Therefore, Plaintiff was likely evicted out of retaliation.

## <u>Count 2- Plaintiff Was Illegally Barred From Public Meetings</u>

### 1. There is No Dispute that the BPCA Barred Plaintiff From Public Meetings

In the September 30th, 2016 order by The Hon. Alison Nathan denying defendants' motions to dismiss (Dkt. No. 177), it removed individuals Mehiel and Serpico from Count 2 of the First Amendment claim[14]. Now, after an extensive discovery process, there is irrefutable proof that Dennis Mehiel personally ordered the BPCA staff to ban Plaintiff from public BPCA board meetings, with no justification, and that Serpico carried out the plans, both violating Plaintiff's First Amendment rights. Therefore, Plaintiff motions this court (Dkt. No. 366) to reinstate Mehiel and Serpico as defendants[15].

This Court's rationale for allowing the count to stand against the BPCA but not against the individuals was detailed in the denial of the motions to dismiss (Dkt. No. 177). However, it is now known from sworn deposition testimony that, (A) Dennis Mehiel personally ordered the staff to ban me from meetings, that (B) Robert Serpico knew about the plans and carried them out, that (C) there was no justification for the defendants doing this since they failed to produce any evidence that

---

[13] See Plaintiff's MOL at 18-19 (Dkt. No. 367).
[14] In its September 30, 2016 Order, the Court construed Plaintiff's meeting exclusion claim as a First Amendment equal access claim. Order at 10–12, ECF No. 177.
[15] FRCP 60(c)(1) allows this motion since the order was rendered less than one year ago.

Plaintiff was a disruptive threat to public meetings, and that (D) the BPCA orchestrated an elaborate ruse to use as an excuse for Plaintiff not being allowed into board meetings, which was that the room was supposedly too full.[16]

During Dennis Mehiel's deposition on April 3rd, 2017, he stated that he was the man who ordered staff to bar Plaintiff from public meetings. There was no equivocation. Mehiel admitted in no uncertain terms to being the person who thought of and ordered the plan to bar Plaintiff.[17]

During the April 6th deposition of BPCA Chief of Staff Kevin McCabe, he too reiterated that Dennis Mehiel ordered staff to bar Plaintiff from public board meetings.[18]

During the deposition of Robert Serpico on March 21st, 2017, he stated that he believed that Mehiel was responsible for the plan to bar Plaintiff from public meetings. Serpico could not recall any specific incident or bad behavior by Plaintiff during public meetings by Plaintiff to justify barring him.[19]

Finally, beyond the sworn deposition testimony is the irrefutable video evidence of Plaintiff being barred from numerous board meetings over a span of approximately a year. Not only was he barred from the board meetings, but also town hall meetings designed specifically to allow public feedback and questions from the press.

**The URL links to the videos** on YouTube are found below:

BPCA barring Plaintiff from July 29, 2015 board meeting
https://youtu.be/K3bHq3p1flc

BPCA not allowing Plaintiff into December 16, 2015 town hall meeting
https://youtu.be/6kgNVEVM58o

BPCA not letting me in to April 13, 2016 board meeting
https://youtu.be/QEh2D0tKH18

---

[16] See Plaintiff's MOL at 6-7 (Dkt. No. 367).
[17] See Plaintiff's MOL at 6 (Dkt. No. 367).
[18] See Plaintiff's MOL at 7 (Dkt. No. 367).
[19] See Plaintiff's MOL at 7 (Dkt. No. 367).

BPCA allowing Plaintiff into June 8, 2016 board meeting after federal order was issued
https://youtu.be/IMh0Zzid86U

## 2. The Decision to Bar Plaintiff from Public Meetings was Indeed "Official Policy"

On page 13 of the BPCA's MOL, they argue esoteric legal theory asserting that the BPCA decision to bar Plaintiff from public meetings was not "official policy". Therefore, the complaint should be dismissed, they argue. They cite *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), "…a municipality may be held liable under 42 U.S.C.§1983 only "for constitutional violations caused by acts committed pursuant to 'official policy.'"

The BPCA then cites a case that attempted to define "official policy":

"An "official policy" can take one of four forms: "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Allan v. City of New York*, 386 F. Supp. 2d 542, 545 n.3 (S.D.N.Y. 2005)"

Using their own definition, the BPCA actions barring Plaintiff were clearly "official policy" because the Chairman and CEO, Dennis Mehiel, ordered it, and other senior ranking staff, such as Kevin McCabe, carried it out, thus satisfying *Allen* definition (1), above.

On page 15 of the MOL, the BPCA also defines "official policy" as:

"This second species of "official policy" arises only where an official possessing "final authority" over the government's policies "with respect to the action ordered," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)…"

Clearly, Dennis Mehiel, who is the Chairman of the Board as well as CEO, and his Chief of Staff McCabe, have "final authority" over BPCA matters.

On page 15 of the MOL, the BPCA claims that none of the defendants were "responsible for establishing the BPCA policies" Therefore, the decision to bar Plaintiff was not "official policy". They go on, "the court must specifically determine whether the government official is a final

policymaker with respect to the particular conduct challenged in the lawsuit." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)"

On page 16, they cite Your Honor's decision in *Guan N. v. NYC Dep't of Educ.*, No. 11-CV-4299 (AJN), 2014 WL 1275487, at *14 (S.D.N.Y. Mar. 24, 2014), "a policymaker has 'final' authority over official policy under *Monell* only if her power to act is *unreviewable* under state law." The BPCA argues that the BPCA board could have, per N.Y. Pub. Auth. Law §1970, stepped in and "reviewed" the decision, presumably implying that the board had the "final authority" rather than Mehiel. That is false.

