UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **STEVEN E. GREER**, MD | ) | |
| | ) | **15-CV-6119 (AJN) (JLC)** |
| Plaintiff; | ) | |
| | ) | |
| v. | ) | |
| | ) | **HON. ALISON J. NATHAN** |
| | ) | DISTRICT JUDGE |
| **Dennis Mehiel, Robert Serpico, The** | ) | |
| **Battery Park City Authority, Howard** | ) | **HON. JAMES L. COTT** |
| **Milstein, Steven Rossi, Janet Martin,** | ) | MAGISTRATE JUDGE |
| **Milford Management, Mariners Cove Site** | ) | |
| **B Associates** | ) | |
| | ) | |
| Defendants. | ) | |

---

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
### TO REAL ESTATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Steven E. Greer, MD, pro se
4674 Tatersall Court
Columbus, Ohio 43230
(212) 945-7252
steve@batterypark.tv

# Table of Contents

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENTS.......................................................................................................................... 2

Plaintiff Did Prove a Prima Facie Section 1983 Case ............................................................ 2

   1. The Serpico Testimony.............................................................................................. 2

   2. The Soriero Testimony ............................................................................................. 3

   3. The Acts of Spoliation.............................................................................................. 4

   4. The Ford Testimony ................................................................................................. 5

   5. The Body of Evidence Is Admissible ....................................................................... 6

There is No Evidence That Plaintiff Would Have Been Evicted Regardless ............................... 6

   1. Plaintiff Paid Timely Rent for 14-Years................................................................... 7

   2. Plaintiff Did Not Harass Neighbors and Building Staff ............................................ 8

   3. Plaintiff Was Treated Differently Than Other Tenants ............................................. 8

   4. The "Mt. Healthy" Defense Does Not Hold.............................................................. 9

Defendants Milstein and Martin Are Indeed Liable ................................................................ 10

The Terms of the Lease Do Not Preclude a Jury Trial ............................................................. 11

   1. Plaintiff's Jury-Waiver Lease Does Not Apply to this First Amendment Case ................... 11

   2. It Would Be Impossible to Try This Case Piecemeal by Jury for the BPCA and Bench

   Hearing for the Real Estate Parties........................................................................... 13

   3. Jury Waivers Are to be Narrowly Construed ........................................................... 14

   4. In Summation ......................................................................................................... 15

Compensatory Damages are Demonstrated and Not "Nominal".....................................16

   1. The Actions of the Defendants Cleary Caused Damages to Plaintiff's.................16

   2. Plaintiff's Valuation Methods are the Gold Standard and Valid...........................17

   3. Plaintiff Established Mental Anguish Damages with Professional Therapy........17

   4. There Is Evidence to Support "Loss of Enjoyment of Apartment" Damages......18

   5. Plaintiff was not Profligate with Moving and Court Travel Expenses.................19

CONCLUSION.......................................................................................................19

# Table of Authorities

**Cases**

*Randall–Smith, Inc. v. 43rd St. Estates Corp.*, 17 N.Y.2d 99, 105–06 (1966) ............................ 17

*Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274 (1977). .............. 6, 9

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, No. 03-cv-8259 (CSH), 2007 WL
    3286645, at *3-4 (S.D.N.Y. Nov. 7, 2007) ................................................................................ 11

*Carey v. Piphus*, 435 U.S. 247 (1978), ........................................................................................ 9

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707–09 (1999). ........... 12

*Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994); *McCann v. Coughlin*, 698 F.2d 112, 126 (2d
    Cir. 1983) .................................................................................................................................. 17

*H & P Research, Inc. v. Liza Realty Corp.*, 943 F. Supp. 328, 331 (S.D.N.Y. 1996) ................. 17

*Hines v. 1025 Fifth Ave., Inc.*, No. 14-cv-3661 (SAS), 2015 WL 765943, at *2 (S.D.N.Y. Feb.
    23, 2015) ................................................................................................................................... 12

*Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 55 (2d Cir.
    2002) ......................................................................................................................................... 18

*Swanson v Battery Park City Authority* 15-cv-6938). .................................................................. 2

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)." ................................................... 1

**Statutes**

New York Consolidated Laws, Real Property Law - RPP § 259-c.: ............................................ 11

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................................... 1

Federal Rule of Evidence Article VIII, § 801(d)(2). ...................................................................... 3

Federal Rule of Evidence, Article VIII, § 804(b)(3)(A)(B) ............................................................ 3

Federal Rule of Evidence, Article X, § 1002 ................................................................................. 3

FRCP 37 ..................................................................................................................................... 2, 10

FRCP 37(e) ....................................................................................................................................... 5

FRCP 406 .......................................................................................................................................... 6

**Treatises**

Ernest H. Schopler, *Supreme Court's construction of Seventh Amendment's guaranty of right to trial by jury*, 40 L. ED. 2d 846.: .......................................................................................... 15

Jean R. Sternlight, *Mandatory Binding Arbitration and the Demise of the Seventh Amendment Right to a Jury Trial,* 16 OHIO ST. J. ON DISP. RESOL. 669 (2001).: .................................. 14

