CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: HOUSING PART C

-------------------------------------------------------X

MARINERS COVE SITE B ASSOCIATES,

Petitioner,

- against-

DR. STEVEN GREER
200 RECTOR PLACE
APARTMENT 35F
NEW YORK, NEW YORK 10280

Respondent.

-------------------------------------------------------X

Index No. L&T 63974/14

**AFFIDAVIT IN SUPPORT OF MOTION**

STATE OF NEW YORK )
)SS.:
COUNTY OF NEW YORK )

Stephen Rossi, being duly sworn, deposes and says:

1. I am a vice-president and director of management services of Milford Management Corp., agent for Petitioner Mariners Cove Site B Associates ("Petitioner"), the owner and landlord of apartment 35F ("Premises") located at 200 Rector Place, New York, New York 10280 ("Building") in which Dr. Steven Greer is the tenant-of-record ("Respondent"). As such, I am fully familiar with the facts set forth below.

2. This affidavit and the accompanying affidavits, affirmation and memorandum of law are respectfully submitted in support of the motion brought by Petitioner which seeks an order: (a) pursuant to CPLR §3211(b) and §3211(a)(6) and (a)(7), dismissing the affirmative defenses and counterclaims interposed by Respondent; (b) striking Respondent's jury demand, in the event same is deemed to be valid; (c) pursuant to CPLR §3212, granting Petitioner summary judgment; (d) issuing a warrant of eviction against Respondent with execution of same forthwith; (e) awarding Petitioner all outstanding use and occupancy; (f) awarding Petitioner its

attorneys' fees incurred in this proceeding, provided a written agreement authorizing such an award exists between the parties; and (g) for such other and further relief as this court may deem just and proper.

**RESPONDENT'S AFFIRMATIVE DEFENSES AND COUNTERCLAIMS SHOULD BE DISMISSED**

3. This is a holdover proceeding Petitioner commenced after Respondent's most recent non rent-regulated lease expired on April 30, 2014. The Premises is a condominium unit owned by Petitioner which it rented to Respondent dating back to 2002. A copy of the notice of petition and petition ("Petition") is annexed hereto as Exhibit "A".

4. Notwithstanding Respondent's allegations otherwise, the Premises is not a rent-regulated apartment and Petitioner was not obligated to renew the lease, either pursuant to the parties' lease or pursuant to applicable law. As a result, Petitioner commenced the instant proceeding.

5. In response to the Petition, Respondent has interposed a 115 page answer consisting of 24 pages of unsubstantiated and false allegations riddled with hearsay, innuendo, fantasy and vitriol ("Answer"). A copy of the Answer is annexed hereto as Exhibit "B".

6. I have read the Answer and, simply put, Respondent's purported affirmative defenses and counterclaims have no merit. Accordingly, your deponent will not take up the Court's time addressing every single word of the Answer, especially since the contents therein often speak for themselves.

7. For example, the Court need look no further than Respondent's unsubstantiated and delirious allegations that local political and/or governmental figures have conspired not to renew Respondent's lease agreement. See Answer ¶¶12-15.

8. Indeed, I am advised by Petitioner's counsel that much, if not all, of what Respondent alleges in the Answer is irrelevant to this proceeding, even assuming all of the allegations are true (which they are not).

9. As Respondent has lived in the Premises since 2002 with knowledge that he was leasing a condominium apartment, Respondent's arguments wreak of desperation. A copy of Respondent's original lease ("Lease") is annexed hereto as Exhibit "C".

10. I am advised by Petitioner's counsel that Respondent should be barred from raising this argument more than 12 years after he moved into the Premises.

11. As I will discuss more fully hereinbelow, Petitioner's decision not to renew the lease was strictly a business decision based on factors discussed in detail hereinbelow. It was not made in retaliation for anything Respondent may or may not have done (assuming such a claim even exists in this proceeding).

**Respondent's Purported Retaliation Defense**

12. As Respondent acknowledges (see Answer ¶5), Petitioner notified Respondent in January 2014 that it was not renewing his lease. A copy of said letter is annexed hereto as Exhibit "D".

13. Petitioner's decision was made collectively by me and Lorraine Doyle, the managing agent of the Building until the end of May, 2014, when she retired. Our decision was based upon numerous factors.

