UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **STEVEN E. GREER**, **MD** | ) | |
| | ) | **15-CV-6119 (AJN) (JLC)** |
| Plaintiff; | ) | |
| | ) | |
| v. | ) | **HON. ALISON J. NATHAN** |
| | ) | DISTRICT JUDGE |
| **Dennis Mehiel**, **Robert Serpico**, **The Battery Park City Authority**, **Howard Milstein**, **Steven Rossi**, **Janet Martin**, **Milford Management**, **Mariners Cove Site B Associates** | ) ) ) ) | **HON. JAMES L. COTT** MAGISTRATE JUDGE |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

### PLAINTIFF'S REPLY TO BPCA'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

Steven E. Greer, MD, pro se
4674 Tatersall Court
Columbus, Ohio 43230
(212) 945-7252
steve@batterypark.tv

I

# Table of Contents

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENTS..................................................................................................................... 2

1. Spoliation Warrants Sanctions and Summary Judgment ............................................... 2

  a. The BPCA Deleted Emails ......................................................................................... 2

  b. The BPCA obstructed Depositions............................................................................. 3

  c. Sanctions are Warranted ............................................................................................. 4

2. Plaintiff's Motion to Reinstate Mehiel as a Defendant is Not "Untimely" ................. 4

3. Mehiel Is Not Entitled to Qualified Immunity............................................................. 6

4. The BPCA Created "Official Policy" to Bar Plaintiff from the Boardroom ............... 8

5. The BPCA is Not Immune to Punitive Damages........................................................... 9

6. The BPCA is a Rogue Authority in Need of Federal Restructuring........................... 10

7. The BPCA Violated the First Amendment by Barring Plaintiff................................. 10

  A. July 29, 2015 was Not the Only Time Plaintiff Was Barred from BPCA Board Meetings . 11

  B. The BPCA Did Not Bar Plaintiff from Meetings in a Content-Neutral Way ...................... 11

  C. Plaintiff's Ability to Report in the Press Was Stifled ......................................................... 13

  D. The Action of Barring Plaintiff from the Boardroom Was Not Reasonably Tailored ........ 14

8. The BPCA Violated the First Amendment by Conspiring to Evict Plaintiff............................ 15

  A.     The Soriero Phone Call Transcript Is Admissible ......................................................... 15

B.    The Swanson Testimony Is Solid Proof of the Conspiracy............................................. 18

C.    The Ford Testimony Proves Serpico's Motive................................................................ 20

D.    The Real Estate Defendants Did Not Evict Plaintiff for Erratic Rent or Harassing

Behavior............................................................................................................................ 21

CONCLUSION ......................................................................................................................... 22

# Table of Authorities

**Cases**

*Accord United States v. Oliver*, 626 F.2d 254, 261 (2d Cir. 1980)................................. 16

*Allan v. City of New York*, 386 F. Supp. 2d 542, 545 n.3 (S.D.N.Y. 2005).................................. 8

*Am. Broad. Cos., Inc. v. Cuomo,* 570 F .2d 1080, 1083 (2d Cir. 1977)......................................... 7

*Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) ..................................................... 6

*Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ..................................................... 8

*Brown v. United States*, 464 A.2d 120, 124 (D.C. Cir. 1983) ....................................... 20

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). ................................ 9

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 516 N.E.2d 190, 192, 521

N.Y.S.2d 653 (N.Y. 1987)........................................................................... 9

*Cusamano v. Sobek*, 604 F. Supp. 2d 416, 432 (N.D.N.Y. 2009) ................................ 21

*Farella v. City of New York*, No. 05-CV-5711 (NRB), 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25,

2007 ........................................................................................................... 2

*Huminski v. Corsones,* 386 F.3d 116, 147 (2d Cir. 2004) ............................................. 7

*Jackson v Dallas School District*: Case No. 3:12cv1903; (M.D. of Pennsylvania, 2015)........ 9, 10

*John Grace & Co. v. State Univ. Constr. Fund*, 44 N.Y.2d 84, 375 N.E.2d 377, 379, 404

N.Y.S.2d 316 (N.Y. 1978)........................................................................... 9

*Jones v. City of Key West, Fla.*, 679 F. Supp. 1547 (S.D. Fla. 1988) ............................ 9

*Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998) ............................ 6

*Majer v. Metro. Transp. Auth.*, No. 90-CV-4608 (LLS), 1992 WL 110995, at *4 (S.D.N.Y. May

7, 1992)..................................................................................................... 9

*Malta v. Slagle*, No. 05-CV-342S, 2007 WL 952045, at *5 (W.D.N.Y. Mar. 29, 2007) ............. 7

*Mancuso v. New York State Thruway Auth.*, 909 F.Supp. 133 (S.D.N.Y.1995)........................... 9

*Mancuso v. New York State Thruway Auth.*, No. 524, Docket 95-7443. (2nd Cir. 1996). ............. 9

*Marks v. Scalabrini*, 204 F. Supp. 3d 514, 525 (S.D.N.Y. 2016) .................................................. 17

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) .................................... 6

*Messier v Southbury Training Sch.*, No. 94-CV-1706 (EBB), 1999 WL 20907, at *4 (D. Conn. Jan. 5, 1999) ................................................................................................................................ 6

*Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658 (1978) ................................... 8

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) ....................... 22

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) ............................................................ 8

*San Filippo v. U.S. Trust Co. of N.Y.*, 737 F.2d 246, 256 (2d Cir. 1984) .................................... 21

*see Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 516 N.E.2d 190, 192, 521 N.Y.S.2d 653 (N.Y. 1987) ...................................................................................................... 9

*see John Grace & Co. v. State Univ. Constr. Fund*, 44 N.Y.2d 84, 375 N.E.2d 377, 379, 404 N.Y.S.2d 316 (N.Y. 1978) ...................................................................................................... 9

*Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004). ................................................................... 10

*Silverstein v. Chase*, 260 F.3d 142, 148 (2d Cir. 2001) ............................................................. 17

*Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 18 (1st Cir. 1994). .......................................... 19, 20

*Tanvir v. LaPorte*, No. 93-CV-6923 (JGK), 1997 WL 473084, at *3–4 (S.D.N.Y. June 13, 1997) ................................................................................................................................................ 9

