UNITED STATES DISTRICT COURT
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **STEVEN E. GREER**, **MD** | ) | **15-cv-6119 (AJN) (JLC)** |
| Plaintiff; | ) | |
| | ) | |
| v. | ) | **HON. ALISON J. NATHAN** |
| | ) | DISTRICT JUDGE |
| **Dennis Mehiel**, **Robert Serpico**, **The** | ) | |
| **Battery Park City Authority**, **Howard** | ) | **HON. JAMES L. COTT** |
| **Milstein**, **Steven Rossi**, **Janet Martin**, | ) | MAGISTRATE JUDGE |
| **Milford Management**, **Mariners Cove Site** | ) | |
| **B Associates** | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S REPLY to REAL ESTATE'S MEMORANDUM of LAW in OPPOSITION to PLAINTIFF'S MOTION for SUMMARY JUDGMENT

---

Steven E. Greer, MD, pro se
4674 Tatersall Court
Columbus, Ohio 43230
(212) 945-7252
steve@batterypark.tv

# Table of Contents

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENTS ...................................................................................................... 2

1. Spoliation Warrants Sanctions and Summary Judgment ................................. 2

    A.    The Email Described by Soriero Was Never Produced ......................... 2

    B.    The Lawyers Obstructed the Depositions ........................................... 4

2. The Soriero Testimony Is Admissible ........................................................... 6

    a.    The Soriero Voice and Phone Call Are Authentic and Validated ......... 6

    b.    The Soriero Transcript Is Not Inadmissible Hearsay .......................... 7

    c.    The Key Email Described by Soriero Was Not Produced ..................... 9

3. The Swanson Testimony Is Admissible .......................................................... 10

4. The Ford Testimony Proves Serpico's Motive for Conspiracy ......................... 10

5. Plaintiff's Rent Payment Pattern Was Never a Reason for Eviction ................. 11

6. Plaintiff's Eviction was Unique and No Other Tenant Was Ever Evicted .......... 12

CONCLUSION ..................................................................................................... 12

# Table of Authorities

## Cases

*CAT3, LLC v. Black Lineage, Inc.*, 14 Civ. 5511 (AT) (JCF), 164 F. Supp. 3d 488, 497 (S.D.N.Y. Jan. 12, 2016) .................................................................................................................. 3

*Evans v. Port Auth. of N.Y. & New Jersey*, 192 F. Supp. 2d 247, 262 (S.D.N.Y. 2002) ............... 8

*Grayson v. Williams*, 256 F.2d 61 (10th Cir. 1958) ...................................................................... 8

*Hargett v. National Westminster Bank, USA*, 78 F.3d 836, 842 (2d Cir. 1996) ............................ 9

*Koninklijke Luchtvaart Maatschappij N.V. KLM Royal Dutch Airlines v. Tuller*, 110 U.S.App.D.C. 282, 292 F.2d 775, 784 (1961) .................................................................. 8

*Martin v. Savage Truck Lines, Inc.*, 121 F.Supp. 417 (D.D.C. 1054) ........................................... 8

*Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 263–64 (S.D.N.Y. 2003) (emphasis supplied) .................................................... 6

*United States v. Dinero Express, Inc.,* No. 99 Cr. 75, 2000 WL 1134484, at *1 (S.D.N.Y. Aug.9, 2000) ................................................................................................................... 6

*United States v. Morrison,* 153 F.3d 34, 56 (2d Cir.1998). ........................................................... 6

## Rules

New Jersey Evidence Rule 63(9)(a) ............................................................................................ 8

Uniform Rule 63(9)(a), Kansas Code of Civil Procedure §60–460(i)(1) ...................................... 8

Federal Rules of Evidence 801 .................................................................................................... 7

Federal Rules of Evidence 804 .................................................................................................... 8

## Treatises

4 Wigmore, 1964 Supp., pp. 66–73 ............................................................................................ 8

*Northern Oil Co. v. Socony Mobile Oil Co.*, 347 F.2d 81, 85 (2d Cir. 1965) ................................ 8

Plaintiff Steven E. Greer, MD hereby submits this Memorandum of Law in Reply to the Real Estate Defendants' Memorandum of Law in Opposition (Dkt. No. 405). The facts underlying this opposition are fully set forth in Plaintiff's previously filed Rule 56.1 Statement of Undisputed Facts in Support of his Motion for Summary Judgment, dated June 7, (Dkt. No. 368) as well as Plaintiff's opposition 56.1 Statements (Dkt. No's 396 and 397).

