UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 2 9 2018

Steven E. Greer,

        Plaintiff,

—v—

Dennis Mehiel, et al.,

        Defendants.

15-cv-6119 (AJN)

MEMORANDUM
OPINION & ORDER

ALISON J. NATHAN, District Judge:

Pro se Plaintiff Steven E. Greer brings this suit against the company that owns his former apartment, the company that manages that apartment building, the Battery Park City Authority ("BPCA"), and several individuals associated with those entities. At this stage, two claims remain in Plaintiff's suit—a First Amendment retaliation claim and a First Amendment equal access claim. Before the Court are three motions for summary judgment: one from Plaintiff, one from a group of Defendants defined below as the Landlord Defendants, and one from a group of Defendants defined below as the BPCA Defendants. Also before the Court are requests by Plaintiff for sanctions and to "reinstate" two previously dismissed defendants, as well as several sealing requests from all parties. For the reasons set forth below, Plaintiff's motion for summary judgment is denied, and Defendants' motions for summary judgment are granted. Plaintiff's other requests are also denied. The sealing requests are granted in part and denied in part.

## I. BACKGROUND

Plaintiff rented Apartment 35F in the building located at 200 Rector Place from 2002 through April 2014. Dkt. No. 381 (Rossi Decl.) ¶¶ 1, 5; Dkt. No. 373, Ex. 16 (Non-Renewal Notice); Dkt. No. 382 (L 56.1) ¶¶ 7-9.

1

At all relevant times, Milford Management ("Milford") managed the property located at 200 Rector Place. L 56.1 ¶ 2; Rossi Decl. ¶¶ 1-2. Stephen Rossi is the Vice President and Director of Management Services for Milford. Rossi Decl. ¶ 1. Mariners Cove Site B Associates ("Mariners Cove"), where Howard Milstein is a partner, owns certain units in the building located at 200 Rector Place. Rossi Decl. ¶¶ 1-2. Janet Martin is involved in the management of properties that Milstein has an interest in. Rossi Decl. ¶ 2. Milstein, Rossi, Martin, Milford, and Mariners Cove comprise the "Landlord Defendants."

The BPCA owns the land on which 200 Rector Place is located. *See* Rossi Decl. ¶¶ 54, 59-60; Dkt. No. 376 (Hyman Decl.) ¶ 5. The BPCA is a New York State public benefit corporation. *See* N.Y. Pub. Auth. Law § 1973(1). The membership of the BPCA consists of seven members, a majority of which constitutes "a quorum for the transaction of any business or the exercise of any power or function of the authority." N.Y. Pub. Auth. Law § 1973(1), (7). The members elect one of themselves as chairman, and the BPCA may delegate to one or more members, officers, agents, or employees "such powers and duties as it may deem proper." N.Y. Pub. Auth. Law § 1973(2), (7). The BPCA has the power to "acquire, lease, hold, mortgage and dispose of real property." N.Y. Pub. Auth. Law § 1974(3). Beginning June 20, 2012, Dennis Mehiel was the Chairman and CEO of the BPCA. Dkt. No. 375 (Mehiel Decl.) ¶ 1. At all times relevant to this litigation, Robert Serpico served as the Chief Financial Officer of the BPCA. Dkt. No. 374 (Serpico Decl.) ¶ 1. The Court refers to Serpico and the BPCA, together, as the "BPCA Defendants."

In 2009, Plaintiff created a blog called BatteryPark.TV, where he published articles about the BPCA's activities. Dkt. No. 377 (BPCA 56.1) ¶ 9; Dkt. No. 394 (Pl. Counter to BPCA 56.1) ¶ 9. According to one BPCA employee, Plaintiff's reporting angered Serpico, who told the

BPCA staff that the blog was not credible and discouraged the staff from reading it. Dkt. No. 395, Ex. 16 (Ford Depo.) at 10:15-11:7.

Serpico and Rossi sometimes met for lunch or coffee, including one such meeting during the fall of 2013. *See* Serpico Decl. ¶ 3; Rossi Decl. ¶¶ 61-63; Dkt. No. 395, Ex. 20 (Swanson Depo.) at 21:8-22:4.

In a letter dated January 24, 2014, Milford informed Plaintiff that his lease would not be renewed and instructed him to vacate his apartment by April 30, 2014. Non-Renewal Notice. Plaintiff insists that there is no proof that he failed to pay rent, *see, e.g.*, Dkt. No. 368 (Pl. 56.1) ¶ 28, but there is evidence in the record that Plaintiff often submitted late payments or owed money on his apartment. *See* Greer Ex. T (Greer Checks); Dkt. No. 373, Ex. 25 (Spreadsheet); Dkt. No. 381, Ex. 6 (7/2/12 Email from Greer); Dkt. No. 381, Ex. 7 (7/30/12 Email Rossi-Greer); Dkt. No. 381, Ex. 9 (9/27/12 Greer-Hill Emails); Dkt. No. 381, Ex. 10 (12/6/12 Email from Greer); Dkt. No. 381, Ex. 11 (3/20/13 Greer-Hill Emails); Dkt. No. 381, Ex. 12 (4/25/13 Email from Greer); Dkt. No. 381, Ex. 15 (5/16/13 Email from Greer); Dkt. No. 381, Ex. 16 (8/7/13 Email from Greer); Dkt. No. 381, Ex. 17; Dkt. No. 381, Ex. 20 (7/3/12 Greer-Rossi Emails). Though disputed, there is also some evidence that the Landlord Defendants took legal action against other tenants when they owed two months' rent or more. *See* L 56.1 ¶¶ 55, 58, 60; Dkt. No. 381, Exs. 34-43.