Firstly, there is no provision in N.Y. Pub. Auth. Law §1970 that states the BPCA board can overturn or block an official policy created by the chairman, and the BPCA points to no such section in the law. To the contrary, in §7 of the law, it states that a quorum of the BPCA board may conduct business or "delegate to one or more of its members, or to its officers, agents or employees, such powers and duties as it may deem proper." Ever since the BPCA was created, the executives filling the roles of chairman, CEO, president, or CFO have been the executives to make the official policy. Only on large matters, such as approval of contracts or budgets, does the board cast a vote. Secondly, the BPCA board has never voted against any proposal that the chairman has advocated since Plaintiff began covering the BPCA in 2009. The board meeting votes are nothing but orchestrated Kabuki Theater with the outcome predetermined.

It is clear that Dennis Mehiel is the ultimate "final policymaker" acting as both the Chairman of the Board and the CEO. Previous chairmen have not chosen to be also the CEO. That unusual decision to grab CEO powers could be one to haunt Mr. Mehiel. The buck stops with Chairman Mehiel.

Satisfying the *Allan v. City of New York* definition No. (4) of "official policy" relating to "deliberate indifference", the BPCA failed to train anyone on the proper understanding of New York Open Meeting law, document retention, or any other basic executive skill. During the Karl Koenig

deposition, he stated that he had received no training in open meeting laws. He also received no training in FOIA or document retention. [20]

During the McCabe deposition, he stated that he had received no training in document retention. His training in FOIA is questionable given that he is not a lawyer but was assigned to handling FOIA requests.[21]

However, the most damning direct evidence proving that the BPCA was acting with "deliberate indifference" in training its staff is found in the September 19, 2013 letter from New York Inspector General Catherine Leahy Scott ordering Robert Serpico to undergo executive management and ethics training that he had previously ignored. He was the acting president of the BPCA at the time the letter was sent.[22]

On page 17 of the MOL, they cite case law where defendants prevailed because the plaintiffs failed to identify "official policy". *Carter v. Cty. of Suffolk*, No. 12-CV-1191 (JFB) (ARL), 2013 WL 6224283, at *4 (E.D.N.Y. Dec. 2, 2013); and *Sheikh v. City of New York, Police Dep't*, No. 03-CV-6326 (NGG), 2008 WL 5146645, at *12 (E.D.N.Y. Dec. 5, 2008). But those cases are irrelevant to this instant case since Plaintiff has clearly demonstrated that the decision to bar him from public meetings was indeed "official policy" set by Chairman and CEO Mehiel.

**3. The Decision to Bar Plaintiff from Public Meetings Was Not Content Neutral**

On page 13 of the MOL, the BPCA argues that the decision to bar Plaintiff from the meetings was "content neutral". Therefore, based on case law, the decision did not violate the First Amendment.

---

[20] See Plaintiff's MOL at 24 (Dkt. No. 367)
[21] See Plaintiff's MOL at 24 (Dkt. No. 367)
[22] See Plaintiff's MOL at 25 (Dkt. No. 367)

On page 9 of the MOL, they argue that other local newspapers were allowed into the BPCA meetings and that they too had been critical in the press of the BPCA. Therefore, the decision was again "content neutral"

However, this rationale is based on faulty analogies. The other local "newspapers" referenced were, "Matt Fenton of the *Broadsheet*, Sue Malesevic of *Downtown Express*, and Carl Glassman of the *Tribecca Trib*, attended the July Meeting." None of those papers have ever reported with even remotely the same degree of veracity as Plaintiff's BatteryPark.TV. The BPCA cites a benign article by the Broadsheet that mentioned troubles with a geothermal well. The BPCA cites only one article from DowtownExpress from 2010, which is long before the Mehiel administration of the BPCA started. Likewise, they cite a Tribeca Tribune article from 2011, before Mehiel began.

In stark contrast, Plaintiff's BatteryPark.TV muckraking of BPCA scandals has been relentless, with scores and scores of articles exposing sexual harassment scandals, crooked rigging of RFP government contracts, wasteful spending, etc.[23] Subsequent to BatteryPark.TV reporting, three presidents of the BPCA abruptly "resigned" (including Robert Serpico), three press communications officers were fired, and several board members mysteriously "resigned"[24]

## 4. The Decision to Bar Plaintiff from Public Meetings Was Unjustified

The only defense that the BPCA defendants could use to prevent their actions from being found to have violated the First Amendment would be if they could demonstrate that Plaintiff was justifiably barred from the public board meetings for being disruptive or a physical threat. However, the BPCA defendants failed to provide any such evidence of Plaintiff being disruptive or a threat.

During his deposition, Kevin McCabe focused on the board meeting of June 9th, 2015 as the time when Plaintiff supposedly became abusive and disruptive enough to warrant the decision to bar

---

[23] See Plaintiff's declaration of exhibits, ¶2 (Dkt. No. 370)
[24] See Plaintiff's MOL at 1, Footnote 1 (Dkt. No. 367)

him. But after extensive questioning, McCabe admitted that Plaintiff never even as much as touched McCabe, and that no security forces were called to remove Plaintiff.[25]

McCabe was asked whether Mehiel cited any specific provision of New York Open Meeting Laws to justify barring Plaintiff from board meetings. He replied that Mehiel had provided no such legal rationale.[26]

During the April 6th deposition of BPCA Comptroller Karl Koenig, he stated that he knew of no instance when any BPCA board member expressed concern over Plaintiff's behavior during board meetings. He also confirmed that no security staff was ever called to deal with Plaintiff. When asked whether Mehiel gave him any reason for barring Plaintiff, Koenig could not recall any. When asked whether he could recall of any occasion when the BPCA boardroom was too crowded to allow Plaintiff in, he could not recall of any.[27]

During the June 9th, 2015 BPCA board meeting cited by defendants, Plaintiff was merely standing up as the BPCA board prepared to go into a private "executive session" and was asking for Mehiel to explain the justification for the private executive session. Executive session is allowed only under strict guidelines by the New York Open Meeting law, and the BPCA has routinely abused this legal loophole to conduct business behind closed doors. After a few seconds, Plaintiff left the meeting without incident when Kevin McCabe instructed him to leave.