Leonard B. Sand, et al., *Modern Federal Jury Instructions* ............................................................ 6

Ninth Circuit Model Jury Instructions, Chapter 1.5 ....................................................................... 6

Robert Frankhouser, *The Enforceability of Pre-Dispute Jury Waiver Agreements in Employment Discrimination Cases, Duquesne Business Law*. Journal, Vol. 8 (2006): ................................ 14

Third Circuit Model Jury Instructions Chapter 1.6 ......................................................................... 6

**Constitutional Provisions**

First Amendment ......................................................................................................................... 1, 9

Plaintiff Steven E. Greer, MD hereby submits this Memorandum of Law in Opposition to the real estate defendants' Motion for Summary Judgment (Dkt. No. 379). The facts underlying this opposition are fully set forth in Plaintiff's previously filed Rule 56.1 Statement of Undisputed Facts in Support of his Motion for Summary Judgment, dated June 7, 2017 (Dkt. No. 368), in Plaintiff's Rule 56.1 Counter-Statement to the BPCA Rule 56.1 statement of facts (Dkt. No. 394). and also in Plaintiff's Rule 56.1 Counter-Statement to the real estate Rule 56.1 statement of facts (Dkt. No. 397).

## PRELIMINARY STATEMENT

The real estate defendants ("defendants") are faced with overwhelming evidence that they did indeed violate Plaintiff's First Amendment rights in many ways. Despite almost all of their "facts" listed in their rule 56.1 being in dispute, they are nevertheless attempting this motion for summary judgment supported by Memorandum of Law ("MOL").

Out of necessity, they resort to smear tactics in an attempt to show that Plaintiff was deserving of eviction because he failed to pay rent and was a troublemaker harassing people in the building. They also use the "data dump" strategy of piling bogus claim after bogus claim upon this Court hoping that they can create reasonable doubt.  However, they fail.

Because the defendants were unable to produce a defense using material facts with no genuine dispute, their motion for summary judgment must be dismissed. "Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)."

1

# ARGUMENTS

## **Plaintiff Did Prove a Prima Facie Section 1983 Case**

From pages 6 to 10 of the defendants' MOL, they argue that Plaintiff failed to prove there was a collusion and conspiracy with the BPCA defendants to retaliate and evict him. Therefore, Section 1983 does not apply and they should win summary judgment. However, Plaintiff did produce a mountain of evidence to prove their conspiracy with the BPCA to evict Plaintiff in retaliation for his press coverage. Moreover, due to flagrant and wanton spoliation, the defendants should not be allowed to argue that the conspiracy did not take place, per sanctions guided by FRCP 37, *inter alia*.

### 1. The Serpico Testimony

Kirk Swanson is a former senior executive at the BPCA who is now also suing the BPCA in this federal court for wrongful termination (*Swanson v Battery Park City Authority* 15-cv-6938). During the Swanson deposition on March 21st, he testified that he witnessed certain actions and words by Robert Serpico to make him believe that Serpico was behind the eviction of Plaintiff. In the transcript (see Greer Decl. Ex. 12 at 24:7-22). Swanson stated that he believed Serpico was the cause of Plaintiff's eviction (by getting Plaintiff's landlord to not renew his apartment lease) because he had heard about it from Kevin McCabe in the BPCA offices on January 21, 2014. *Id.* at 19:4-20:19. Swanson then immediately walked to Serpico's office and asked him whether he had anything to do with, "Greer not getting his lease renewed". Swanson then concluded, based on Serpico's nonverbal response with a "smirk and shrug", that Serpico was indeed the culprit.

Swanson also testified that Serpico was often aware of and upset by Plaintiff's press coverage of him, indicating a motive for the retaliation. *Id.* at 16:4-17:9, and 22:5-18.

Swanson also testified that he saw defendants Serpico and Rossi meeting in late 2013 shortly before Plaintiff was notified that he was going to be evicted. The meetings would take place outside of the BPCA offices, for example, in the coffee shop called Au Bon Pain. *Id.* at 21:2-22:4. This is evidence of the collusion between the real estate and BPCA defendants.

**2. The Soriero Testimony**

Another witness to Serpico's conspiracy with the real estate defendants, Linda Soriero, who was Serpico's personal secretary for 18-years, can be heard on an audio recording made by Plaintiff of a telephone call on March 12th, 2017. Soriero stated that she directly witnessed an email on Serpico's computer at work in his office, proving that Serpico conspired and colluded with Rossi no less than a "year and a half ago" to retaliate against Plaintiff using eviction as the means (see Greer Decl. Ex. 13, at 2:19-3:25, and 16:23-17:14, and 18:4-20).

However, soon after Linda Soriero began to be a cooperating witness to Plaintiff, the BPCA tampered with the witness by firing her from the BPCA. A complaint was made to Magistrate Judge Cott on April 7, 2017 (Dkt. No.ˢ 311 and 313). As a result, Soriero ignored two different subpoenas to be deposed on two different occasions. Therefore, sworn testimony to corroborate the audio does not yet exist.

Federal Rule of Evidence, Article X, § 1002 requires that an original copy of the audio recording be produced in order to be admissible. Plaintiff has provided that to the defendants.