14. First, Respondent's payment history had become erratic. While Respondent's payment history was satisfactory at first after he moved into the Premises in 2002, his payments became more irregular in approximately the spring of 2012. A copy of Respondent's rent history is annexed hereto as Exhibit "E".

15. As demonstrated by the rent history, Respondent had a running balance for the majority of the period beginning in June 2012. See Exhibit "E" annexed hereto.

16. Petitioner finally commenced a nonpayment proceeding in early April 2014, which sought all rent due and owing in the amount of $10,887.00 through March, 2014. A copy of the nonpayment petition ("Nonpayment Petition") is annexed hereto as Exhibit "F".

17. The $10,887.00 sought did not include either April 2014 rent or any late fees and legal fees. Thus, the rent deposited into Court by Respondent in April 2014 (which is discussed more fully hereinbelow) did not include April, 2014 rent or any additional fees. A copy of the certificate of deposit is annexed hereto as Exhibit "G".

18. Second, I am unaware of any complaints made in **good faith** by Respondent to any governmental authority or agency.

19. In response to Respondent's allegation that Petitioner retaliated for the "numerous" complaints he made to HPD regarding purported conditions in the Premises, online searches on HPD's website for each of the last 2 years reveals that there were are no violations issued against the Building prior to . Copies of those 2 printouts are annexed hereto collectively as Exhibit "H".

20. Further, HPD's website also reveals that Respondent filed complaints on February 18 and on February 24 under complaint numbers 6800143 and 6809481 respectively. The first complaint was closed when no violation was issued after an inspection and the second complaint was closed when HPD was informed by a tenant that heat and hot water had been restored. Copies of said records are annexed hereto collectively as Exhibit "I".

21. These same records demonstrate that there were no complaints made to HPD from July 2013 through February 18, 2014, a period of more than 6 months.

22. The two complaints filed by Respondent in February are referenced in Exhibit "F" annexed to the Answer.

23. Respondent also filed a complaint on June 18, 2014 alleging that there was no hot water Building-wide. <u>See</u> Exhibit "I" annexed hereto. As with the February 24 complaint,

the June 18 complaint was closed when HPD was informed by a tenant that heat and hot water had been restored. See Exhibit "I" annexed hereto.

24. Indeed, since Respondent filed these 3 complaints after Petitioner notified him that it would not be renewing his lease, Petitioner submits that Respondent's complaints were retaliation for Petitioner's decision.

25. Further, Petitioner submits that its definition of "numerous" differs quite a bit from Respondent's definition of "numerous".

26. As stated hereinabove, Petitioner cannot emphasize enough that, in a structure with 44 stories and nearly 550 apartments, there were no violations in the Building prior to Petitioner's commencement of this proceeding.[1]

27. Respondent also alleges that he is an "upstanding member of the community, praised by hundreds of people for his community work, has no complaints from neighbors" (see Answer ¶6).

28. First, Respondent fails to offer any proof either in the Answer or annexed thereto in the numerous pages of exhibits that any of these allegations are true.

29. Second, even assuming arguendo that these allegations are true (which Petitioner clearly vociferously disputes), they do not rise to the level of obligating Petitioner to renew the Lease.

30. Respondent also maintains that he was notified that the Lease would not be renewed after "he organized the community on his local website called BatteryPark.TV". See Answer ¶8.

1 Petitioner received notice in late June 2014 of a double cylinder lock-related violation at the Building, which it is in the process of correcting. Petitioner surmises again that said complaint was filed by Respondent and again asks the Court to take judicial notice of the retaliatory nature of said complaint, along with the others filed by Respondent since February 2014.

31. However, Petitioner submits that Respondent's establishment of a website is not tantamount to his "organization of the community".

32. Indeed, in Respondent's own words on the BatteryPark.TV website, "BatteryPark.TV is social networking with original multimedia content. You can contribute your own comments, photos, and stories" and "BatteryPark.TV is a genuine web-news outlet with original content, video production, producers, editor, cameramen, and national guests". The top of said page says "we inform". A copy of the first page of said website is annexed hereto as Exhibit "J".

33. Thus, at best, Respondent's website would seem to be a combination of a local "Facebook and news outlet" which is informational in nature, with absolutely no indication, let alone proof, that the local community is organized by said website.