*United States v. DeSalvo*, No. 94-CR-119 (RPP), 1995 WL 479487, at *3 (S.D.N.Y. Aug. 10, 1995) ...................................................................................................................................... 17

*United States v. Flecha*, 539 F.2d 874, 876–77 (2d Cir. 1976) .................................................. 19

*United States v. Miller*, 478 F.3d 48, 51 (1st Cir. 2007) ............................................................. 20

*United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 176 (S.D.N.Y. 2006) ................................. 16

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ....................................................... 10

*Williamson v. United States*, 512 U.S. 594 (1994) ..................................................................... 17

*Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir. 1994) ........................................... 20

World Trade Center Lower Manhattan Disaster Site Litigation No. 15-2181 (2d Cir. 2017)........ 9

*WPIX, Inc. v. League of Women Voters,* 595 F. Supp. 1484, 1489 (S.D.N.Y. 1984).................... 7

**Statutes**

U.S. 42 § 1983 ........................................................................................................................... 8

**Rules**

Federal Rule of Evidence 804(b)(3)(A) ..................................................................................... 17

Federal Rules of Civil Procedure 30(c)(2) .................................................................................. 3

Federal Rules of Civil Procedure 37 .......................................................................................... 4

Federal Rules of Evidence 804(a)(5) ........................................................................................ 16

Federal Rules of Evidence 801(d)(2)(B).................................................................................... 19

**Treatises**

3 Rodney A. Smolla, Smolla & Nimmer on Freedom of Speech § 25: 1 (2016). .......................... 7

Bret Ruber, Comment, "Adoptive Admissions and the Duty to Speak: A Proposal for an

    Appropriate Test for the Admissibility of Silence in the Face of an Accusation," Cardozo Law

    Review, 36 Cardozo L. Rev. 299, 311 n. 84 (2014). ................................................................. 19

Kenneth S. Braun et al., McCormick On Evidence 405–06 (6th ed. 2006)................................. 20

Plaintiff Steven E. Greer, MD hereby submits this Memorandum of Law in Reply to the BPCA defendants' Memorandum of Law in Opposition (Dkt. No. 400). The facts underlying this opposition are fully set forth in Plaintiff's previously filed Rule 56.1 Statement of Undisputed Facts in Support of his Motion for Summary Judgment, dated June 7, (Dkt. No. 368) as well as Plaintiff's opposition 56.1 Statements (Dkt. No's 396 and 397).

## PRELIMINARY STATEMENT

In the Battery Park City Authority's ("BPCA") Memorandum of Law ("MOL") in response to Plaintiff's Motion for Summary Judgment (Dkt. No. 400), they extensively use hyperbole and smear tactics as defense strategies. The lawyers state, for examples, "Simply stated, none of the "evidence" cited by Plaintiff is sufficient to warrant summary judgment in Plaintiff's favor." and, "In a futile attempt to seek summary judgment on his exclusion claim, Plaintiff asserts, in a wholly conclusory manner, that…" However, those tactics are often the last resort when a party lacks real evidence for a defense.

Plaintiff has proven beyond a reasonable doubt, and much more by a preponderance of the evidence, that (A) Chairman and CEO of the BPCA, Dennis Mehiel, ordered Plaintiff to be barred from public meetings just hours after Plaintiff challenged his authority for closed-door sessions during a board meeting, thereby singling out Plaintiff, a member of the press, and violating the First Amendment, and (B) that BPCA acting president Robert Serpico conspired with the real estate defendants to evict Plaintiff in retaliation for his coverage in the press of BPCA scandals, and (C) that the BPCA engaged in flagrant spoliation of crucial email evidence and tampered with a key witness, thereby warranting sanctions.

1

## ARGUMENTS

### 1. Spoliation Warrants Sanctions and Summary Judgment

#### A. The BPCA Deleted Emails

In their MOL in opposition, the BPCA ignored the fact that they committed flagrant spoliation of email evidence in many ways, as well as tampered with Plaintiff's star witness Soriero causing her to ignore two subpoenas for deposition. Only in footnote #14 at the bottom of page 14 do they address it with one sentence, "Because the BPCA Defendants have produced an email fitting Soriero's description, Plaintiff's scurrilous accusations of spoliation are baseless." The lawyers cite, "*See, e.g.*, *Farella v. City of New York*, No. 05-CV-5711 (NRB), 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007) (holding that "for sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence *actually existed and was destroyed*")"

However, the *Farella* case is irrelevant to this instant matter. In that case, there was no evidence that the lead exposure database that was allegedly spoliated even existed ("it is apparent that plaintiffs fundamentally misunderstand the concept of spoliation, as they presuppose that spoliation sanctions are appropriate in the absence of any evidence showing that the "missing" evidence ever existed"). But in this instant case, there is credible admissible testimony by Soriero that the smoking gun email from Serpico to Rossi, asking Rossi to find ways to evict Plaintiff, exists, and that the email produced does not match the Soriero description. In addition to Soriero, the real estate defendants admitted to deleting emails from the BPCA from their server.

Both parties of defendants successfully quashed two subpoenas seeking the emails from archives. Then, to chill and silence Soriero, the BPCA fired her promptly after Plaintiff produced discovery documents about her cooperation with his case.

2

**B. The BPCA obstructed Depositions**

During the deposition of Mehiel (Greer Decl. Ex. F), lawyer Tremonte used the word "objection" approximately 83-times during the brief hour-long deposition without any explanation for the objection, violating FRCP 30(c)(2). There were only approximately 105 total questions. Therefore, almost every one of Plaintiff's questions was stalled and hindered by frivolous objections, violating FRCP 30(c)(2).

Lawyer Tremonte also improperly instructed Mehiel not to answer questions, obstructing the deposition by violating FRCP 30(c)(2) "A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)."

At (*Id*. 10:7-10), Tremonte blocked Plaintiff's question about the new EEOC officer of the BPCA being unqualified and operating a sports betting ring. He claimed that it was "beyond the scope of permissible discovery", presumably using the exception in FRCP 30(c)(2), "to enforce a limitation ordered by the court". But nowhere did Tremonte elaborate, nor did Judge Cott ever limit any discussion of the new EEOC officer.