## PRELIMINARY STATEMENT

In the Real Estate Defendants' MOL in opposition, they attempt to refute the mountain of evidence against them, which includes 10 depositions and thousands of documents. Their defense arguments claim the witness testimony as inadmissible hearsay, claim that Plaintiff failed to pay timely rent for years (but was only "erratic", never missing payments), and claim they were not guilty of spoliation that would warrant sanctions. Lacking real evidence, they resort to smear tactics and hyperbole, such as "Plaintiff has not proffered any evidence, let alone admissible evidence…"

Plaintiff has proven beyond a reasonable doubt, and much more by a preponderance of the evidence, that (A) Defendant Rossi conspired with the BPCA's Robert Serpico to not renew Plaintiff's apartment lease, thereby evicting him in retaliation for his reporting in the press on BPCA scandals. (B) Serpico and Rossi had a close relationship for 30-years and Rossi was technically the tenant to Serpico's BPCA landlord. Therefore, Serpico had leverage over Rossi derived from the friendship and business relationship. (C) Also, Serpico had a motive to retaliate, with an eyewitness stating the Serpico would angrily discuss Plaintiff's BatteryPark.TV during official meetings.

1

And finally, (D), Plaintiff proved that he did nothing to deserve to being evicted. He never missed a rent payment prior to being evicted and never behaved badly toward other residents. In fact, his lease was recently renewed in May of 2013 before the January 2014 letter on non-renewal. The defendants can only claim that rent payments were "erratic", citing erroneous inadmissible accounting spreadsheets made for the sole purpose of this litigation. Likewise, the allegations that Plaintiff was harassing neighbors derive from efforts by the lawyers to collect incriminating evidence solely for the purpose of this litigation.

# ARGUMENTS

## 1. Spoliation Warrants Sanctions and Summary Judgment

On page 14 of the real estate defendants MOL in opposition, they deny Plaintiff's spoliation charges and portray the matter as being all related to one single "smoking gun email". In fact, Plaintiff's spoliation charges relate to multiple acts of spoliation and obstruction of depositions.

### a. The Email Described by Soriero Was Never Produced

Plaintiff detailed in his MOL (Dkt. No. 367 at 15) the "smoking gun" email described by witness Linda Soriero during a telephone call. She stated on the call:

> "Oh, because I saw an email that -- but see I'm not supposed to see an email. It was on Bob's screen to Steve Rossi that basically -- to -- to look into your -- to -- to your rent situation. And then he kept calling and calling. And Bob said one day to me: Oh, Steven Greer, he's no longer in his apartment. So I looked at him like: What? And you didn't have anything to do with it?"

That email was never produced during discovery and both groups of defendants (i.e. the BPCA and real estate) blocked multiple attempts by Plaintiff to subpoena the contents of their computer archive servers (see Judge Cott order quashing subpoenas, Dkt. No. 345). The real estate defendants openly admitted to Judge Cott during a bench hearing conference call on May 18, 2017, as well as in an affidavit ordered by Judge Cott (Greer Decl. Ex. N), and then again in their

2

MOL in opposition on page 17, that they deleted emails from their in-house real estate office computer server. Now in a pickle, the lawyers try to use case law to escape the liability of spoliation.

On page 14 of their MOL in opposition, they argue that FRCP 37(e) does not allow sanctions because Plaintiff failed to "show" that the email is not available from the BPCA's computers, citing *CAT3, LLC v. Black Lineage, Inc*., 14 Civ. 5511 (AT) (JCF), 164 F. Supp. 3d 488, 497 (S.D.N.Y. Jan. 12, 2016). But that argument is false because the BPCA quashed a subpoena of their Iron Mountain archives, making it impossible to "show" whether the email exists or not.