When one BPCA employee asked Serpico "if [Serpico] had anything to do with Greer not getting his lease renewed," Serpico, according to the employee, "visibly smirked, shrugged," and did not answer the question. Swanson Depo. at 19:9-21, 24:7-20.

Despite the non-renewal notice, Plaintiff did not vacate his apartment by April 30, 2014. *See* BPCA 56.1 ¶ 13; Pl. Counter to BPCA 56.1 ¶ 13. Accordingly, Mariners Cove began an

eviction proceeding against Plaintiff. *See* Pl. 56.1 ¶ 46. In response to an email from Plaintiff warning Defendants not to delete any emails, Serpico emailed Rossi on May 28, 2014, and asked, "Is [Plaintiff] now evicted? Where is he living?" Dkt. No. 374, Ex. 1 (5/28/14 Serpico Email).

Plaintiff was ultimately evicted from his apartment in the spring of 2016. Dkt. No. 184, Ex. D (Housing Court Decision).

Defendants contend that Plaintiff regularly harassed and bothered BPCA employees and Battery Park City residents. *See, e.g.*, BPCA 56.1 ¶ 14. Plaintiff denies those accusations and emphasizes that any alleged misconduct occurred after Plaintiff's lease was not renewed. Pl. Counter to BPCA 56.1 ¶ 14. However, there is evidence that the BPCA Defendants were aware of at least one incident in which Plaintiff acted antagonistically before January 2014. *See* Dkt. No. 373, Ex. 11 (March 11, 2013 Email) (detailing an incident in which a woman called the police because Plaintiff was yelling at her and trying to videotape her).

Plaintiff attended the BPCA board meeting held on June 9, 2015. BPCA 56.1 ¶¶ 40-42; Pl. Counter to BPCA 56.1 ¶ 41. At the end of the meeting, the BPCA board transitioned to an executive session, which was closed to the public. *See* BPCA 56.1 ¶ 43; Pl. Counter to BPCA 56.1 ¶¶ 41-42. However, Plaintiff refused to leave the meeting room. BPCA 56.1 ¶ 44; Pl. Counter to BPCA 56.1 ¶ 43. Kevin McCabe, Mehiel's Chief of Staff, asked Plaintiff to leave the room and advised Plaintiff that if he did not leave the police would be called. BPCA 56.1 ¶¶ 44-48; Pl. Counter to BPCA 56.1 ¶ 47. Plaintiff then left the room. Pl. Counter to BPCA 56.1 ¶ 48.

After the June 9, 2015, board meeting, Mehiel decided to exclude Plaintiff from the BPCA offices, including future BPCA board meetings, to ensure safety and minimize disruptions. Mehiel Decl. ¶¶ 13-15; *see also* Dkt. No. 373, Ex. 3 (McCabe Depo.) at 32:24-33:3

(McCabe stating that Mehiel directed security to ban Plaintiff from BPCA offices because of Plaintiff's "abusive and disruptive behavior"); Dkt. No. 376, Ex. 13 (6/9/15 Email from Mehiel) (instructing security to exclude Plaintiff from the BPCA office because of his "[c]onsistent hostile behavior"). According to Mehiel, the BPCA could have reviewed that decision but chose not to. Mehiel Decl. ¶ 16. Instead of attending the July 29, 2015 BPCA board meeting, Plaintiff was allowed to watch a live video feed of the meeting in a building several blocks away from the BPCA main offices. *See* Mehiel Decl. ¶ 14; BPCA 56.1 ¶ 56; Pl. Counter to BPCA 56.1 ¶ 50.

On August 4, 2015, Plaintiff filed a complaint in this action. Dkt. No. 1. He filed a Second Amended Complaint on November 4, 2015. Dkt. No. 85 (SAC). Plaintiff alleged, inter alia, that Defendants violated his First Amendment rights. Specifically, he claimed that the non-renewal of his lease, which led to his ultimate eviction, was the result of a conspiracy by the Landlord Defendants and the BPCA, Mehiel, and Serpico to retaliate against Plaintiff for his blog. *See* SAC ¶¶ 42-43, 64. In addition, Plaintiff claimed that the BPCA, Mehiel, and Serpico unlawfully excluded him from the July 2015 board meeting. *See* SAC ¶¶ 68-73. Plaintiff initially sought an order enjoining Defendants from evicting him. *See* SAC ¶ 36; Dkt. No. 2. On February 24, 2016, the Court denied Plaintiff's motion for a preliminary injunction enjoining the then-ongoing eviction proceedings in state court. Dkt. No. 138.