During Plaintiff's deposition on April 13, 2017, he explained the rationale for why he was seeking to investigate the pattern of abuse of closed-door executive session. Some of the most important decisions ever made by the BPCA, resulting in hundreds of millions of taxpayer dollars being misappropriated to projects that benefited cronies of the state, have been made in secret during these closed-door executive sessions.[28]

---

[25] See Plaintiff's MOL at 8 ¶3 (Dkt. No. 367)
[26] See Plaintiff's MOL at 8 ¶4 (Dkt. No. 367)
[27] See Plaintiff's MOL at 8 ¶53 (Dkt. No. 367)
[28] See Plaintiff's MOL at 9 ¶2 (Dkt. No. 367)

The actions by Plaintiff described above are in no way a justification for barring him from the public board meetings. There is no evidence that Plaintiff did anything other than engage in investigative reporting and challenge the need for a closed-door executive session.

On page 11 of the BPCA's MOL, they reference a series of anonymous hand-written journal entries made by several different people over unknown periods of times that are supposedly evidence of Plaintiff treating the BPCA staff so horribly over the phone that it justified Mehiel's decision to bar him from meetings.[29] These journal entries cannot be authenticated, are not supported by any affidavit from the people who allegedly wrote the call journal entries, and are nothing but a legal defense strategy adopted after this litigation began.

What actually occurred was that the BPCA had gone into crisis mode, literally locking the doors[30] and not answering phone calls, all in the wake of Plaintiff's successful reporting of various scandals. The BPCA's media relations person at the time, Robin Forst, was refusing to take calls from Plaintiff, violating his First Amendment rights be singling him out and treating him differently than other local news outlets to whom she did take calls. When it became clear that Forst was ignoring him, Plaintiff tried to call other office landline numbers to no avail. He then left messages on the personal cell phones of a member of the BPCA legal team, Seema Singh, and on President Hyman's phone, alerting them to the fact that their behavior was illegal and a violation of the First Amendment. Ms. Forst was later fired, as was legal counsel Seema Singh[31].

Moreover, all of these calls referenced by the BPCA allegedly took place before the first board meeting incident in which Plaintiff was barred, which was July 29, 2015. If the "harassing" calls were truly the cause for Mehiel's decision to bar Plaintiff, then why did he not act sooner? If

---

[29] See BPCA's Rule 56.1 Statement of Facts at ¶¶ 18,19
[30] See YouTube video at URL https://youtu.be/46BsTP2MpoY
[31] Singh was ousted and relocated to another New York State "authority", the MTA.

the calls were so concerning, why were no police reports made? Instead, Hyman makes a vague unsubstantiated claim that she reported them to the Manhattan District Attorney's office[32].

Then, on page 10 of the BPCA's MOL, the BPCA engages in classic smear tactic strategies as a defense. The lawyers bring up two irrelevant incidents that are grossly misrepresented.

The ludicrous claim that Plaintiff "stalked" an innocent "summer camp director" is actually regarding Plaintiff's coverage in the press that exposed Bob Townley, a crony of disgraced felon Sheldon Silver, for fleecing the Battery Park City taxpayer by taking annual $250,000 "grants" despite not even being located in Battery Park City. Townley also conspired with former BPCA president Gayle Horwitz to prevent the opening of a newly constructed $70 million Battery Park City community center (with pool, basketball courts, theater, and kitchen for cooking classes) because it was going to take away business from his own poorly managed community center in TriBeCa. Once this scam was exposed by Plaintiff, Horwitz promptly "resigned"

The absurd statement that Plaintiff "harassed children playing soccer on a park lawn" relates to a conspiracy between the BPCA and a local mother to destroy legally protected "green" park areas in the form of a grass lawn and replace it with toxic artificial turf. By organizing soccer games with players wearing cleats, they intentionally destroyed two different sod grass fields in order to justify the artificial turf. The artificial turf contract was awarded to a crony of Chairman Mehiel and the governor.[33]

<u>However, even if these defamatory allegations were true, they are utterly irrelevant to the BPCA's defense arguments.</u> Their misleading versions of reality took place miles away from the BPCA offices and had nothing whatsoever to do with BPCA board meetings or Plaintiff's behavior that might justify him being barred from BPCA board meetings.

---

[32] Hyman provides no exhibits or proof that she actually made any report to the Manhattan District Attorney.
[33] See BatteryPark.TV story at http://batterypark.tv/real-estate/shoddy-construction-of-the-west-thames-cancer-turf-field.html

Of note, Plaintiff is beloved by the Lower Manhattan community and praised for his press coverage in BatteryPark.TV. As evidence, the "Testimonials" tab on BatteryPark.TV has dozens of compliments made to Plaintiff over the years from upstanding members of the community. Likewise, in the comments section are numerous notes of thanks and praise from the community.