The testimony by Soriero is not hearsay because she spoke about things that she directly witnessed, per Federal Rule of Evidence Article VIII, § 801(d)(2).

Also, because declarant Soriero is unavailable for cross-examination before the jury, due to being chilled and tampered by the BPCA, her testimony is not hearsay, given that her testimony made on the telephone was against her best interests, and indeed got her fired. Federal Rule of Evidence, Article VIII, § 804(b)(3)(A)(B) states:

"(A) a reasonable person in the declarant's position would have made <u>only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest</u> or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
(B) is <u>supported by corroborating circumstances</u> that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."

There is ample "corroborating circumstances" proved in this case to support the declarant's testimony, and her testimony led to her losing her job. Therefore, the criteria in (A) and (B) are met.

In addition to the telephone call testimony described above, one email was produced by Soriero also helping to prove the conspiracy between Serpico and Rossi. Serpico emailed Rossi after Plaintiff sent a cease-and-desist email to not destroy documents on May 28, 2014 (see Greer Decl. Ex. 14, at 2). This was long before the federal case was filed that made them co-defendants. <u>Conspiracy to evict is the likely explanation for the two men to be communicating in such a way at that early time.</u>

## 3. The Acts of Spoliation

The real estate defendants never produced the "smoking gun" email described by Soriero. It should have been stored in their computers since Serpico emailed it to Rossi. In fact, other emails from Serpico to Rossi were produced by the BPCA, but yet the real estate lawyers never produced those same emails during discovery. Two attempts by Plaintiff at subpoenaing the BPCA archive computers operated by a company called Iron Mountain were quashed by Magistrate Judge Cott based on procedural technicalities (Dkt No's. 324 and 345).

Another attempt at subpoena by Plaintiff, this time of the real estate computers, was also quashed for unknown reasons (Dkt. No. 345). During a conference call with Judge Cott, lawyer Riegel admitted that her clients had "accidentally" deleted the archived emails. But yet they were somehow able to produce volumes of emails spanning years when it was convenient for their

case against Plaintiff. Clearly, the lawyers were playing games, misleading Judge Cott, and committing spoliation.

However, instead of allowing the subpoena, Judge Cott required the defendants to instead provide an affidavit detailing the email archival system that they used. The real estate lawyers provided a carefully worded nonresponsive affidavit (see Greer Decl. Ex. 15) from an employee hired just a few months ago in 2017, who clearly could not properly explain why the real estate emails were deleted. In that affidavit, they admit to deleting crucial email evidence.

Since all defendants admitted under oath to deleting emails from their office computers (detailed above) and even from backup computer servers (*Id*.), that spoliation authorizes this Court to grant sanctions of adverse inference in favor of Plaintiff. The emails missing should be assumed to exist as Soriero and Plaintiff claim they do, and are unfavorable to the defendants. FRCP 37(e).

**4. The Ford Testimony**

Allyson Ford is a former in-house legal counsel for the BPCA and an African-American female. She too was fired in retaliation for properly doing her job and investigating Robert Serpico, similarly to Kirk Swanson. During Ms. Ford's deposition on April 12, 2017, she shed light on the motive for Serpico retaliating against Plaintiff. During the deposition (Greer Decl. Ex. 16 at 9:16-11:13), she explained how the then-acting president Robert Serpico would discuss Plaintiff and his press coverage in BatteryPark.TV during official board meetings. Serpico instructed staff to not read or believe what was on the news site. This occurred in 2013 prior to Plaintiff learning that his lease would not be renewed. Ford also testified that Serpico was the source of anonymous information being leaked to Plaintiff in order for negative press to be written about Serpico's enemies within the BPCA. *Id*. 33:2-23. Clearly, Serpico was obsessed with Plaintiff and his reporting.

Ford also testified that she believed the executives within the BPCA engaged in "ill behavior", "wrongdoing", and harmed many people. *Id.* 25:12-26:6 and 42:6-43:12. That indicates a pattern of behavior by the BPCA consistent with the retaliation against Plaintiff. Of note, another African-American female in-house counsel for the BPCA, Nancy Harvey, was also fired in retaliation for investigating complaints about Serpico. *Id.* 7:19-8:3.

**5. The Body of Evidence Is Admissible**

Regarding the use of circumstantial evidence during trials, various federal district court model jury instructions have stated, "The law makes no distinction between the weight to be given to either direct or circumstantial evidence"[1]. In the Southern District of New York and Second Circuit, Leonard B. Sand, et al., *Modern Federal Jury Instructions* is often used.

In this instant case, the overwhelming evidence establishes that, (a) Serpico and Rossi knew one another and routinely met outside of official offices, that (b) Serpico was obsessed with Plaintiff and his press coverage of him, that (c) Serpico had a motive to retaliate seeing that Plaintiff's actions had led to disciplinary actions against other BPCA officials and a warning letter from the New York Inspector General, that (d) witnesses close to Serpico testified that they believe Serpico contacted Rossi to effectuate Plaintiff's eviction, and that (e) this was a "Habit and Routine Practice" by Serpico and the BPCA, which is admissible per FRCP 406.