34. Further, there is no demonstration by Respondent that his website was remotely relevant to Petitioner's decision not to renew the Lease.

35. Indeed, Petitioner can emphatically demonstrate otherwise since, upon information and belief, Petitioner offered Respondent renewals in the past after Respondent had already established his website.

36. Thus, they do not rise to the level of obligating Petitioner to renew the Lease

37. According to Respondent, Exhibit "G" annexed to the Answer, which consists of 19 pages of assorted emails, also supports his allegation that Petitioner retaliated against Respondent.

38. However, a closer review of these emails reveals that nothing could be further from the truth.

39. The first 11 of the 19 pages of emails (see Exhibit "B"; pp. 42-52 of the Answer) are from 2011 and earlier, aside from any questions regarding the substantive legitimacy of the emails.

40. On the next pages, there are 2 additional emails from 2012 (see Exhibit "B"; pp. 53-54 of the Answer). Petitioner again sets aside any questions regarding the legitimacy of the emails.

41. The remaining emails on pp. 55-60, which purportedly cover the time period of August 2013-March 2014, can be categorized as follows: (a) Respondent complaining during working hours that the water has allegedly been turned off; (b) Petitioner providing Respondent (and other residents in the Building) with advance notice of an upcoming water shutdown for valid reasons, i.e.; DEP replacing the Building's water meter and the annual cleaning of the Building's water tower; (c) Petitioner reminding Building residents of construction; (d) Respondent's complaints about the foregoing.

42. Petitioner also has received complaints about Respondent's behavior and actions from other residents and employees of the Building. More specifically, Petitioner has received reports that Respondent confronted other residents in the Building including, but not limited to, one who contributes to one of the neighborhood's local newspapers.

43. Respondent apparently believed that the resident's reporting was inaccurate and believed that he had *carte blanche* to verbally attack and harass this resident.

44. Respondent also instigated an incident with the Building's overnight concierge, which resulted in the dismissal of the Building's employee.

45. The Court should not be surprised by these aforestated incidents as they are consistent with Respondent's instigatory exchange with Lorraine Doyle described in ¶10 of the Answer, assuming of course that the purported transcription of the "incident" is true. See Exhibit "B" annexed hereto.

46. Further, it was incidents such as these that prompted Milford to hire Spartan Security Services ("Spartan") to monitor Milford's office located at 99 Battery Place. Respondent was fond of repeatedly coming to Milford's office and stating "what do you have to say to me?"

and he often filmed random exchanges between Milford's employees, causing annoyance and alarm among them.

47. The affidavit of Michael Healy, a security supervisor employed by Spartan who was stationed at Milford's office, accompanies this motion and details one such incident. The February 12, 2014 incident detailed in Healy's affidavit caused him to recommend to Milford to file a police report against Respondent, a copy of which is annexed hereto as Exhibit "K".

48. Notwithstanding the foregoing, as Petitioner does not own every apartment in the Building, Petitioner would not interfere if Respondent found another owner in the Building willing to rent to him.

49. I also must emphasize that, even assuming said allegation is relevant (which I do not concede), I have not received either any telephone calls or any correspondence of any kind from any of the numerous individuals named in the Answer.

50. Thus, I have not heard from either Sheldon Silver, who Respondent suspects of playing a role in "retaliating" against Respondent, or his staffer Paul Goldstein. See Exhibit "B" annexed hereto, ¶¶12-13.

51. I also have not heard from Robert Serpico or Dennis Mehiel, acting president and CEO of Battery Park City Authority ("BPCA") respectively, regarding Respondent's occupancy in the Premises.

52. I also have not been informed of any such calls or correspondence by any other employee of either Milford or Petitioner.

53. Each of the foregoing individuals presumably has more important concerns than interfering with Petitioner's decision not to renew Respondent's lease.

54. Similarly, whatever the Department of Transportation "("DOT") may or may not be doing in and around the Building and Respondent's purported commentary thereon had no effect on Petitioner's decision not to renew Respondent's lease.

55. While I certainly concur with Respondent's concern about the safety of pedestrians crossing streets in the neighborhood, this issue is irrelevant to this proceeding.