When Plaintiff asked about the highly important letter form the New York Inspector General forcing Serpico to undergo training on sexual harassment, Tremonte stated, "Objection. I'm going to shut it down. Don't answer. It's beyond the scope of discovery." (*Id*. at 13:3-5).

When Plaintiff asked Mehiel whether he ever saw Kirk Swanson act unethically, Tremonte instructed Mehiel not to answer. Tremonte's explanations for the objection were boilerplate and invalid (*Id*. at 14-19).

When Plaintiff asked whether his press coverage caused the BPCA to fire Serpico, Tremonte blocked the witness again (*Id*. at 26:2-3).

When Plaintiff asked whether the BPCA conducts business with the real estate

defendants, Tremonte blocked the witness (Id. at 48:5-9).  Plaintiff objected to his objection, and

Tremonte continued to obstruct.

During the depositions of Serpico, McCabe, and Koenig, Tremonte engaged in the same

obstruction of the deposition process, violating FRCP 37. Detailing those is beyond the scope of

space allowed for this MOL. For the complete discussion of the spoliation, please refer to

Plaintiff's MOL, Argument 5, A-D.

**C. Sanctions are Warranted**

Plaintiff makes this issue of spoliation his #1 argument because it renders the rest of the

BPCA's MOL in opposition moot. Per FRCP 37, *inter alia*, sanctions should be applied to

prevent the BPCA from even attempting to deny that the conspiracy did not take place.

## 2. Plaintiff's Motion to Reinstate Mehiel as a Defendant is Not "Untimely"

At the bottom of page 17 of the BPCA's MOL, in footnote #17, they make the strange

argument that Plaintiff is actually attempting a motion to amend the complaint at this late date

two years later. However, Plaintiff is not doing anything of the kind.

The lawyers state in their footnote #17:

"Although Plaintiff appears to move under Federal Rule of Civil Procedure 60(b)
"to reinstate Mehiel and Serpico as defendants", his motion is essentially one to
amend the [complaint]….
       As the Court observed in its September 30, 2016 Order granting Mehiel
and Serpico's motion to dismiss this claim against them, "[t]here are no
allegations in the [CAC] that either [Mehiel or Serpico] had a role in excluding
Greer from the meeting." Order at 12, ECF No. 177. Now Plaintiff seeks to
amend the CAC to allege that both individuals were personally involved in the
exclusion."

In the amended complaint, individual Mehiel is already listed as a defendant. Therefore, there is

no need now to amend the complaint. Rather, Plaintiff is asking this Court for relief from the

September 30, 2016 order, which is allowable per FRCP 60(b) because fewer than 12-months

have transpired.

Regarding Your Honor's order from September 30, 2016 (Dkt. No. 177) on the motions

to dismiss, it states on page 12:

> "Greer has not, however, plausibly alleged that Serpico and Mehiel, the individual
> BPCA defendants, personally participated in this alleged denial of Greer's First
> Amendment rights. *See Ying Jing Gan,* 996 F.2d at 536-37. There are no
> allegations in the complaint that either individual had a role in excluding Greer
> from the meeting, and Greer's only argument on this point is that Mehiel and
> Serpico have "fiduciary duties to know what is going on right under their noses in
> the small office of the BPCA.""

However, that paragraph is an erroneous statement and one reason why this Court should grant

relief per FRCP 60(b). In the amended complaint, Plaintiff did indeed list Mehiel and Serpico as

individual defendants. He also stated that eyewitness Kirk Swanson told him that Mehiel and

Serpico were involved in the conspiracy. Then, Plaintiff made the additional argument about it

being their fiduciary duty to know what takes place on their watch. But the September 30th, 2016

order seems to recognize only this "fiduciary duty" argument and not the other allegations.

In Plaintiff's November 30, 2015 MOL in opposition to the BPCA's motion to dismiss,

he bundled both violations of the First Amendment into the same argument, which is that Mehiel

and Serpico are individually liable. In response to that, Your Honor made the ruling quoted in the

paragraph above regarding "fiduciary duty", but did not also mention Plaintiff's reference to the

eyewitness Swanson who accused the individuals. Therefore, the sentence in the order stating,

"There are no allegations in the complaint that either individual had a role in excluding Greer

from the meeting" is erroneous because it fails to give credit to the reference to eyewitness

Swanson.

Since Plaintiff is absolutely not trying to amend the complaint two-years later, the

BPCA's case law cited is moot. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir.

2007), and *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998), and *Messier v*

*Southbury Training Sch.*, No. 94-CV-1706 (EBB), 1999 WL 20907, at *4 (D. Conn. Jan. 5, 1999).

     Finally, the BPCA lawyers argue that it would be unfair to reinstate Mehiel as a defendant at

this juncture because discovery has concluded and they would have somehow conducted discovery

differently had they known that their client Mehiel was a defendant. But that argument is weak. In

reality, discovery would not have been conducted any differently. Mehiel, Serpico, McCabe, Koenig,

and Swanson were all deposed. The same questions the lawyers used to defend the BPCA would

have been used to defend individual Mehiel. Moreover, the lawyers had a duty to anticipate this

scenario of Plaintiff discovering that Mehiel was guilty as charged. In fact, their law firm is a white-

collar criminal defense firm retained midway into this case to defend the individuals.

## 3. Mehiel Is Not Entitled to Qualified Immunity

     On page 19 of their MOL, they argue that Mehiel is entitled to qualified immunity. They

state:

> "A defendant is entitled to qualified immunity "if either (a) the defendant's action
> did not violate clearly established law, or (b) it was objectively reasonable for the
> defendant to believe that his action did not violate such law." *Anderson v. Recore*,
> 317 F.3d 194, 197 (2d Cir. 2003)."

This Court has already ruled in the September 30, 2016 denial of the motions to dismiss that both

counts of the amended complaint were violations of the First Amendment, satisfying (a) in the

case law above. Satisfying (b), <u>Mehiel clearly knew that barring Plaintiff from public meetings</u>

<u>was illegal because his BPCA concocted an elaborate ruse in the form of the "video overflow</u>

<u>room"</u> and then claimed that the boardroom was too full to allow Plaintiff into the meetings. Any

jury would agree that it was "objectively reasonable" for Mehiel to have known that what he was

doing was illegal.