They argue that, since the Soriero-described email was sent by Serpico, it should have been produced by the BPCA during discovery. However, that argument falls flat too because the BPCA staff admitted during depositions (see Serpico transcript, Greer Decl. Ex. H, at 21:13-35) that they deleted emails from their office desk computers. This spoliation occurred after Plaintiff had sent cease-and-desist emails, warning all defendants to not delete documents or other evidence, on March 23, 2014 (see Greer Decl. Ex O) and May 28, 2014 (*Id.* Ex. P).

The real estate defendants argue on page 15 that Plaintiff never motioned the BPCA to be compelled to produce emails. That too is false. Plaintiff not only opposed the motion to quash, but then also motioned for Judge Cott to reconsider his order, and was denied again (Dkt. No. 345). Then, Plaintiff issued to the BPCA a supplemental document request for the emails after the depositions and the BPCA refused to comply again, objecting to the requests (see Greer Decl. Ex. Y). All of this was reported to Judge Cott during a bench hearing conference call on May 18, 2017.

Also, Plaintiff filed a formal motion to compel the real estate defendants to produce the emails on May 13, 2017 (Dkt. No. 342). It was denied.

On page 16 of their MOL in opposition, they wrote a sentence that seems to make no sense:

> "Thus, it is Landlord Defendants' position that Plaintiff has the documents at issue (*see* Plaintiff's Exhibit P) or has failed to do so, and has thereby waived any spoliation claims by not seeking the document prior to the close of discovery."

In addition to the sentence being incomplete, Ex. P, to which they refer, is an email that seems irrelevant.

> Then on page 16, the lawyers argue that:

> "Plaintiff cannot show that Landlord Defendants could have reasonably anticipated litigation requiring the preservation of Plaintiff's emails prior to the filing of this action….Landlord Defendants do not concede that Plaintiff's emails from March and May 2014 (*see* Exs. O & P), sent more than a year prior to the commencement of this litigation, put Plaintiff on reasonable notice to preserve its emails."

The real estate lawyers argue, since housing court litigation was near at hand but not yet initiated, and since those special proceedings courts do not allow discovery, that somehow Plaintiff's emails to cease-and-desist from destroying emails did not apply to them. This argument obviously fails because there was no indication that Plaintiff would not or could not start his own lawsuit in either state court or federal court where discovery is allowed.

### b. The Lawyers Obstructed the Depositions

During the deposition of Rossi (Greer Decl. Ex. S), lawyer Riegel used the word "objection" more than 100 times without ever explaining the reason for her objections. There were only approximately 53 questions asked by Plaintiff during the short hour-long deposition. Therefore, <u>nearly half of the questions were obstructed by frivolous objections</u>. Moreover, in none of Riegel's briefs at this summary judgment stage has she ever used any of those objections as a basis for a motion to strike a Rossi answer. She was clearly engaging in frivolous obstruction of the deposition.

4

Riegel also violated the rules of discovery by instructing Rossi not to answer legitimate questions that should have been answered.  She instructed him to not answer questions about people who allegedly complained about Plaintiff's behavior (*Id*. at 32:5). Riegel also instructed Rossi to not answer questions about a street safety plan that Plaintiff had worked on with the New York City DOT to implement by the apartment building, which was blocked by the real estate defendants (*Id*. at 53:4). Both of those topics directly related to the motivation for Rossi to conspire.

During the Milstein deposition, lawyer Riegel once again frivolously objected approximately 80 times during a deposition that took less than an hour to complete (see Greer Decl. in opposition to Rossi declaration, Ex. 1 (Dkt. No. 399). Plaintiff only asked approximately 110 questions. Therefore, <u>almost 73% of the questions were obstructed by a Riegel objection</u>.