Defendants filed motions to dismiss, Dkt. Nos. 102, 114, which the Court granted in part and denied in part on September 30, 2016,[1] *see* Dkt. No. 177. Relevant here, the Court granted a motion to dismiss the retaliation claim against Mehiel but denied the motion to dismiss that

---

[1] The Court granted the motion to dismiss Plaintiff's First Amendment claim alleging harassment by security officers, Dkt. No. 177 at 6, his claim for a substantive violation of the Fair Housing Act, Dkt. No. 177 at 15-19, his claim for retaliation under the Fair Housing Act, Dkt. No. 177 at 19-21, and his defamation claim, Dkt. No. 177 at 21-23. The Court later denied Plaintiff's motion to dismiss the Landlord Defendants' counterclaim for attorney's fees. *See* Dkt. No. 425.

5

claim against the Landlord Defendants, the BPCA, and Serpico. *See* Dkt. No. 177 at 6. The Court also granted a motion to dismiss the second claim—unlawful exclusion from the board meeting—against Mehiel and Serpico but allowed the claim to continue against the BPCA. *See* Dkt. No. 177 at 6. Accordingly, at this point, Plaintiff has two remaining claims: (1) a First Amendment retaliation claim against Defendants BPCA and Robert Serpico (the "BPCA Defendants") and Defendants Mariners Cove Site B Associates, Howard Milstein, Steve Rossi, Janet Martin, and Milford Management (the "Landlord Defendants"), and (2) a First Amendment equal access claim against the BPCA.

The Landlord Defendants and the BPCA Defendants each move for summary judgment. Dkt. Nos. 371, 379. Plaintiff also moves for summary judgment. Dkt. No. 366.

## II. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

A party is entitled to summary judgment only if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012). In reviewing the evidence on a motion for summary judgment, courts construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012)).

## B. First Amendment Retaliation Claim

Plaintiff contends that he is entitled to summary judgment because he has established Defendants' liability on his First Amendment retaliation claim. Dkt. No. 367 (Pl. Memo) at 12-19. Each set of Defendants has cross-moved for summary judgment on the claim.

Because the Landlord Defendants are private actors, to succeed on his § 1983 claim against them Plaintiff must demonstrate that they conspired with the BPCA Defendants, who are state actors, to retaliate against Plaintiff. *See Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) ("To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between . . . a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). The BPCA Defendants and the Landlord Defendants contend there is no evidence of a conspiracy between them; Plaintiff argues that the evidence clearly establishes that a conspiracy existed. *See* Pl. Memo at 12-16; Dkt. No. 380 (L Memo) at 7-10; Dkt. No. 372 (BPCA Memo) at 3-7. The Landlord Defendants further argue that, even if there were evidence of a conspiracy, they would be entitled to summary judgment because Plaintiff's failure to pay rent on time and his harassment of building tenants and staff caused the Landlord Defendants not to renew Plaintiff's lease. L Memo at 10-18.

Assuming arguendo that sufficient evidence exists to support a conclusion that the BPCA Defendants and the Landlord Defendants conspired to retaliate against Plaintiff, Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claim because there is no genuine issue of material fact that could lead a reasonable juror to conclude that Defendants retaliated against Plaintiff.

To succeed on a First Amendment retaliation claim, a plaintiff must prove that "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or

7

substantially caused by the exercise of that right; and (3) defendants' actions caused" the plaintiff some injury. *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *see also Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006) ("To survive summary judgment on a section 1983 First Amendment retaliation claim a plaintiff must demonstrate that he engaged in protected speech, and that the speech was a substantial or motivating factor in an adverse decision taken by the defendant."). "A causal relationship [between the protected activity and the adverse action] can be demonstrated either indirectly by means of circumstantial evidence, including that the protected speech was followed by adverse treatment, or by direct evidence of animus." *Wrobel v. County of Erie*, 692 F.3d 22, 32 (2d Cir. 2012); *see also Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) (explaining that a causal connection may be established by showing that the adverse action closely followed the protected activity). In the context of speech-based retaliation, the defendant may prevail "by demonstrating by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech." *Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003); *see also Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286-87 (1977) (same).

Here, the heart of the retaliation issue is whether the non-renewal of Plaintiff's lease was motivated by Plaintiff's exercise of his First Amendment right. Because the record could not lead a reasonable juror to conclude that it was, Defendants are entitled to summary judgment on this claim.

Plaintiff's evidence of retaliation rests on little more than speculation. Although Serpico was aware of and disapproved of Plaintiff's blog, *see* Ford Depo. at 9:15-11:7, and may have been involved in the decision not to renew Plaintiff's lease, *see, e.g.*, Swanson Depo. at 19:9-21,

24:7-20, there is no evidence in the record that Serpico wanted to harm Plaintiff *because of* Plaintiff's blog. Indeed, Plaintiff had been operating his blog for several years before the non-renewal of his lease, BPCA 56.1 ¶ 9; Pl. Counter to BPCA 56.1 ¶ 9; Pl. 56.1 ¶ 2, and at all times during that period Serpico was the Chief Financial Officer of the BPCA, Serpcio Decl. ¶ 1.