**5. Plaintiff's Press Reporting Was Read by BPCA Defendants and was the Motive for Retaliation**

On page 9 of the BPCA's MOL, they claim that Mehiel, "…testified that he did not even read Plaintiff's blog. (56.1 ¶ 66.) And there is no evidence that Plaintiff was denied entry because of the content of his reporting." Implying it was a content-neutral decision. However, that is false. Mehiel did indeed testify during his deposition that he was aware of Plaintiff's BatteryPark.TV reporting on the BPCA, that he was frequently sent those press articles by his Chief of Staff via email, and that Mehiel read them (see Mehiel Dep., Greer Decl. Ex 4, at 23:16-24:2).

Other deposition testimony also proves that the BPCA executives frequently read, and became angered by, Plaintiff's press coverage. During the deposition of former in-house legal counsel Allyson Ford, she explained how President Serpico would warn staff during official meetings not to read BatteryPark.TV and would smear his reputation (see Ford Dep., Greer Decl. Ex. 5, at 9:6-12:21).  In addition, during the deposition of Chief of Staff Kevin McCabe, he acknowledged reading numerous articles from BatteryPark.TV and forwarding them to Mehiel (see McCabe Dep., Greer Decl. Ex. 6, at 25:5-30:17).

**6. Plaintiff's Ability to Report in the Press Was Impaired**

On pages 8 and 11 of the BPCA's MOL, they claim that the decision to bar Plaintiff from open board meetings created no harm and damages because his ability to report in the press was not "impaired" because the BPCA had set up a separate webcast video viewing room a half-mile away. Those are false conclusory statements.

The quality of the live video webcasts of BPCA board meetings is of such poor quality and low resolution (likely intentionally) that viewers cannot even tell which board members are in attendance or

which voice is associated with which speaker[34]. Also, the entire audience section of the room is blocked from camera view except for a few seats. It is crucial to see the details of inside the boardroom in order to report. For example, quite often conspicuous absences of board members have been the only signs that a board member has been quietly removed (e.g. as in the cases of BPCA board members Martha Gallo, Fernando Mateo, and Frank Branchini, who were all silently ousted). It is also obvious that if a reporter cannot tell which person on the board is doing the speaking, then proper reporting is impossible.

The BPCA claims that the video viewing room set up solely for the benefit of Plaintiff, who was singularly excluded, was a "reasonably tailored" solution. However, any reasonable juror would agree that the measure was an elaborate ruse to conceal the real goal of completely preventing Plaintiff from reporting on the BPCA, and was not a "reasonably tailored" solution to respect the First Amendment.

### 7. Rebuttal of BPCA's Case Law Regarding Count 2

The Second Circuit ruled: "the First Amendment requires equal access to all of the media." *Am. Broadcasting Cos., Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977). The BPCA argues that this ruling is "not absolute" and that they were justified in not granting Plaintiff equal access.

The BPCA cites *Huminski v. Corsones*, 396 F.3d 53, 55–59 (2d Cir. 2005) as the legal basis for barring Plaintiff from meetings (holding that the First Amendment right of access to court proceedings is subject to reasonable restrictions). However, *Humiski* dealt with a person being ejected from a legal courtroom venue where the need for strict decorum is a quantum leap greater than during a BPCA board meeting. Also, that person was deemed to be a genuine threat and disturbance, unlike Plaintiff in this instant case.

In *Stevens v. N.Y. Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987), that Court ruled that the decision to bar Plaintiff must be content neutral (Thus, the first amendment prohibits government from restricting a journalist's access to areas otherwise open to the press based upon the content of the

---

[34] See archived video here: https://batteryparkcity.granicus.com/ViewPublisher.php?view_id=1

journalist's publications. *Sherrill v. Knight,* 569 F.2d 124, 129 (D.C. Cir.1977); *cf. New York City Unemployed & Welfare Council v. Brezenoff,* 677 F.2d 232 (2d Cir.1982) ("restrictions based on the content of communication are especially disfavored")). However, in this instant case, the BPCA's decision was clearly not content neutral, but rather an act of retaliation for the content (*supra* §3).

The BPCA tries to argue that Plaintiff had no right to be present at the meetings in order to videotape, citing *Malta v. Slagle*, No. 05-CV-342S, 2007 WL 952045, at *5 (W.D.N.Y. Mar. 29, 2007) ("Indeed, "[c]ourts have generally held that there is no constitutional right to videotape public proceedings, particularly where the public has an alternative means of gathering information, such as making an audio recording or taking notes."). However, *Malta* is irrelevant to this instant case. Neither Plaintiff nor the BPCA have ever argued that the reason Plaintiff was barred from the BPCA meetings had anything to do with Plaintiff wanting to film the meetings. Also, the BPCA has its own crew filming, and there are no space constraints to prohibit the press from filming, unlike *Malta* where the mayor claimed the meeting room lacked space.

Moreover, the New York Authorities Budget Office "Best Practices"[35] states that video broadcasting of the BPCA meetings should be performed and that "the public has the right to attend the meetings" citing New York Public Officers Law §104(4). Therefore, for the BPCA to exclude Plaintiff from the live boardroom meetings goes against best practices and New York law.

The BPCA cites on page 13 of their MOL a slew of case law all supporting the point that disruptive members of the public or press can be ejected form public meetings. *Mesa v. Hudson Cty. Bd. of Chosen Freeholders*, No. CIV.A. 09-3576 KSH, 2011 WL 4592390, at *6 (D.N.J. Sept. 30, 2011); and *Thornton v. City of Kirkwood*, No. 07-CV-79 (CDP), 2008 WL 239575, at *5 (E.D. Mo. Jan. 28, 2008); and Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev. 927, 954 (1992).