## There is No Evidence That Plaintiff Would Have Been Evicted Regardless

In pages 10-18 of the real estate MOL, they essentially admit that they did the crime, but that they are exonerated by the "Mt. Healthy" defense (*Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274 (1977). They argue that since Plaintiff was not paying rent and

---

[1] From Ninth Circuit Model Jury Instructions, Chapter 1.5, and Third Circuit Model Jury Instructions Chapter 1.6

6

was harassing people, he would have been evicted regardless of the conspiracy. However, their allegations are baseless and nothing but a desperate smear tactic strategy of a losing party.

**1. Plaintiff Paid Timely Rent for 14-Years.**

From pages 12-13 of the real estate's MOL, they produce clean tables and exhibits (never produced during discovery) meant to sway this Court into giving them the benefit of the doubt and assuming that there must be some fire (i.e. real evidence on nonpayment) with all of this smoke (i.e. data-dump of inadmissible financial exhibits). However, in Plaintiff's Rule 56 Statement of Opposition, all of the real estate exhibits, charts, and emails are thoroughly debunked (see Plaintiff's Rule 56 Statement in Opposition, Dkt. No. 397 at ¶¶ 15-35).

There is one false allegation in particular that needs to be repeated. It was also refuted in Plaintiff's Rule 56 Statement of Opposition at ¶ 79.

Lawyer Riegel attempts to mislead this Court by omitting key facts regarding the $44,135 judgment. That dollar amount represented the rent for 12-months of time after the housing court litigation began. Since Plaintiff had counterclaimed that the real estate party owed him money damages as a result of the retaliatory eviction, due to pending motions, it was legal for Plaintiff to not pay rent or "fair use" payments. However, this $44,135 has nothing to do with any rent owed prior to the January 2014 decision to not renew Plaintiff's lease. Riegel has repeatedly tried to obfuscate and misleads courts on this.

In fact, Plaintiff paid that judgment. Judge Hahn, who ordered the payment, did not make it clear that this large dollar amount was owed prior to the trial that she allowed. When Judge Hahn rotated to a new part and left the case, the new judge assigned was eager to clear her docket of that complex case and used the non-payment of the $44,135 judgment as a justification for dismissing the case and avoiding a trial (see Greer Decl. ¶ 39).

**2. Plaintiff Did Not Harass Neighbors and Building Staff**

From pages 14-17 of their MOL, they peak in their intensity of smearing Plaintiff, trying to mislead this Court into thinking that Plaintiff was a psychopath harassing and scaring people. In most of their examples, they cite inadmissible and irrelevant incidents that took place after the conspiracy to evict and decision to not renew the lease. The allegations are thoroughly refuted in Plaintiff's Rule 56 Statement in Opposition, Dkt. No. 397 at ¶¶ 42-50.

In one *ex post facto* concocted "noise complaint" about Plaintiff, the email evidence proves that the building managers were encouraging the apartment owner to file anonymous complaint and then never reported any complaints to Plaintiff. This all took place long after the decision to evict plaintiff. In another example, again taking place after the eviction decision, Plaintiff filed a complaint about a bad employee working the night shift.

**3. Plaintiff Was Treated Differently Than Other Tenants**

During discovery, Plaintiff sought details of any other eviction litigation brought by the defendants for any reason, in order to determine whether or not he was treated differently from other tenants. Judge Cott approved this and ordered them to provide the documents. However, in behavior consistent with their spoliation throughout discovery, the real estate lawyers instead provided documents that were nearly 100% redacted and useless. Then, in their MOL, they now try to spin those documents as meaning that the defendants frequently evicted tenants, just as they did to Plaintiff.

In Plaintiff's Rule 56.1 Statement of Facts in Opposition (Dkt. No 397 at ¶¶ 53-61), he easily refutes in detail the claims that certain other tenants were evicted. The lawyers are hoping that this Court is sloppy and will not bother to read the minutia. Despite their several pages of *ex post facto* charts and tables made for their MOL and Rule 56.1, there is no underlying evidence

that any other tenant was ever evicted for anything, much less for noise or "erratic rent payment".

They provide no housing court case numbers, no reasons for litigation, and Rossi could not recall details during his deposition. In fact, Rossi could not recall the name of a single person that he supposedly had evicted (see Rossi Dep., Greer Dec. Ex. 2 at 44:20-47:3). In fact, in one case of a man with a mental disorder hoarding multiple large-breed dogs, cats, and birds in his small apartment generating numerous complaints from the building residents, the real estate defendants refused to even evict him.

**4. The "*Mt. Healthy*" Defense Does Not Hold**

Since none of the allegations against Plaintiff (i.e. his rent payment was unacceptable and he was a menace to society harassing people) are relevant or true, therefore, the real estate defendants' "*Mt. Healthy*" defense is moot. Moreover, the preponderance of the evidence makes the "*Mt. Healthy*" argument actually work in favor of Plaintiff.