56. Thus, even assuming Respondent's self-serving Exhibits "A" and "C" annexed to the Answer can be authenticated, articles purportedly written by Respondent in connection with the DOT simply put are unrelated to Petitioner's claim for possession of the Premises.

**The Building and the Premises Are Condominiums**

57. Respondent alleges that the Building is rent-stabilized regulated by the "421-a law" and that the Building is "not a pure condo building".

58. Respondent's allegations lack merit and lack any supporting documentation.

59. Simply put, Petitioner never participated in the "80/20 program" referred to by Respondent (see Exhibit "B" p. 8, ¶23), its receipt of 421-a tax benefits was irrelevant to Petitioner's tenants and the 421-a participation expired in approximately 1998.

60. Notably absent from the Answer is any proof of Respondent's allegations in lieu of mere conjecture.

61. Annexed hereto as Exhibits "L" and "M" respectively are the declaration of condominium for the Building and the amended declaration of condominium for the Building.

62. Moreover, I am advised by Petitioner's counsel that this a "defense" that Respondent has long since waived since he moved into the Premises in 2002 and signed renewal leases since then.

63. In addition, Petitioner's counsel advises me that, to the extent that Respondent is seeking declaratory relief in the Answer, said claim should not be entertained in this Court.

**Petitioner Has Not Threatened Respondent**

64. I am advised by counsel that Respondent's claims of intimidation and harassment have no relation to this proceeding.

65. Nevertheless, I feel compelled to respond to at least some of the allegations therein to demonstrate the utter lack of merit.

66. For example, the purported incident on February 12, 2014 is discussed in the accompanying affidavit of Michael Healy. Respondent's description thereof and the email he purportedly sent to the NYPD "memorializing" said "incident" (see Exhibit "H" annexed to the Answer) demonstrate the extent of Respondent's delusions.

67. Respondent next describes a purported email exchange between him and Janet Martin. See Exhibit "B"; p. 13, ¶¶38-39.

68. However, even assuming this email exchange occurred, it has no relevance to the fact that Respondent's non rent-regulated lease expired and he does not have the right to its renewal.

69. Respondent also discusses two accounting issues he had with Petitioner's management office.

70. However, any objective analysis of these 2 accounting issues should result in the conclusion that these were minor "incidents", if that, which Respondent attempted (and still attempts) to escalate into an epic confrontation.

71. Indeed, the Court is respectfully referred to Exhibits "K" and "L" annexed to the Answer which, based upon the venom and vitriol therein, speak for themselves.

72. Petitioner not so rhetorically asks the following question based upon the tone and content of the Answer; how reasonable and how credible is it that Respondent felt either threatened or harassed by Petitioner?

**Respondent Still Owes Rent**

73. As discussed hereinabove and also in the accompanying affirmation of Petitioner's counsel, Petitioner commenced a nonpayment proceeding against Respondent in early April 2014 which sought all rent due and owing through March 2014. See Exhibit "F" annexed hereto.

74. I am advised by Petitioner's counsel that Respondent did not answer the nonpayment petition but rather took it upon himself to deposit the rent sought through March into Court. See Exhibit "G" annexed hereto.

75. I am advised by Petitioner's counsel that its motion to have those funds released is returnable next on July 22. A copy of said notice of motion is annexed hereto as Exhibit "N".

76. The Court should note that since the nonpayment proceeding sought rent only through March and Respondent's lease expired on April 30, Respondent still owes April 2014 rent pursuant to said lease agreement.

77. The nonpayment petition has not been amended to include rent for April 2014 and, contrary to Respondent's allegation in his answer in the nonpayment proceeding, Petitioner also has neither kept Respondent's security deposit nor credited same to April rent.

78. Simply put, since Respondent still occupies the Premises, it would be premature and improper for Petitioner either to credit the deposit to April rent or to return the security deposit to Respondent.

79. As for May "rent", Respondent acknowledges that Petitioner informed him that it does not have his purported May "rent" check. See Exhibit "B", ¶45.

80. The registered managing agent listed in the Petition and in the nonpayment proceeding as well is Lorraine Doyle. She retired at the end of May 2014, after both proceedings were commenced.