     Then, the lawyers attempt to argue that the law governing equal access to the press was

"not clearly established in July 2015" and cite *S.H.A.R.K. v. Metro Parks Serving Summit Cty.*,

499 F.3d 553, 560 (6th Cir. 2007) (emphasis added). They state, "Indeed, neither the Supreme

Court nor the Second Circuit have set forth a standard to govern this type of claim.", which is

untrue.

<u>However, that is not how the law works. There was indeed a well-established law in

place when Mehiel engaged in his illegal activity and it is called The First Amendment</u>. A law

does not become activated or relevant only after a higher court has interpreted it. Once the law is

made, it becomes the law of the land, and ignorance of a law is no defense.

Moreover, this Court has indeed cited extensive case law in the order denying the

motions to dismiss (Dkt. No. 177 at 10) that does "set forth a standard" governing the illegality

of selectively barring certain members of the press. Your Honor's order stated:

> "The conduct described in Greer's complaint may, however, have violated the
> First Amendment. The First Amendment guarantees, at a minimum, that the press
> have the same access to information as the general public. 3 Rodney A. Smolla,
> Smolla & Nimmer on Freedom of Speech § 25: 1 (2016). As the Second Circuit
> has explained, "once there is a public function, public comment, and participation
> by some of the media, the First Amendment requires *equal access* to all of the
> media or the rights of the First Amendment would no longer be tenable." *Am.
> Broad. Cos., Inc. v. Cuomo,* 570 F .2d 1080, 1083 (2d Cir. 1977) (emphasis
> added); *see also Huminski v. Corsones,* 386 F.3d 116, 147 (2d Cir. 2004), *as
> amended on reh 'g,* 396 F.3d 53 (2d Cir. 2005) (same). Excluding a particular
> reporter "carries with it the danger that granting favorable treatment to certain
> members of the media allows the government to influence the type of substantive
> media coverage that public events will receive, which effectively harms the
> public." *Huminski,* 386 F.3d at 147 (internal quotation marks, alterations, and
> citation omitted). Nonetheless, a reporter's "right to equal access under the first
> amendment is not absolute," as "the interest to be served by the newsgathering
> activity at issue must be balanced against the interest served by denial of that
> activity." *WPIX, Inc. v. League of Women Voters,* 595 F. Supp. 1484, 1489
> (S.D.N.Y. 1984)."

Finally, they argue that the right to videotape a public meeting is not constitutionally

protected per *Malta v. Slagle*, No. 05-CV-342S, 2007 WL 952045, at *5 (W.D.N.Y. Mar. 29,

2007). However, that is *non sequitur* logic. Plaintiff was completely barred from entering the

boardroom at all, making any form of firsthand reporting impossible, not just video recording.

On page 20 of their MOL, they deny even the fact that Plaintiff was barred from the boardroom. They argue that, "Plaintiff was not even prevented from reporting on the July Meeting, as Plaintiff concedes that he was able to view a real-time video broadcast of the July Meeting from a separate room." However, the BPCA lawyers are conflating to produce *non sequitur* argument. The issue at hand is the barring of Plaintiff, and only the Plaintiff, from physically observing the board meetings from the actual boardroom. A video overflow room that is a half-mile away, concocted solely as a ruse, does not mean that Plaintiff was not barred from the boardroom.

### 4. The BPCA Created "Official Policy" to Bar Plaintiff from the Boardroom

On page-21 of the BPCA's MOL in opposition, they argue essentially that the BPCA might have been guilty of singling out Plaintiff to bar him from the boardroom, but that it was not "official policy" Therefore, § 1983 cannot be used as the tool for this First Amendment violation, they argue. They cite *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658 (1978) and *e.g.*, *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).

In Plaintiff's MOL in opposition to the BPCA's own motion for summary judgment, he refutes this in detail (see Dkt. No. 396 at 10-12). To summarize that argument, by using the BPCA's own definition of official policy, the BPCA actions barring Plaintiff were "official policy" because the Chairman and CEO, Dennis Mehiel, ordered it, and other senior ranking staff, such as Kevin McCabe, carried it out, thus satisfying definition (1) in *Allan v. City of New York*, 386 F. Supp. 2d 542, 545 n.3 (S.D.N.Y. 2005). Dennis Mehiel, who is the Chairman of the Board as well as CEO, and his Chief of Staff McCabe, clearly have "final authority" over BPCA matters, satisfying the definition of official policy in the case of *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

## 5. The BPCA is Not Immune to Punitive Damages

On page 22 of their MOL, the BPCA argues that it is a public benefit corporation and is immune to punitive damages like a municipality is immune.  They cite *Tanvir v. LaPorte*, No. 93-CV-6923 (JGK), 1997 WL 473084, at *3–4 (S.D.N.Y. June 13, 1997); *Majer v. Metro. Transp. Auth.*, No. 90-CV-4608 (LLS), 1992 WL 110995, at *4 (S.D.N.Y. May 7, 1992); and *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

However, the status of the BPCA's immunity is currently under review by the United States Court of Appeals for the Second Circuit. In the case of the World Trade Center Lower Manhattan Disaster Site Litigation No. 15-2181 (2d Cir. 2017), the Second Circuit certified down to the New York Court of Appeals the question of:

> "(1) Before New York State's capacity-to-sue doctrine may be applied to determine whether a State-created public benefit corporation has the capacity to challenge a State statute, must it first be determined whether the public benefit corporation "should be treated like the State," *see Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 516 N.E.2d 190, 192, 521 N.Y.S.2d 653 (N.Y. 1987), based on a "particularized inquiry into the nature of the instrumentality and the statute claimed to be **[\*\*26]** applicable to it," *see John Grace & Co. v. State Univ. Constr. Fund*, 44 N.Y.2d 84, 375 N.E.2d 377, 379, 404 N.Y.S.2d 316 (N.Y. 1978), and if so, what considerations are relevant to that inquiry?"

The New York Court of Appeals is scheduled to hear the question in September of 2017.