Riegel also violated rules of discovery by instructing Milstein to not answer legitimate questions. When Plaintiff tried to learn exactly who now owns the apartment building in question, which is a sensitive topic because Milstein's partners have ousted him, Riegel instructed him to not answer (*Id*. 11:9-11, 12:3-18, 13:12-20). Plaintiff replied at one point, "Objection to that objection. It's flagrantly frivolous and made to harass and stall the deposition. Mariners Cove is a defendant and no one knows who owns it." (*Id*. 12:19-24). When Plaintiff tried to learn whether his apartment in dispute was up for sale, Riegel instructed Milstein not to answer (*Id*. 27:2-25, 29:13-16). When Plaintiff was trying to learn whether Rossi or Martin had authority to approve this expensive litigation without Milstein's approval, Riegel again obstructed by telling Milstein not to answer (*Id*. 31-14-17). When Plaintiff asked whether Milstein's business partners, who now manage the apartment building, have actually authorized Riegel's law firm to represent them (and there is no evidence that they have), she instructed Milstein to not answer (*Id*. 34:13-19).

5

## 2. The Soriero Testimony Is Admissible

Like the BPCA legal team, the real estate defense team seems very concerned about the recorded testimony of Robert Serpico's long-time assistant, Linda Soriero. In the real estate's MOL in opposition, they devote six-pages, 6-11, on disputing the admissibility of the transcribed phone call, arguing that it is hearsay. Plaintiff has thoroughly explained why the Soriero transcript is admissible in his reply (Dkt. No. 412) to the BPCA's MOL in opposition and adopts those arguments here. New arguments will be addressed below.

### a.   The Soriero Voice and Phone Call Are Authentic and Validated

On page 6 of their MOL in opposition, the real estate defendants dispute that the voice on the phone call and transcript (Greer Decl. Ex. Q) of the Soriero call are verifiably genuine. They incorrectly cite two unrelated cases to support the same excerpt of a ruling. *United States v. Dinero Express, Inc.,* No. 99 Cr. 75, 2000 WL 1134484, at *1 (S.D.N.Y. Aug.9, 2000); *United States v. Morrison,* 153 F.3d 34, 56 (2d Cir.1998). Presumably, they are actually intending to cite from *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 263–64 (S.D.N.Y. 2003) (emphasis supplied). The lawyers emphasized "that the speakers are identified" as a criteria for an audio recording to be admissible.

The *Penguin* ruling is irrelevant to this instant matter. The judge ruled in that case:

> "However, the integrity of the transcript and the identity of the speakers has not been established. Todeschi had no knowledge as to whether or not the tapes had been, or could have been edited or altered. He had no knowledge as to the identity of the speakers other than the labels. Mazza could not testify as to the integrity of the tapes and in fact noted that the tapes had been started and stopped in a number of places, leading to the conclusion that the tapes were not integral and complete. There has been no evidence to establish the identity of the speakers or indeed the relevance of any statements to the publication issue."

In this case, unlike *Penguin*, Plaintiff Greer provided transcripts with no integrity issues, made by an official court reporter. In the Second Greer Declaration (Dkt. No. 410), he swears that he made the recording, that it was unaltered, and that the voice was Soriero. In addition, Plaintiff

6

promptly told Judge Cott about the Soriero call during a bench hearing on March 21, 2017 (see Greer Decl. Ex. A at 7:2-6), and testified under oath during his deposition that he had the call with Soriero (Greer Dec. Ex. J at100 and 100).

In *Penguin*, unlike this instant matter, the audio tapes came from an archive and the party submitting them had no personal involvement the recording. In this case, Plaintiff personally recorded the call and there are no chain of custody issues. The Soriero call is continuous and not edited.

In *Penguin*, unlike this case, there was no evidence to establish the identity of the voice. In this case, in addition to Greer's declaration, a second shorter audio recording of a Soriero voice message was produced (Greer Dec. Ex. zA) which matches the voice in the longer call. In addition, emails from Soriero to Greer referencing the comments made on the phone call were produced to the defendants (Greer Decl. Exs. zB, zC).

Also, due to spoliation and tampering with the Soriero witness by firing her (Dkt. No 313), the defendants should be sanctioned and not even be allowed to deny that the Soriero call is not genuine or that the conspiracy to evict never occurred (see Plaintiff's MOL in support Dkt. No. 367 at 19-22).