By contrast, the record contains extensive evidence to support a conclusion that Defendants would not have renewed Plaintiff's lease even in the absence of Plaintiff's blog.

Most significantly, the undisputed record demonstrates that Plaintiff did not consistently pay rent on time. Copies of rent checks from Plaintiff show that he paid rent late on several occasions throughout 2012 and 2013. *See* Greer Ex. T ("Greer Checks") (check dated January 1, 2013, for December rent; check dated February 19, 2013, for January rent; check dated March 1, 2013 for February and March rent; check dated March 31, 2013 for March rent—presumably for the amount remaining after the March 1, 2013 check; check dated December 25, 2013, for December rent); Dkt. No. 381, Ex. 17 (check dated August 31, 2012, for August and September rent; check dated December 1, 2012, for November rent); *see also* Dkt. No. 184, Ex. A (filings in housing court listing payments owed by Plaintiff). In addition, emails between the Landlord Defendants and Plaintiff from 2012 and 2013 reveal discussions in which Plaintiff acknowledges that he owes money to the Landlord Defendants. *See* 7/30/12 Email Rossi-Greer (Plaintiff explaining to Rossi that he is "getting some banking matters corrected" and will bring a check shortly for money that was "outstanding" from July); 8/7/13 Email from Greer (Plaintiff stating, "I screwed up. I recently closed an account but failed to throw away that checkbook. . . . I mistakenly gave you a check from the wrong closed out account."); *see also* 7/2/12 Email from Greer (Plaintiff stating that rent for June 2012 and July 2012 would be arriving soon); 9/27/12 Greer-Hill Emails (showing that Plaintiff owed unpaid storage fees); 12/6/12 Email from Greer

("I see that I owe as of today $4,142 for apartment rent, including December, and $214 for storage. *I did miss a few months* (but not 6!).") (emphasis added)); 5/16/13 Email from Greer (Plaintiff stating that he would drop off the May rent if he receives his countersigned lease); 7/3/12 Greer-Rossi Emails (Rossi explaining that a late fee would be charged for the June rent). Although in one email from April 2013, Plaintiff claims that he paid rent every month for 11 years, *see* 4/25/13 Email from Greer, the evidence outlined above shows that he did not pay that rent on time. And even in that April 2013 email Plaintiff admits that he owes a balance in excess of $3000. 4/25/13 Email from Greer.

Besides the contemporaneous admissions by Plaintiff of his late payments, Plaintiff has also made statements recognizing that the evidence produced in this litigation demonstrates that he failed to consistently pay his rent on time. For example, Plaintiff cites to rent checks for the years 2012 and 2013 and states that they prove "he paid on the first of the month *and was never more than 30-days late*." Pl. 56.1 ¶ 31 (emphasis added). Plaintiff also recognizes that there were "[o]ngoing disagreements over the actual balances owed." Pl. 56.1 ¶ 31. In addition, Plaintiff acknowledges that a spreadsheet submitted by the BPCA Defendants, Dkt. No. 373, Ex. 25[2], shows that Plaintiff had "running balances equal to two-months or more of rent," Pl. Counter to BPCA 56.1 ¶ 81. However, Plaintiff argues that the balance appears because Milford was late in processing his payments. Pl. Counter to BPCA 56.1 ¶ 81. Nevertheless, although there are emails indicating that the Landlord Defendants sometimes reduced the amounts that Plaintiff owed in response to his protestations, *see* Dkt. No. 370, Ex. W, there is no evidence that

---

[2] Plaintiff refers to Docket Number 373, Exhibit 17 in his Counter Statement to the BPCA Defendants' 56.1 Statement, but it appears from the context of Plaintiff's Counter Statement and the 56.1 Statement that he is countering that Plaintiff likely intended to reference Exhibit 25.

the Landlord Defendants' accounting system was inaccurate—or at least that its inaccuracy accounts for every late payment by Plaintiff.

In his final counter-argument to the overwhelming evidence of his non-payment of rent, Plaintiff asks why, if he was "truly failing to pay rent for two-months at a time" the Landlord Defendants renewed his lease in 2012 and 2013. *See* Pl. Counter to BPCA 56.1 ¶ 81. Although the record provides no clear answer why Plaintiff's lease was not renewed in 2014 as opposed to any other year, there is no evidence that Plaintiff's blog motivated the non-renewal.

Furthermore, there is evidence that the Landlord Defendants took legal action against other tenants who owed amounts comparable to that owed by Plaintiff. Rossi Decl. ¶¶ 42-50. Plaintiff adamantly disputes that conclusion and insists that there is no evidence the other tenants were taken to court or evicted. *See* Dkt. No. 397 (Pl. Counter to Landlord 56.1) ¶ 53. Plaintiff is correct that Defendants have not provided eviction notices or court filings for other tenants. But the "Legal Action Update Report" shows when legal action was taken against a particular tenant, and the Reports in the record show that action was often taken when tenants owed two months' rent. *See* Dkt. No. 381, Exs. 34-43.