---

[35] Page 3 at:
https://www.abo.ny.gov/recommendedpractices/BoardMeetings_BestPracticesGuideforPublicAuthorities2015.pdf

However, those cases are all irrelevant to this instant case since the <u>BPCA never accused Plaintiff of being disruptive during board meetings</u>. McCabe testified that Plaintiff never touched him and no police or security had to be called to make Plaintiff leave the boardroom (*supra,* Count 2, §4). Instead, realizing that they needed to concoct a defense strategy, <u>the BPCA now claims that it was Plaintiff's behavior on the phone prior to the BPCA board meetings that justified him being barred from those meetings</u>.[36] Plaintiff strongly disputes those accusations (*supra* Count 2, §4).

## Compensatory Damages are Demonstrated and Not "Nominal"

On page 17 of the BPCA's MOL, they try to make the argument that Plaintiff's damages were not proven to have been caused by the First Amendment violations of the BPCA. Therefore, according to their case law, Plaintiff should be awarded only "nominal damages". *Phillips v. City of New York*, 871 F. Supp. 2d 200, 206 (E.D.N.Y. 2012). However, common sense says otherwise and the lawyers provide no explanation or rationale to support their bold claim that the BPCA's actions did not directly cause Plaintiff's damages.

The BPCA lawyers' list of case law[37] on page 18 is without a corresponding argument. For example, why did not the BPCA's actions leading to the eviction directly cause damages to Plaintiff? They do not explain. However, to the contrary, any reasonable jury would agree *prima facie* that the retaliatory eviction directly harmed both BatteryPark.TV and The Healthcare Channel because both were headquartered in the apartment and required the proximity to Lower Manhattan to function. It is also obvious that Plaintiff's medical practice and plans to open an urgent care and surgery center in Manhattan were destroyed by the retaliation, and that his moving expenses were caused by the eviction, etc.

---

[36] See pages BPCA's MOL at 10, 11 (Dkt. No. 372)
[37] *Wallace v. Suffolk Cty. Police Dep't*, 809 F. Supp. 2d 73, 82 (E.D.N.Y. 2011); and *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998

**1. There is Evidence to Support Claims for "Lost Value" Damages**

  **A. Damages to the Media and Technology Companies**

   On page 18, the BPCA claims that Plaintiff failed to prove actual damages to his media companies, which are The Healthcare Channel and BatteryPark.TV. That is false. In Plaintiff's FRCP 26(a)(1) initial disclosure form, he detailed the financial rationale for determining the "loss of value" to his media companies (see Greer Decl. Ex. 7, at 5). He explained how the revenue and income of his companies were irrelevant to the "value" of the company because they are small media/technology firms rather than mature revenue-income-earning companies. <u>"Loss of revenue or income" was not argued by Plaintiff, but rather "loss of value" was</u>. Plaintiff successfully argued before Magistrate Judge Cott that the defendants' document requests to learn details of revenue and income should not be allowed (see Greer Decl. Ex. 8, at 13).

   Plaintiff provided in his initial disclosures the rationale for deriving the estimated loss of value for his media companies (see Greer Decl. Ex 7, at 5). He used both the "Comparative Market Transaction Approach" or "Benchmark" method (i.e. This approach determines the value of the business by comparing the subject firm to comparable firms that have been bought or sold during a reasonably recent period of time.) and the discounted cash flow method. Those are the same methods allowed by the courts.[38]

   As one example, the closest comparison company to the Healthcare Channel is MedPage Today. When that company first sold its shares on the public market via IPO, the SEC filing called the S1 detailed the valuation methods[39] used by their bankers at Goldman Sachs.[40] On page 75 of the S1, it states:

---

[38] Kolaski and Kuga: Journal of Law and Commerce (Fall 1998): Measuring Commercial Damages via Lost Profits or Loss of Business Value: Are these Measures Redundant or Distinguishable? https://www.cisg.law.pace.edu/cisg/biblio/kolaski.html

[39] U.S. SEC Form S-1, Registration Under the Securities Act of 1933: EVERYDAY HEALTH, INC. found at http://www.nasdaq.com/markets/ipos/filing.ashx?filingid=9368492

[40] Peter van der Goes was the senior banker for this deal at Goldman Sachs and has worked with Plaintiff on projects before, such as being a speaker at Plaintiff's Miami University seminars.

"Since 2012, the independent valuation consultant has considered two scenarios for estimating our firm value. The first scenario, which assumes that we will complete an initial public offering, or IPO, utilizes a market-based approach. The second scenario, which assumes that we will remain a private company or experience a liquidation event other than an IPO, utilizes the discounted cash flow method… The selected peer group of companies has been consistently used in both the market and income approaches"

Therefore, Goldman Sachs used the exact same valuation methodologies for MedPage Today's parent company (i.e. They looked at "peer groups" of companies and their market value) as did Plaintiff for The Healthcare Channel in his initial disclosure.

On page 20 of the BPCA MOL, they cite a case claiming that the benchmark comparison method of valuation is not credible. The BPCA states:

"Indeed, comparable businesses, even in the hands of an expert, "can rarely provide a stable basis for a damages calculation because 'the ultimate conclusions are still projections' that rely on 'known or unknown factors.'" *Washington v. Kellwood Co.*, No. 05-CV-10034 (SN), 2016 WL 3920348, at *8 (S.D.N.Y. July 15, 2016) (quoting *Kenford Co. v. Erie Cty.*, 493 N.E.2d 234, 236 (N.Y. 1986))."