The 14-year pattern of behavior by the real estate defendants meets the "*Mt. Healthy*" burden by showing that there is every reason for a reasonable jury to believe that Plaintiff's lease would have been renewed "but for" the conspiracy and violation of the First Amendment. Despite the alleged problems with Plaintiff's rent and his alleged harassing behavior, the landlord nevertheless renewed his lease more than seven-times over 14-years. They even renewed it as recently as April of 2012, and then again in May of 2013, just shortly before the January 2014 letter was drafted regarding non-renewal. Moreover, they had never evicted anyone else for any reason, much less for noise complaints or rent less than 30-days late.

As a matter of law, *Carey v. Piphus*, 435 U.S. 247 (1978), decided by the Supreme Court one year after *Mt. Heathy*, overruled a Court of Appeals that cited *Mt. Healthy*. The plaintiffs in

that case successfully argued that their constitutional rights to due process were violated and that they were owed damages regardless of whether or not they were deserving of the punishment.

## Defendants Milstein and Martin Are Indeed Liable

On page 19 of the real estate defendants' MOL, they argue that it is possible that they will be found liable of conspiracy to violate the First Amendment. However, their king on the chessboard, Howard Milstein, and his accomplice Janet Martin, should be pardoned because they were ignorant of the crimes.

This is disputed. The expensive litigation that the defendants initiated in housing court, and their defense in this federal court, had to be approved by Martin and Milstein (see Plaintiff's Rule 56.1 Statement in Opposition at ¶ 13). During his deposition, Milstein did not deny knowing about the housing court litigation. He also indicated that Janet Martin would have to authorize such extensive litigation (see Milstein Dep, Greer Decl. Ex. 1, at 31:5-32:11).

Milstein refused to answer direct questions about how litigation from his companies are handled (*Id*.). During the Rossi deposition, he also refused to answer direct questions about who authorized lawsuits and hired law firms (see Rossi Dep, Ex. 2, at 59:23-61:4). Therefore, per FRCP 37, the jury should be instructed by adverse inference to assume that Martin and Milstein were required to sign off on the lawsuits. FRCP 37 also allows sanctions in the form of not allowing Milstein and Martin to deny that they were involved.

As owner and managing partner at the time, Milstein is liable for the actions of his companies. As the senior most executive running Milstein's property companies, Janet Martin is also liable.

## The Terms of the Lease Do Not Preclude a Jury Trial

### 1. Plaintiff's Jury-Waiver Lease Does Not Apply to this First Amendment Case

On pages 19-21 of their MOL, they argue that Plaintiff is not entitled to a jury trial due to a provision in the apartment lease striking jury trials. However, such lease terms were made illegal in the 1960's by New York Consolidated Laws, Real Property Law - RPP § 259-c.:

> Any provision in a lease, executed after the effective date of this act, that a trial by jury is waived in any action, proceeding or counterclaim brought by either of the parties thereto against the other in any action for personal injury or property damage, is null and void.

For unknown reasons, real estate moguls in New York still routinely insert jury-waiver provision in their leases. The problem is similar to the rampant pervasive ignoring of the rent-stabilization terms that are tied to the lucrative tax-breaks granted to the moguls under 421-a and 421-g laws.[2]

The real estate defendants then cite a jury-waiver case unrelated to apartment leases. *Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, No. 03-cv-8259 (CSH), 2007 WL 3286645, at *3-4 (S.D.N.Y. Nov. 7, 2007) as a case where a jury trial was prohibited due to a contract provision. However, the *Bear Stearns* case is irrelevant to this instant matter.

In *Bear Stearns*, the jury-waiver related to the complex financial contract and loan between the two parties, and the dispute directly related to that business matter. However, in this instant matter, the constitutional First Amendment matter arising from a conspiracy with a state actor has little to do with the mundane terms of an apartment lease, such as "No dogs allowed" or "Pay your rent on time", etc.

---

[2] See story on BatteryPark.TV http://batterypark.tv/real-estate/landmark-victory-for-renters-421-g-buildings-are-rent-stabilized.html

The sole provision upon which the real estate defendants rely to prohibit a jury trial in this federal case is embedded in the fine print within the apartment lease between Plaintiff and the defendants. The lease was signed back in 2002. In section 26 of the lease, it states:

> "26. GIVING UP RIGHT TO TRIAL BY JURY AND COUNTERCLAIM   A. Both Tenant and Owner agree to give up the right to a trial by jury in a court action, proceeding or counterclaim on any matters concerning this Lease, the relationship of Tenant and Owner, as Tenant and Owner, or Tenant's use or occupancy of the Apartment."

The phrase, "any matters concerning this Lease, the relationship of Tenant and Owner, as Tenant and Owner, or Tenant's use or occupancy of the Apartment" means that this federal complaint over violation of Plaintiff's First Amendment constitutional rights has no relevance to the lease provision.

Then, the lawyers cite a Supreme Court case of *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707–09 (1999). <u>However, in that case, the Court ruled that a jury trial was indeed appropriate</u>.