81. Needless to say, while Petitioner will obviously update the information with HPD, it is inconsequential to this proceeding and, most importantly, not prejudicial at all to Respondent since the Building remains registered with HPD.

82. Respondent clearly knows who to contact in the Building if any issues arise.

**Respondent's Rent is Fair Market Which He Has Never Challenged**

83. Not surprisingly, in response to this proceeding, Respondent suddenly alleges that his rent has been too high.

84. However, this is an unregulated apartment and the rent can be whatever the "fair market" will bear.

85. Second, a review of Respondent's tenancy and rent history (see Exhibit "E" annexed hereto) reveals that Respondent's rent 12 years ago was $2,265.00 and increased at an extremely reasonable rate since then.

86. While in July 2003, Respondent's rent increased to $2,378.25, the rate of the increase remained steady thereafter, as Respondent's rent increased to $2,450.00 in August 2004, $2,495.00 in August 2005, $2,575.00 in August 2006, $2,675.00 in August 2007, $2,850.00 in August 2008 (where it remained until April 2011), $2,995.00 in May 2011, $3,150.00 in May 2012 and $3,395.00 in May 2013.

87. Respondent voluntarily signed these lease renewals and paid rent pursuant to same, although as your deponent explains hereinabove, Respondent's rent payments became erratic in 2012.

88. Annexed as Exhibit "O" to the Answer (see ¶53) is what Respondent purports to be "a list of some recent apartments rented by individual owners" in the Building "and a list of apartments rented by Milstein" which purportedly demonstrates the "large discrepancy in rents" charged by both.

89. First, even as a layperson, your deponent realizes that Exhibit "O" is of absolutely no evidentiary value. Aside from the fact that only one "list" is annexed thereto, the purported source of said list is not mentioned and there are no additional details offered regarding any of the three apartments listed.

90. Further, even assuming the purported discrepancy in rents is relevant to Petitioner's nonrenewal of the Lease, it should not be surprising if rents for individually owned apartments are less than rents for Petitioner's apartments as the respective rental prices are motivated by different factors.

91. Although Respondent also alleges how he has been "hustled" and "systematically misled" by Petitioner when he renewed his lease in past years, Petitioner can emphatically state that neither scenario occurred.

92. Most importantly, based upon the tone and content of the Answer, Petitioner again not so rhetorically asks how credible is it that Respondent would allow himself to be "hustled" and "systematically misled"?

93. As for Respondent's attempt to move elsewhere in the Building, Respondent was informed that he had to submit a full rental application package in order to rent the other apartment.

94. Your deponent does not know whether Respondent followed up on that. However, Petitioner did not interfere with that process.

**PETITIONER'S MOTION FOR SUMMARY JUDGMENT**

95. Annexed hereto respectively as Exhibits "L", "M" and "O" are copies of the declaration of condominium for the Building, the amended declaration of condominium for the Building and the Building's certified multiple dwelling registration.

96. Annexed hereto as Exhibit "C" collectively are the Lease and the most recent renewal lease for the Premises which expired on April 30, 2014 (collectively referred to as

the "Lease"), both of which were signed by Respondent. The original Lease was signed by Lorraine Doyle and the renewal was signed by Clive Spagnoli, Milford's director of lease services. I have seen all of their signatures numerous times and are extremely familiar with them.

97. I am advised by Petitioner's counsel that ¶17E of the Lease contains the language necessary for Petitioner to seek its attorneys' fees incurred herein. See Exhibit "C" annexed hereto.

98. Annexed hereto as Exhibit "E" is the rent history for the Premises which shows no payments made by Respondent after the expiration of the Lease and, of course, prior to the expiration of the Lease as well.

99. The documents annexed hereto as Exhibits "C", "E', "L" and "M" are kept by Milford's office in the ordinary course of its business, are kept in the custody of Milford and it is the duty of Milford to do so and to keep the records current.

100. Given the foregoing and the accompanying affirmation of Petitioner's counsel and Petitioner's memorandum of law, Petitioner's motion should be granted in its entirety.

Stephen Rossi

Sworn to before me this
15th day of July, 2014

Notary Public

DAVID BARRY PECKERMAN
Notary Public, State of New York
No. 02PE6298446
Qualified In Kings County
Commission Expires March 31, 2018