In *Mancuso v. New York State Thruway Auth.*, 909 F.Supp. 133 (S.D.N.Y.1995), the District Court denied the Thruway Authority's motion for summary judgment to dismiss the punitive damages. They appealed, and the Second Circuit refused to vacate the District Court ruling that allowed punitive damages. *Mancuso v. New York State Thruway Auth.*, No. 524, Docket 95-7443. (2nd Cir. 1996). In addition, there have been cases of federal courts awarding punitive damages against states and municipalities. *Jones v. City of Key West, Fla.*, 679 F. Supp. 1547 (S.D. Fla. 1988); and *Jackson v Dallas School District*: Case No. 3:12cv1903; (M.D. of

Pennsylvania, 2015). Therefore, the BPCA's motion to strike Plaintiff's claims for punitive damages should be dismissed.

## 6. The BPCA is a Rogue Authority in Need of Federal Restructuring

On page 23 of their MOL, the BPCA lawyers argue that there is no need for this Court to step in and restructure the authority. They cite case law and argue that a "likelihood of future injury" must be demonstrated. *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004). They argue that restructuring would "go far beyond what is necessary" to address the chronic pattern of retaliation against whistleblowers by the BPCA. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

However, this Court has full jurisdiction and authority to restructure the BPCA if it sees fit. In Plaintiff's MOL and declaration, he explained how his complaints to numerous oversight agencies have fallen upon deaf ears. Meanwhile, the BPCA looked the other way as a serial sexual assaulter, Robert Serpico, flourished amongst their ranks for decades, accruing one EEOC complaint after another, and then destroyed his own human resources files. Plaintiff detailed how two African-American female lawyers, Allyson Ford and Nancy Harvey, were fired for doing their jobs and investigating Serpico. Plaintiff explained how the new EEOC officer, Anthony Peterson, is a completely unqualified man who spends his days handling sports betting pools. Plaintiff also explained how Kirk Swanson was fired for not going along with corrupt contract rigging. And, of course, Plaintiff himself was retaliated against.

## 7. The BPCA Violated the First Amendment by Barring Plaintiff

On pages 3-8 of the BPCA's MOL in opposition, they argue that Count 2 did not occur despite admitting to singling out Plaintiff and barring him from public meetings. The mountain of evidence against them is undeniable and the lawyers attempt to use esoteric legal theory to justify their clients' actions.

**A. July 29, 2015 Was Not the Only Time Plaintiff Was Barred from BPCA Board Meetings**

The lawyers begin by arguing (in Footnote #4, page 4) that the only incident to be considered in this case should be the first time that Plaintiff was barred from a BPCA board meeting, which was July 29, 2015. However, this complaint was filed a few days later on August 4th and amended on November 4th (Dkt. No. 85). Briefs relating to the motions to dismiss were also filed in November. Meanwhile, Plaintiff did not attempt to attend another BPCA event until the town hall on December 16, 2015. The next board meeting Plaintiff attempted to attend was not until April 13, 2016.

There was no need to delay justice by approximately six-months, and add more paperwork to be managed by Your Honor, simply to add these new incidents to a twice-amended complaint. It does not require multiple offenses for a defendant to be found guilty of violating the constitution. The July 29, 2015 incident sufficed. However, the subsequent violations are admissible evidence that prove the ongoing pattern of the BPCA barring Plaintiff from meetings.

The video evidence of the subsequent First Amendment violations that took place in December of 2015 and April of 2016 were produced in the earliest stages of discovery. The defense lawyers were well aware of them. It was their duty to address these incidents during discovery and depositions. They cannot argue now that the incidents should be prevented from being presented to a jury simply because the lawyers feel that they might have conducted discovery in a different manner.

**B. The BPCA Did Not Bar Plaintiff from Meetings in a Content-Neutral Way**

On page 4 of the MOL in opposition, the BPCA argues that the decision to bar Plaintiff from the meetings was "content neutral". Therefore, based on case law, the decision did not violate the First Amendment. As "evidence", the lawyers engage is what can only be called a classic smear effort, spewing one false allegation after the other about Plaintiff.

**C. Plaintiff Did Nothing to Warrant the BPCA Actions**

On pages 4-7 of the MOL, the BPCA argues that Plaintiff was barred from meetings "because of his history of threatening and disruptive behavior, including his behavior during the board meeting held on June 9, 2015" All of this was thoroughly refuted in Plaintiff's MOL in opposition to the BPCA's motion for summary judgment (Dkt. No. 396 at 12-17). Nevertheless, Plaintiff will summarize the important facts again.

The BPCA relies heavily on hand-written anonymous notebook logs of alleged "harassing" phone calls made by Plaintiff to the BPCA offices, which are inadmissible hearsay per FRE 801 and 802. <u>Because the logs were created for the sole purpose of litigation, and no other logs were made of other incoming calls, they were not "regularly conducted activity of a business" and not admissible "business records" under FRE 803.</u>

The lawyers then try to sway this Court with false anecdotes that would be inadmissible even if they were true because they are utterly irrelevant. For example, they try to spin Plaintiff's investigative reporting into Bob Townley, one of Sheldon Silver's partners in crime who was secretly taking at least $250,000 per year in BPCA "grants" despite having no business in Battery Park City, as Plaintiff "stalking a summer camp director" That false allegation also has nothing to do with the BPCA board meetings and their decision to bar Plaintiff. The lawyers also claim that Plaintiff was "harassing children for playing soccer on a park lawn", which again is completely untrue and irrelevant if it were true. The lawyers make a slew of false allegations about Plaintiff threatening Kevin McCabe, yelling during a board meeting, and "lingering" in the BPCA offices, all of which are wholly unsubstantiated smears.

<u>Finally, if all of these allegations about Plaintiff being such a harassing and threating person were true, why did the BPCA wait nearly a year to act? Why did Mehiel personally send</u>

an email to Brookfield security to bar Plaintiff only on June 9, 2015, just hours after Plaintiff challenged his authority to enter into closed-door sessions, when they allege that Plaintiff was a menace long before that? Clearly, Dennis Mehiel, who hobnobs with U.S. Senators, Vice Presidents, and presidential candidates, acted out of hubris by using his power to retaliate against Plaintiff for his content and actions of reporting on the BPCA in the press. It was an "I'll show him" moment of arrogance.