Finally, the only reason that a transcript of a call is being used as evidence in lieu of a deposition transcript is because the BPCA defendants flagrantly tampered with the witness by firing her from the BPCA. Soriero was going to willingly testify during a deposition until the BPCA chilled her, causing her to go into hiding. The defendants cannot simultaneously obstruct a deposition, then complain about the lack of sworn testimony.

**b.  The Soriero Transcript Is Not Inadmissible Hearsay**

On page 8-10, the real estate lawyers argue that the Soriero testimony is inadmissible hearsay for several reasons. First, they make the argument that, per FRE 801(d)(2)(D), Soriero

was required to have be acting as an official BPCA employee in order to be a "party" and have

the transcript be excluded from the hearsay definition. However, the FRE notes on 801(d)(2)(D)

specifically address a situation identical to Soriero's:

> FRE 801(d)(2)(D): The tradition has been to test the admissibility of statements
> by agents, as admissions, by applying the usual test of agency. Was the admission
> made by the agent acting in the scope of his employment? **Since few principals
> employ agents for the purpose of making damaging statements, the usual
> result was exclusion of the statement. Dissatisfaction with this loss of valuable
> and helpful evidence has been increasing. A substantial trend favors
> admitting statements related to a matter within the scope of the agency or
> employment.** *Grayson v. Williams*, 256 F.2d 61 (10th Cir. 1958); *Koninklijke
> Luchtvaart Maatschappij N.V. KLM Royal Dutch Airlines v. Tuller*, 110
> U.S.App.D.C. 282, 292 F.2d 775, 784 (1961); *Martin v. Savage Truck Lines, Inc.*,
> 121 F.Supp. 417 (D.D.C. 1054), and numerous state court decisions collected in 4
> Wigmore, 1964 Supp., pp. 66–73, with comments by the editor that the statements
> should have been excluded as not within scope of agency. For the traditional view
> see *Northern Oil Co. v. Socony Mobile Oil Co.*, 347 F.2d 81, 85 (2d Cir. 1965)
> and cases cited therein. Similar provisions are found in Uniform Rule 63(9)(a),
> Kansas Code of Civil Procedure §60–460(i)(1), and New Jersey Evidence Rule
> 63(9)(a).

In the bold highlighted section above, the note perfectly addresses Soriero's position at

the time of the phone call, which was one of being a BPCA employee but making

damaging statements against Serpico and the BPCA. Therefore, the case that they cite on

page 8 of their MOL, *Evans v. Port Auth. of N.Y. & New Jersey*, 192 F. Supp. 2d 247,

262 (S.D.N.Y. 2002), is irrelevant and conflicts with the actual federal rules committee

notes.

Next, the real estate lawyers argue on page 8 of their MOL that FRE 804(b)(3)

also does not allow the Soriero transcript to be excluded from the definition of hearsay

because Soriero's comments were not "against her interests" On page 9, the lawyers

wrote:

> "Here, the Recording as a whole seems to be made entirely in Ms. Soriero's
> interest, as during the phone call she attempts to list a long list of grievances with
> BPCA (that are entirely unrelated to this case) and appears to be attempting to
> formulate a lawsuit against BPCA. Furthermore, the specific portion of statements
> Plaintiff is seeking to introduce do not concern Ms. Soriero's pecuniary interest;

they concern a purported email from Mr. Serpico to Mr. Rossi unrelated to Ms. Soriero or her pecuniary interest in any way.

However, no reasonable jury would agree. Soriero was still employed at the time of the call and very fearful of losing her job as a result of speaking to Plaintiff. She was courageously doing so because of her dislike for her long-time boss Serpico and because she thought it was the right thing to do.

In the transcript (see Greer Decl. Ex. Q), the comments prove that Soriero was scared to tell Plaintiff much of anything, in fear of retribution from Serpico. At *Id*. 2:23-25, she stated, "Well, I don't want to do that without a lawyer present. You know what I'm saying? I got to protect myself.", and at *Id*. 3:20-21, "See, I can't talk. I don't know you. I haven't met you.", and at *Id*. 8:3-6, "I've been gone for heart tests. I've been having a lot of anxiety and stress. And a lot of it has been caused by him with the stuff he's done to me." Therefore, the case law cited, *Hargett v. National Westminster Bank, USA*, 78 F.3d 836, 842 (2d Cir. 1996), is moot.