Finally, Defendants argue that incidents of harassment by Plaintiff also contributed to the decision not to renew Plaintiff's lease and to his ultimate eviction. However, several of the incidents that Defendants highlight occurred *after* the non-renewal of Plaintiff's lease on January 24, 2014. The Court declines to consider those incidents because they could not have motivated the non-renewal of Plaintiff's lease. Nevertheless, there is evidence that the BPCA Defendants were aware of at least one instance of Plaintiff's antagonistic behavior before January 2014. *See* March 11, 2013 Email (describing an incident in which Plaintiff yelled at a woman and tried to videotape her, prompting the woman to call the police).

Despite Plaintiff's arguments to the contrary, there is no evidence beyond mere speculation that Plaintiff's blog motivated Defendants not to renew Plaintiff's lease. Speculation alone is insufficient to support Plaintiff's claims at this stage. *See Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). Instead, the evidence, taken in the light most favorable to Plaintiff, only supports a conclusion that Defendants "would have taken the same adverse action in the absence of the protected speech." *Mandell*, 316 F.3d at 382. No reasonable jury could conclude otherwise. Indeed, there is extensive evidence of Plaintiff's frequent untimely rent payments and Defendants' taking legal action against other tenants in similar circumstances. Because the undisputed evidence does not support a reasonable conclusion that the decision not to renew Plaintiff's lease was motivated or substantially caused by Plaintiff's exercise of his First Amendment rights, the Landlord Defendants and the BPCA Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

### C. First Amendment Equal Access Claim

The BPCA also moves for summary judgment on Plaintiff's equal access claim, as does Plaintiff. *See* BPCA Memo at 8-13; Pl. Memo at 5-12. Plaintiff maintains that he "proved" his equal access claim, while the BPCA responds that it did not violate Plaintiff's First Amendment rights by excluding him from the July 29, 2015, board meeting. The BPCA emphasizes that the decision to exclude Plaintiff was a response to Plaintiff's prior disruptive and threatening behavior and that Plaintiff was still allowed to watch the meeting from a different room. BPCA Memo at 2, 8-13. The BPCA also argues that it is entitled to summary judgment because

Plaintiff's exclusion from the July 29, 2015, board meeting was not the result of an official policy or custom, as required to impose liability on the BPCA.[3] *See* BPCA Memo at 13-17.

A municipal entity can be sued under § 1983 if its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The same law applies to public benefit corporations. *See Estes-El v. State Dep't of Motor Vehicles Office of Admin. Adjudication Traffic Violation Bureau*, 95 Civ. 3454, 1997 WL 342481, at *4 (S.D.N.Y. June 23, 1997). "Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). Courts look to state law in determining whether the official in question possessed final policymaking authority. *Id.* The Second Circuit has "explicitly rejected the view that mere exercise of discretion [is] sufficient to establish municipal liability." *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003). "[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (emphasis omitted). "Where a plaintiff relies . . . on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law. *Jeffes*, 208 F.3d at 57-58;

---

[3] The BPCA further argues that for the same reason, summary judgment should be entered in favor of Serpico, in his official capacity, on the equal access claim. *See* BPCA Memo at 13, 17 n.13. Because the operative complaint, Dkt. No. 85, lists "Robert Serpico, an individual," as a defendant and does not assert claims against Serpico in his official capacity, the Court does not consider that argument.

*see also Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (stating that, when a plaintiff "seeks to hold a municipality liable for a single decision by a municipal policymaker, the plaintiff must show that the official had final policymaking power" (internal quotations omitted)).

New York law establishes the BPCA as a public benefit corporation. N.Y. Pub. Auth. Law § 1973(1). The law provides that the BPCA shall consist of seven members. N.Y. Pub. Auth. Law § 1973(1). A majority of the members of the BPCA "shall constitute a quorum for the transaction of any business or the exercise of any power or function of the authority." N.Y. Pub. Auth. Law § 1973(7). Still, the BPCA "may delegate to one or more of its members, or to its officers, agents or employees, such powers and duties as it may deem proper." N.Y. Pub. Auth. Law § 1973(7).