However, in *Washington v. Kellwood Co.*, the plaintiffs were using the "Lost Profits" rationale for damages, which requires a provable historic stream of revenue. In this instant case, Plaintiff has specifically avoided the "lost profits" method to estimate damages. Instead, Plaintiff argues that the entire sale value of his media companies has been damaged. This "lost business value" method of estimating damages does not rely on historical revenue because many startup companies, particularly in media and technology, have little or no revenue, yet are still worth million of dollars.[41]

In the case of *Taylor v. B. Heller and Company*, 364 F. 2d 608 - Court of Appeals, 6th Circuit 1966, it was ruled that the best method for determining damages to a small company was the difference in market value before and after the incident ("The law of Ohio, which governs in this diversity action, recognizes the action for damages for destruction of a business as measured by the difference between the value of the business before and after the injury or destruction"). The media companies at question in

---

[41] See Section IV of Kolaski and Kuga: Journal of Law and Commerce (Fall 1998): Measuring Commercial Damages via Lost Profits or Loss of Business Value: Are these Measures Redundant or Distinguishable? Available online at https://www.cisg.law.pace.edu/cisg/biblio/kolaski.html

this instant case are Ohio businesses part of an Ohio LLC called Cortex Television, LCC, owned by Plaintiff.

In *Wagenheim v. Alexander Grant Co.,* 19 Ohio App.3d 7, 19 O.B.R. 71, 482 N.E.2d 955, 967 1983) ("When an established and ongoing business is wrongfully injured or destroyed, the correct rule for determining the recovery should be the difference between the value of the business before and after its injury or destruction.").

In the case of *Royal Capital Development, LLC v. Maryland Casualty Company*, No. 10–15716, Court of Appeals, Eleventh Circuit, 2011, that Court certified a question to the Supreme Court of Georgia in *Royal Capital Development LLC v. Maryland Cas. Co*., ___ S.E.2d ___, 2012 WL 1909842 (Ga. May 29, 2012) ("if the insurer elects to the repair the building, must it also compensate the insured for the diminution in value of the property resulting from stigma due to its having been physically damaged?"). "The Georgia Court extended a prior ruling and held that insurers providing first-party insurance, which includes homeowners insurance, are required to compensate policyholders for what is sometimes called "stigma" damages, or a decrease in value based solely on the fact that the property has been damaged in the past. Previously, the Supreme Court had ruled, in *State Farm Mut. Auto. Ins. Co. v. Mabry*, 274 Ga. 498 (2001), that automobile insurers are required to compensate auto owners for the diminution in value to their automobiles in addition to the vehicle repair cost."[42]

On page 20 of the BPCA's MOL, the lawyers point out that Plaintiff did not reveal details of his finances. Therefore, they argue his damage estimates are nothing more than "speculation and guesswork". However, Judge Cott disagreed, ruling that the financial documents the BPCA requested would be too far afield. Plaintiff, a Wall Street veteran and expert[43] on valuing early-stage technology companies, also disagrees with the BPCA arguments. The "lost business value" method is what the stock market analysts rely on, not lost profits.

---

[42] From the website of law firm Turkheimer & Hadden
[43] See Plaintiff's declaration filed on July 17, 2017 (Dkt. No. 395)

Concluding their argument on this section, the BPCA claims:

"no rational factfinder could determine the lost value or profits claimed by Plaintiff with "reasonable certainty,"…with respect to Plaintiff's claim for lost profits and the lost value of his media companies. *See, e.g.*, *Dockery v. Tucker*, No. 97-CV-3584 (ARR) (RLM), 2006 WL 5893295, at *26 (E.D.N.Y. Sept. 6, 2006)"

However, *Dockery v. Tucker* is a magistrate judge order on a criminal case in which that plaintiff was filing frivolous motions over many years and picking estimates for damages out of thin air to his property after an arrest. The district judge tossed the entire case after the plaintiff tried to appeal the magistrate judge order. Clearly, that criminal case law is irrelevant to this instant case.

### B. Destruction of the Medical Businesses

In a supplementary disclosure provided by Plaintiff on April 19th, 2017, after his deposition, he provided a detailed business plan for opening an urgent care and surgery center near these federal courts on Duane Street (Greer Decl. Ex. 9). However, this disclosure was ignored by the BPCA and not mentioned in their MOL. That medical businesses plan was "destroyed" by the defendants' actions. The time-consuming litigation and eviction made it impossible for Plaintiff to execute plans of opening a small hospital.

The "Destruction of business" damages are calculated by estimating the cash stream of the enterprise out to perpetuity, then discounting back to current day.[44] The business plan provided by Plaintiff to the BPCA contained a financial chart of projected revenue and income. *Id*.

At the bottom of page 19 of the BPCA's MOL, in footnote #15, they erroneously and derogatorily state that Plaintiff did not have a medical practice prior to the defendants' retaliatory eviction, and that he only wrote prescriptions for friends and himself. However, Plaintiff's testimony during deposition extensively discussed this medical business (see Greer Dep in Greer Decl. Ex. 3, at 36:11-14, 116:4-121:13, 270:8-275:13).

---

[44] See Section III of Kolaski and Kuga: Journal of Law and Commerce (Fall 1998): Measuring Commercial Damages via Lost Profits or Loss of Business Value: Are these Measures Redundant or Distinguishable? Available online at https://www.cisg.law.pace.edu/cisg/biblio/kolaski.html

Since Plaintiff is requesting a trial to determine the amount of damages, and since he is the only person handling (with very limited resources) his own litigation, he has deferred providing more exhaustive information until the time of trial for damages. More expert witnesses will be provided at that time as well.

## 2. Plaintiff is an Expert Witness on Business Valuation

On page 20 of the BPCA's MOL, they claim that Plaintiff provided no expert witness to validate the damages claims, and that Plaintiff is not allowed to be his own expert witness because he is a "lay witness". Those assertions are false.