> ("A § 1983 suit seeking legal relief is an action at law within the Seventh Amendment's meaning. It is undisputed that when the Amendment was adopted there was no action equivalent to § 1983. It is settled law, however, that the [Seventh] Amendment's jury guarantee extends to statutory claims unknown to the common law, so long as the claims can be said to "soun[d] basically in tort,"…The controlling question is whether, given the city's apparent concession that the instructions were a correct statement of the law, the matter was properly submitted to the jury. We conclude that it was, and that the judgment of the Court of Appeals should be affirmed."

Next, the lawyers cite *Hines v. 1025 Fifth Ave., Inc.*, No. 14-cv-3661 (SAS), 2015 WL 765943, at *2 (S.D.N.Y. Feb. 23, 2015) where an apartment lease jury waiver was ruled valid and the judge prohibited a jury trial, then ruled in favor of the Plaintiffs regardless. However, the terms of the jury waiver in that case were much broader to include "<u>any matters whatsoever</u>":

> It is mutually agreed by and between the Lessor and the Lessee that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaims brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this lease, the Lessee's use or occupancy of the apartment, or any claim of damage

resulting from any act or omission of the parties in any way connected with this lease or the apartment.

In this instant matter, the jury waiver only applies to litigation relating to:

"…any matters concerning this Lease, the relationship of Tenant and Owner, as Tenant and Owner, or Tenant's use or occupancy of the Apartment."

However, Plaintiff, in this instant case, initiated this federal case long after the lease expired, when he was no longer a proper "tenant" Also, unlike the *Hines* case where the plaintiffs were suing over disputes related to owning a dog and renovating the apartment, and then used the Disabilities Act to get into a federal court venue, this instant case involved a pure First Amendment matter arising from a complex conspiracy of many parties.

In their final argument, the real estate defendants claim that this federal matter stems from the lease being "wrongfully terminated". Therefore, they argue, the jury waiver provision governs this case. That is not true. Plaintiff's lease was never terminated. The real estate defendants carefully avoided that morass of legal traps and simply waited for the lease to expire in April of 2014 before initiating "Holdover Proceedings", knowing that they did not have a leg to stand on to evict Plaintiff during the lease term. This instant federal First Amendment case deals with matters that took place after the lease expired and was no longer relevant (i.e. the Holdover Proceeding and the decision by the BPCA to bar Plaintiff from public meetings).

## 2. It Would Be Impossible to Try This Case Piecemeal by Jury for the BPCA and Bench Hearing for the Real Estate Parties

It would be impossible to properly try this case piecemeal by convening a jury trial just for the BPCA parties whilst having a separate bench trial for the real estate defendants. The jury must be allowed to see the evidence relating to the real estate defendants.

**3. Jury Waivers Are to be Narrowly Construed**

The Supreme Court and Appeals Courts have ruled that the Seventh Amendment should be, "jealously guarded by the Supreme Court", and that jury waivers must be narrowly construed with the burden of proof on the party drafting the waiver.

In the treatise by Robert Frankhouser, *The Enforceability of Pre-Dispute Jury Waiver Agreements in Employment Discrimination Cases, Duquesne Business Law*. Journal, Vol. 8 (2006):

> "Court review of the validity of pre-dispute jury waiver agreements is subject to a different standard from the one governing mandatory arbitration provisions. In short, while the analysis resembles an "unconscionability" inquiry the courts have more latitude to invalidate the pre-dispute jury waiver agreement. The reason for this is because the courts considering the validity of the jury waiver agreement engage in a constitutional analysis that requires the court to consider whether the waiver was entered into knowingly, voluntarily and intentionally. As a result of the jury trial being a fundamental right, the United States Supreme Court has frequently required that courts indulge every reasonable presumption against such a waiver. In applying this standard, courts review several factors: (1) whether there exists gross disparity in bargaining power between the parties; (2) the business or professional experience of the party opposing the waiver; (3) whether the opposing party had the opportunity to negotiate contract terms; and (4) whether the clause containing the waiver was conspicuous."

In this instant case, Plaintiff had (1) no bargaining power because the lease was nonnegotiable, (2) had no knowledge of contract law, (3) the lease was nonnegotiable, (4) the jury waiver clause was buried in the fine print and not conspicuous.

In the treatise by Jean R. Sternlight, *Mandatory Binding Arbitration and the Demise of the Seventh Amendment Right to a Jury Trial,* 16 OHIO ST. J. ON DISP. RESOL. 669 (2001).:

> "While jury trial rights under the Seventh Amendment are admittedly subject to waiver, waiver is tightly constrained by the following principles: (1) jury trial waivers may not be lightly implied; (2) courts look at a whole host of factors to determine whether the waiver was voluntary, knowing, and intentional; (3) many courts provide that the party seeking waiver bears the burden of proof; (4) courts' holdings render suspect the use of unsigned or uninitiated documents to support the finding of a jury trial waiver; (5) in interpreting purported jury trial waivers, courts have stated that they must be narrowly construed. These waiver principles apply in cases between two private parties, and, thus, no "state action" must be proven to show a violation of jury trial rights."

Inn this instant case, the (5) "state action" of the BPCA in violating the First Amendment muddles the jury waiver since it must be narrowly construed, and (3) the real estate defendants bear the burden of proof that a state action was not involved.