### D. Plaintiff's Ability to Report in the Press Was Stifled

On pages 7-8 of the MOL, the BPCA argues that the actions to bar Plaintiff from the boardroom did not, "...impair Plaintiff's ability to gather the news in any way." They support that argument by claiming that Mehiel never fielded and answered questions during board meetings.

However, that is false, and Plaintiff produced irrefutable video evidence of Mehiel answering questions on many occasions, not only from Plaintiff, but from the New York Times and other news outlets. It is all detailed in Plaintiff's MOL (Dkt. No. 367, at 9-10).

In fact, Mehiel admitted under oath that he fields questions. On page 8 of their MOL in opposition, the lawyers state:

> "While Mehiel clarified that he has occasionally responded to press inquiries, he was equally clear that he did not take such questions during board meetings. Mehiel testified: "On occasion *after a meeting is over*, a reporter has asked me a question or two and I've answered it. It's not common, but it happens, and when it does I try to respond." (Mehiel Dep. at 39:19–23 (emphasis added).)"

Therefore, Plaintiff missed out on opportunities to ask questions. His ability to report on the BPCA was impaired.

In addition, on pages 17-18 of Plaintiff's MOL in opposition (Dkt. No. 396), he explains how being physically present in the boardroom is essential given that the quality of the webcast video is so poor. The entire row of people on the left side of the table have their faces obscured making it

impossible to know which voice is coming from which speaker. It is also impossible to see who is in attendance from the BPCA board and the audience. The audience is not in the video shot.

### E. The Action of Barring Plaintiff from the Boardroom Was Not Reasonably Tailored

On pages 7 of the MOL in opposition, the BPCA argues that their scheme to concoct an excuse for barring Plaintiff from the boardroom by claiming the meetings were full and sending him to a video viewing room a half-mile away was "reasonably tailored" Therefore, per case law, it did not violate the First Amendment, they argue.

Firstly, much more was done than simply suggest that Plaintiff go to a video viewing room. In the course of setting up this charade, the BPCA severely damaged Plaintiff's reputation with defamatory emails to the New York Police Department, Brookfield Security, and god only knows who else, claiming Plaintiff was a scary security threat. Also, the act of turning away Plaintiff in a public office lobby with many people onlooking was humiliating.

Secondly, it was not reasonably tailored to completely bar Plaintiff from reporting in-person from the BPCA boardroom. Plaintiff and his BatteryPark.TV had been for years the only news source willing to muckrake and expose the corruption within the BPCA. His reporting led to the halting of $250,000 "grants" to Bob Townley, the opening of the $70 Million BPC community center that Gayle Horwitz was stallin in order to protect Townley's nearby Manhattan Youth community center, the "resignation" of two BPCA presidents (Horwitz and Boutris), three media relations officers, and several board members. After Plaintiff's press coverage, all of the elected officials representing Battery Park City began a letter writing campaign urging Dennis Mehiel to allow questions during board meetings. Also, State Senator Squadron and Assemblywoman Glick successfully passed through both chambers a state bill mandating local residents be appointed to the BPCA board.

<u>This matter before the Court is not an abstract freedom of the press matter. The BPCA</u> <u>stifled the one and only critic of the authority by barring Plaintiff from meetings</u> (They also effectively banished Plaintiff from New York City by conspiring to evict him). <u>Their actions</u> <u>were neither "reasonably tailored" nor warranted. It was classic New York State Politics in</u> <u>action, retaliating against the squeaky wheel.</u>

## 8. The BPCA Violated the First Amendment by Conspiring to Evict Plaintiff

On pages 9-17 of the BPCA's MOL in opposition, they address Count 1 and deny that they conspired with the real estate defendants to evict Plaintiff. Due to the mountain of evidence against them, their arguments are mostly that the evidence is inadmissible.

### A.  The Soriero Phone Call Transcript Is Admissible

On pages 11-14 of the BPCA's MOL, they devote a significant portion of the entire MOL to refuting Plaintiff's evidence obtained from witness Linda Soriero. Ms. Soriero was the personal assistant and secretary to Robert Serpico for 18-years. She knew of this lawsuit and contacted Plaintiff on March 12, 2017 to give him unsolicited help and evidence. Plaintiff recorded the phone calls and hired a court reporter to create transcripts (Greer Decl. Ex zA and Q).

Soriero was willing to testify during a deposition in order to support her comments recorded on the phone call, which were that she personally saw on Serpico's office computer an email from him to Rossi asking Rossi to essentially find an excuse to evict Plaintiff (see Greer Second Decl. ¶ 3 (Dkt. No 410)). But due to spoliation, this smoking gun email was never produced.

When the BPCA lawyers learned that Soriero was cooperating with Plaintiff, they promptly fired her from the BPCA in April of 2017. This scared Soriero, chilling her into ignoring Plaintiff's subpoena for a deposition. Then, the BPCA issued their own subpoena for

Soriero to appear for a deposition, and she ignored that as well. Soriero was even ignoring her own lawyer (*Id.* ¶ 5-8).

Plaintiff reported this witness tampering to Magistrate Judge Cott and he declined to rule on whether or not the BPCA was guilty of witness tampering, stating, "the Court…makes no finding with respect to the alleged witness tampering. The Soriero deposition should proceed as scheduled." (Dkt. No. 313). This was in response to Plaintiff's motion (Dkt. No. 311) asking for "urgent relief" to assist in assuring that Soriero would not be chilled into ignoring the subpoena. Judge Cott's order in effect compelled the deposition to proceed.

The only reason that Plaintiff is now forced to rely on a transcript of an out-of-court phone call from Soriero is because of the witness tampering perpetrated by the BPCA. Yet, now the BPCA has the gall to argue that the transcript is inadmissible. The BPCA cannot chill a witness out of testifying and then complain about the lack of deposition testimony.