Next, on page 10, the real estate lawyers seem to cut and paste from the BPCA lawyers' MOL. Here, the defendants have the chutzpah to argue that the Soriero transcript is inadmissible because the original email from Serpico to Rossi would be better evidence, citing Best Rules of Evidence and FRE 1002. This is despite the fact that they are the ones who committed spoliation, refused to produce the smoking-gun email, deleted emails from servers, and quashed subpoenas of both the in-house real estate computer archives and of the BPCA archives held by Iron Mountain servers.

c.    **The Key Email Described by Soriero Was Not Produced**

On page 11, the real estate lawyers again seem to cut and paste from the BPCA and deny failing to produce the "smoking gun email" described by Soriero. They reference one email that was produced, which was sent after the housing court litigation began and long after the conspiracy to evict transpired. This May of 2014 email from Serpico to Rossi, "Is he now

evicted? Where is he living?", prompted by an email from Plaintiff warning them to not delete

any emails, is clearly not what Soriero was referring to when she said on the phone call:

> "Oh, because I saw an email that -- but see I'm not supposed to see an email. It
> was on Bob's screen to Steve Rossi that basically -- to -- to look into your -- to --
> to your rent situation. And then he kept calling and calling. And Bob said one day
> to me: Oh, Steven Greer, he's no longer in his apartment. So I looked at him like:
> What? And you didn't have anything to do with it?"

Also, due to spoliation and sanctions allowing a jury to be instructed on adverse

inference, the BPCA cannot even argue that this email does not exist.

### 3. The Swanson Testimony Is Indeed Admissible

On pages 5-6 of the real estate's MOL in opposition, they dispute the admissibility of the

Swanson testimony against Serpico as irrelevant "carrying no evidentiary value whatsoever.",

citing *Thaxton v. Simmons*, No. 9:10-cv-1318, 2013 WL 4806457, *11-*12 (N.D.N.Y. Sept. 9,

2013). They claim that Serpico's nonverbal answer to Swanson is nothing but Swanson's

inadmissible opinion.

Plaintiff thoroughly refutes these arguments in his reply to the BPCA's MOL in

opposition (Dkt. No. 412, at 17-19). Plaintiff adopts those arguments here.

### 4. The Ford Testimony Proves Serpico's Motive for Conspiracy

On page 6, the real estate lawyers use more hyperbole and argue that the Allyson Ford is

"entirely unrelated to this matter", despite the BPCA lawyers admitting that it "might" prove a

motive. Ignoring the fact that Ford was an eyewitness to Serpico angrily discussing

BatteryPark.TV during official BPCA meetings, proving a motive for the conspiracy, the real

estate lawyers instead focus on whether Ford's comment that the BPCA engaged in

"wrongdoing" is relevant.

Plaintiff has fully addressed the relevance and admissibility of the Ford testimony in his

various MOL's (Dkt. No. No.s 367, 396, 398, 412). He adopts those arguments here.

**5. Plaintiff's Rent Payment Pattern Was Never a Reason for Eviction**

On page 12, the lawyers admit that they never argued during the three years of housing court litigation that Plaintiff was either (A) a non-payment, or "erratic payment", problem, and/or (B) a menace to other residents, as the reason for the lease non-renewal. Lawyer Riegel claims:

> "It was a tactical decision to bring the summary proceeding to evict Plaintiff based solely on the expiration of his lease rather than the non-payment of rent or because of Plaintiff's harassment (see State Court Proceeding petition; P. Ex. R), because the latter causes of action are more burdensome to prove than the mere expiration of a lease. This tactical decision is very common amongst experienced landlord/tenant law practitioners."