There is no evidence that the officials who decided to deny Plaintiff entry to the July 2015 board meeting had final policymaking authority. Mehiel, Chairman and CEO of the BPCA, made the decision to exclude Plaintiff from the BPCA board meeting after concluding "that Plaintiff posed a threat to public safety, the orderly conduct of BPCA board meetings, and the smooth continued operations of the BPCA." Mehiel Decl. ¶ 13; *see also* McCabe Depo. at 32:24-33:3 (McCabe stating that Mehiel told security to exclude Plaintiff from BPCA offices); 6/9/15 Email from Mehiel (instructing security to ban Plaintiff from the BPCA office). According to Mehiel, the "BPCA board could have, if it so chose, reviewed [Mehiel's] decision." Mehiel Decl. ¶ 16. The record contains no evidence to contradict that assertion. Although, as Plaintiff points out, *see* Dkt. No. 396 (Pl. BPCA Opp.) at 11, New York law allows the BPCA board to delegate "powers and duties as it may deem proper," there is no evidence that the BPCA in fact delegated to Mehiel the power to exclude individuals from board meetings. Similarly,

that Mehiel was both Chairman of the Board and CEO, *see* Pl. BPCA Opp. at 11, does not on its own demonstrate that he had final policymaking power. Plaintiff's other argument—that the BPCA failed to train anyone on the New York Open Meeting Law, document retention, or ethics, *see* Pl. BPCA Opp. at 11-12—is not relevant to the question whether Plaintiff's exclusion from the July 2015 board meeting represented official policy.

Because the undisputed evidence shows that Mehiel's decision to exclude Plaintiff was "subject to review" by the BPCA board, *Praprotnik*, 485 U.S. at 127, the record does not support a conclusion that Mehiel had "final policymaking authority," *Jeffes*, 208 F.3d at 57.

## III.    PLAINTIFF'S REQUEST FOR SANCTIONS

Plaintiff alleges an "egregious pattern of spoliation by all defendants" and requests sanctions pursuant to Federal Rule of Civil Procedure 37 or the Court's inherent powers. Pl. Memo at 19-22. Specifically, Plaintiff alleges that (1) Defendants deleted emails, including an email from Serpico to Rossi that Serpico's secretary, Linda Soriero, witnessed; (2) the BPCA engaged in witness tampering by firing that secretary after she began to assist Plaintiff in this case; and (3) Serpico's counsel inappropriately instructed Serpico not to answer certain questions during his deposition. Pl. Memo at 19-20. As a sanction, Plaintiff seeks entry of summary judgment or default judgment against Defendants. *See* Pl. Memo at 21-22.

Federal Rule of Civil Procedure 37 provides that, "[i]f electronically stored information that should have been preserved . . . is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court may, "upon finding prejudice to another party from loss of the information, . . . order measures no greater than necessary to cure the prejudice." Fed. R. Civ. Proc. 37(e)(1). In addition, "upon funding that the party acted with the intent to deprive another party of the information's use in

the litigation," the court may "presume that the lost information was unfavorable to the party [or] . . . dismiss the action or enter a default judgment."[4] Fed. R. Civ. Proc. 37(e)(2). "[D]ismissing a complaint or entering judgment against a defendant[] are severe sanctions, but they may be appropriate in 'extreme situations,' as 'when a court finds willfulness, bad faith, or any fault on the part of the' noncompliant party." *Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 450-51 (2d Cir. 2013) (quoting *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 764 (2d Cir. 1990)).

The Court declines to impose sanctions on Defendants. As an initial matter, Plaintiff's contention that the BPCA engaged in witness tampering is mere speculation and lacks any evidentiary support. Moreover, sanctions are not warranted against Serpico or the BPCA as a result of their attorney's instruction to not answer certain questions during Serpico's deposition. Counsel stated on the record his basis for directing Serpico not to answer those questions. *See* Greer Ex. H (Serpico Depo.) at 31:18-33:22. Finally, although there is evidence that some of the Landlord Defendants' emails were deleted, the BPCA Defendants produced copies of those emails. Those emails thus *can* "be restored or replaced through additional discovery." Fed. R. Civ. Proc. 37(e). To the extent that Plaintiff believes that a "smoking gun" email was deleted and not produced by either group of Defendants, there is simply no basis to conclude that such an email existed. The only evidence Plaintiff cites is Soriero's statement that she saw an email between Serpico and Rossi discussing Plaintiff. However, assuming arguendo that the Court

---

[4] Plaintiff argues that sanctions are appropriate pursuant to Federal Rule of Civil Procedure 37(c). *See* Pl. Memo at 20-21. Rule 37(c) provides for sanctions if a party "fails to provide information or identify a witness as required by Rule 26(a) or (e)." However, the heart of Plaintiff's request is the argument that Defendants deleted emails, to which Rule 37(e), which provides for sanctions if a party fails to preserve electronically stored information, is more applicable.

should consider Soriero's statement, the record contains no details regarding the alleged "smoking gun" email. It is thus quite possible that the May 2014 email between Serpico and Rossi was the one Soriero was alluding to. In any event, Plaintiff has not demonstrated "willfulness, bad faith, or any fault" on the part of Defendants that would justify the "severe" sanction of the entry of summary or default judgment. Plaintiff's request for sanctions is denied.