Firstly, Federal Rules of Evidence 701 and 702 say nothing about prohibiting a party from being their own expert witness. In the case of *Glenn E. Tagatz, Plaintiff-appellant, v. Marquette University, Defendant-appellee*, 861 F.2d 1040 (7th Cir. 1988), it states, "Rule 702 of the Federal Rules of Evidence, which governs the qualification of expert witnesses, is latitudinarian, and nothing in its language suggests that a party cannot qualify as an expert."

Secondly, during Plaintiff's deposition, he testified at length explaining his rationale in deriving the damages (see *Id*. at 43:4-12, 212:3-24, 214:21-243:22) and why he is an expert in financial valuation (see *Id*. At 231:4-232:6). Plaintiff has a finance degree and was a senior analyst for large Wall Street banks before becoming a portfolio manager overseeing $250,000,000 in his trading portfolio that was part of a larger $10 Billion hedge fund owned by Merrill Lynch. As an analyst, plaintiff built from scratch the detailed financial spreadsheet models that were used by the investment bankers to transact IPO and other stock offerings that required valuations. In fact, Plaintiff pioneered at Credit Suisse the method of probability adjusting for risky drugs in development that is now the gold standard of healthcare analysts to this day. Plaintiff also wrote the research reports used to initiate coverage on new companies as part of the healthcare research team at Donaldson Lufkin & Jenrette and Credit Suisse. His research team was ranked #1 by Institutional Investor magazine, which is the industry standard ranking (see Greer Decl. ¶¶ 42-45).

### 3. There Is Evidence to Support Mental Anguish Claims

On pages 21 and 22 of the BPCA's MOL, they claim that Plaintiff failed to provide adequate evidence of mental anguish. However, the lawyers once again mislead this Court by failing to discuss supplemental discovery evidence that Plaintiff provided on April 27th, 2017 proving that he had begun seeking mental health care (see Greer Decl. Ex. 10). That care is ongoing and the expert witness will be available for a trial of damages. Therefore, their case of *Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002) is irrelevant.

### 4. The BPCA Destroyed Plaintiff's Reputation, Causing Mental Anguish

On page 21 of the MOL, in footnote #16, the lawyers claim that Plaintiff provided no evidence that being barred from the meetings caused mental anguish. That is false. In the course of manipulating various security agencies in Lower Manhattan into agreeing to bar Plaintiff, the BPCA issued misleading emails to the security staff of Brookfield Properties and the New York Police Department.[45] Those emails portrayed Plaintiff as a serious threat and mentally unstable.

Battery Park City is a small community and the four large office towers of Brookfield bisect it into north and south halves. People are forced to walk through Brookfield towers every day just to conduct daily business. As a result of the security being placed on alert by the defamatory emails, Plaintiff received sinister looks from the Brookfield security and was harassed (See videos, *supra*, page 10). Likewise, the NYPD officers involved were also prejudiced and treated Plaintiff like a suspicious criminal (See videos from July 29, 2015, and April 13, 2016, *supra*, page 10). All of this was extremely unnerving and contributed to Plaintiff's mental anguish.

Since this evidence of public humiliation does indeed exist, their case law of *Annis v. County of Westchester*, 136 F.3d 239 (2d Cir. 1998) and *Uddin v. New York City / Admin. for Children's Servs.*, No. 99-CV-5843 (GEL), 2001 WL 1512588, at *6 (S.D.N.Y. Nov. 28, 2001) is also irrelevant.

---

[45] See Plaintiff's MOL at 25 ¶5, 26 ¶1 (Dkt. No. 367)

**5. There Is Evidence to Support "Loss of Enjoyment of Apartment" Damages**

On page 23, the lawyers state, "Plaintiff cannot recover the ethereal personal value he placed on the lease itself." in response to the damages in Plaintiff's initial disclosure labeled as "Loss of enjoyment of NYC apartment" (see Greer Decl. Ex. 7, at bottom of 5). The best way to value the loss of a view and enjoyment of an apartment is to simply estimate its market value. The average selling price for a one-bedroom apartment in Battery Park City, in the same building with the same view, is approximately $1 Million. A trial of damages will pinpoint that estimate.

This methodology is not "obviously flawed", as the BPCA lawyers state. Plaintiff is an expert on financial valuations (see Greer Decl. ¶¶ 42-45).

Also, the BPCA's statement on page 23, "There is no evidence that Plaintiff was unable to find a replacement lease for a similar apartment on similar terms" is false. Plaintiff stated during sworn deposition that he was unable to find any apartments in lower Manhattan, in part because the real estate defendants own every high-rise building in Battery Park City with a similar unobstructed high view of the ocean and sunsets, *inter alia* (see Greer Dep. in Greer Decl. Exhibit 3, at 256:7-258:17).

The panoramic view from Plaintiff's apartment overlooking the New York Harbor and Statue of Liberty was a crucial component of Plaintiff's mental health regimine. He chose that apartment in 2002 precisely for the view because plaintiff was suffering mental anguish after 9/11 in his congested apartment by the United Nations. The view is the only reason that Plaintiff chose to become a resident of Battery Park City. At the time, Battery Park was disaster zone with the World Trade Center "Ground Zero" still in smoldering ruins nearby. Few people wanted to live Downtown whilst Plaintiff pioneered.

Plaintiff photographed the view from his apartment and frequently posted the images on BatteryPark.TV (see Greer Decl. Ex. 11). Now in Ohio, Plaintiff has no view from his ground-level apartment and has not engaged in his photography hobby for nearly a year. The expensive camera equipment sits idle. Plaintiff's mental anguish damages have been compounded by this loss of enjoyment of the apartment.