In the treatise Ernest H. Schopler, *Supreme Court's construction of Seventh Amendment's guaranty of right to trial by jury*, 40 L. ED. 2d 846.:

> "The right to a jury trial in civil actions at common law under the Seventh Amendment, jealously guarded by the Supreme Court, is in diversity cases governed by federal, rather than state law. Although the thrust of the Seventh Amendment was to preserve the right of jury trial as fixed by the common law the right extends beyond common-law forms of action recognized in 1791 when the Amendment was adopted and, in particular, extends to new causes of action created by federal statutes under which legal rights and remedies are enforceable in an action for damages in the ordinary courts of law."

## 4. In Summation

The State of New York outlawed jury-waivers in apartment leases long ago, yet the powerful real estate moguls, such as Howard Milstein, still routinely insert them. The jury-waiver in Plaintiff's lease is not only illegal, but it is irrelevant as well.

This instant case involves First Amendment violations that took place before and after the lease expired. Those violations are not related to the use of the apartment. Plaintiff is not suing, for example, over violations of the disability act harming his ability to use the apartment.

Jury-waivers are also to be narrowly construed by the courts. Jury-waivers are to govern matters between two private parties. However, this instant case involves a conspiracy of private and state actors.

Finally, it would be impossible to fairly try this case in piecemeal fashion, with a jury trial for the BPCA parties and a separate bench trial for the real estate defendants. A jury would have to hear the evidence related to Steve Rossi and his collusion with Robert Serpico, as well as the rebuttal of the false allegations that Plaintiff deserved to evicted for not paying rent and being a menace.

## **Compensatory Damages are Demonstrated and Not "Nominal"**

On page pages 19-21 of the real estate MOL, they argue that Plaintiff failed to prove that damages were caused by their actions and then failed to prove the dollar amounts of those damages. Therefore, any awards should be nominal. That is false.

**1. The Actions of the Defendants Cleary Caused Damages to Plaintiff's**

In Plaintiff's FRCP 26 Initial Disclosures, he detailed the damage calculations that applied to lost value of his media/tech companies and to his medical business. The media companies require proximity to New York in order to function properly. BatteryPark.TV has to be run from an office in Battery Park City, and The Healthcare Channel has to be near studious in New York as well as numerous corporate events related to publicly traded healthcare companies.

Therefore, by Plaintiff being dislocated because of the retaliatory eviction to even just a different part of Manhattan would have been damaging.  However, it was worse than that. Due to the historic housing market bubble raising rentals rates to absurd levels, the landlords instituted metrics to gauge the ability of a potential tenant to afford the rent. They used multiples of rent to determine the minimum income that a tenant must prove. At 45-times-rent, this meant that an income of $200,000 or more was required for apartments, such as 41 River Terrace in Battery Park. For self-employed applicants, such as Plaintiff, the lack of a verifiable pay stubs handicaps them even more.

Therefore, unable to afford a new lease, Plaintiff moved to Ohio, making his media companies even more challenging to stay in business. However, he would have been able to continue to live in his apartment but for the eviction.

Plaintiff's well-developed business plan to start an urgent care center near this federal Court on Duane Street was made impossible by the eviction. His existing medical practice was also stifled.

Any reasonable jury would clearly agree that the eviction harmed all of Plaintiff's businesses. Therefore, their case of *Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994); *McCann v. Coughlin*, 698 F.2d 112, 126 (2d Cir. 1983) is moot.

**2. Plaintiff's Valuation Methods are the Gold Standard and Valid**

On page 21 of the MOL, the lawyers confuse valuation methods stating, "Lost profits or a loss in a company's value "must be proven with sufficient certainty and not be speculative." *H & P Research, Inc. v. Liza Realty Corp.*, 943 F. Supp. 328, 331 (S.D.N.Y. 1996) (*citing Randall–Smith, Inc. v. 43rd St. Estates Corp.*, 17 N.Y.2d 99, 105–06 (1966))." Plaintiff does not use "lost profits" method, but rather "lost value". This was detailed in Plaintiff's initial disclosures. Therefore, their argument is moot.

Plaintiff details the use of "lost value" to derive his monetary damages (see Plaintiff MOL in opposition to BPCA's motion, Dkt. No. 396, at 21-29). For the sake of not wasting time and paper, that detailed discussion will not be repeated here. Suffice it to say that plaintiff used the exact same method used by Goldman Sachs to take MedPage Today, a division of EVERYDAY HEALTH, public. MedPage Today is the closest comparable company to the Healthcare Channel in a group of peers.

**3. Plaintiff Established Mental Anguish Damages with Professional Therapy.**

On page 23 of the MOL, the real estate lawyers try the same trick that the BPCA lawyers did by omitting the fact that Plaintiff has indeed found a psychologist for the mental anguish damages (In fact, it seems that they cut and pasted from the BPCA document). In supplemental discovery evidence that Plaintiff provided on April 27th, 2017, it proves that he had begun seeking mental health care (see Greer Decl. Ex. 17). That care is ongoing and the expert witness will be available for a trial of damages. Therefore, their case of *Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002) is irrelevant.