On page 11, the lawyers argue that Plaintiff has failed to prove that Soriero is unavailable as a witness for a jury trial. Therefore, the hearsay exception of FRE 804 does not hold and the phone transcript is inadmissible. They claim that by a witness merely failing to appear for a deposition does not establish "unavailability" to meet FRE 804, citing *Flagg v. City of Detroit*, No. 05-74253, 2010 WL 4366868, at *2 (E.D. Mich. Oct. 28, 2010), and *Accord United States v. Oliver*, 626 F.2d 254, 261 (2d Cir. 1980).

Then, they argue that Plaintiff failed to "take any steps whatsoever…to procure Soriero's attendance at trial", citing FRE 804(a)(5) (requiring that proponent of statement take "reasonable means" to procure statement of declarant who is absent from trial or hearing) and *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 176 (S.D.N.Y. 2006) (holding that "some affirmative steps must be taken" to demonstrate "reasonable means" to procedure declarant's appearance).

However, Plaintiff did indeed take exceptional steps in attempting to depose Soriero. He subpoenaed her twice with two different dates. He also motioned Judge Cott for urgent relief and

16

Judge Cott ordered that the deposition should proceed, which was an order to compel Soriero. In addition, the BPCA also subpoenaed Soriero for a deposition and she ignored that as well.

Next, the BPCA lawyers argue on page 12 of their MOL that, "Soriero's description of an email was not "so contrary to [her] proprietary or pecuniary interest or had so great a tendency to invalidate [her] claim against someone else or to expose [her] to civil or criminal liability" that it could be admissible under Federal Rule of Evidence 804(b)(3)(A), citing *Williamson v. United States*, 512 U.S. 594 (1994), and *United States v. DeSalvo*, No. 94-CR-119 (RPP), 1995 WL 479487, at *3 (S.D.N.Y. Aug. 10, 1995); and *Silverstein v. Chase*, 260 F.3d 142, 148 (2d Cir. 2001). However, Soriero was indeed taking great personal risk "contrary to her pecuniary interest" by assisting Plaintiff and making the comments documented in the phone call transcript. In fact, her testimony likely resulted in the BPCA firing her shortly thereafter.

The BPCA argues that the actual comment by Soriero relevant to this case, the one describing an email she saw on Serpico's computer, was not a risky thing to tell and not "against her interest" to divulge to Plaintiff, citing *Marks v. Scalabrini*, 204 F. Supp. 3d 514, 525 (S.D.N.Y. 2016). However, the Soriero's comments contradict this. The transcript (Greer Decl. Ex. Q) proves that Soriero was scared to tell Plaintiff much of anything, in fear of retribution from Serpico. At *Id.* 2:23-25, she stated, "Well, I don't want to do that without a lawyer present. You know what I'm saying? I got to protect myself.", and at *Id.* 3:20-21, "See, I can't talk. I don't know you. I haven't met you.", and at *Id.* 8:3-6, "I've been gone for heart tests. I've been having a lot of anxiety and stress. And a lot of it has been caused by him with the stuff he's done to me."

On page 13, the BPCA lawyers have the chutzpah to argue that the Soriero transcript is inadmissible because the original email from Serpico to Rossi would be better, citing Best Rules of Evidence and FRE 1002. This is despite the fact that they are the ones who committed spoliation, refused to produce the email, deleted emails from servers, and quashed a subpoena of the Iron Mountain archives.

The BPCA denies the fact that they failed to produce this "smoking gun email". They reference one email that was produced, which was sent after the housing court litigation began and long after the conspiracy to evict transpired. This May of 2014 email from Serpico to Rossi, "Is he now evicted? Where is he living?", prompted by an email from Plaintiff warning them to not delete any emails, is clearly not what Soriero was referring to when she said on the phone call:

> "Oh, because I saw an email that -- but see I'm not supposed to see an email. It was on Bob's screen to Steve Rossi that basically -- to -- to look into your -- to -- to your rent situation. And then he kept calling and calling. And Bob said one day to me: Oh, Steven Greer, he's no longer in his apartment. So I looked at him like: What? And you didn't have anything to do with it?"

Also, due to spoliation and sanctions allowing a jury to be instructed on adverse inference, the BPCA cannot even argue that this email does not exist.

Finally, the BPCA argues, essentially, that even if the smoking gun email exists as Soriero described it, that it does not prove a conspiracy. Any reasonable jury would disagree.

### B. The Swanson Testimony Is Solid Proof of the Conspiracy

On page 15 of the BPCA's MOL in opposition, they argue again that the Kirk Swanson deposition testimony is of no support to Plaintiff's argument that Serpico conspired with Rossi. The essence of their defense is that the non-verbal response of Serpico to Swanson's question, which was "shrugged his shoulders and rolled his eyes" is inadmissible. However, that is not the case.

First, the BPCA lawyers once again, in yet another brief, misquote Swanson. In his deposition, Swanson never mentioned "rolled his eyes". Rather, he stated, "And I asked Bob if he had anything to do with Greer not getting his lease renewed, to which Bob visibly smirked, shrugged and didn't answer my question and walked away." (see Swanson Dep. at 24:16-20).

Given that this one sentence is such crucial evidence against their clients, the BPCA lawyers' inability to quote Swanson properly raises red flags about the truthfulness and accuracy of their entire MOL.

The BPCA cites one case law from the First Circuit for their rationale as to why a nonverbal gesture by Serpico is inadmissible. *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 18 (1st Cir. 1994). However, this instant case is in the Second Circuit not the First, and case law from the Second Circuit, as well as Federal Rules of Evidence, clearly allow such testimony to be admissible.

In a 2014 Cardozo law review article[1] on the "Admissibility of Silence in the Face of an Accusation", it states:

> "The Federal Rules of Evidence, enacted in 1975, codified the common law doctrine of tacit admissions in **Rule 801(d)(2)(B).** While the rule itself does not refer to silence, the advisory committee's notes explicitly state that silence in the face of an accusation can be considered an adoptive admission."

That actual federal rule committee notes state:

> "When silence is relied upon [i.e. Serpico's smirk and shrug in this instant case], the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue. The decision in each case calls for an evaluation in terms of probable human behavior. In civil cases, the results have generally been satisfactory."