While it might be true that this strategy is often used for routine evictions of orphans, widows, and non-English-speaking immigrants who cannot afford lawyers (which are the vast majority of cases that Riegel and her law firm deal with in housing court), once Plaintiff began winning motion after motion, and the case became protracted, it would have seemed logical that the lawyers would have started to mention these egregious crimes by Plaintiff, if they were actually true. After two or three years of housing court, when it was clear that Plaintiff was not moving out and was going to defend his rights, it is inconceivable that the lawyers never mentioned that Plaintiff allegedly was two-months late in rent for 15 of the most recent months, or engaged in abominable behavior toward neighbors.

The likely explanation for the real estate lawyers never arguing that Plaintiff was "erratic" and chronically late in rent is that those allegations are false and could not be easily proven in court. Indeed, Riegel states that it would have been, "more burdensome to prove" this non-rent-payment allegation. That is because the accounting system used by Milford Management is archaic and produces incorrect invoices every month. Even for this federal case, the real estate lawyers could not produce original raw accounting data to prove their case. Instead, they created *ex post facto* clean-looking tables solely for the purpose of this litigation, which are inadmissible.

**6. Plaintiff's Eviction Was Unique and No Other Tenant Was Ever Evicted**

On page 13, the lawyers make a carefully worded, intentionally vague, statement so as to avoid perjury, "Landlord Defendants did take legal action where other residents of the Building who did not pay rent in similar amounts to Plaintiff." In fact, they failed to produce any evidence that any other tenant has ever been evicted for any reason whatsoever. Even in the case of a man in Plaintiff's building committing egregious building violations by hoarding three large-breed Huskie dogs (one dog died, possibly from neglect, but he promptly adopted another), plus many cats and many birds, the defendants never initiated eviction proceedings. The inadequate list of "legal action" that they produced could not be verified due to heavy redaction and failure of Rossi to recall any details during his deposition (Greer Decl. Ex. S, at 43:23-48:20). The litigation cases were likely just automatic "Three-Day Warning" letters, or people who moved out without paying, but it is impossible to determine.

Of note, Judge Cott found this to be such an important argument by Plaintiff that he ordered the real estate defendants to produce documents showing any past litigation and evictions since 2010 (see transcript of bench hearing with Judge Cott on March 21, 2017, Greer Decl. Ex. A, at 52:8-12). Despite that, the best that they could produce was highly redacted illegible reports.

Since the real estate defendants could not produce any evidence, not even verbal testimony by Rossi or Milstein, that they have ever evicted anyone for any reason over 30-years, then Plaintiff was clearly treated differently from everyone else in the building. This helps prove the conspiracy and a reasonable jury would agree.

## CONCLUSION

After initiating litigation against Plaintiff in May of 2014 and never accusing him of either missing rent, being erratic with rent, or of harassing neighbors, the real estate defendants are now forced

to justify their eviction of Plaintiff in this Federal Court as something other than a conspiracy with the BPCA to retaliate. As a result, the real estate defendants, in collusion with the BPCA, have concocted an elaborate ruse using smear tactics and lies to portray Plaintiff as a man who deserved to be evicted.

However, the real estate defendants could produce no raw, verifiable, admissible accounting ledger book data to prove that Plaintiff was guilty of non-payment, because Plaintiff paid rent for 14-years. Likewise, they could produce no evidence that Plaintiff harassed any neighbors prior to the decision to not renew the lease, because Plaintiff never did any such thing. The only evidence that they could produce on both charges was *ex post facto* accounting tables created in 2017, or irrelevant emails from neighbors who were instigated by the real estate lawyers to complain about Plaintiff solely for the purposes of this litigation. To prevent the documented facts that support Plaintiff's charges from contradicting their fabricated story, the defendants engaged in flagrant spoliation of evidence.

That spoliation warrants sanctions to prevent them from denying the conspiracy took place. The mountain of evidence, in the form of numerous deposition transcripts, emails, and obvious deletion of key emails, should also sway this Court to grant Plaintiff's motion for summary judgment.


Dated: July 27, 2017
Columbus, Ohio

By: *Steven Greer*

Steven Greer, *pro se*
4674 Tatersall Court
Columbus, Ohio 43230
(212) 945-7252
steve@batterypark.tv

13