## IV. PLAINTIFF'S REQUEST TO REINSTATE MEHIEL AND SERPICO AS DEFENDANTS

In its September 30, 2016 Order, the Court explained that Plaintiff had included "no allegations in the complaint that either [Mehiel or Serpico] had a role in excluding Greer from the [July 2015 board] meeting." Dkt. No. 177 at 12. Accordingly, the Court granted the motion to dismiss the First Amendment equal access claim against those individuals. *See id.*

Plaintiff now requests that his First Amendment equal access claim be reinstated against Mehiel and Serpico. Pl. Memo at 6. Plaintiff appears to cite to Federal Rule of Civil Procedure 60(b) in support of his request. *See* Pl. Memo at 6 & n.4. However, Rule 60(b) is not applicable here because the Court's decision regarding Defendants' motions to dismiss is not a final order. *See Glendora v. Malone*, 165 F.R.D. 42, 43 (S.D.N.Y. 1996) (stating that an order dismissing certain defendants is not final, "unless the court makes the findings contemplated by Fed. R. Civ. P. 54(b) and enters partial final judgment as to those parties").

Alternatively, if Plaintiff's argument is construed as a motion for reconsideration of the Court's September 30, 2016 Order, it is untimely. *See McDowell v. Eli Lilly & Co.*, No. 13 Civ. 3786, 2015 WL 4240736, at *1 (S.D.N.Y. July 13, 2015) ("Under Local Civil Rule 6.3, 'a notice of motion for reconsideration or reargument of a court order determining a motion shall be served within fourteen (14) days after the entry of the Court's determination of the original

motion, or in the case of a court order resulting in a judgment, within fourteen (14) days after the entry of the judgment.'" (quoting Local Civil Rule 6.3)).

Finally, to the extent that Plaintiff is seeking to amend his complaint under Federal Rule of Civil Procedure 15, that request is denied. As an initial matter, the Court notes that Plaintiff previously sought to amend his complaint for a third time to clarify other claims, and the Court denied that request because Plaintiff had chosen not to amend his complaint in response to Defendants' motions to dismiss. *See* Dkt. No. 192; *see also* Dkt. No. 221. In any event, at this point, Plaintiff has already amended his complaint twice, discovery has been completed, and all parties have moved for summary judgment. To allow Plaintiff to amend his complaint now would unduly delay this litigation. Although some of the discovery regarding Serpico's and Mehiel's alleged involvement in Plaintiff's exclusion from the board meeting undoubtedly would overlap with some of the discovery that has already occurred, additional discovery, at least as to Serpico's role, would likely be needed. Indeed, there is no evidence in the record that Serpico was involved in the decision to exclude Plaintiff from the meeting, thus suggesting that amendment as to the claim against Serpico would be futile. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("A district court has discretion to deny leave [to amend] for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."). Moreover, Mehiel has raised the defense of qualified immunity, Dkt. No. 400 (BPCA Opp. to P) at 19-21, a question that the parties would likely need an opportunity to brief. Given the late stage of litigation, the Court denies Plaintiff leave to amend his complaint.

## V. SEALING REQUESTS

The parties also make several sealing requests.

The BPCA Defendants request that Exhibits 1 and 2 to the Declaration of Shari Hyman, Dkt. No. 376, be filed in redacted form to protect the identities and personal information of third parties. That request is granted. Those documents already appear on the docket in redacted form and shall remain on the docket in that form. Within three weeks of the date of this Order, the BPCA Defendants shall file unredacted versions of those exhibits under seal.

The BPCA Defendants have also requested to file under seal certain documents and testimony that Plaintiff has produced and designated as "Confidential." Specifically, Plaintiff informed the BPCA Defendants that he wanted to maintain the following exhibits under seal: Exhibits 2, 9, 10, 15, 16, 17, 19, 20, 21, 22, 23, and 24 to the Declaration of Michael Tremonte, Dkt. No. 373. There does not appear to be any valid reason to file those documents under seal. As the BPCA Defendants point out, Exhibits 15 and 16 have already been filed publicly in this case. Accordingly, the BPCA Defendants are instructed to file the exhibits at issue on the public docket within three weeks of the date of this Order.

Furthermore, on July 20, 2017, Plaintiff informed the Court that Docket Numbers 381-1, 381-3, 381-5—filed by the Landlord Defendants—revealed Plaintiff's bank account information. Dkt. No. 407. The Court ordered that the exhibits be temporarily sealed. Dkt. No. 408. On July 24, 2017, the BPCA Defendants informed the Court that Docket Number 381-5, filed by the Landlord Defendants and which the Court had temporarily sealed, was the same as Docket Number 373-5, filed by the BPCA Defendants. Dkt. No. 409. Accordingly, the Court temporarily sealed Docket Number 373-5. Dkt. No. 411.

The Landlord Defendants have since acknowledged that redactions to Docket Numbers 381-1 and 381-3 are necessary to protect Plaintiff's bank account information. Accordingly, the Landlord Defendants' request to file redacted versions of 381-1 and 381-3 on the public docket

is granted. Within three weeks of the date of this Order, the Landlord Defendants shall file

redacted versions of those exhibits on the public docket. The unredacted versions of 381-1 and

381-3 shall be filed and remain under seal. Document 381-5 does not, however, include any

bank account information. Accordingly, the temporary seal on Docket Numbers 381-5 and 373-

5 is lifted. Within three weeks of the date of this Order, the Landlord Defendants shall file

unredacted versions of 381-5 and 373-5 on the public docket.