**6. Plaintiff Can Recover Expenses Incurred After His Eviction**

On page 22, the BPCA states:

"Plaintiff claims various "moving" costs, but the claimed expenses are well beyond what any factfinder would regard as reasonably foreseeable costs of being evicted…. Specifically, Plaintiff claims $50,000 in moving costs, which includes the cost of a Mercedes-Benz sedan for $19,089.25, …and the costs of four moves – including long-term stays at the Ritz Carlton and Hyatt hotels…"

Again, the lawyers mislead this Court. The hotel stays were at negotiated reduced rates of $150 per night, which is below the market rate in New York City (see Greer Decl. Ex. 12). To get these rates, Plaintiff was forced to move 30-miles away to White Plains, and then even farther to Greenwich. The cost of the used 2012 Mercedes is well below the cost of a new American-made sedan. Plaintiff had not owned a car for 19-years since moving to New York and the car was essential once he moved back to Ohio. The cost of meals cited in footnote 17 are from Plaintiff's travel to New York from Ohio for court appearances and depositions. They are all very reasonable charges by New York restaurant standards for a person traveling.

Since Plaintiff was indeed frugal and reasonable rather than profligate, the BPCA's arguments are moot and their case law of *Monette v. Cty. of Nassau*, No. 11-CV-539 (JFB) (AKT), 2015 WL 1469982, at *18 (E.D.N.Y. Mar. 31, 2015); and *Miller v. Lovett*, 879 F.2d 1066, 1070 (2d Cir. 1989); and *Miller v. Lovett*, 879 F.2d 1066, 1070 (2d Cir. 1989) is irrelevant.

## <u>BPCA Is Not Immune from Punitive Damages</u>

The BPCA argues on Page 24 of the MOL that it is a public benefit corporation, and as such enjoys immunity from punitive damages under 42 U.S.C. §1983. However, the status of the BPCA's immunity is currently under review by the United States Court of Appeals for the Second Circuit. In the case of the World Trade Center Lower Manhattan Disaster Site Litigation No. 15-2181 (2d Cir. 2017), the Second Circuit certified down to the New York Court of Appeals the question of:

"(1) Before New York State's capacity-to-sue doctrine may be applied to determine whether a State-created public benefit corporation has the capacity to challenge a State statute, must it first be determined whether the public benefit corporation "should be treated like the State," *see Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 516 N.E.2d 190, 192, 521 N.Y.S.2d 653 (N.Y. 1987), based on a "particularized inquiry into the nature of the

instrumentality and the statute claimed to be **[\*\*26]**  applicable to it," *see John Grace & Co. v. State Univ. Constr. Fund*, 44 N.Y.2d 84, 375 N.E.2d 377, 379, 404 N.Y.S.2d 316 (N.Y. 1978), and if so, what considerations are relevant to that inquiry?"

The New York Court of Appeals is scheduled to hear the question in September of 2017.

In *Mancuso v. New York State Thruway Auth.*, 909 F.Supp. 133 (S.D.N.Y.1995), the District Court denied the Thruway Authority's motion for summary judgment to dismiss the punitive damages. They appealed, and the Second Circuit refused to vacate the District Court ruling that allowed punitive damages. *Mancuso v. New York State Thruway Auth.*, No. 524, Docket 95-7443. (2nd Cir. 1996).

In addition, there have been cases of federal courts awarding punitive damages against states and municipalities. *Jones v. City of Key West, Fla.*, 679 F. Supp. 1547 (S.D. Fla. 1988); and *Jackson v Dallas School District*: Case No. 3:12cv1903; (M.D. of Pennsylvania, 2015). Therefore, the BPCA's motion to strike Plaintiff's claims for punitive damages should be dismissed.

## CONCLUSION

Faced with overwhelming evidence against them, the BPCA has filed a frivolous motion for summary judgment and the taxpayer is footing the legal bill. That moral hazard is also likely why this case (as well as the case of *Swanson v BPCA* 15-cv-6938) was not settled six-months ago.

Through extensive discovery by a *pro se* litigant, deposing ten people and writing dozens of briefs, Plaintiff now has a mountain of evidence to prove that Robert Serpico abused his power as acting president of the BPCA and coerced the real estate defendants into his conspiracy to retaliate against Plaintiff with using eviction as the weapon. The defendants' motive was Plaintiff's muckraking in the press exposing scandals relating to Serpico. Serpico was ultimately ousted by the BPCA. This was the first act by the defendants that violated the First Amendment.

The defendants engaged in flagrant spoliation of crucial evidence. Sanctions should apply preventing them from arguing that the retaliatory eviction did not take place.

There is also evidence beyond a reasonable doubt that BPCA Chairman Mehiel ordered his staff to illegally bar Plaintiff from public board meetings. This was the second act that violated the First Amendment.

The damages caused by these actions are of the compensatory and punitive nature. The BPCA is not clearly immune to punitive damages and the Second Circuit is reviewing that question now. The methodologies used by expert witness Plaintiff are sound and backed by the courts. The damages to the media companies are based on "loss of value" and derived by the "Benchmark" or "Comparative Market Transaction Approach" and "discounted cash flow" models. The damage to the medical business is derived from a total "destruction of business" method. A professional psychologist validates the mental anguish damages, and the direct costs of moving after eviction are indisputable.

In addition, Plaintiff is asking for equitable relief in his own motion for summary judgment. The BPCA is a rogue agency operating in the shadows as an "authority" free from the scrutiny of an official state agency. For more than 30-years, the BPCA has made a mockery of EEOC, Open Meetings, FOIA, and constitutional law. This federal Court should restructure the BPCA.

Dated: July 17, 2017
Columbus, Ohio

By: _____

Steven Greer, *pro se*
4674 Tatersall Court
Columbus, Ohio 43230
(212) 945-7252
steve@batterypark.tv