17

**4. There Is Evidence to Support "Loss of Enjoyment of Apartment" Damages**

On page 25 on the real estate MOL, the lawyers state, "There are many apartments available for Plaintiff to rent at a comparable price in New York City, none of which Plaintiff attempted to rent. Plaintiff has not lost any value whatsoever." That is false. There are only three rental buildings in Battery Park City that are high-rise and have unobstructed views of New York Harbor, and they are owned by the defendants. Therefore, they were unavailable to Plaintiff due to this litigation.

Plaintiff stated during sworn deposition that he was unable to find any apartments in lower Manhattan, in part because the real estate defendants own every high-rise building in Battery Park City with a similar unobstructed high view of the ocean and sunsets, *inter alia* (see Greer Dep., Greer Decl. Exhibit 11, at 256:7-258:17).

The best way to value the loss of a view and enjoyment of an apartment is to simply estimate its market value. The average selling price for a one-bedroom apartment in Battery Park City, in the same building with the same view, is approximately $1 Million. A trial of damages will pinpoint that estimate.

Of note and important for this Court to know, the panoramic view from Plaintiff's apartment overlooking the New York Harbor and Statue of Liberty was a crucial component of Plaintiff's mental health regimine. He chose that apartment in 2002 precisely for the view because plaintiff was suffering mental anguish after 9/11 in his congested apartment by the United Nations. The view is the only reason that Plaintiff chose to become a resident of Battery Park City. At the time, Battery Park was disaster zone with the World Trade Center "Ground Zero" still in smoldering ruins nearby. Few people wanted to live Downtown whilst Plaintiff pioneered.

Plaintiff photographed the view from his apartment and frequently posted the images on BatteryPark.TV (see Greer Decl. Ex. 18). Now in Ohio, Plaintiff has no view from his ground-

level apartment and has not engaged in his photography hobby for nearly a year. The expensive

camera equipment sits idle. Plaintiff's mental anguish damages have been compounded by this

loss of enjoyment of the apartment.

**5. Plaintiff Was Not Profligate with Moving and Court Travel Expenses.**

On page 24 of the real estate MOL, they again seem to cut and paste from the BPCA

MOL and argue that Plaintiff was extravagant and failed to mitigate damages during the moving

process and during trips from Ohio to New York for discovery. But again, the lawyers mislead

this Court.

The hotel stays during moving were at negotiated reduced rates of $150 per night, which

is below the market rate in New York City (see Greer Decl. Ex. 19). To get these rates, Plaintiff

was forced to move 30-miles away to White Plains, and then even farther to Greenwich. The cost

of the used 2012 Mercedes is well below the cost of a new American-made sedan. Plaintiff had

not owned a car for 19-years since moving to New York and the car was essential once he moved

back to Ohio. The cost of meals cited in footnote 17 are from Plaintiff's travel to New York from

Ohio for court appearances and depositions. They are all very reasonable charges by New York

restaurant standards for a person traveling.

Since Plaintiff was indeed frugal and reasonable rather than profligate, the BPCA's

arguments are moot and their case law is moot.

## CONCLUSION

Faced with a mountain of incriminating evidence gathered during a through discovery process,

the real estate defendants have nothing to lose by filing their frivolous motion for summary judgment

that utilizes concocted exhibits and pure smear tactics. Their hope is that by data-dumping hundreds of

pages of exhibits related to an irrelevant closed housing court case, that this federal court will roll its eyes

and view this as nothing but a lowly matter masquerading as a First Amendment case. By fabricating

"evidence" that Plaintiff was a menace to tenants, and erratic in rent, he was deserving of eviction regardless of whether they actually conspired with the BPCA to retaliate.

However, there are glaring problems with their defense strategies. The allegeds incidents of noise complaints took place long after the decision to not renew the lease, and are proven by emails to be instigated by the lawyers who were collecting evidence. Plaintiff was never informed of any noise complaints. The alleged incident of Plaintiff harassing building staff also took place long after the retaliatory conspiracy, and were instigated by the lawyers. The alleged "erratic payment" of rent is not supported by actual accounting data, but rather from tables made expressly for this litigation. The raw data sought during discovery was never produced.

Then again, the defendants engaged in flagrant spoliation by deleting evidence from computer servers and refusing to answer questions during deposition. They also somehow successfully quashed subpoenas. Sanctions are warranted to instruct a jury by adverse inference to assume that the omitted evidence exists, and to bar the lawyers from arguing that the conspiracy never took place.

Plaintiff has proven damages and demonstrated valid computational methods. As a financial expert, he used the same methods used by Goldman Sachs for a company similar to his that was damaged in value. Mental anguish damages have also been validated.

All of the real estate defendants are liable. Milstein and Martin were aware of the litigation and had to approve the hiring of lawyers. As owner and manager, the two are responsible for what happens beneath them.

A jury trial is allowed. The jury-waiver in the lease is illegal by state law, and the Supreme Court has ruled that jury-waiver must be narrowly construed.

Dated: July 19, 2017
Columbus, Ohio

By: _Steven Greer_

Steven Greer, *pro se*
4674 Tatersall Court
Columbus, Ohio 43230
(212) 945-7252
steve@batterypark.tv