From the Second Circuit, in the case of *United States v. Flecha*, 539 F.2d 874, 876–77 (2d Cir. 1976), "silence" [such as the nonverbal gestures by Serpico in this case] is admissible if, "…there are circumstances which render it <u>more reasonably probable that a man would answer the charge made against him than that he would not</u>. (emphasis added)"

---

[1] Bret Ruber, Comment, "Adoptive Admissions and the Duty to Speak: A Proposal for an Appropriate Test for the Admissibility of Silence in the Face of an Accusation," Cardozo Law Review, 36 Cardozo L. Rev. 299, 311 n. 84 (2014).

Serpico was the acting president of the BPCA and boss of Swanson at the time Mr. Swanson asked him on January 21st, 2014 whether he was behind the eviction of Plaintiff. In reply, Serpico was coy with Swanson, smiling and shrugging his shoulders. Therefore, it was "reasonably probable" that Serpico should have answered Swanson with a simple "No", or with indignation, such as "What are you talking about?" if Serpico were truly innocent of the First Amendment violations alleged in this complaint.

In the case of *United States v. Miller*, 478 F.3d 48, 51 (1st Cir. 2007) ("…a party's agreement with a fact stated by another may be inferred from (or 'adopted' by) silence." (citations omitted)); see also Kenneth S. Braun et al.., *McCormick On Evidence* 405–06 (6th ed. 2006). The belief that silence is probative in at least some instances was the decision in *Brown v. United States*, 464 A.2d 120, 124 (D.C. Cir. 1983).

To refute the case of *Smith v. Stratus Computer, Inc.* cited by the BPCA, that case is not similar to this instant case. The nonverbal shrug reply in *Smith* was not even addressing a direct question, unlike Swanson's direct questioning of Serpico in this instant case, which was:

> "I asked Bob [Serpico] if he had anything to do with Greer not getting his lease renewed, to which Bob visibly smirked, shrugged and didn't answer my question and walked away." (Swanson dep. **Exhibit 1**, at 24:16).

*Smith v. Stratus Computer, Inc.* also states, "Because we are reviewing a grant of summary judgment, we view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in plaintiff's favor. *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir. 1994)." Therefore, for the purposes of the BPCA's motion for summary judgment, Serpico's non-verbal response consisting of a smirk, shrug, and walking away from Swanson should be adopted as an admission of guilt for the purposes of this motion.

## C. The Ford Testimony Proves Serpico's Motive

On page 15 of the BPCA's MOL in opposition, they attempt to dismiss the importance of the Allyson Ford deposition. They claim that "water cooler talk" proves nothing. They cite *San Filippo v. U.S. Trust Co. of N.Y.*, 737 F.2d 246, 256 (2d Cir. 1984), which seems to be irrelevant to their argument and cited simply because it is from the Second Circuit and includes the search term "conspiracy".

The BPCA argues that Ford's detailed discussion of Serpico's obsession with, and hatred of, BatteryPark.TV does not prove a motive. They cite *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 432 (N.D.N.Y. 2009) and include this summary "(holding that "evidence of a series of expressions of a common dislike of a plaintiff by a handful of individuals is different from evidence of a conspiratorial agreement between those individual[s]")." However, Plaintiff was unable to find these quotes in the actual decision. Regardless, this case also seems irrelevant to refuting the importance of Ford stating in no uncertain terms that Serpico discussed in anger BatteryPark.TV during official meetings, thus proving a motive.

### D. The Real Estate Defendants Did Not Evict Plaintiff for Erratic Rent or Harassing Behavior

On pages 9 and 16 of the BPCA's MOL in opposition, they rely on their co-conspirators, the real estate defendants, to help them with their defense. They claim that "Plaintiff's non-payment of rent and complaints about Plaintiff's behavior toward other residents of 200 Rector Place" were the real reasons that the lease was not renewed. Plaintiff thoroughly refutes these arguments in his MOL in opposition to the Real Estate motions for summary judgment (Dkt. No. 398, at 6-9).

In Footnote #9 at the bottom of page 9, the BPCA raises an issue that even the real estate defendants did not bother to argue. The BPCA lawyers seem to be woefully misinformed on the irrelevant housing court litigation. They also accuse Plaintiff of wanting to "relitigate" the housing court matter when he is doing nothing of the kind.

21

This non-payment "case" of $10,887 was never actually a court case because Plaintiff paid it before a judge could even be assigned. However, to explain again since it was raised, the $10,887 was for rent accrued after the decision to not renew the lease was made. Therefore, it in no way proves that Plaintiff was deservingly evicted for not paying rent. Plaintiff was withholding rent in escrow preparing for the impending holdover case. Likely knowing that this argument is totally irrelevant, the BPCA lawyers are hoping that it clouds the issue enough to avoid losing on summary judgment.

The BPCA uses the terms "non-payment of rent", but even the real estate defendants never attempt to argue (either in their own MOL in support of their motion for summary judgment (Dkt. No. 380), or during the housing court litigation) that Plaintiff was guilty of "non-payment of rent". The worst accusation that they make is that Plaintiff was "erratic", and yet decided to renew his lease numerous times despite these allegations (which have been concocted purely for purposes of this litigation).

Finally, the BPCA uses the real estate defendants' "*Mount Healthy*" defense, citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Plaintiff thoroughly refutes this argument in his MOL in opposition to the real estate motion for summary judgment (Dkt. No. 398, at 6-9)

## CONCLUSION

After an extensive discovery period, whereby the *pro se* Plaintiff deposed 10 witnesses and obtained thousands of documents, his charges of conspiracy to evict and of illegally barring Plaintiff from public meetings have been proven by a preponderance of evidence. In addition, egregious spoliation by the defendants warrants sanctions to prevent them from even denying the allegations.

The BPCA lawyers have wasted hundreds of thousands of Battery Park City tax dollars "overlitigating" this case, to use Judge Cott's words. They have treated it like a white-collar criminal

defense case. The lawyers have tried every smear tactic and esoteric legal theory argument that they could think of, but have failed to refute Plaintiff's arguments.

Plaintiff should win this case on summary judgment. He has suffered tremendous damages. The BPCA should be restructured.

Dated: July 27, 2017
Columbus, Ohio

By: _Steven Greer_

Steven Greer, *pro se*
4674 Tatersall Court
Columbus, Ohio 43230
(212) 945-7252
steve@batterypark.tv