In his July 20, 2017 letter, Plaintiff also stated that 381-4, 381-9, 381-17, 381-19, 381-25,

381-26, 381-27, 381-29, 381-30, and 404-6 were classified as "Confidential" and should not

have been filed on the public docket. Dkt. No. 407. The Court ordered that the exhibits be

temporarily sealed. Dkt. No. 408.

Similarly, at Plaintiff's request, the Landlord Defendants requested to file under seal the

following exhibits: Exhibits 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 17, 20, 58, 62, 64, 65, 66, and 67 to

the Declarations of Stephen Rossi and Deborah Riegel, Dkt. Nos. 381 & 383. The Landlord

Defendants also requested to seal certain documents that quote from the "Confidential"

documents, specifically: the memorandum of law in support of their motion for summary

judgment, Dkt. No. 380; the 56.1 statement of material facts, Dkt. No. 382; Stephen Rossi's

declaration, Dkt. No. 381; and Deborah Riegel's declaration, Dkt. Nos. 383.

Since making that sealing application essentially on Plaintiff's behalf, the Landlord

Defendants have acknowledged that some redactions to those exhibits are necessary to protect

Plaintiff's bank account number. There does not appear to be any other basis to redact or file

under seal the documents identified by Plaintiff. Accordingly, within three weeks of the date of

this Order, the Landlord Defendants shall file all exhibits and documents that were the subject of

the sealing application on the public docket, with only Plaintiff's bank account information redacted as necessary.

Finally, Plaintiff has requested that several of his own exhibits be filed under seal. As to the exhibits to his memorandum of law in support of his motion for summary judgment, Dkt. No. 367, Plaintiff complains that Exhibits B, D, J, T, U, W, X, zD, and zE "would be embarrassing and harmful to [his] reputation." Although some of the exhibits may harm Plaintiff's reputation by demonstrating that he failed to pay rent in a timely manner or was thought to be a security threat, those issues are at the core of this case. Accordingly, Plaintiff's request to seal those documents because they may damage his reputation are denied. However, Exhibits T, U, and W appear to contain banking information for Plaintiff. Those exhibits should thus be filed in redacted form, with the banking information removed. Within three weeks of the date of this Order, Defendants[5] shall file on the public docket Exhibits B, D, J, X, and zE and a redacted version of Exhibits T, U, and W. In addition, the Court is in receipt of only a redacted version of Exhibit zD. To fully evaluate whether the redactions are necessary, Plaintiff shall submit via email a clean, unredacted version of Exhibit zD to the Court within three weeks of the date of this Order.

For other exhibits to his motion for summary judgment (Exhibits A, F-M, O-V, Y), Plaintiff makes no argument why they should be sealed and states that if the Court decides that the exhibits are "not worthy of being sealed," he "will not contest that decision." Similarly, Plaintiff requests that Exhibits 1-11, 13-16, and 19 to his declaration in opposition to the Landlord Defendants' motion for summary judgment, Dkt. No. 399, be filed under seal, but he

---

[5] Because Plaintiff is pro se, the Court requests that Defendants file the documents at issue on the docket.

does not make specific arguments why they should be sealed and again states that he will not contest the Court's decision that the exhibits are "not worthy of being sealed." Plaintiff takes the same approach regarding Exhibits 3-7, 9, 10-12, 13, 17-19, 21, and 22 to Plaintiff's declaration in opposition to the BPCA Defendants' motion for summary judgment, Dkt. No. 395. Neither the Landlord Defendants nor the BPCA Defendants contend that those exhibits should be filed under seal. Accordingly, the Court rejects the request to file under seal Exhibits A, F-M, O-V, and Y to Plaintiff's motion for summary judgment; Exhibits 1-11, 13-16, and 19 to Plaintiff's declaration in opposition to the Landlord Defendants' motion for summary judgment; and Exhibits 3-7, 9, 10-12, 13, 17-19, 21, and 22 to Plaintiff's declaration in opposition to the BPCA Defendants' motion for summary judgment. Within three weeks of the date of this Order, Defendants shall file those exhibits on the public docket.

## VI. CONCLUSION

Defendants' motions for summary judgment are granted, while Plaintiff's motion for summary judgment is denied. This resolves Docket Numbers 366, 371, and 379. Within three weeks of the date of this Order, Defendants shall file on the public docket the documents discussed above. Similarly, within three weeks of the date of this Order, Plaintiff shall submit to the Court a clean, unredacted copy of Exhibit zD to Plaintiff's motion for summary judgment. In addition, within three weeks of the date of this Order, the parties shall submit a status update regarding the remaining counterclaim for attorneys' fees and a proposed schedule for resolution of that claim. *See* Dkt. Nos. 235, 425.

SO ORDERED.

Dated: March 28, 2018
New York, New York

_____
ALISON J. NATHAN
United States District Judge